# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEONARD HOWARD, individually and on behalf of all others situated, 1434 Sunset Hwy East Wenatchee, WA  98802, | : : : : : | Case No. 1:14-cv-01183-BAH |
| | : | <u>CLASS ACTION</u> |
| Plaintiff, | : : | |
| v. | : : | |
| LIQUIDITY SERVICES INC., 1920 L Street NW Washington, DC  20036 | : : : : | |
| WILLIAM P. ANGRICK III, 1920 L Street NW Washington, DC  20036 | : : : : | |
| and JAMES M. RALLO, 1920 L Street NW Washington, DC  20036, | : : : : : | |
| Defendants. | : : | |

# AMENDED COMPLAINT FOR VIOLATIONS OF
# THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................8

II.    JURISDICTION AND VENUE .......................................................................17

III.    PARTIES .........................................................................................................17

IV.    CLASS ACTION ALLEGATIONS ................................................................18

V.    BACKGROUND AND FACTS .......................................................................20

     A.    Nature of the Company.........................................................................20

     B.    Significant Metrics for Liquidity .........................................................21

     C.    How Liquidity Makes Money...............................................................22

     D.    Liquidity's Business Divisions ............................................................23

          1.    Retail/Commercial Division ....................................................23

          2.    Capital Assets Division............................................................24

          3.    Public Sector/State and Municipal Government........................25

     E.    Liquidity's Attempt to Move Beyond DoD ..........................................25

VI.    SUMMARY OF THE FRAUD .......................................................................28

     A.    Behind the Scenes, the Retail Division and Capital Assets Are Suffering...........30

          1.    Liquidity's retail division was experiencing a reduction in organic growth and shrinking margins due to increased competition ...................31

          2.    Liquidity's retail division suffered from inflated sales reporting .............35

          3.    A number of Liquidity's capital assets businesses suffered from serious undisclosed problems, including integration challenges and sales issues ................................................................................36

     B.    Liquidity Finally Admits that its Growth Is Compromised and Reduces 2014 Guidance ...................................................................................43

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...................46

     A.    February 1, 2012 Press Release ..........................................................46

B.      February 1, 2012 – 1Q12 Earnings Call ...................................................48

C.      May 3, 2012 Press Release ......................................................................50

D.      May 3, 2012 – 2Q12 Earnings Call .........................................................53

E.      May 9, 2012 Press Release ......................................................................55

F.      July 5, 2012 Press Release ......................................................................57

G.      July 31, 2012 Press Release ....................................................................58

H.      July 31, 2012 – 3Q12 Earnings Call .......................................................61

I.      November 29, 2012 Press Release............................................................64

J.      November 29, 2012 – 4Q and FY2012 Earnings Call ...........................67

K.      December 12, 2012 Investor Day Presentation.......................................72

L.      January 16, 2013 Press Release ..............................................................80

M.      January 31, 2013 Press Release ..............................................................80

N.      January 31, 2013 – 1Q13 Earnings Call .................................................83

O.      March 5, 2013 Conference Call ...............................................................88

P.      May 2, 2013 Press Release ......................................................................89

Q       May 2, 2013 – 2Q13 Earnings Call .........................................................91

R.      July 16, 2013 Press Release ....................................................................95

S.      August 6, 2013 Press Release .................................................................96

T.      August 7, 2013 – 3Q13 Earnings Call ....................................................99

U.      November 21, 2013 Press Release..........................................................103

V.      November 21, 2013 – 4Q and FY2013 Earnings Call ..........................105

W.      February 7, 2014 Press Release ............................................................107

X.      February 7, 2014 – 1Q14 Earnings Call ...............................................109

Y.      May 8, 2014 The Truth is Revealed ................................................................. 111

VIII.    UNDISCLOSED ADVERSE INFORMATION ............................................ 113

IX.     SCIENTER ALLEGATIONS ...................................................................... 115

     A.      Defendants' Knowledge of the Wrongful Conduct ............................ 115

     B.      Insider Trading ................................................................................... 123

X.      NO SAFE HARBOR ................................................................................... 130

     A.      Many of Defendants' False and Misleading Statements Were Not Forward-Looking ............................................................................... 131

     B.      Defendants' False and Misleading Statements Were Not Accompanied by Meaningful Cautionary Language ...................................................... 132

     C.      Defendants Knew that the Risks they Warned of Had Already Come to Pass ................................................................................................. 133

XI.     LOSS CAUSATION ................................................................................. 133

XII.    APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ......................................................................... 140

COUNT I
For violations of Section 10(b) of the Exchange Act and Rule 10b-5, against all defendants ................................................................................................ 140

COUNT II
For violations of Section 20(a) of the Exchange Act and Rule 10b-5, against all defendants ................................................................................................ 142

PRAYER FOR RELIEF ............................................................................................ 144

DEMAND FOR TRIAL BY JURY ............................................................................ 144

Co-Lead Plaintiffs Caisse de dépôt et placement du Québec ("Caisse") and the Newport News Employees' Retirement Fund ("NNERF"), individually and on behalf of all other persons similarly situated, allege the following in support of their Amended Complaint against Defendants:

Co-Lead Plaintiffs' allegations are based upon personal knowledge as to themselves, and information and belief as to all other matters, which information and belief is based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of public documents, conference calls and announcements made by Defendants, Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Liquidity Services Inc. ("Liquidity" or the "Company"), analysts' reports and advisories about the Company, and information readily available in the public record. Co-Lead Plaintiffs believe that further substantial evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

Co-Lead Plaintiffs' allegations are also based, in part, on interviews with numerous former employees of Liquidity and others who have knowledge of the relevant aspects of the Company's operations and financial reporting, including:

    a.  Confidential Witness 1 ("CW 1"),[1] a former Business Analyst and Contact Center Manager with the Company from October 2010 through November 2013, who managed the business-to-business ("B2B") and business-to-consumer ("B2C") portions of Liquidity's eBay "stores" and the Liquidation.com website, and who dealt with big-box companies (such as Target, Best Buy, and Wal-Mart) from whom Liquidity bought merchandise; this CW reported to the Director of

---

[1] All CWs will be described in the masculine to protect their identities.

Customer Support and Major Account Sales, who reported to Vice President of Channel Optimization, who in turn reported to the President of Retail Supply Chain Group, who reported directly to CEO Defendant William Angrick ("Angrick");

b. Confidential Witness 2 ("CW 2"), former Senior Sales Executive with the Company from August 2007 through October 2014, whose responsibilities included handling B2B transactions on the Company's Liquidation.com website and managing auctions for the Major Account Group clients (such as American Heritage Billiards); this CW reported during his tenure to various sales directors, who in turn reported to the Vice President of Business Development, who reported to the President of Retail Supply Chain Group, who reported directly to Defendant Angrick;

c. Confidential Witness 3 ("CW 3"), a former Channel Optimization Specialist in the Company's Asset Recovery Division from February 2008 through November 2012, whose responsibilities included purchasing electronics inventory from Global Accounts clients (such as Wal-Mart and Target), personally overseeing electronics inventory at Liquidity's warehouses throughout the U.S., and selling items on the Company's websites, and thus described himself as involved in "every step of the process" in the electronics vertical; this CW reported to the Senior Manager of Channel Optimization, who reported to the Senior Director of Channel Optimization, who in turn reported to the Vice President of Channel Optimization, who reported directly to Defendant Angrick;

d.  Confidential Witness 4 ("CW 4"), former Director of Global Compensation with Liquidity from March 2013 through November 2013, whose responsibilities included managing the Company's compensation programs, including those related to sales, executive bonuses, and annual bonuses; this CW reported to the Vice President of Human Resources, who reported directly to Defendant Angrick;

e.  Confidential Witness 5 ("CW 5"), a former Senior Account Manager for Government Liquidation, LLC ("Government Liquidation"), a Liquidity subsidiary, from April 2012 through July 2014, and a former Private Treaty Sales Specialist with GoIndustry DoveBid ("GoIndustry"), another Liquidity subsidiary, from June 2011 through April 2012, whose responsibilities included working with his government and medical equipment accounts on selling material they no longer wanted, such as forklifts, shelving equipment, baking equipment, and other materials; this CW reported to the Director of Account Management and Business Development – Capital Assets Group, who reported to Senior Vice President of Capital Assets Group, who reported to Executive Vice President of Capital Assets Group, who reported to the President of Capital Assets Group, who CW 5 believed reported directly to Defendant Angrick;

f.  Confidential Witness 6 ("CW 6"), a former Director of Human Resources from August 1998 until January 2013, and a Senior Director of Human Resources with Liquidity's subsidiary Government Liquidation from January 2013 through October 2013, whose responsibilities included all human resources operations, such as implementation and management of HR systems, policies, and

procedures; this CW reported to the Vice President of Human Resources, who reported directly to Defendant Angrick;

g.  Confidential Witness 7 ("CW 7"), a former Director of Global Sales from October 2013 through May 2014, and a Director of Business Development from March 2009 through October 2013, who was employed by the Company in the Retail Supply Chain and whose responsibilities included business development and selling products that Liquidity bought from other customers; this CW reported to the Vice President of Business Development and later to the Vice President of Marketing and Sales (when CW 7 started working in sales).  Both the Vice President of Business Development and the Vice President of Marketing and Sales reported to the President of Retail Supply Chain Group, who in turn reported to Defendant Angrick;

h.  Confidential Witness 8 ("CW 8"), a former Senior Corporate Recruiter with the Company from December 2011 through June 2014, who, as the third-ranking Human Resources Director, partnered with Liquidity's leadership in recruiting candidates for positions with the Company; this CW reported to the Senior Director of Human Resources, who reported to the Vice President of Human Resources, who in turn reported directly to Defendant Angrick;

i.  Confidential Witness 9 ("CW 9"), former Vice President of Business Development who was employed by the Company from November 2007 through April 2014, and who was responsible for all sales and account management within the Consumer Products Division; this CW reported to the Vice President of Retail Supply Chain Group, who reported directly to Defendant Angrick;

j.   Confidential Witness 10 ("CW 10"), a former Inventory Control Quality Assurance Analyst with Liquidation.com, a Liquidity subsidiary, from January 2013 through April 2014, whose responsibilities included monitoring inventory and auditing the work of the employees who determined the quality of the merchandise; this CW reported to the Inventory Control and Quality Manager, who reported to the Senior Director of Operations, who reported to the Vice President of Channel Optimization, who in turn reported to the President of Retail Supply Chain Group, who reported directly to Defendant Angrick;

k.   Confidential Witness 11 ("CW 11"), a former Senior Manager of Sales and Marketing Platforms from July 2011 through March 2014, who was the administrator of Salesforce, the customer relationship management ("CRM") software used by the Company, as well as the administrator of Eloqua, the Company's marketing platform; this CW reported to the Senior Director of Product Development, who reported to the Vice President of Corporate Marketing, who in turn reported directly to Defendant Angrick;

l.   Confidential Witness 12 ("CW 12"), a former Project Manager with Network International ("Network International") from 2006 through April 2014, who supervised the asset management team as well as certain sales services; this CW reported to the Vice President of Operations, who reported to Network International's Chief Operating Officer ("COO"), who reported directly to Defendant Angrick;

m.  Confidential Witness 13 ("CW 13"), a former Account Manager (November 2012-August 2012) and Marketing Developer (November 2011-November 2012)

at Liquidity subsidiary Network International from November 2011 through August 2013, whose responsibilities included listing material on Network International's website for auction, confirming that the sales team was contacting the appropriate buyers for the product, and developing new buyers; this CW reported to the Vice President of Operations, who reported to Network International's COO, who in turn reported to Defendant Angrick;

n.  Confidential Witness 14 ("CW 14"), a former Marketing Communications Specialist with Network International from 2005 through March 2014, whose responsibilities included customer support and inside sales marketing with customers; this CW's direct supervisor reported to the Vice President of Operations, who reported to Network International's COO, who in turn reported directly to Defendant Angrick;

o.  Confidential Witness 15 ("CW 15"), a former Senior Inside Sales Representative at Liquidity subsidiary Network International, from October 2013 through April 2014, whose responsibilities included finding buyers to participate in online auctions; this CW reported to the Director of Pipe Sales, who reported to Network International's COO, who reported directly to Liquidity Defendant Angrick;

p.  Confidential Witness 16 ("CW 16"), a former Director of Technical Program Management in Liquidity's Program Management Office from August 2013 through May 2014, whose responsibilities included creating a new customer-interfacing platform portal for the purpose of allowing customers a website for one-stop shopping that incorporated the products and services of the Company and its acquired entities; this CW reported to the Vice President of Program

Management, who reported to the Chief Information Officer, who CW 16 believed reported directly to Defendant Angrick;

q. Confidential Witness 17 ("CW 17"), a former Office Manager with Government Liquidation from January 2012 through July 2013, whose responsibilities included loading new surplus material from the U.S. Department of Defense ("DoD") onto the Government Liquidation website and reporting inventory on a weekly basis; this CW reported to a site manager, who reported to the Western Pacific Zone Director, who reported to Vice President of Operations, who CW 17 believed reported directly to Defendant Angrick;

r. Confidential Witness 18 ("CW 18"), former Senior Manager of Client Services in the Company's Asset Recovery Division (April 2011 – January 2013), as well as other positions, from July 2006 through January 2013, whose responsibilities included managing several Global Accounts and accounts in the Government Liquidation line of business, and who characterized his role as liaison between the accounts and the Company; this CW reported to the Senior Director of Client Services, who reported to the Vice President of Business Development, who reported to the President of Retail Supply Chain Group, who reported directly to Defendant Angrick;

s. Confidential Witness 19 ("CW 19"), a former Inside Sales Representative with Network International, a Liquidity subsidiary, from December 2012 through July 2014, whose responsibilities included contacting buyers to participate in online auctions; this CW first reported to the Director of Inside Sales, then to the Vice

President of Strategic Business Development, who reported to Network International's COO, who reported directly to Defendant Angrick; and

t.   Confidential Witness 20 ("CW 20"), a former B2C Channel Associate with Liquidity from June 2009 through April 2012, whose responsibilities included loading product inventory onto websites like amazon.com, eBay,[2] and B2C's standalone website secondipity.com, and then tracking Gross Merchandise Volume ("GMV"), which Liquidity defines as a measurement of "the total sales value of all merchandise sold through our marketplaces during a given period," and which thus provides a measure of the volume of goods being sold in Liquidity's marketplaces; this CW reported to the Director of Retail Marketplace, who reported to the Vice President of Channel Optimization, who reported to the President of Retail Supply Chain Group, who reported directly to Defendant Angrick.

## I.   **NATURE OF THE ACTION**

1.   Co-Lead Plaintiffs bring this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons and entities who purchased or otherwise acquired Liquidity common stock between February 1, 2012, and May 7, 2014, inclusive (the "Class Period"), against the Company and certain of its officers for executing a scheme whereby Defendants disseminated materially false and misleading information and omitted other material information that artificially inflated Liquidity's stock price and caused damage to Co-Lead Plaintiffs and to members of the Class.

---

[2] While Amazon and eBay were Liquidity's main competitors, Liquidity also had business arrangements with these sites to sell its customers' products.

2.      Liquidity provides online auction marketplaces for surplus and salvage assets, also known as a "reverse supply chain."  Its main competitors include online sellers such as ebay.com and Amazon.com.  It makes money by retaining a percentage of the proceeds from the sales it manages for its sellers.  Liquidity began life in November 1999 as Liquidation.com, Inc. and its business soon became dominated by government contracts.  By 2005 it had the exclusive right to manage and sell substantially all DoD scrap property, and the majority of its revenue came from its DoD contracts.

3.      The DoD relationship was, in the words of a former Vice President of Business Development, a "cash cow," and one that, in the words of another former employee, was vital to the overall health of the Company.  Fear was mounting, however, within all levels of the Company that because the DoD contracts were subject to a competitive bidding process, there was no guarantee they would be renewed on the same favorable terms, or even renewed at all.  Thus, Liquidity knew it needed to diversify its operations to lessen its substantial dependence on the government contracts market.  This diversification plan meant expanding into the promising retail reverse supply chain market and, to a lesser extent, the capital assets market.

4.      Liquidity knew that in order to capture a bigger share of the critical, but fragmented, retail market it would need to expand its geographic reach and its client base.  This meant acquiring competing businesses, and in the lead up to the start of the Class Period, Liquidity went on a shopping spree.

5.      When the Class Period begins on February 1, 2012, and with most of these acquisitions having already occurred, the Company heralded itself as a major growth story, describing its fiscal year 2011 and first quarter of 2012 results as "strong" and "driven by record volumes in both our commercial capital assets and retail supply chain verticals."  At the same

time, Defendants assured investors of the Company's enormous growth potential.  In doing so, they emphasized two pillars of this growth:  (1) "organic" growth ***through sustained margins*** and improvements in client penetration and services; and (2) "inorganic" growth ***through Liquidity's acquisition strategy***.  Thus, from the beginning of the Class Period, Defendants primed investors to focus on sustained margins and acquisition growth as key components of the Company's future plans.  And the market took note.  For example, two days after the earnings call (on February 3, 2012), an analyst from Roth Capital stated:  "We believe LQDT remains well positioned to emerge as the market leader in the online reverse supply chain.  Its strong 1Q12 results demonstrate the operating leverage in its model and we expect *continued margin expansion* through FY13."  (Emphasis added.)

6.      Six months later, Defendants announced the purchase of GoIndustry, a global provider of surplus asset management, auction, and valuation services.  GoIndustry was touted as a major shot in the arm for the Company's acquisition pillar of its growth strategy, particularly as GoIndustry was meant to expand the Company's client roster and push Liquidity further into the international sphere and drive growth.  Based on guidance from the Company, analysts regurgitated this positive story:  "[w]e believe the [GoIndustry] deal significantly expands LQDT's growing footprint in Capital Asset recovery and provides global reach in Europe with a strong client base including GE, Pfizer, Coke and P&G (50 clients in Fortune 1000)" and "[w]e view GoIndustry as a relatively attractive tuck-in acquisition that will provide LQDT with a more global footprint."

7.      Pushed along by its own narrative, the Company continued to tout its growth story.  On July 31, 2012, for example, Defendant Angrick said Liquidity "advanced all key elements of our growth strategy during [the second quarter], driving organic growth, innovation

and external growth via acquisition," and that this strategy supported a growth target of 15-20%, which Defendant CFO James Rallo ("Rallo") called "sustainable."    Six months later, on December 12, 2012, Angrick described Liquidity's "huge opportunity to transform an industry," emphasizing past success and expected growth in GMV, adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"), adjusted earnings per share ("EPS"), and registered buyers, and telling the market that by 2016 it planned to more than double GMV – from $864 million to over $2 billion.   Angrick said Liquidity would accomplish this by acquiring complimentary businesses, growing the buyer base, increasing penetration of existing sellers, and developing new seller relationships.  At the same time, Liquidity touted the strength of its retail and capital markets divisions, and in particular, focused on the GoIndustry acquisition as "strengthening Liquidity's position in existing markets."

8.      As before, analysts who were primed by Liquidity then repackaged those buoyant descriptions to the investment community at large.  For example, on December 13, 2012, Janney Capital Markets published a report commenting:   "Key takeaways include: (1) the Capital Asset business represents a significant global opportunity with [GoIndustry], (2) Commercial Retail has significant growth opportunities through deeper client engagement while sales cycles remain long due to complexity/changing industry behavior."  On the same day, an RBC Capital Markets Analyst wrote a report underscoring a positive long-term outlook for the Company and that Liquidity "finds itself in a defensible position with a strong growth opportunity."

9.      At the very time Defendants were priming analysts and the market regarding Liquidity's twin growth pillars – sustained margins and acquisitions – internal assessments of these "motors" were decidedly bleak, rendering the Company's public statements false and misleading by omission.

10.     The reality was that myriad undisclosed problems in both the retail and capital assets divisions were having a marked effect on the Company's profitability and growth potential.   Liquidity's retail supply chain business was enduring substantial troubles, with margins and revenues *deteriorating* throughout the Class Period.   While Defendants repeatedly told investors of the strong momentum in organic growth that was expanding Liquidity's market share in both the commercial and public sectors, Defendants were not forthcoming about the heightened competition that was forcing Liquidity to accept new and renegotiated contracts at ever-reduced margins.   Numerous former employees attest to the increasingly crowded market that materially cut into Liquidity's profitability.   A former Business Analyst and Contract Center Manager (CW 1), for example, noted that the Company entered into barely profitable – and sometimes unprofitable – arrangements just to maintain relationships with existing customers and prevent them from leaving for Liquidity's competitors.   With the rise of "newer players on the block," margins were "a lot less than expected."   A former Senior Sales Executive (CW 2) who worked at the Company for seven years (including the entirety of the Class Period) noted a decline in margins in B2B transactions as early as March 2011.   A former Channel Optimization Specialist (CW 3), whose Global Accounts clients included large retailers like Target and Wal-Mart, noticed that margins in the electronics vertical were "definitely" trending downward throughout 2012.

11.     Defendants also assumed a dismissive public posture toward competition. Emblematic was Defendant Rallo's public statement that Liquidity's competition was "not very formidable."   Yet such public pronouncements were wholly at odds with the concerns expressed by a host of former employees who worked at Liquidity during the Class Period and who were watching merchandise – like items in the electronics vertical – being sold *at a loss*.   Although

Defendants finally disclosed the fact that, over time, they expected margin growth to slow, they did not come anywhere near the necessary level of candor with investors.   Ultimately, deteriorating margins was a tremendous problem, one that hampered organic growth, a fact that Defendants were keenly aware of but stubbornly refused to adequately disclose.

12.    At the same time, sales numbers were being manipulated in the retail division. Defendants knew or were reckless in not knowing, but failed to disclose, that the retail supply chain group was playing fast and loose with its sales numbers to keep up appearances, all while revenues and margins slipped throughout 2013 and 2014.   Liquidity had a Company-wide "culture" of overstating sales goals, in the words of a former management-level employee. According to a former Director of Global Compensation (CW 4), sales figures in the retail segment were "sinking fast" and, in 2013, were inflated by at least 10%.   Importantly, this fudging of numbers was known and endorsed at the highest levels.   According to CW 4, the Retail Segment was "*doing a lot of data massaging with credits and other things to inflate the numbers*."   This former Director of Global Compensation was discouraged from raising his concerns by no less than the Vice President of Human Resources, who told CW 4 that *Defendant Angrick himself* did not want CW 4 "rattling [Vice President of Retail Supply Chain Group]'s chain" and ordered him to leave the retail sales figures alone.   "*I was actually told to back off from getting their numbers as per Bill [Angrick]*," this confidential witness stated.   The retail supply chain was already at the mercy of mix changes, or variation in the value of merchandise that Liquidity's customers were looking to dispose of – another fact materially underreported in Defendants' public statements – and manipulating sales numbers helped mask this and deceive the market.

13.     Likewise, Liquidity's capital assets business, though touted as a source of great opportunity for the Company, was saddled with problems.  The acquisition of GoIndustry in May 2012, widely recognized by Liquidity employees as being historically unprofitable and, in the words of one former employee (CW 5), about to "shut their doors," was not working.  As a former Senior Director of Human Resources (CW 6) put it, the GoIndustry acquisition surprised many people within Liquidity, as it was "not a money-maker" and was known in the industry as never being profitable.   Yet Defendants repeatedly misrepresented the degree of success Liquidity was having in integrating GoIndustry into Liquidity's business.   Even when Defendants attempted to create the appearance of candor by publicly discussing difficulties integrating GoIndustry, they craftily revealed only logistical integration issues, not the more troubling integration issues, including that posed by the fact that GoIndustry's top European sales staff were defecting and taking their clients, while the remainder of its European sales force was unprofitable.  On all fronts, Liquidity was unable to leverage synergies from this acquisition.

14.     Another of Liquidity's capital assets businesses – Network International, which specializes in oil and gas assets – faced problems that, as with other issues, Defendants did not timely reveal.  Weaknesses at Network International became internally apparent no later than August 2013, by which point clear signs of a macroeconomic slowdown had developed.  The Company issued a number of extremely general statements throughout the Class Period concerning macroeconomic volatility that might impact Network International's business.  For example, a boilerplate and oft-repeated statement in Liquidity's November 29, 2012 earnings release pointed to "the volatility in the macro environment and its potential impact on the retail and industrial supply chains and GDP growth."  However, Defendants failed to adequately warn the market about the specific, then-known negative developments in the energy vertical (its

customers in the energy business) in a timely fashion after the August 2013 discovery of actual and significant macroeconomic weaknesses in that sector.  Not only did the Company fail to disclose any such macroeconomic problems until nearly a year later, but, as former Liquidity employees explained, Liquidity senior management's ill-conceived interference with Network International's business compounded the problem by alienating its niche customer base.

15.     Throughout the Class Period, and despite these rampant threats to the Company's profitability, Defendants continued to misleadingly portray Liquidity as a Company with substantial potential for further growth, and falsely reassured investors that any struggles the Company faced were merely temporary side effects of its lucrative growth initiative.  Even when Defendants acknowledged that certain business segments faced difficulties and headwinds, and tempered projections for upcoming quarters, they did so in a woefully incomplete manner that did not presage the calamitous toll on earnings that such issues were taking.  In effect, investors were entirely unprepared for the news that leveled them in May 2014; and level them it did.

16.     Before the market opened on May 8, 2014, Liquidity announced its second quarter fiscal 2014 results,[3] revealing that the Company suffered heavy, unforeseen losses and was forced to drastically reduce its guidance for GMV, adjusted EBITDA, and adjusted diluted EPS.  Liquidity suffered a *43%* year-over-year decrease in adjusted EBITDA, a *46%* year-over-year decrease in adjusted diluted EPS, and a 12% year-over-year decrease in the Company's GMV.  Defendant Angrick attributed the drastic decline in earnings to "mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe. [Liquidity] also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment."  Also, as a result of Liquidity's significant year-

---

[3] Liquidity's fiscal year ends on September 30.

over-year losses in these key metrics, the Company was forced to slash its guidance for the remainder of 2014.

17.     Investors were stunned by the unforeseen plummet in earnings, and Liquidity's share price tumbled 30%, from $17.31 on May 7, 2014, to $12.17 on May 8, 2014, a loss of $5.14 per share, on atypically high volume of approximately 8 million shares.

18.     Defendants were moved to mislead investors for a number of reasons, chief among them pure self interest.   Here, Defendant Angrick rode the wave of artificial stock inflation all the way to the bank; his strategically timed stock sales during the Class Period – in atypical amounts (1,642,979 shares, approximately 25% of his holdings) paid him *$68.2 million*. These sales – serendipitously, he would surely have the market believe – were clustered around periods ***directly*** ***preceding*** announcements that, while by no means revealing the whole truth of what was occurring within the Company, had the effect of depressing the stock price.   Moreover, Angrick's Class Period trades were double his sales during the two-year period preceding the Class Period, earning him four-and-a-half times as much money.   In short, Defendant Angrick's stock selling represents a textbook example of insider trading and motive to mislead investors.

19.     Nor can the Individual Defendants (as defined herein) claim ignorance of the operational issues attested to by the approximately twenty former employees whose statements are documented herein.   They uniformly describe in precise detail how all of the relevant sales and financial metrics, as well as the status of contracts, the pace of acquisition integration, and trends in competition and market share at all operating units within all business segments were upstreamed on a constant basis to senior management – including weekly reports and meetings in which Defendant Angrick participated.

20.     As alleged herein, Defendants deliberately deceived investors as to a variety of matters bearing on the sustainability and growth of Liquidity's operations.  The Company's public statements were wholly insufficient to provide investors with a true and complete picture of the Company's operations.  Those who were privy to the truth – like CEO Defendant Angrick – were able to capitalize on what was widely known internally.  But Class Members paid dearly for Defendants' repeated – and belated – failure to come clean.

## II.     JURISDICTION AND VENUE

21.     This action arises under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b5, promulgated thereunder.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and conduct complained of herein, including the preparation and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

24.     In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

25.     Co-Lead Plaintiff Caisse is an institutional investor headquartered in Montreal, Québec, Canada.  As shown in its previously-filed Certification pursuant to the federal securities

laws, Caisse purchased Liquidity common stock at artificially inflated prices during the Class Period, and was damaged as a result.

26.     Co-Lead Plaintiff NNERF is a public pension fund established and administered by the City of Newport News, Virginia.  As shown in its previously-filed Certification pursuant to the federal securities laws, NNERF purchased Liquidity common stock at artificially inflated prices during the Class Period, and was damaged as a result.

27.     Defendant Liquidity is a Delaware corporation and is based in Washington, D.C., where most of its day-to-day operations are conducted.

28.     Defendant William P. Angrick III is the current Chairman and Chief Executive Officer of Liquidity, and has served in those capacities since January 2000.  Defendant Angrick has signed Sarbanes-Oxley certifications on all of the Company's quarterly SEC filings since the start of the Class Period.  Throughout the Class Period, Defendant Angrick sold 1,642,979 shares at artificially inflated prices for a cash windfall of over $68.2 million.

29.     Defendant James M. Rallo is the current Chief Financial Officer, Treasurer, and President of the Retail Supply Chain Group at Liquidity.  Rallo has served as CFO and Treasurer of Liquidity since 2005.  Defendant Rallo has signed Sarbanes-Oxley certifications on all of the Company's quarterly SEC filings since the start of the Class Period.

30.     Defendants referenced in ¶¶ 28-29, above, are sometimes collectively referred to herein as the "Individual Defendants."

## IV.     CLASS ACTION ALLEGATIONS

31.     Co-Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Liquidity common stock during the Class Period and who were damaged thereby (the "Class").

Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Liquidity, and the directors, officers, and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors, and assigns of any excluded person.

32.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Co-Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Co-Lead Plaintiffs believe that there are thousands of members of the Class located throughout the United States. Throughout the Class Period, Liquidity common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "LQDT."  Record owners and other members of the Class may be identified from records maintained by Liquidity and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

33.    Co-Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, which violated federal law.

34.    Co-Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.   whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.   whether Defendants participated in and pursued the common course of conduct complained of herein;

    c.   whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented and/or omitted material facts concerning Liquidity's growth initiative, growth potential, and financial and operating conditions;

    d.   whether the market price of Liquidity common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions and failures to correct the material misrepresentations complained of herein; and

    e.   the extent to which the members of the Class have sustained damages and the proper measure of damages.

36.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.    BACKGROUND FACTS

### A.    Nature of the Company

37.    Liquidity provides online auction marketplaces for surplus and salvage assets, also known as a "reverse supply chain." The reverse supply chain provides for the redeployment and remarketing of assets such as retail customer returns, overstock products, and end-of-life goods or capital assets. Liquidity enables buyers and sellers to transact in automated online auction environments offering more than 500 product categories across industry verticals, including consumer electronics, general merchandise, apparel, scientific equipment, aerospace parts and equipment, technology hardware, and specialty equipment. The Company's online

auction marketplaces are found at www.liquidation.com, www.govliquidation.com, www.govdeals.com, www.networkintl.com, www.truckcenter.com, www.secondipity.com, www.go-dove.com, and www.jacobstrading.com. Liquidity's customers are both commercial and government entities, and Liquidity transacts business worldwide. Liquidity's main competitors include online sellers such as ebay.com and Amazon.com.

### B.    Significant Metrics for Liquidity

38.    Liquidity provides investors with a number of different metrics that can be used to measure the Company's performance. GMV, as alleged above, is a metric often provided by online sellers and which Liquidity defines as a measurement of "the total sales value of all merchandise sold through our marketplaces during a given period."[4] GMV provides a measure of the volume of goods being sold in Liquidity's marketplaces and thus the activity of those marketplaces. Liquidity also considers EBITDA[5] and adjusted EBITDA[6] "important indicators of our operational strength and the performance of our business because they provide a link between profitability and operating cash flow."[7]

39.    As an auction site, Liquidity has several additional metrics it uses to measure the strength of its business. For example, Liquidity tracks "completed transactions," "total registered buyers," and "total auction participants." "Completed transactions" represent the number of auctions in a given period from which Liquidity records revenue. Similar to GMV,

---

[4] 2012 Form 10-K at 31.

[5] EBITDA stands for Earnings Before Interest, Taxes, Depreciation and Amortization. EBITDA is equal to net income plus (a) interest income (expense) and other income(expense), net; (b) provision for income taxes; (c) amortization of contract intangibles; and (d) depreciation and amortization. *See* 2012 Form 10-K at 32.

[6] Adjusted EBITDA is different from EBITDA because Liquidity further adjusts EBITDA for stock based compensation expense and acquisition costs such as transaction expenses and changes in earn out estimates. *See* 2012 Form 10-K at 32.

[7] 2012 Form 10-K. at 33.

Liquidity considers completed transactions a key business metric because it provides an additional measurement of the volume of activity flowing through its online marketplaces. "Total registered buyers" is used to evaluate how well marketing and promotional efforts are performing. "Total auction participants" allows Liquidity to compare its online auction marketplaces to its competitors, including other online auction sites and traditional on-site auctioneers. "Total auction participants" are also measured to evaluate the activity level of Liquidity's base of registered buyers and to measure the performance of the Company's marketing and promotional efforts.

### C. How Liquidity Makes Money

40. Liquidity makes money by retaining a percentage of the proceeds from the sales it manages for its sellers. Liquidity sells products for its customers using three different pricing models: a profit-sharing model; a purchase model; and a consignment model.

41. Under the consignment model, Liquidity recognizes commission revenue from the sale of merchandise that is owned by others. These commissions represent a percentage of the sale price the buyer pays upon completion of a transaction.

42. Under the profit-sharing model, the Company purchases inventory from its sellers and shares with them a portion of the profits received from a completed sale. Distributions to the Company and to the sellers under this model are calculated based on the value received from the sale after deducting direct costs, such as marketing, technology, and operations, as well as other general and administrative costs.

43. Under the purchase model, Liquidity offers sellers a fixed sum for their over-stocked products, or the option for the sellers to share a portion of the proceeds received from the completed sales in the form of a distribution. In this model, distributions are calculated based on

the money received from the sale after deducting a required return to the Company that is negotiated with the sellers.

44.     For both the purchase model and the profit-sharing model, Liquidity takes physical possession of the goods and along with it assumes general and physical inventory risks and credit risk.  Under these models, Liquidity recognizes as revenue the sale price paid by the buyer upon completion of a transaction, not only the Company's share of the distributions.[8] During the Class Period, the purchase model and profit-sharing model accounted collectively for 81.96% of the Company's revenue and approximately 43.6% of the Company's GMV.

### D.     Liquidity's Business Divisions

#### 1.     Retail Division

45.     Liquidity's retail division (sometimes referred to as its commercial division) enables Fortune 500 retailers and manufacturers of consumer goods to sell their surplus and salvage consumer goods through Liquidity's auction websites.  The retail division has three components: a B2B marketplace; a B2C marketplace; and a direct-sales marketplace, where Liquidity can sell products it purchases from its customers directly to consumers.  The retail division operates through several websites, including "Liquidation" (www.liquidation.com), "Jacobs Trading" (www.jacobstrading.com), and "Secondipity" (www.secondipity.com).

46.     The Liquidation marketplace, for example, enables corporations located in the United States to sell surplus and salvage consumer goods for a set price to domestic and international buyers.  The Secondipity marketplace provides customers with consumer products, such as electronics, cameras, and mobile phones.

---

[8] Liquidity accounts for distributions under "Costs and Expenses from Continuing Operations."

47.     The Jacobs Trading marketplace sells customers' bulk returns from well-known retailers in the form of (1) general merchandise loads, or mixed, "as is" products that were returned to a retail store from the consumer, and (2) single category "as-is" loads, which are sold at closeout prices on buy-backs, over-stocks, shelf-pulls, excess inventories and damaged goods purchased directly from retail vendors and manufacturers.

## 2.     Capital Assets Division

48.     Liquidity's capital assets division sells large items such as material-handling equipment, rolling stock (such as trucks or military tanks), heavy machinery, and scrap metal. The capital assets division operates through several websites including "Network International" (www.networkintl.com), "GoIndustry DoveBid" (www.go-dove.com), "Truck Center" (TruckCenter.com), and "Government Liquidation" (www.govliquidation.com).    Liquidity's capital assets sellers include commercial sellers and the U.S. Department of Defense ("DoD"). Liquidity commonly refers to the "commercial" capital assets business to describe the non-DoD portion of its capital assets business.

49.     Network International is a global, online marketplace for energy sector clients looking to sell idle, surplus, and scrap equipment in the oil and gas, petrochemical, and power generation industries.  The GoIndustry marketplace enables corporations in the manufacturing sector located in the United States, Europe, and Asia to sell surplus and salvage capital assets to domestic and international buyers.  The Truck Center marketplace sells trucks and trailers though live and online auctions.  The Government Liquidation marketplace enables selected federal government agencies to sell surplus and scrap assets.

50.     Liquidity also sells surplus and scrap assets for the DoD as the exclusive contractor for the Defense Logistics Agency ("DLA") on its Government Liquidation website. Surplus assets include computers, electronics, office supplies, equipment, aircraft parts, clothing,

and textiles.   Liquidity entered into a surplus contract with the DoD in December 2008 (the "Surplus Contract").   The Surplus Contract had a 36-month term (through February 2012) with two 12-month renewal options exercisable by the DoD. The DoD exercised both renewal options, which expired in February 2014.  Liquidity entered into a scrap contract with the DoD in 2005 (the "Scrap Contract").  The Scrap Contract expired in June 2012, but the DoD extended it for two one-year terms, through June 2015.  The DoD had the right to renew the Scrap Contract for a third year as well.   This contract covers assets including metals, alloys, and building materials.

### 3.   Public Sector/State and Municipal Government

51.   Liquidity's Public Sector division customers include state and municipal governments.   The GovDeals (www.govdeals.com) marketplace enables local and state government entities including city, county, and state agencies, as well as school boards and public utilities located in the United States, to sell surplus and salvage assets to domestic and international buyers.

### E.   Liquidity's Attempt to Move Beyond DoD

52.   Liquidity was incorporated in Delaware in November 1999 as Liquidation.com, Inc. and commenced operations in early 2000.   During 2000, Liquidity began auctioning merchandise primarily for small commercial sellers and government agencies.  In June 2001, Liquidity was awarded its first major DoD contract, the Surplus Contract.   In June 2005, Liquidity was awarded an additional exclusive contract with the DLA Disposition Services to manage and sell substantially all DoD scrap property, the Scrap Contract.  Between 2001 and 2005, Liquidity was primarily a government contractor, and the majority of its revenue came from its DoD contracts.

53.     Although Liquidity had successfully captured part of the DoD reverse supply chain market, its hold on this market was tenuous.  The DoD contracts were up for renewal in 2014 and were subject to a competitive bidding process, so there was no certainty they would be renewed then or at the time of future bids.  *See* Section VI.A.1, *infra*.  Thus, Liquidity sought to expand beyond the military space and into retail and commercial markets.  In 2005, Liquidity opened its first distribution center in Dallas, Texas, and began selling excess goods for top commercial retailers.  Between 2006 and the start of the Class Period, Liquidity grew its non-DoD commercial capital assets business, while the DoD business correspondingly decreased as a percentage of the Company's revenue and GMV.

**Percentage Breakdown of Revenues and GMV from 2006-2011**

|  | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
|---|---|---|---|---|---|---|
| **DoD Revenue** | 83.1% | 61.5% | 62.4% | 54.3% | 54.9% | 55.8% |
| **Non-DoD Revenue**[9] | 16.9% | 38.5% | 37.6% | 45.7% | 45.1% | 44.2% |
|  |  |  |  |  |  |  |
| **DoD GMV** | 70.9% | 52.3% | 45.8% | 36% | 36.6% | 33.9% |
| **Non-DoD GMV**[10] | 29.1% | 47.7% | 54.2% | 64% | 63.4% | 66.1% |

54.     Liquidity's plan to expand outside of the DoD space to increase its business was initially successful, and its overall GMV grew at a compound annual growth rate ("CAGR") of approximately 31% between fiscal year 2006 and 2011.  Even though Liquidity's GMV for DoD

---

[9] Non-DoD Revenue includes retail/commercial, capital assets and public sector revenues.

[10] Non-DoD GMV includes retail/commercial, capital assets and public sector GMV.

was declining as a percentage of the Company's overall business, as described more fully below, investors still considered DoD a key component of Liquidity's financial health, and Defendants reassured the market repeatedly about the renewal of its DoD relationships when they reached the point of expiration.   Other important metrics such as completed transactions, total registered buyers and total auction participants also increased.

| | Year ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| | (dollars in thousands) | | | | | |
| **Supplemental Operating Data:** | | | | | | |
| Gross merchandise volume from continuing operations | $ 173,090 | $ 226,996 | $ 347,583 | $ 338,721 | $ 416,314 | $ 548,552 |
| Completed transactions | 194,000 | 212,000 | 372,000 | 469,000 | 522,000 | 475,000 |
| Total registered buyers | 524,000 | 685,000 | 999,000 | 1,202,000 | 1,403,000 | 1,604,000 |
| Total auction participants | 993,000 | 1,115,000 | 1,751,000 | 2,118,000 | 2,247,000 | 1,936,000 |

55.     Liquidity's revenue and EBITDA also improved markedly throughout this period.

| | Year ended September 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **2011** |
| | (dollars in thousands) | | | | | |
| **Consolidated Statement of Operations Data:** | | | | | | |
| Total revenue | $ 147,813 | $ 192,037 | $ 251,851 | $ 219,011 | $ 273,015 | $ 327,378 |
| | | | | | | |
| **Non-GAAP Financial Measures:** | | | | | | |
| EBITDA from continuing operations | $ 14,385 | $ 18,260 | $ 21,545 | $ 19,163 | $ 32,117 | $ 43,022 |
| Adjusted EBITDA from continuing operations | 15,008 | 20,203 | 26,220 | 25,628 | 40,532 | 58,860 |
| | | | | | | |

56.     Leading up to the start of the Class Period in 2012, Liquidity was successful, but it had barely scratched the surface of the global reverse supply chain market opportunity, which was estimated to be between $100 and $150 billion of GMV.  It also knew that the *retail* reverse

supply chain market (estimated at $73 billion of GMV) was exponentially bigger and more important than the *capital assets* reverse supply chain market (estimated at $20 billion of GMV) and the *state and local government* markets (estimated at just $2 billion of GMV).  Liquidity also knew that capturing a bigger share of the fragmented retail market would require creating more efficient liquidation and disposal methods and increasing access to supply, and that this meant expanding its geographic reach and its client base through a series of acquisitions.

57.     To this end, Liquidity expanded beyond the DoD space by acquiring various companies prior to 2012, including GovDeals (completed on January 1, 2008), Network International (completed on June 15, 2010), TruckCenter.com (completed on June 1, 2011), and Jacobs Trading (completed on October 1, 2011).  The acquisitions of competing entities in the reverse auction marketplace were intended to expand the Company's business into new markets with new client bases.

## VI.    SUMMARY OF THE FRAUD

58.     As the renewal period for Liquidity's lucrative DoD Surplus Contract loomed, and in the face of growing competition in that marketplace, Defendants grew increasingly concerned that it would not be renewed or extended.  As CW 4 – Liquidity's Director of Global Compensation from March 2013 to November 2013 – explained, by mid-2013, Defendants were "extremely concerned" that the DoD would not renew Liquidity's contract and that Liquidity's primary competitors in the DoD space were poised to vie for it.  By June 2013, the Company had a strong inclination that the DoD contract would not be renewed.  This was confirmed in August 2013, when the DoD informed Liquidity that it would issue a competitive RFP and that a decision would be made in February 2014.  As CW 4 explained, at that point Defendants were hoping to hang on to at least a portion of the DoD contract.

59.     CW 7, Director of Business Development from March 2009 through October 2013, and Director of Global Sales from October 2013 through May 2014, noted that it was well known internally that the government business was very significant to Liquidity and had a "large impact" on its overall profitability.  CW 7 further explained that the government business tended to prop up many of the Company's less profitable business units.

60.     Given these concerns, both prior to and during the Class Period, the Company sought to diversify away from its dependence on its DoD relationship by expanding into the promising retail reverse supply chain market and, to a lesser extent, the capital assets market through a series of acquisitions of competing businesses.  But building a successful business through disparate acquisitions was a tall order.  Ensuring that the Company maintained strong revenue and margins growth at the same time was tougher still.  Yet, Defendants chose to paper over these difficulties in public statements to analysts and investors by portraying Liquidity's revenue growth as robust, its margins as sustainable, and its ability to effectively integrate these various new businesses as sure.  Large numbers of former employees have painted an entirely different contemporaneous picture.  They describe a company that bought bad businesses, couldn't integrate them, and whose margins were not sustainable.  The statements of these confidential witnesses stand in stark contrast to the Company's otherwise upbeat pronouncements.  Had the information known by these confidential witnesses been disclosed to the market as it should have been, investors' shock at the end of the Class Period would have been decidedly tempered.

61.     Defendants' false and misleading statements began on February 1, 2012, the start of the Class Period.  At this time, the Company portrayed itself as a major growth story built on two key pillars:  (1) "organic" growth ***through sustained margins*** and improvements in client

penetration and services; and (2) "inorganic" growth *through Liquidity's acquisition strategy*. Analysts took note and began focusing on this theme of sustained margins and acquisition growth as key components of the Company's future plans.  Three months later, the announced acquisition of GoIndustry was heralded as a major development in the Company's growth strategy, particularly in the expansion of its client roster and its international reach.  Thereafter, and throughout the Class Period, Liquidity continued to tout its growth strategy, and analysts who were primed by Defendants then repackaged those buoyant descriptions to the investment community at large.

62.    Throughout the Class Period, Defendants played a deceptive shell game with investors by periodically acknowledging relatively meager hiccups in Liquidity's growth story and tempering projections for upcoming quarters.  But slipping less enthusiastic statements into the overall flood of misrepresentations hardly gave investors a true sense of how materially different the Company's public presentations were from Liquidity's true financial state.  Indeed, this was underscored at the end of the Class Period, when investors were stunned at the news on May 8, 2014, that Liquidity's second quarter fiscal 2014 results revealed heavy, unforeseen losses that forced the Company to drastically reduce its guidance for GMV, adjusted EBITDA, and adjusted diluted EPS.  Liquidity suffered a *43%* year-over-year decrease in adjusted EBITDA, a *46%* year-over-year decrease in Adjusted Diluted EPS, and a 12% year-over-year decrease in the Company's GMV.  In response, Liquidity's share price tumbled 30%.

### A.    Behind the Scenes, the Retail and Capital Assets Divisions Are Suffering

63.    Unbeknownst to the market, during the Class Period, two of Liquidity's major divisions – the two the Company sought to migrate to so as to diminish its reliance on DoD

contracts – were suffering from a slew of problems, which had a marked effect on Liquidity's profitability and growth potential.

### 1.    Liquidity's retail division was experiencing a reduction in organic growth and shrinking margins due to increased competition

64.    Throughout the Class Period, Defendants repeatedly represented to investors that there was strong momentum in the drivers of organic growth, and that "broad-based organic growth" was translating into an expansion of Liquidity's market share in the retail, capital assets, and public sector markets.   Yet, at the same time, Liquidity's retail supply chain business endured substantial troubles, with margins and revenues dwindling.   Although Defendants periodically disclosed the fact that, over time, they expected margin growth to slow, they did not fully disclose the extent of, or reasons for, these challenges.   In particular, Defendants were not forthcoming about the fact that Liquidity faced increased competition that led it to accept a number of new and renegotiated contracts at ever-shrinking margins, and that it was unable to build off of synergies in its retail supply chain acquisitions.   Thus, even as the Company expanded its client base, it did so at the expense of improved profitability, and organic growth regressed throughout the Class Period.   At the same time, Defendants knew or were reckless in not knowing, and failed to disclose, that the retail supply chain group was playing fast and loose with its sales numbers to keep up outward appearances, all while revenues and margins slipped throughout 2013 and 2014.   Finally, Defendants failed to adequately inform investors of the extent to which the Company was at the mercy of mix changes in the retail supply chain.

65.    Confidential witnesses explain how organic growth was slowing and that this was obvious well before Defendants went public with such negative trends.   For example, CW 4, a former Director of Global Compensation who was employed by Liquidity from March 2013 through November 2013, characterized the retail business as a "mess," and that it was "tanking"

and "sinking fast."  According to him, revenue was only coming in from existing contracts, as Liquidity was unable to secure new contracts.  CW 7, a former Director of Global Sales who was employed in Liquidity's retail division from 2009 through May 2014, observed that even the addition of new business did not translate into profitability for the business segment, as the Company had to purchase the retail products it would sell and then warehouse them at its own cost.

66.     CW 8, a former Senior Corporate Recruiter whose December 2011 through June 2014 tenure encompassed the entire Class Period, expressed a "gut feeling" that during his employment, Defendants were misinforming the public as to the trends in the business and the financials.  By 2014, CW 8, his direct supervisor, Senior Director of Human Resources Novelette Murray, and Murray's direct supervisor, Vice President of Human Resources Mike Lutz – who reported directly to CEO Defendant Angrick – would emerge from quarterly meetings and discuss their shared view that Liquidity's prospects were not as strong as what was being publicly portrayed.

67.     Likewise, a host of former employees who, due to their positions and tenures, had access to internal information, stated that Defendants were not forthcoming with investors about how increasing competition was causing the Company's margins to shrink.  For example, CW 1, a former Business Analyst and Contact Center Manager from October 2010 through November 2013, managed portions of the Company's Ebay stores and Liquidation.com, and thus had visibility into both the Company's B2B and B2C divisions.  He observed that as the market grew increasingly crowded, Liquidity was forced to renegotiate contracts at a much lower level of profitability – sometimes to the point where the Company was merely breaking even, sometimes to the point where the Company was losing money – just to keep contracts away from

competitors.  According to CW 1, GMV and margins trended downwards during his three-year tenure due to "newer players on the block," and margins were "a lot less than expected" when competition forced Liquidity to renegotiate with big-box stores.  Specifically, CW 1 recalled losing a contract with a large overstock company to a competitor in or around October-November 2012.  He believed at the time that such a loss was "really going to hurt us," which ended up being the case:  soon afterwards, 10% of his workforce at the Contact Center was terminated as a direct consequence of the lost business.

68.    Although as far back as 2012 Defendants mentioned that margins could impact Liquidity's balance sheet in the near term, these were belated and soft-pedaled general references that hardly revealed the truth regarding the known impact of competition on margins and profitability.  CW 7, a former Director of Global Sales who was with the Company for a five-year period encompassing 2009 through the end of the Class Period, observed that the market became more sophisticated with an influx of competition, which translated into more pressure for Liquidity to price its services so as to win business, retain business, and ultimately become profitable.  CW 7 noted that competitors were vying for the same business as Liquidity, and thus the Company was forced to accept lower margins, which negatively impacted profitability.

69.    CW 2, a Senior Sales Executive whose seven-year tenure spanned August 2007 through October 2014, first noticed a decline in margins in his B2B group as early as ***March 2011***.  Margins declined in 2011, according to CW 2, then experienced a period of flatness. They declined again during 2012 and 2013, and then were flat in 2014.

70.    CW 3, a Channel Optimization Specialist in Liquidity's DC headquarters from February 2008 through November 2012, corroborated these facts.  CW 3 worked with clients in Global Accounts (large retailers and big-box stores), such as Target and Wal-Mart.  He noted

that sales margins in the electronics vertical for Global Accounts clients were "definitely" trending downward throughout 2012.  CW 3 recalled, for instance, that in his electronics vertical, televisions were often sold at a loss during 2012.  CW 1 stated that sometimes bids for merchandise were kept so low that Liquidity would lose money, but that the low bids were done to keep customers.

71.    No less an authority than CW 9, who was Vice President of Business Development and a six-and-a-half-year veteran of the retail division (November 2007 through April 2014), stated that "margins [were] tighter" during the Class Period and were nowhere near as aggressive as on the government side of the business.  According to CW 9, Defendants believed that the acquisition of Jacobs Trading in October 2011 would enhance Liquidity's margins since that entity had historically earned high margins.  That, however, was not the case.

72.    Indeed, many of the contracts that the Company was securing during that time frame were low margin.  According to CW 9, Liquidity got a large, long-term contract with Acer.  Acer set the bar for sales "precedents" for subsequent years, but margins on that account were "fixed" in the low teens, and thus they had to rely on volume instead of margins to make money off this account.  Similarly, CW 10, an Inventory Control Quality Assurance Analyst at the Liquidation.com subsidiary from January 2013 through April 2014, stated that while the Company renegotiated a contract with Amazon.com in approximately April 2013, the new terms were not favorable.  Margins were so low on that renegotiated contract that it was not even profitable enough to support labor costs.

73.    CW 2 explained that the quantity of transactions within his B2B group did not decline during his seven-year employment with the Company, but margins did decline.  By way

of example, he noted that items that used to sell for $500 were selling for $200 during the last few years of his tenure.

### 2. Liquidity's retail division suffered from inflated sales reporting

74.     Former employees also tell of certain practices – fostered and/or encouraged by management – that had the effect of artificially inflating the retail division's sales.  According to CW 4, the retail segment (increasingly critical to the Company) was the hardest segment from which to obtain accurate sales figures, and the Retail Supply Chain Group's sales numbers were often incorrect during his tenure.  In CW 4's  view, the retail segment was a mess because of Cayce Roy, Vice President of Retail Supply Chain Group, who was manipulating the sales figures to benefit his group and thereby maximize compensation and bonuses for his team.  CW 4 believed that the sales numbers for the retail segment in 2013 were inflated by at least 10% and did not support the commissions being paid to sales representatives.  He observed that more money was being paid out in compensation and bonuses to Cayce Roy's group than was being brought in.  As CW 4 succinctly put it, these were "not healthy numbers."

75.     According to CW 4, the Retail Segment was "doing a lot of data massaging with credits and other things to inflate the numbers."  When looking further into these issues, Mike Lutz, Vice President of Human Resources, informed him that **Defendant Angrick did not want CW 4 "rattling Cayce [Roy]'s chain" and to leave the retail sales figures alone**.  According to CW 4, "**I was actually told to back off from getting their numbers as per Bill [Angrick]**." (Emphasis added.)  This demonstrates that at the highest levels of management, the Company was condoning the proliferation of inaccurate sales data.

76.     CW 1 believed the problem was more widespread than the retail division. According to him, Liquidity had a Company-wide "culture" of overstating sales goals.  He observed sales targets for his area growing increasingly more unrealistic through 2013.  The

divisions in which CW 1 worked – he managed online stores in B2B and B2C – got progressively worse throughout 2013 in terms of missing sales goals.  According to CW 1, following quarterly telephonic meetings chaired by Defendants Angrick and Rallo, during which the sales targets for each division were announced, CW 1's colleagues in other divisions privately complained that the sales goals were unrealistic, that they had been missing them, and that there was "no way" they were going to meet the new goals.  CW 1's direct supervisor, Mary Hageny, Director of Customer Support and Major Account Sales, used to state during team meetings that sales goals handed down by management were unattainable.

77.    Ultimately, throughout the Class Period, management's unrealistic sales targets informed the Company's projections, both in terms of GMV and earnings, and unreasonably raised market expectations in a form of shell game.  Even when Defendants tempered those projections, they did not do so sufficiently, and instead, kept from investors the dire state of Liquidity's sales and thus its ability to reach the forecasted levels of performance.

**3.    A number of Liquidity's capital assets businesses suffered from serious undisclosed problems, including integration challenges and sales issues**

78.    Like its retail businesses, Liquidity's capital assets businesses encountered numerous difficulties throughout the Class Period that belied Defendants' rosy statements.  For instance, Defendants missed no opportunity to tout the Company's 2012 acquisition of GoIndustry.  Defendants represented that the acquisition "[e]xpands size and depth of buyer base, client roster, sales team, and marketing capabilities," with "[c]omplementary technology to expand services for clients and buyers."  Defendants also told the market that GoIndustry "significantly expands Liquidity Services' geographic footprint:  ***adds critical mass in Europe and Asia***."  (Emphasis added.)  As to GoIndustry's clients, Defendants stated that "[t]hese blue chip corporate clients are ***already being integrated*** into our commercial business."  (Emphasis

added.)   Similarly, "*we give high marks to GoIndustry's organization for penetrating these clients*, not just in the corporate headquarters suite but throughout their supply chain in multiple continents …."  (Emphasis added.)   In truth, GoIndustry hardly lived up to the expectations fostered by Defendants.

79.     CW 6, who joined Liquidity in 2001 as a Senior Director of Human Resources, and who remained with the Company until October 2013, explained that Liquidity's purchase of GoIndustry, as part of its growth-through-acquisition strategy, surprised many people at Liquidity, noting:  "I had the historical background to know that GoIndustry DoveBid was not a money maker."  CW 6 followed competition in the industry from the time he began working at Government Liquidation in 1998.  Indeed, as CW 5 – who worked at GoIndustry as a Private Treaty Sales Specialist from June 2011 until it was acquired in 2012, when he joined Liquidity as a Senior Account Manager (and served in that position until July 2014) – explained, leading up to the acquisition, GoIndustry was about $3 million in debt (a fact he learned from Randy Small, then GoIndustry's Vice President of Assets Sales and Services) and about to "shut their doors." CW 5 noted that GoIndustry's problems were company-wide, and described it as a "mess."  He understood these problems to stem, at least in part, from GoIndustry's practice of overpromising its clients – *i.e.*, promising to obtain a certain price for its clients' products, but having to sell them for substantially less than the promised price – leading to missed expected revenue targets.

80.     Further, although Defendants touted GoIndustry as an acquisition that had a "global presence," with "36 offices across 20 countries," and which "significantly expands Liquidity Services' geographic footprint:  adds critical mass in Europe and Asia," according to CW 4, Defendants quickly realized that GoIndustry's European division was not as strong as Liquidity originally believed.  CW 4, who worked at Liquidity from March 2013 to November

2013, explained that GoIndustry's compensation model differed drastically from Liquidity's, with GoIndustry sales reps receiving both commissions and high base salaries.  This disparity was especially problematic in GoIndustry's European division, where, as CW 4 explained, the business was not doing well, meaning that "no one was selling and they were all getting big salaries."  And although Liquidity attempted a massive reorganization of GoIndustry's European business in 2013, it did not help matters.  According to CW 4, three of the top sales reps in the European division left GoIndustry following the acquisition, taking their accounts to competing companies, including a "million dollar" energy account in Germany that was responsible for selling "major assets."  As CW 4 summed up his experience with the GoIndustry acquisition, "GoIndustry really hurt the Company."

81.    Facing these troubles, Defendants made a number of disclosures during the Class Period that were calculated to give the appearance that any difficulty integrating GoIndustry would be short-lived.  For example, during the Company's November 29, 2012 earnings call, Defendant Angrick stated that "we expect the integration of GoIndustry will require significant upfront investments . . ., which will result in a drag on earnings in the first half of fiscal '13 . . . ."  During the same call, Defendant Rallo noted that GoIndustry "has not been run historically with common systems and common processes, which is a departure from the normal Liquidity Services philosophy," concluding that the Company's approach to dealing with GoIndustry represented "an opportunity to change those things more quickly and more dramatically than we had originally thought."  But these statements dealt with *logistical* issues, and largely concerned issues integrating the two businesses' different computer systems.  CW 11, a Senior Manager of Sales and Marketing Platforms at Liquidity from July 2011 to March 2014, recalled that it was a tough go integrating GoIndustry's platforms into Liquidity's, and that it took approximately six

months for that aspect of integration to be complete – which was longer and more costly than expected.

82.     Defendants meanwhile concealed the fact that GoIndustry's European business – one of the main reasons for the acquisition in the first place – remained, and would remain, the subject of a major reorganization effort and would not benefit the Company for some time, if at all.   CW 11 was keenly aware of GoIndustry's financial weakness.   CW 11 had access to GoIndustry's sales figures while integrating their system into Liquidity's, and thus knew that GoIndustry was not turning a profit when acquired or when CW 11 left the Company in March 2014.   As CW 4 noted, the reorganization efforts regarding GoIndustry's European business were underway in 2013 and continue to this day.   And although Liquidity was able to make progress in improving GoIndustry's domestic business, the European business was not performing well when he left in November 2013, and neither the domestic nor the European sides of GoIndustry were profitable.   CW 5 confirmed that a major impediment following the acquisition by Liquidity was a lack of training, and that GoIndustry did not improve before his tenure ended in July 2014.   In fact, because of this a number of his GoIndustry colleagues left the Company.

83.     In contrast, Defendants said relatively little about Network International, the Company's energy-vertical capital assets business, before revealing disastrous financial results attributable, in part, to "unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment."   As a number of confidential witnesses reported, however, Defendants knew or were reckless in not knowing such weaknesses months beforehand.   CW 12, who worked at Network International from 2006 until it was acquired by Liquidity in 2010, and then worked at Liquidity as a Project Manager in Asset Management and part of the

leadership team at Network International until April 2014, spoke to the importance of Network International to Liquidity's bottom line.  CW 12 noted that although Network International is a small business segment, it was a key part of Liquidity's business because it was historically the "most profitable" business segment.  CW 12 further noted that, among the products Network International handled, line pipe was its "bread and butter," traditionally contributing between 65% and 70% of Network International's overall profits.

84.     As CW 13 explained, it became clear long before Defendants' May 2014 disclosure that the energy vertical had challenges.  CW 13, who served variously as an Account Manager and Marketing Developer at Network International between November 2011 and August 2013, noted that at the end of his tenure, Brooks Graul, Network International's Director of Pipe Sales, conducted a market analysis showing that the business was heading into a period of flatness and growth stagnation (at around 1-2%) with "not a lot of growth opportunities."  CW 12 confirmed the existence and accuracy of these projections, noting that Network International began to see softer numbers for pipe sales around September or October of 2013, and that the business was not meeting internal projections at that time.  CW 12 further explained that the decline in the line pipe business was "absolutely" a huge hit for Network International and Liquidity.

85.     At the same time, according to former Liquidity employees, Network International's business began to suffer as a result of Defendants' poorly executed plan to incorporate each of Liquidity's business units under a single brand and to streamline their operations.  As CW 12 explained, for roughly two-and-a-half years after Liquidity acquired Network International, it "stayed out of our business"; around November 2013, however, Liquidity's senior management got significantly more involved in the day-to-day business.  CW

12 stated that this occurred around the time that Tom Burton (who reported directly to Defendant Angrick) took over the Capital Asset group, resulting in a shift in who was supervising the Network International business segment and the direction it was taking.  In that regard, CW 12 noted a number of staffing changes at Network International, as well as Liquidity's takeover of Network International's existing marketing department in late 2013 as part of a Company-wide initiative to "umbrella" marketing throughout all of the Company's divisions.

86.     CW 14 – who worked at Network International from 2005 through March 2014 – corroborated CW 12's account.  In his role as a Marketing Communications Specialist, CW 14 became involved with customer support and inside sales marketing with customers, especially towards the end of his tenure, when Liquidity senior management began taking an increasingly active role in Network International's operations.  Like other Network International Employees, CW 14 noted a lot of change at the business beginning in late 2013 and early 2014.  For instance, CW 14 noted that Liquidity management consolidated the individual websites of its businesses so that each required a "unified log-in" that allowed customers to bid on products across the various business units at Liquidity.  Although this unified log-in may have made practical sense, the change directly and negatively affected Network International's customer base, which CW 14 described as tending to be older and less computer savvy.  This poorly thought-out strategy alienated many of Network International's customers, who CW 14 witnessed getting discouraged and simply "giving up" after encountering difficulty logging into the website – a situation he described as "chaos" and not well thought out.

87.     CW 14 also criticized Liquidity's decision to consolidate the Company's call centers, moving Network International's call center to Scottsdale, where the call center personnel were unfamiliar with Network International's niche customers and products.  This had a negative

impact on Network International's customer base.  CW 14 commented that Liquidity failed to consider Network International's customers when they decided to "roll out all these glamorous changes," and, as a result of Liquidity's poorly executed strategy, Network International was disorganized and in complete disarray during the year leading up to his departure in March 2014.

88.     CW 15, a Senior Inside Sales Representative at Network International from October 2013 through April 2014, likewise reported a "big slowdown" in that entity's business based on comments by his supervisor, Brooks Graul, Director of Pipe Sales.  CW 15 recalled Graul stating numerous times – starting at the beginning of CW 15's tenure – that Network International was not making as much in the auctions as it had been.

89.     Although the Company issued a number of general statements throughout the Class Period concerning macroeconomic volatility that "might" impact Network International's business – for example, a statement in Liquidity's November 29, 2012 earnings release noting "the volatility in the macro environment and its potential impact on the retail and industrial supply chains and GDP growth" – Defendants utterly failed to adequately warn the market about the actual and specific negative developments in the energy vertical known to them following the August 2013 discovery of macroeconomic weaknesses in that sector.  Not only did the Company fail to disclose any such macroeconomic problems until nearly a year later but, as former Liquidity employees explained, Liquidity senior management's ill-conceived interference with Network International's business compounded the problem by alienating its niche customer base.

90.     In another example of the Company's inability to achieve coordination among its acquired entities, according to CW 16, a former Director of Technical Program Management in Liquidity's Program Management Office, his efforts to create a one-stop shopping website for the products and services of the Company and all of its acquisitions were not successful.  In his

view, Liquidity's acquisitions were slow and hesitant to provide the information needed to create the portal.  The website project was not launched by the time CW 16's tenure ended in May 2014, and he does not believe it is currently up and running.

**B.      Liquidity Finally Admits that its Growth Is Compromised and Reduces 2014 Guidance**

91.      Despite the information identified by the various confidential witnesses above, Liquidity continued to tout the strength of its commercial and capital assets divisions until May 8, 2014.  On that date, Liquidity announced that it would substantially revise its forecast for the full fiscal year 2014. The Company reduced its GMV forecast for fiscal year 2014 to a range of $930-$975 million, down from its previous guidance of $1.0-$1.075 billion.  Liquidity reduced expected adjusted EBITDA for fiscal year 2014 to a range of $70-$80 million, down from its previous guidance of $100-$108 million.  Adjusted diluted EPS was revised for fiscal year 2014 to range from $1.10-$1.27, from its previous guidance of $1.60-$1.76.

92.      Angrick explained that "our Adjusted EBITDA and Adjusted EPS were lower than expected due to mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe.  We also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment."  Thus, the market finally learned the full truth – that the retail and capital assets segments were not performing as strongly as previously touted, and that Liquidity's growth could not be sustained.

93.      On this news, Liquidity's stock price plummeted 29.6%, to close at $12.17 per share on May 8, 2014, down from a closing price of $17.31 per share on May 7, 2014.

94.      Not only were Defendants aware of the information identified above by various confidential witnesses, but Defendant Angrick deliberately profited by its nondisclosure.  During the Class Period, he sold an atypical amount of stock – 1,642,979 shares, approximately 25% of

- 43 -

his holdings – and reaped enormous proceeds of *$68.2 million*.   These sales were clustered around periods ***directly*** ***preceding*** announcements that, while by no means revealing the whole truth of what was occurring within the Company, had the effect of depressing the stock price.

95.    The massive hits to the Company's adjusted EBITDA and adjusted EPS belatedly revealed on May 8, 2014 reflect a company that could no longer kick the can down the road. The disclosures on May 8, 2014 acknowledge that Defendants' efforts over several quarters to conceal the significant difficulties Liquidity was experiencing in its retail and capital assets businesses, including the impairment of its margins, could not be maintained and that they would, and did, directly impact Liquidity's significant decline in adjusted EBITDA and adjusted EPS.   Defendants sought to conceal these difficulties by, *inter alia*: (i) downplaying the increasing level of competition that was negatively impacting margins and organic growth in the retail vertical; (ii) concealing GoIndustry's poor historical performance leading up to the acquisition, as well as the continued failure of that business, particularly its important European business, thereafter; and (iii) hiding from investors clear evidence of weakness in Network International's business, which stemmed from both macroeconomic forces and the failures of Defendants' own intervention in that business.

96.    *First*, a number of former employees have attested to the fact that Defendants could not live up to the growth story they publicly portrayed, as increased competition in the market throughout the Class Period was having a devastating impact on margins.   For instance, as noted by CW 1, GMV and margins trended downwards during his three-year tenure due to "newer players on the block," and margins were "a lot less than expected" when competition forced Liquidity to renegotiate contracts with big-box stores.   Likewise, CW 9 stated that "margins [were] tighter" during the Class Period and were nowhere near as aggressive as on the

government side of the business.  Any increase in clients the Company may have enjoyed provided little help as, ultimately, the reduced margins Liquidity had to accept outpaced client growth.  The precipitous plummeting of earnings reflects that Defendants simply could not hide from this any longer.  And the correspondingly calamitous drop in the stock evidences the fact that Defendants did not adequately warn the market of Liquidity's exposure to fluctuations in the retail mix.

97.     *Second*, numerous former employees also attested to the impact of difficulties in the capital assets business, including the integration of the GoIndustry acquisition, on the Company's earnings.  CW 6, for example, noted that "GoIndustry DoveBid was not a money maker" and, CW 4 explained that, in the wake of the acquisition, GoIndustry's European business suffered throughout the Class Period, as "no one was selling and they were all getting big salaries."  Yet Defendants downplayed the chaos at GoIndustry, chalking up difficulties to logistical issues.  Again, by 2Q 2014, Defendants had reached the point where they could no longer bury the adverse impact that the GoIndustry inefficiencies were having on growth and earnings.

98.     *Third*, notwithstanding Defendants' failure to disclose weak sales of line pipe – Network International's "bread and butter" – in Liquidity's energy vertical until May 2014, numerous confidential witnesses (CWs 12, 13, and 15, for example), have documented that Network International was aware of such macro trends as early as August 2013, and, in fact, began to encounter weak sales as early as September/October of that year.  Moreover, CW 14 described several internal changes at Network International – all imposed by Liquidity corporate – that alienated Network International's customers and disrupted its business.  These facts

wholly undermined the Company's claim that "softness" in the energy vertical had taken it by surprise in 2Q 2014.

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.   February 1, 2012 Press Release

99.   The Class Period begins on February 1, 2012, when Liquidity issued a press release announcing its financial results for the first quarter of fiscal year 2012.  For the quarter, Liquidity reported record revenue of $106 million, an increase of approximately 35% from the prior year period.  Adjusted EBITDA was a record $22.7 million, an increase of approximately 105% from the prior year period, and total GMV was also a record $179.2 million, an increase of approximately 41% from the prior year period.  Adjusted net income for the quarter was $11.9 million, or $0.37 diluted earnings per share.

100.   In connection with these results, Defendant Angrick issued the following statement:

> Record GMV results were driven by ***growth in the volume of capital assets sales across our commercial and government clients*** and benefited from improved merchandising, penetration of existing clients and ***expanding market share*** . . . Our progress has generated strong financial results for our shareholders, exemplified by our adjusted EBITDA of $64.3 million and operating cash flow of $44.0 million over the last 12 months.  By continuing to invest in growing our e-commerce business we intend to capture a significant share of large, highly fragmented markets, both in the commercial and public sector, while having a positive impact on our clients' financial and environmental sustainability initiatives. (Emphasis added.)

101.   The Company also provided updated guidance for fiscal year 2012 and for the second quarter of fiscal year 2012, which included upward revisions in many of its key metrics. Liquidity forecasted that GMV for fiscal year 2012 would now range from $700 million to $740 million, an increase over the previous guidance of $690 million to $730 million, and GMV for the second quarter would range from $165 million to $175 million.  The Company increased

its adjusted EBITDA forecast for fiscal year 2012 to a range of $83 million to $87 million, up from previous guidance of $78 million to $82 million, with adjusted EBITDA for the second quarter ranging from $18.5 million to $20.5 million.   Lastly, Liquidity upped its adjusted earnings per diluted share forecast for fiscal year 2012 to a range of $1.32 to $1.38, an increase over the previous guidance of $1.26 to $1.32, with adjusted EPS for the second quarter expected to range from $0.28 to $0.32.

102.    The 1Q12 press release also included the following outlook:

**Business Outlook**

While economic conditions have improved, our overall outlook remains cautious due to the volatility in the macro environment and its potential impact on the retail supply chain and GDP growth.  Additionally, during fiscal year 2012 we expect to fund major upgrades in our technology infrastructure to support further integration of our existing businesses and online marketplaces, including the integration of Truckcenter.com and Jacobs Trading.  In the longer term, we expect our business to continue to benefit from the following trends: (i) as consumers trade down and seek greater value, *we anticipate stronger buyer demand for the surplus merchandise sold in our marketplaces,* (ii) as corporations and public sector agencies focus on reducing costs, improving transparency and working capital flows by outsourcing reverse supply chain activities, *we expect our seller base to increase,* and (iii) as corporations and public sector agencies increasingly prefer service providers with a proven track record, innovative technology solutions and demonstrated financial strength, *we expect our seller base to increase*.  As we improve operating efficiencies and service levels, *we expect our competitive position to strengthen*. (Emphasis added.)

103.    On February 8, 2012, the Company filed its Form 10-Q with the SEC containing its full first-quarter financial results, including those which appeared in the February 1 press release.

104.    In the February 1, 2012 press release, Liquidity reported record revenue, adjusted EBITDA, and GMV, and upward revisions in many of its key metrics, including GMV, adjusted EBITDA, and adjusted diluted EPS.  It claimed these results were "driven by growth in the volume of capital assets sales across our commercial and government clients," as well as

"improved merchandising, penetration of existing clients and expanding market share."  The "Business Outlook" section represented the anticipated strengthening of buyer demand, an increased seller base, and the strengthening of the Company's competitive position.   These financial results and guidance, and positive statements of success and growth, among other statements, were materially false and misleading.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated commercial contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

### B.      February 1, 2012 – 1Q12 Earnings Call

105.    Also on February 1, 2012, the Company held a conference call with analysts. During that call, Defendant Angrick stated as follows:

> ***During Q1, Liquidity Services reported strong financial results***, as we expanded our leadership position in the reverse supply chain market by delivering significant value to our clients and buying customers.
>
> *
>
> Second, we have a talented organization, and our team is engaged in a continuous improvement process that adds both organic and inorganic growth to our business. Our organic growth comes principally from using data and expertise to enhance the value of the assets we sell, penetrating existing client relationships, and adding new sellers to our platform. ***Our business has strong momentum in all three of these organic growth areas. We are increasing the demand side of our marketplace to drive higher returns on the assets we sell.*** We are expanding our existing relationships by improving our clients' management of surplus assets, including the full range of returns, seasonal and overstock consumer goods, and high-value capital equipment for the world's leading corporations.  In turn, we are increasingly becoming a critical tool to enable our clients to reduce waste and improve organizational compliance with sustainability goals. Our success has not gone unnoticed and we continue to add

new Fortune 500 clients, including retailers, manufacturers and industrial corporations who desire to leverage our growing platform to stay competitive and reduce their total supply chain costs.

*We also continue to grow our business inorganically through acquisitions and partnerships.  For example, our recent acquisition of Jacobs Trading has further enhanced our position as the leading reverse supply chain solution for large retailers and their suppliers. We are pleased to report that our integration of Jacobs Trading is proceeding as planned, with our teams working well together to maintain highest service levels while identifying numerous exciting opportunities to create value for our buyers and clients.*  The markets we serve are still very fragmented and we continue to seek and evaluate strategic acquisitions which would enhance our seller and buyer base, product domain expertise and level of value-added services provided to our clients.  (Emphasis added.)

106.    Also on this call, Defendant Rallo stated that:

*Our strong results for the quarter were driven by record volumes in both our commercial capital assets and retail supply chain verticals.*

\*

As far as the full-year margins go, Ross, again, from my comments earlier, I think we expect to be around 12% for the year.  I didn't check your math on the 11.8%, but certainly that is around 12%.  *We had a couple of nice things happen this quarter that drove margins a little higher, both in the retail side of our business and commercial capital assets.  So, from our full-year guidance, we would expect to continue to have stronger margins.*  (Emphasis added.)

107.    Defendant Angrick further stated on the February 1 earnings call:

Well, let me first say, Colin, *the strategic plan we have is sound.*  We're very encouraged by the increasing interest in using our platform and service offering to manage the full range of returned and, in some cases, more industrial equipment. I think as we moved through the holiday season, it was reported on and we experienced a change in behavior by many of the large players in the retail industry.  In years past we saw a heavy amount of in-store discounting.  In this past season, I think many retailers were very protective of that margin, in-store margin and moved volumes out of the store earlier.  That helped improve volume in our business. So, hard to speculate if that's a structural change, but I can say that we observed that in many of our existing programs in 2011 in the December quarter.  *But I think, overall, we are very optimistic about the progress we're making, particularly with the organic growth in our retail supply chain business.*  (Emphasis added.)

- 49 -

108.    On this news, the Company's stock rose nearly $5 per share, from a pre-announcement close of $34.51 per share on January 31, 2012, to close at $39.36 on February 2, 2012.

109.    Defendants Angrick's and Rallo's statements concerning the Company's strong results and Liquidity's ability to sustain organic growth in its retail and capital assets divisions, including growth in margins, and to capitalize on inorganic opportunities presented through its acquisitions were materially false and misleading because, as discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but also failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated commercial contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

### C.    May 3, 2012 Press Release

110.    On May 3, 2012, Liquidity issued a press release announcing its financial results for the second quarter of fiscal year 2012.  For the quarter, Liquidity reported record revenue of $125.7 million, an increase of approximately 41% from the prior year period.  Adjusted EBITDA for the quarter was a record $30.9 million, an increase of approximately 120% from the prior year period.  The Company reported record GMV of $218.4 million, which was up approximately 59% from the prior year period.  Liquidity also achieved record adjusted diluted EPS of $0.52, which was a 136% increase from the prior year period.

111.    In connection with this announcement, Defendant Angrick made the following

statement:

> LSI reported record results for GMV, Adjusted EBITDA and Adjusted EPS in
> Q2-12 all of which exceeded our guidance range. ***Record GMV results were
> primarily driven by growth in the volume of goods sold in our retail supply
> chain and municipal government marketplaces by existing and new clients***.
> Our team did an excellent job handling the increased volumes while maintaining a
> high level of service and quality to our clients and buying customers. . . .  Our
> progress has generated strong financial results for our shareholders, exemplified
> by our adjusted EBITDA of $81.2 million and operating cash flow of
> $62.2 million over the last 12 months.  By continuing to invest in growing our e-
> commerce business we intend to capture a significant share of large, highly
> fragmented markets, both in the commercial and public sector, while having a
> positive impact on our clients financial and environmental sustainability
> initiatives.  (Emphasis added.)

112.    Additionally, the Company provided updated guidance.  Liquidity expected GMV

for fiscal year 2012 to range from $760 million to $800 million, an increase from the previous

guidance range of $700 million to $740 million.  For the third fiscal quarter, Liquidity expected

GMV to range from $205 million to $215 million.  The Company also forecasted that adjusted

EBITDA for fiscal year 2012 would range from $96 million to $100 million, a significant

increase over its previous guidance of $83 million to $87 million.  For the third quarter, the

Company expected adjusted EBITDA to range from $26 million to $28 million.  Liquidity

projected that adjusted diluted EPS for fiscal 2012 would range from $1.64 to $1.70 per share, an

increase over the previous guidance range of $1.32 to $1.38 per share.  In the third quarter, the

Company forecasted that adjusted diluted EPS would be $0.43 to $0.46.

113.    The May 3, 2012 press release also provided information on the Company's

business outlook:

> In the longer term, we expect our business to continue to benefit from the
> following trends: (i) as consumers trade down and seek greater value, we
> anticipate stronger buyer demand for the surplus merchandise sold in our
> marketplaces, (ii) as corporations and public sector agencies focus on reducing

costs, improving transparency and working capital flows by outsourcing reverse supply chain activities, *we expect our seller base to increase*, and (iii) as corporations and public sector agencies increasingly prefer service providers with a proven track record, innovative technology solutions and demonstrated financial strength, *we expect our seller base to increase. We continue to implement the Jacobs Trading acquisition according to our original plan. The network effect of the integration is creating efficiencies for our selling and buying customers. These efficiencies continue to bring new sellers into our marketplace and have enabled us to increase our operating performance creating margin improvements as we scale our commercial business. As we improve operating efficiencies and service levels, we expect our competitive position to strengthen.* (Emphasis added.)

114.   On May 4, 2012, the Company filed its Form 10-Q containing its second quarter 2012 financial results with the SEC.

115.   In the May 3, 2012 press release, Liquidity reported record revenue, adjusted EBITDA, GMV, and adjusted diluted EPS, and upward revisions in many of its key metrics, including GMV, adjusted EBITDA, and adjusted diluted EPS.   It claimed these results were "driven by growth in the volume of goods sold in our retail supply chain and municipal government marketplaces by existing and new clients" and noted that the integration of the Jacobs Trading acquisition was "creating efficiencies for our selling and buying customers. These efficiencies continue to bring new sellers into our marketplace and have enabled us to increase our operating performance creating margin improvements as we scale our commercial business."   These statements and others were materially false and misleading.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could

not capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

### D.    May 3, 2012 – 2Q12 Earnings Call

116.    Also on May 3, 2012, the Company hosted an earnings conference call to discuss the Company's financial results and outlook.  During that call, Defendant Angrick stated that: "*During Q2, Liquidity Services reported very strong financial results* as we expanded our share and leadership position in the reverse supply chain market by delivering significant value to our clients and buying customers."  (Emphasis added.)

117.    Defendant Rallo added that:  "*Our strong results for the quarter were driven by record volumes in both our retail supply chain group, which has its seasonal high in the second quarter*, and public sector verticals."  (Emphasis added.)

118.    Likewise, on the May 3 earnings call, Defendant Angrick stated:

At the beginning of fiscal '12, we established a long-term goal of tripling our business to $1.5 billion of GMV and $150 million of EBITDA.  *We are pleased to report that we are well on our way to achieving these objectives.*

\*

*So, there's a lot of additional growth in the retail business and that, frankly, was, as I mentioned in the initial remarks and in our press release, one of the key drivers of Q2.*  (Emphasis added.)

119.    Also during the call, Defendants Angrick and Rallo made a number of representations on a number of topics, including growth, the demand for Liquidity's services, the Company's margins, and product mix:

Rallo:

Our record second-quarter results reflect market share gains and enhanced service levels in *operating efficiencies across our entire business* as a result of investments we have made to support our growth over the last several years.

\*

As corporations and public sector agencies increasingly prefer service providers with a proven track record, innovative technology solutions and demonstrated

financial strength, ***we have continued to penetrate our larger, highly fragmented markets***.

*

Angrick:

So those are trends that, naturally, will take us outside the United States over time.  And whether we build or buy these various capabilities over time?  Clearly this is addressing the needs of the client, which is why it's a sound-expansion strategy.  ***And we believe that as we've demonstrated over time, we're very good at refining and relentlessly improving our operations, so that when we do make such investments, they'll drive high returns for owners and clients***.

*

Rallo:

Also, you have to understand the mix of business too.  So, as our mix of business changes from – more to a consignment model, if we have higher levels of capital assets under the consignment model, that margin just mathematically goes down, [].  ***So, I think the margins will bounce around a little bit from quarter-to-quarter.  I do believe that we can maintain the solid margins we have.  I do not expect to see continued improvement like we have at the pace over the last 18 months.***

*

Our strategy is really to try to gather the Fortune 1000, provide services and improve their efficiencies in the reverse supply chain through our innovative marketplaces around the world.  ***And we would expect to continue to grow that client base over the coming quarters***.

*

Obviously, we expect to have growth next year over this year.  We're not formally giving guidance on next fiscal year yet.  But again, as we roll out with some of these larger clients, [], there will be times when you get a – what I would say accelerated growth cycle for a period of time.

*

Angrick:

So, first, on the second question, you have a two-sided marketplace and you will go through different phases of development.  In which case, you need to build a demand side to invite credible large sellers to transact in that marketplace, so there's the chicken and the egg problem, and I'd say, depending upon the nature of the marketplace, that could take decades or years to resolve, but we've transcended that issue, Jordan.  We have outstanding liquidity in over 500 commodity categories with our buyer base.  And therefore, the supply side is very excited by the nature of our solution, the ability to absorb large volumes. (Emphasis added.)

- 54 -

120.     On this news, the Company's stock spiked more than $8 per share, from $54.93 per share on May 2, 2012, up to $62.24 per share on May 3, 2012.

121.     Defendants Angrick's and Rallo's statements in the May 3, 2012 earnings call concerning, *inter alia*, strengths in Liquidity's retail supply chain business, were materially false and misleading, as were Defendant Angrick's statements regarding growth and profitability, such as his assertion that "we are well on our way to achieving these objectives [of $1.5 billion of GMV and $150 million of EBITDA]" and Defendant Rallo's statements concerning the Company's ability to maintain solid margins, because they gave a misleadingly positive impression about Liquidity's current financial position and its potential for growth.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

### E.     May 9, 2012 Press Release

122.     On May 9, 2012, Liquidity announced in a press release (filed with the SEC on the same day as an exhibit to a Form 8-K) that it had agreed to acquire UK-based auction service GoIndustry.  The Company announced that it would pay $0.73 cents per share in cash and would assume all of GoIndustry's outstanding indebtedness for total consideration of $31 million.

Liquidity stated that the acquisition would provide the Company with more than 50 Fortune 1000 clients and more than 407,000 professional buyers.  At the time of the transaction, GoIndustry clients included BAE, Bosch, Covance, Ford-Europe, Honeywell, Ingersoll-Rand, Pfizer, Renault, and Visteon, as well as asset-based lenders Barclays, HSBC, Lloyds, JP Morgan, PNC, RBS, and Siemens Financial.  The press release quoted Defendant Angrick as saying:  "This strategic combination enhances the size and scale of our online capitals [sic] asset marketplace in several key industry verticals and enables us to serve our respective Fortune 1000 clients and buying customers with the broadest array of innovative services and a truly global footprint to maximize efficiency and financial recovery."  Defendant Angrick also stated:  "Our combined offering will enable corporations to efficiently manage, value, redeploy and sell surplus and idle equipment with a uniformly high level of service and transparency throughout the globe in any asset class."  Despite the seemingly marginal price paid for GoIndustry, Defendants repeatedly hyped this acquisition as one that would result in expanded international business, new clients, and long-term growth for the Company.

123.   The Company also issued a slide presentation (which was filed as a second exhibit to the May 9 Form 8-K) promoting the GoIndustry acquisition.  This slide presentation included a number of statements touting the value created by the GoIndustry acquisition, including noting that:  "[it e]xpands size and depth of buyer base, client roster, sales team, and marketing capabilities"; "GoIndustry DoveBid enhances our online capital assets marketplace in a global market valued at $100 billion"; GoIndustry had "[c]omplementary technology to expand services for clients and buyers"; GoIndustry had a "Global Presence," with "36 offices across 20 countries"; and that GoIndustry "Significantly Expands Liquidity Services' Geographic Footprint:  Adds Critical Mass in Europe and Asia."

124.    The statements in the May 9, 2012 press release and slide presentation were materially false and misleading because they misrepresented that the GoIndustry acquisition was a positive development for Liquidity that would help the Company to grow organically and successfully expand into Europe, and that it would be able to build off of synergies created by "[c]omplementary technology."  As discussed more fully at ¶¶ 79-82, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:   (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an extended and expensive logistical integration process; (iii) GoIndustry's European division was not having success in that market; and (iv) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

125.    Between May 23, 2012, and June 12, 2012, Defendant Angrick took advantage of the inflated value of Liquidity's stock by unloading 170,300 shares at prices ranging from $60.57 to $63.89 for proceeds of $10,809,653.80.  His total proceeds from the sale of stock at inflated prices during the first three months of the Class Period alone were $20,022,804.

**F.    July 5, 2012 Press Release**

126.    On July 5, 2012, the Company announced via press release that its acquisition of GoIndustry for $31 million had been completed.  The Company expected the transaction to be neutral to fiscal year 2012 earnings and worth $0.01 to $0.03 per share to fiscal 2013.   In announcing the consummation of the acquisition, Defendant Angrick represented that:

> This strategic combination expands our seller base by adding over 50 Fortune 1000 clients across complementary vertical market segments, enables us to offer important new services and broader global coverage to our existing sellers, and

- 57 -

grows the buyer base for our online marketplaces. . . .  Our combined offering will enable corporations to efficiently manage, value, redeploy and sell surplus and idle equipment around the globe with a uniformly high level of service and transparency. Our complementary strengths, unmatched buyer base and know-how clearly position Liquidity Services as the trusted provider of choice for Fortune 1000 corporations in the reverse supply chain.

127.     The statements in the July 5, 2012 press release were materially false and misleading because they misrepresented that the GoIndustry acquisition was a positive development for Liquidity that would provide a platform for organic growth and an opportunity to successfully expand into global markets, such as Europe.  As discussed more fully at ¶¶ 79-82, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but Defendants failed to disclose that, *inter alia*:  (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an extended and expensive logistical integration process; (iii) GoIndustry's European division was not having success in that market; and (iv) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

128.     On July 5, 2012, in reaction to the announcement of the GoIndustry acquisition, Liquidity's shares rose by 4.56%.

**G.      July 31, 2012 Press Release**

129.     On July 31, 2012, Liquidity issued a press release announcing its financial results for the third quarter of fiscal year 2012, which also appeared in the Company's Form 10-Q, filed with the SEC on August 3, 2012.  For the quarter, the Company reported revenue of $121.3 million, an increase of approximately 46% from the prior year period, and adjusted EBITDA of $33.4 million, an increase of approximately 121% from the prior year period.  Total

GMV had also increased by a record 52% over the prior year period to $225.6 million, and adjusted diluted EPS was $0.45 per share, which was driven by a one-time tax benefit worth approximately $0.26 per diluted share from the closing of the Company's UK operations in the prior year.

130.     Along with its earnings results, the Company's July 31, 2012 press release also made the following representations regarding the GoIndustry acquisition:

> We are pleased to have closed our acquisition of GoIndustry (www.go-dove.com) in early July and have commenced the integration of this business.  GoIndustry's client base which includes over 50 leading Fortune 1000 global manufacturers and asset based lenders across multiple industries, including aerospace, consumer packaged goods, electronics, pharmaceutical, technology and transportation, will benefit significantly from our logistics, support and large buyer base for a range of high value capital assets such as: material handling equipment, rolling stock, heavy machinery and scrap metal.  ***The acquisition of GoIndustry enhances Liquidity Services' ability to deliver surplus asset management, valuation and disposition services to large multinational enterprises across North America, Europe and Asia. These blue chip corporate clients are already being integrated into our commercial business demonstrating our strategic focus on further growing our capital assets vertical and penetrating many existing clients with additional services***.  (Emphasis added.)

131.     In addition, Liquidity provided improved guidance for GMV, adjusted EBITDA, and adjusted diluted EPS.  The Company forecasted that its GMV for fiscal year 2012 would range from $850 million to $860 million, an increase from its previous guidance of $760 million to $800 million, and forecasted that fourth quarter GMV would range from $230 million to $240 million.  Adjusted EBITDA for fiscal year 2012 was expected to range from $108 million to $110 million, up from previous guidance of $96 million to $100 million, and adjusted EBITDA for the fourth quarter was predicted as between $21 million and $23 million.  Additionally, adjusted diluted EPS for fiscal year 2012 was expected to range from $1.81 to $1.84 per share, up from previous guidance of $1.64 to $1.70, and adjusted diluted EPS for the fourth quarter was predicted to be in the range of $0.35 to $0.38.

132.   The July 31, 2012 press release reported increased revenue, adjusted EBITDA and GMV, and upward revisions in many of its key metrics, including GMV, adjusted EBITDA and adjusted diluted EPS.  It also claimed that the GoIndustry acquisition was enhancing the Company's "ability to deliver surplus asset management, valuation and disposition services to large multinational enterprises across North America, Europe and Asia" and that these clients were "already being integrated into our commercial business demonstrating our strategic focus on further growing our capital assets vertical and penetrating many existing clients with additional services."  The financial results and guidance provided by the Company in the July 31, 2012 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, including GoIndustry, while behind the scenes, Liquidity's business was suffering.  Further, the statements regarding the GoIndustry acquisition gave the misleading impression that GoIndustry was a positive development that would provide Liquidity with a platform for organic growth and an opportunity to successfully expand into global markets, such as Europe.  As discussed more fully at ¶¶ 64-73, 79-82 *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe; (iv) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (v) GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an

extended and expensive logistical integration process; (vi) GoIndustry's European division was not having success in that market; and (vii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

### H.   July 31, 2012 – 3Q12 Earnings Call

133.   Also on July 31, 2012, the Company hosted an earnings conference call to discuss its financial results.   During the call, Defendant Angrick stated that:   "*During Q3, Liquidity Services reported strong financial results,* as we expanded our share and leadership position in the reverse supply chain market by delivering significant value to our clients and buying customers." (Emphasis added.)

134.   He also stated that:   "*The acquisition of GoIndustry enhances Liquidity Services' ability to deliver surplus asset management, valuation and disposition services to large enterprises across North America, Europe and Asia.*"  (Emphasis added.)

135.   During the call, Defendant Rallo stated that:

*Our strong results for the quarter were driven by record volumes in both our retail supply chain group, which did not slow down from its seasonal high in the second quarter as we continued to add new clients and further penetrate existing clients*, and continued growth in our public sector verticals.  (Emphasis added.)

136.   Defendant Angrick also stated the following on the call:

At the beginning of fiscal year 2012, we established a long term goal of tripling our business to $1.5 billion of GMV and $150 million of EBITDA. *We are pleased to report that we are well on our way to achieving these objectives.*

*

Now, I think you have followed us for a long while, *we have long had a secular growth target of 15% to 20% organic growth and we are frankly, significantly achieving that today. And we see that as sustainable given the breadth of clients.*  (Emphasis added.)

137.    Also during this conference call, Defendants Angrick and Rallo made the following statements:

Angrick:

***In addition to generating strong financial results, our team advanced all key elements of our growth strategy during this quarter, driving organic growth, innovation and external growth via acquisition. During the quarter, we enjoyed broad-based organic growth as we expanded our market share within both the commercial and public sector markets.*** Our value proposition is resonating with retailers, manufacturers and public sector agencies, which is reinforcing our network effect and resulting in new client wins in the reverse supply chain market.

*

Rallo:

Our seller bases continue to grow as corporations and public sector agencies focus on reducing costs, improving transparency and working capital flows by outsourcing reverse supply chain activities.  As corporations and public sector agencies increasingly prefer service providers with a proven track record, innovative technology solutions and demonstrated financial strength we have continued to penetrate our large, highly fragmented markets.

*

Angrick:

As we reflect on our strong Q3 results we have renewed excitement where we can take our business.  Though we now have the scale of $1 billion GMV business we have only 1% penetration of the highly fragmented $100 billion global reverse supply chain market.  Indeed, we are merely at the beginning of our journey to transform the global reverse supply chain.

*

Why do we have conviction that we can lead this transformation?  Our credibility. We have an outstanding record of past performance serving the world's largest organizations in the bigger industry sectors in the world: retail, energy, transportation, healthcare, consumer packaged goods, technology, and the public sector.   Our strong client relationships and track record with the leading companies in each of these industry sectors is resulting in the referral of new business across the supply chain.

*

So, whether it is on the manufacturer's side, working with suppliers to improve the return to vendor process, eliminate transportation costs, maximize margin because we are able to turn products quicker through our global marketplace, or on the retailer's side to streamline and outsource the entire process, ***we are seeing outstanding receptivity for what we are doing and we have never had a broader portfolio of organic growth opportunities***.

- 62 -

*

Rallo:

*. . . with our acquisition of GoIndustry, we are currently running that business at a breakeven to a small profit.  I think next year we will obviously have better profits out of that business, but it will be less than our corporate average as far as margins.  And then again we will be bringing those back up over fiscal 2014 and 2015 to really our corporate average.*

*

Angrick:

When you look at how these global clients think and operate, it takes years to penetrate them in multiple geographies.   And *we give high marks to GoIndustry's organization for penetrating these clients, not just in the corporate headquarters suite but throughout their supply chain in multiple continents.  And so, there is a really fertile ground for us to do a couple things.*

*

And it is also the case that we have many large retailers that we only work with in the United States, but that are global in scale and own a lot of property, plant and equipment, and are very interested in leveraging the set of services and geographic support to grow their business with us.  So that is where we see a lot of cross-pollination by having this range of services.

*

Let me just add one other comment. Some folks would say, well, why do more in capital assets?  When you look at the roster of corporate clients that GoIndustry has served at a very high level for many years, and you look at our clients, there are just obvious conversations that are strategic in nature for us to have.  It is public knowledge that GoIndustry DoveBid was Supplier of the Year for Procter & Gamble, which has something like 30,000 vendors.  They are the world's largest supplier to retailers globally.

Well, we happen to work with the world's largest retailer since 2005 – have an excellent relationship at a very high level.  And here you have two companies focused on removing waste and being more efficient in the handling of materials, equipment, inventory.  And we are in a unique situation and a unique role to be a strategic buyer-advisor to both these companies to help them streamline and improve their reverse supply chain.  That is unique and that is one of the elements of this acquisition that underscores the strategic value to Liquidity Services. (Emphasis added.)

138.    The statements made by Defendants Angrick and Rallo during the July 31, 2012

earnings call regarding growth and profitability, including Defendant Rallo's statements

concerning strength in the Company's retail supply chain and Defendant Angrick's statements

- 63 -

touting the GoIndustry acquisition, stating that "we are well on our way to achieving these objectives [of $1.5 billion of GMV and $150 million of EBITDA]," and stating that the Company's 15% to 20% organic growth targets were sustainable, were materially false and misleading because they gave a misleadingly positive impression about the Company's current financial position and its potential for growth.  As discussed more fully at ¶¶ 64-73, 79-82, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe; (iv) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (v) GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an extended and expensive logistical integration process; (vi) GoIndustry's European division was not having success in that market; and (vii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

139.    In response to the statements made by Defendants, the price of the Company's shares increased by 4.03% on July 31, 2012.

I.     **November 29, 2012 Press Release**

140.    On November 29, 2012, Liquidity issued a press release and filed its Form 10-K with the SEC announcing its financial results for the full fiscal year 2012 and for the fourth

quarter of fiscal year 2012.   For the full fiscal year 2012, the Company reported record consolidated revenue of $475.3 million, record adjusted EBITDA of $110.1 million, record GMV of $864.2 million, and record adjusted diluted EPS of $1.47 per share.   For the fourth quarter, the Company reported consolidated revenue of $122.3 million, an increase of approximately 52% from the prior year period, and record GMV of $241 million.   Adjusted EBITDA for the fourth quarter was $23.1 million, an increase of approximately 85% from the prior year period, and adjusted diluted EPS was $0.40 per diluted share.

141.   In connection with the release of the Company's financial results, Defendant Angrick stated:

> Liquidity Services generated strong results during Q4-12 as we **continued to grow our market share and build on our leadership position** in the reverse supply chain market during a seasonally low quarter for the Company.  We continued to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high value capital asset sales, which drove strong growth this quarter. . . .   Our recent acquisition, of NESA, further enhances our position as the leading reverse supply chain solution for large retailers and their suppliers, and we are excited by the numerous related opportunities to create value for our buyers and clients, which we plan to demonstrate during fiscal year 2013.  During fiscal year 2012, we continued to advance our business strategy of building a defensible, leadership position in the reverse supply chain market and generated strong results for our clients and shareholders . . . .   **We believe our continued focus on delivering the breadth of services, geographic coverage and global market data that large enterprises require in the reverse supply chain positions us well for fiscal year 2013 and continued long term profitable growth and market leadership**. . . . **Operationally, Liquidity Services continued to build on the process improvements and scale efficiencies started last fiscal year resulting in overall improved cycle times and margins. . . .   Liquidity Services remains focused on executing our long term growth strategy to ensure the Company is well positioned to drive attractive returns for shareholders.**  (Emphasis added.)

142.   In the press release, the Company also represented that "[w]hile economic conditions have improved, our overall outlook remains cautious due to the volatility in the macro environment and its potential impact on the retail and industrial supply chains and GDP growth."

Moreover, the Company expected investments of several million dollars to integrate its GoIndustry acquisition, which would be a drag on earnings in the first half of fiscal 2013. Liquidity had previously expected the acquisition to boost its profits through 2013.

143.   Also in the November 29, 2012 press release, the Company provided its full fiscal year 2013 guidance and guidance for the first quarter of 2013.  Liquidity expected GMV to range from $1.1 billion to $1.2 billion for the year, and to range from $240 million to $250 million in the first quarter.  The Company forecasted adjusted EBITDA to range from $123 million to $133 million for the year, and $22 million to $24 million for the first quarter.  Liquidity also expected that adjusted diluted EPS would range from $2.05 to $2.23 per diluted share for the year and $0.36 to $0.40 per diluted share for the first quarter.  The Company's adjusted diluted EPS guidance for the first quarter of fiscal 2013 missed the consensus estimate from analysts of $0.46 per share.

144.   The November 29, 2012 press release reported record revenue, GMV, adjusted EBITDA, and adjusted EPS for fiscal 2012, and claimed that Liquidity "continued to grow our market share and build on our leadership position in the reverse supply chain market," that it believed it was well positioned "for fiscal year 2013 and continued long term profitable growth and market leadership," and that it had "continued to build on the process improvements and scale efficiencies started last fiscal year resulting in overall improved cycle times and margins." The financial results and guidance provided by the Company in the November 29, 2012 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, while behind the scenes, Liquidity's business was suffering.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the

aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.   Moreover, as discussed more fully at ¶¶ 79-80, 82, *supra*, although Defendants gave the appearance of candor by discussing logistical issues relating to GoIndustry's integration, and a potential impact on earnings, they failed to disclose that, *inter alia*:  (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's European division was not having success in that market; and (iii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

### J.      November 29, 2012 – 4Q and FY2012 Earnings Call

145.    Also on November 29, 2012, Liquidity hosted an earnings conference call to discuss the Company's financial results.  On the call, Defendant Angrick stated:

> Though we now have a scale of a $1 billion GMV business, we have only 1% penetration of the highly fragmented $100 billion global reverse supply chain market. At the beginning of fiscal year 2012, we established a five-year goal of tripling our business to $1.5 billion of GMV. ***Based on our strong execution and growing credibility in the marketplace, we are ahead of plan,*** and, therefore, we've established a new goal of reaching $2 billion of GMV by fiscal year 2016 or $500 million higher than the previous target. ***We are confident in our ability to achieve our long-range goals due to our many strengths.***  (Emphasis added.)

146.    On the November 29, 2012 earnings call, Defendants Angrick and Rallo also made the following statements:

Angrick:

During Q4, Liquidity Services reported strong financial results as we continued to grow our market share and build on our leadership position in the reverse supply chain market. We continue to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high-value capital assets, which drove strong growth this past quarter.

\*

During the past year, *we enjoyed broad-based organic growth as we expanded our market share within both the commercial and public sector markets. Our consistent execution has enabled Liquidity Services to become the trusted provider of choice in our industry . . . .*

\*

*. . . [I]n addition to growing our business organically, our team continues to drive inorganic growth* and the consolidation of our industry to provide Fortune 1000 clients with the scale and services they require across industries, products, and geographies. *In this context, we completed the acquisitions of GoIndustry in July* and the National Electronics Service Association in October. *These transactions enhance our ability to deliver surplus asset management, valuation, and disposition services to Fortune 1000 enterprises across North America, Europe and Asia, and enable us to offer important new services to our existing sellers, while also growing our buyer base.*

Of note, we expect the integration of GoIndustry will require significant upfront investments to fully realize the global capital assets market opportunity, which will result in a drag on earnings in the first half of fiscal '13 *but will benefit the second half of fiscal '13 and our long-term growth prospects.*

\*

 We are confident in our ability to achieve our long-range goals, due to our many strengths.  Liquidity Services has the largest global buyer base for surplus assets, which continues to grow. We possess proprietary market data and knowledge derived from over $3 billion of completed asset sales to assist our growing client base, and the valuation and sale of assets in over 500 product categories in all condition types.  And we possess the most innovative sales channels and services to meet the needs of the marketplace.

\*

*. . . [W]e have strong organic growth opportunities with our existing clients,* which now include the world's largest organizations in the biggest industry sectors in the global economy:  retail, energy, transportation, healthcare, consumer packaged goods, technology, and the public sector.

\*

. . . [M]acro trends are increasing the demand for our services and potential for new client additions in the retail and manufacturing supply chains.

\*

Rallo:

***Then you look out at next year, we don't really see any change in our top-line expectations [for GoIndustry] at this point.***  As Bill commented earlier, our initial meeting with the clients have been strong.  The opportunities between the two organizations are tremendous.  ***What we want to do is simply accelerate what we believe is the long-term opportunity that we see with the business.  And we moved our integration, I think, up more into the first half of this year.***

So to be specific on your question as far as what changed, I think what changed really was our timetable.  A greater knowledge of the business now operating it for the last four to five months.  And we expect to, yes, I would say see $0.02 to $0.03, as you indicated, dilutive, if you would, for the first two quarters of the year.  And then break even to making money in the second half of the year.  ***And again, I mean, I think that's reflected in our full-year guidance which represents over 18% organic growth year-over-year.***

*

***. . . [O]ne comment on margins for next year, I think its – our margins for next year that are represented in our guidance are actually in line with exactly what we said last quarter.***  So we expected to finish this year around a 13% EBITDA – adjusted EBITDA to GMV margin.  I believe the year was 12.8%, 12.7%, something like this.  So again, in line with our expectation.

*

Angrick:

And so we are smart and experienced to know that be careful what you ask for, in the sense of if clients like the value proposition, they're going to want to do a lot of business.  And they are going to, in this case, want to do it globally.  So we want to get ahead of the curve in terms of our financial reporting systems, our global sales force automation and sharing of data, and our operations teams.  So that we execute crisply against we anticipate to be a lot of future growth. (Emphasis added.)

147.    Also on the conference call, Defendant Angrick made specific representations as

to the rationale underlying the GoIndustry acquisition:

Let me first introduce the rationale for the GoIndustry transaction.  Global clients increasingly need and expect uniform service globally for all of their equipment.  And having met with many of the top clients of that business, we are not only seeing that rationale play out, but ***we are even more enthusiastic about the long-term growth prospects of cross-selling services to many large companies***.  In fact, companies that have traditionally been selling equipment on the GoDove [GoIndustry DoveBid] marketplace also are major players in consumer-packaged goods and have inventory and scrap material that needs to be handled and sold.  ***And so we like very much the opportunity to integrate a global enterprise sales organization, integrate their 300,000 global buyers, and then continue to scale the business***. (Emphasis added.)

- 69 -

148.    Defendant Rallo added that:

As far as investment goes, I think Bill hit a fair amount of those during his overview. But specifically – and what changed our expectations, I think, was when we really dug into the global opportunity for the $100 billion capital asset market, and we looked at the disparate organization of GoIndustry, one that has not been run historically with common systems and common processes, which is a departure from the normal Liquidity Services philosophy. ***We just saw an opportunity to change those things more quickly and more dramatically than we had originally thought. Again, from a due diligence process, versus running the business for the last four or five months. And we believe that's going to create more opportunity in the long run***. (Emphasis added.)

149.    Similarly, with respect to margins, Defendant Rallo stated that:

As far as the investments go, ***we absolutely expect to see improvements in margins going forward after fiscal 2014 and '15 from our investments***. ***Primarily, a lot of those investments are bringing everybody together as it relates to the GoIndustry acquisition.*** And we've indicated, again starting with our last call, our plans to do that. So you're looking at taking a business that's running at break-even to a level of profitability that is consistent with the other capital markets pieces of our business today. ***So we would expect to see leverage on margins moving forward after this year.*** (Emphasis added.)

150.    The statements made by Defendants Angrick and Rallo during the November 29, 2012 earnings call regarding Liquidity's growth and profitability, including Defendant Angrick's statements about the Company's organic growth, were materially false and misleading because they gave a misleadingly positive impression about the Company's current financial position and its potential for growth.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins

and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.   Moreover, as discussed more fully at ¶¶ 79-80, 82, *supra*, although Defendants Angrick and Rallo gave the appearance of candor by discussing logistical issues relating to GoIndustry's integration, they continued to tout the GoIndustry acquisition as one favorable to the Company, with Defendant Angrick stating, for example, that GoIndustry provided "the opportunity to integrate a global enterprise sales organization, integrate their 300,000 global buyers and then continue to scale the business."   In doing so, they failed to disclose the material information that, *inter alia*: (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's European division was not having success in that market; and (iii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

151.   On these statements, the Company's stock dropped $5.96, from $43.73 on November 28, 2012, down to $37.83 on November 29, 2012.   In analyzing this decline, some media sources focused on Defendants' statements about macroeconomic conditions, as opposed to operational concerns within the Company, such as the logistical issues in integrating GoIndustry.   For instance, an article in the AP on November 29 stated as follows:   "Shares of Liquidity Services, Inc. tumbled more than 17 percent in Thursday morning trading, after the online auction operator posted a 77 percent jump in fiscal fourth-quarter net income, ***but warned that global economic conditions remain tough.***"   (Emphasis added.)   The article further noted that "Liquidity Services said that while the economy has improved, ***it remains cautious about the effect of volatile economic conditions on retail and industrial supply chains***, as well as

- 71 -

GDP growth." (Emphasis added.) Thus, for the reasons articulated above in ¶¶ 79-80, 82, the market absorbed a message from Defendants that did not reflect the truth of what was being experienced within the Company.

152. Likewise, notwithstanding the Company's statements regarding the fourth quarter and full year 2012, a report issued by Barrington Research on December 3, 2012, indicated that that firm would be maintaining an "outperform" rating on the Company, its highest rating. This demonstrates that analysts digested the half-truths that Defendants put forward to explain Liquidity's financial position at the time.

**K.    December 12, 2012 Investor Day Presentation**

153. On December 12, 2012, Defendants presented at Liquidity's Investor Day in Indianapolis, an event in which investors and analysts could also participate via teleconference. In connection with this event, Defendants prepared and distributed an extensive 100-page Powerpoint presentation titled "2012 Investor Day," dated December 12, 2012 (the "Investor Day Presentation"), which was intended as an overview of the Company, its performance in recent years, and strategy for future growth.

154. Among the many topics addressed in the Investor Day Presentation was margins. Defendants represented in slide 13 that the Company had an "***attractive margin profile***," and presented a graph purporting to show sizeable increases in adjusted EBITDA as a percentage of GAAP revenue every year since Liquidity's initial public offering in 2006. According to this slide, earnings as a percentage of revenue grew from 10.2% in fiscal year 2006 to 23.1% in fiscal year 2012. The statements in this slide were materially false and misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity was suffering. As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make

the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

155.    Another slide in the Investor Day Presentation, marked as slide 26, touted the Company's relationship with the DoD.  In characterizing Liquidity as "the safe and trusted provider of choice," Defendants boasted the Company's "[e]xclusivity with DoD and 5,000 agency clients," as well as "[t]hree DoD contract wins and exercise of all renewals."  The same slide touted Liquidity's positioning in the market:  in noting "strong customer loyalty," Defendants stated that it had achieved "[s]ignificant expansion with F1000 commercial clients" and "[b]uyer annual growth rate of 41.6% over past 10 years."  These representations gave no hint as to the threats posed by competitors at that time.  Further, the slide boasted Liquidity's "high customer value," representing that it had achieved a "20%+ increase in net recovery value."  Such statements concealed the truth that Liquidity was, in fact, selling merchandise at lower values in an attempt to stay ahead of the competition. *See* ¶¶ 67-70, 73, *supra*.

156.    Slide 28 of the Investor Day Presentation purported to show its success in "multiple, large markets still in early stages of online adoption."  There, the Company boasted GMV of $50 billion in the Retail Supply Chain (Liquidation.com and Jacobs Trading), GMV of $100 billion in Capital Assets (Network International, GoIndustry, and TruckCenter.com), and GMV of $3 billion in the Public Sector (Government Liquidation and GovDeals).  The

- 73 -

statements in this slide were materially false and misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity was suffering. As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. The slide also omitted negative information about GoIndustry that was impacting Liquidity's profitability and ability to grow, including that, *inter alia*: (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's European division was not having success in that market; and (iii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

157. Defendants also touted the Company's ability to achieve growth through acquisition. In slide 39 of the Investor Day Presentation, Liquidity boasted a "strong M&A track record," and stated that "*[a]cquisitions have grown 20% or better fueled by our expertise and resources*." This slide pointed to acquisitions such as GovDeals, Network International, TruckCenter.com, Jacobs Trading, GoIndustry, and NESA, and indicated that they had all resulted in "*cross-selling synergies*." These representations gave investors no clue as to true,

concealed difficulties the Company was experiencing in the integration of some of its acquisitions. *See* ¶¶ 79-82, *supra*.

158.    Defendants' portrayals of optimism in the Investor Day Presentation included representations in slide 41 that it had a "[h]uge opportunity to transform an industry," noting in support that, among other things, it had "[k]ey competitive advantages," a "[s]trong track record of operational execution," and an "[e]xtensive base of buyers and sellers with a network effect." Curiously, despite the fact that Liquidity had just weeks earlier attributed its disappointing fourth quarter and full year 2012 to volatile economic conditions, it represented in this presentation that "[m]acro tail winds support growth opportunity."   The statements in this slide were materially false and misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity was suffering.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, such as Jacobs Trading, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

159.    Similarly, the Investor Day Presentation, at slide 51, indicated to investors and analysts that there was a "***Large Retail Supply Chain Growth Opportunity***" for Liquidity in terms of existing clients, retail prospects, and OEM (original equipment manufacturer) prospects.

The statements in this slide were materially false and misleading because they gave investors the false impression of sustained profitability and growth at the Company while, behind the scenes, Liquidity's business was suffering.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.

160.   Not surprisingly, the Investor Day Presentation also specifically touted the GoIndustry acquisition.  In a series of slides beginning at slide 65, Defendants extolled the virtues of the deal from all perspectives.  Defendants represented, *inter alia*, that *GoIndustry "[e]xpands size and depth of buyer base, client roster, sales team, and marketing capabilities*," and that it "*[a]dds new 'inside the building' markets" and "[c]aptures new supply from existing and new accounts*."   Defendants pointed to the many ways in which GoIndustry "*Broaden[s] [Liquidity's] Global Service Offering*," and specifically noted how the "*[l]imited overlap with [Liquidity's] existing buyer base*" expands the Company's buyer base.

161.   Defendants also emphasized the fact that the GoIndustry acquisition brought to the Company an "[e]nterprise-level surplus asset management platform," known as AssetZone.  AssetZone is essentially the software used by GoIndustry – and through acquisition, Liquidity – to help customers evaluate their capital assets and determine whether they are idle or underperforming and thus in need of "redeployment."  Among the many benefits of AssetZone,

- 76 -

both to sellers and to Liquidity, were the "*[s]eamless integration with client business systems*," and the "*[a]bility to rapidly roll-out unique tools & capabilities across all F1000 clients*."

162.    All of the information regarding GoIndustry conveyed by Defendants in the Investor Day Presentation gave no indication as to the challenges that, as numerous confidential witnesses corroborate, were known at the time at the highest levels of management.

163.    In addition, during the 2012 Investor Day, members of Liquidity's management – including Defendants Angrick and Rallo – addressed the attendees and participants, and made specific representations regarding the Company's performance and prospects.  For instance, with respect to growth and margins, Defendant Angrick stated as follows:  "We're growing at about twice the growth rate of eCommerce.  We've had 40 consecutive quarters of profitability.  We've positioned ourselves to be a market leader.  And we have *some of the best margins in the entire category of eCommerce*. . . .  And *we are able to drive margin expansion*."  (Emphasis added.) He further stated that "I think 10% EBITDA margins or better are achievable for us in the long-term growth in terms of the industry evolution."

164.    Speaking on behalf of the Company, Cayce Roy, Vice President of Retail Supply Chain Group, addressed growth through acquisition:

> I know there's a multi-channel capabilities in the buyer growth.  If we're going to ask clients, you need to add buyers, you need to add new channels, you need to help your clients grow and that's a key element of our success.  *M&A integration and growth, we'll continue to look for, as we've done with Jacobs Trading and NESA in the recent – the last year*.  We'll continue to look for opportunities to build out our business, to build out the services as Bill [Angrick] noted, to expand the client and the buyer base and geographic *locations and we'll do a great job at integrating them into the company*. (Emphasis added.)

165.    With respect to the competition facing Liquidity, Defendants assumed the familiar dismissive posture.  Defendant Rallo stated that:

And so again, ***when you look to the competition, there is a lot of it, but it's not very formidable***.

*

So I'm talking about the state and local government is known over the last four, five years, to go under tremendous amount of pressure.  Budgetary pressures; they've been under efficiency pressures, transparency pressures.  And how can we help them?  The same way we helped the DoD, same way we help our commercial buyers.  ***We come in and we offer a better mousetrap.  We'll be able to move these assets more quickly than our competition.  We're going to be able to get a better price*** and we'll give a private and transparent marketplace to do that, and we have a full breadth of services.  (Emphasis added.)

166.   The statements made by Defendants Angrick and Rallo, and attributable to the Company through Cayce Roy, were materially false and misleading.   Defendant Angrick's statements touting Liquidity's margins and Roy's statements downplaying Liquidity's competition in the commercial space gave investors a false impression of the Company's current growth and its ability to sustain growth and profitability.  Further, Defendant Rallo's statements regarding the Company's track record of integrating acquisitions materially overstated Liquidity's success in that regard.   As discussed more fully at ¶¶ 64-73, *supra*, Liquidity's growth picture was not so rosy, and as various confidential witnesses have detailed, Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; and (iii) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Nor was the Company as adept at integrating acquisitions as investors were led to believe.  As discussed more fully at ¶¶ 71,79-80, 82, *supra*, Defendants failed to disclose that, *inter alia*:  (i) GoIndustry was historically unprofitable and about to "shut their doors" when Liquidity acquired it; (ii) GoIndustry's European division was not having success in

- 78 -

that market; (iii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them; and (iv) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected.

167.    Analysts absorbed Defendants' 2012 Investor Day representations as intended. For example, in a report published on December 13, 2012, Janney noted the following:

> On 12/12, we attended LQDT's first analyst day including a tour of its largest Commercial distribution center in Indianapolis. While we have covered LQDT since its IPO in 2006, the event was a good deep-dive into its growth strategy, competitive advantages, and ongoing technology/process improvements in a $150BN TAM. ***Key takeaways include: (1) the Capital Asset business represents a significant global opportunity with GOI, (2) Commercial Retail has significant growth opportunities through deeper client engagement while sales cycles remain long due to complexity/changing industry behavior***, (3) Government Surplus visibility appears strong, (4) expect LT margin expansion, and (5) model remains less capital intensive than other eCommerce players despite slightly higher technology investments. (Emphasis added.)

168.    Likewise, in a report dated December 20, 2012, and titled "Key Highlights of LSI's Investor Day," Barrington Research echoed the message conveyed by Defendants. The report noted that "[s]ecular tailwinds are driving growth within this market including increased product innovation, eCommerce growth and initiatives related to sustainability. . . . Competitive advantages for LSI include a 2.2 million buyer base, a supplier base totaling over 6,000, a global footprint in 40 countries, domain expertise and turnkey service offerings." With respect to margins and growth, the Barrington report stated that "[u]sing FY/12's adjusted EBITDA margin on GMV of 12.75% and applying it to $2 billion of GMV in FY/16 yields potential adjusted EBITDA generation of $255 million, more than double FY/12's adjusted EBITDA of $110 million." In light of the highly optimistic picture painted by Defendants at the 2012 Investor Day, Barrington maintained its highest rating of "outperform" on Liquidity's shares.

169.    On December 13, 2012, the day after the Company's Investor Day presentation, Liquidity's shares surged 5.10%.

**L.    January 16, 2013 Press Release**

170.    On January 16, 2013, the Company issued a press release announcing preliminary GMV results of $234 million, which was below its previous guidance.  Nonetheless, Liquidity reaffirmed its guidance for the first quarter of fiscal year 2013 for adjusted EBITDA and adjusted diluted EPS.

171.    The statements in ¶ 170 were materially false and misleading because they created the impression that the Company was on track in terms of earnings growth.  As discussed more fully at ¶¶ 64-73, *supra*, Defendants failed to disclose, *inter alia,* the following facts, which undermined its growth story:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts, and (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins.

**M.    January 31, 2013 Press Release**

172.    On January 31, 2013, Liquidity issued a press release announcing its financial results for the first quarter of fiscal year 2013.  The Company reported consolidated revenue of $122.2 million, which was an increase of approximately 15% from the prior year period; adjusted EBITDA of $24.2 million, approximately 6% above the prior year period; GMV of $233.4 million, an increase of approximately 30% from the prior year period; and adjusted diluted EPS of $0.41 per diluted share, an 11% increase over the prior year period.  This information also appeared in the Company's Form 10-Q filed with the SEC on February 8, 2013.

173.    Based on the reduced GMV for the quarter, Liquidity adjusted downward its forecasts for key metrics for both the second quarter and the full fiscal year.  Specifically, the Company reduced its fiscal 2013 GMV guidance to a range of $1.025 billion to $1.1 billion,

down from previous guidance of $1.1 billion to $1.2 billion.  For the second fiscal quarter, the Company expected GMV to range from $250 million to $275 million.  As for adjusted EBITDA, the Company revised its full year guidance to $115 million to $121 million, reduced from previous guidance of $123 million to $133 million.  Second quarter 2013 adjusted EBITDA was expected to fall within the range of $28 million to $30 million.  Liquidity also reduced its guidance for adjusted diluted EPS for the fiscal year to range from $1.90 to $2.02, a significant decrease from the previous guidance of $2.05 to $2.23.  Adjusted diluted EPS for the second quarter was expected to be from $0.46 to $0.50.

174.    In connection with the release of the Company's financial results, Defendant Angrick made the following statements concerning Liquidity's performance:

> Liquidity Services generated strong adjusted EBITDA and EPS results during Q1-FY13 as we expanded margins in our core business due to operating leverage and as we continued to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high value capital asset sales. . . . **We remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal year 2016.** During the quarter, we continued to advance our multi-year investment efforts in upgrading our ecommerce platform, investing in our sales and marketing organization and integrating our recent acquisitions of NESA and GoIndustry which have expanded our operations to Canada, Europe and the Asia Pacific regions.  **While the pace of integrating our GoIndustry acquisition is currently slower than expected and will require more investment, particularly in the Asia Pacific region, our expanded breadth of services, industry expertise and geographic coverage has been well received by our clients and has strengthened our competitive position in the reverse supply chain market.** We believe these important investments uniquely address the client needs of Fortune 500 retailers, manufacturers and public sector agencies and position us well for long term profitable growth and market leadership. (Emphasis added; internal quotations omitted.)

175.    In the January 31, 2013 press release, Liquidity reported improved revenue, adjusted EBITDA, GMV, and adjusted diluted EPS over the same quarter the prior year.  It noted that although the pace of integrating GoIndustry was currently slower than expected, its breadth of services was well received by clients and that Liquidity's competitive position had been

strengthened.  Even so, Defendant Angrick stated that "[w]e remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal year 2016."  These statements and others were materially false and misleading.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability had begun to suffer as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendant Angrick gave the appearance of candor by discussing logistical difficulties in integrating GoIndustry, they failed to disclose that, *inter alia*:  (i) GoIndustry's European division was not having success in that market, and (ii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them.

176.    Defendants used the January 31 press release to provide a generic, boilerplate warning of the impact of macroeconomic factors on the Company's business:  "While economic conditions have improved, our overall outlook remains cautious due to the volatility in the macro environment including instability arising from the fiscal cliff and debt ceiling negotiations and their potential impact on the retail and industrial supply chains and GDP growth."  This "warning" hardly provided investors with any sort of balance as to the true state of the

Company's financial health, particularly considering the buoyant statements and financial results that were contemporaneously presented, and the vast amount of facts that contradicted such jubilance – but which remained undisclosed.

**N.     January 31, 2013 – 1Q13 Earnings Call**

177.    Also on January 31, 2013, the Company held an earnings conference call to discuss its financial results.  During the call, Defendant Angrick stated:

> ***During Q1, Liquidity Services reported strong financial results as we continued to grow our market share and build on our leadership position in the reverse supply chain market.***
> *
> *Despite our reduced outlook for fiscal year 2013, we remain confident and focused on the execution of our long-term growth strategy to achieve $2 billion in GMV by fiscal year 2016.*
> *
> ***We are confident in our long-term growth prospects and recently increased our long-term growth target to $2 billion of GMV and we have a clear strategy to achieve this objective. Our competitive position continues to strengthen.***
> *
> [W]e may revise guidance based on the data we have at the time we provide earnings results or updates.  This process, led by our CFO, Jim Rallo, has been and continues to be consistent and effective for us as a public company. (Emphasis added.)

178.    Also, on that call, Defendant Angrick specifically stated that:

> ***Following our acquisitions of GoIndustry and NESA, we are well positioned to support the needs of our target market in Canada, Europe and the Asia-Pacific regions***. While the pace of integrating our GoIndustry acquisition is currently slower than initially expected, and will require more investment, particularly in the Asia-Pacific region, ***our expanded breadth of services, industry expertise and geographic coverage have been well received by our clients and have strengthened our competitive position in the reverse supply chain market***.
> *
> ***But we are very comfortable with what we have on our plate in 2013 with GoIndustry DoveBid and NESA. Our clients are using our services in both respects to do more volume with us and I think in fiscal 2014, you are going to see results based on the investments we've made in fiscal 2013 that will be very encouraging***. So, we do look at acquisitions, I don't view it as a driver for the balance of 2013, but there are always situations that present themselves. (Emphasis added.)

179.    On that call, Defendant Rallo stated that "*the retail business performed extremely well during the first quarter*."  (Emphasis added.)  He further represented that:

> After six months of operating the GoIndustry organization and reaching out to many of our clients, we are focused on cultivating all the good team members serving the needs of our clients; investing in changes in technology to conform the usability of Liquidity Services' marketplaces onto the GoIndustry platform; and restructure the organization to adopt the efficient operating model of Liquidity Services. This restructuring includes replacing senior members of the U.S. and Asian GoIndustry organization with tenured members of the Liquidity Services team.

180.    On the January 31, 2013 call, Defendants Angrick and Rallo also made the following statements:

> Rallo:
>
> During Q1, Liquidity Services reported strong financial results as we continue to grow our market share and build on our leadership position in the reverse supply chain market.  *We continue to benefit from large commercial and government clients placing their trust in us to handle more of their excess inventory and high-value capital assets sales, which drove strong growth this quarter.*
>
>                   *
>
> Angrick:
>
> *One of the greatest organic growth opportunities we have is to do more business with our current clients*.  Today we provide services to over 130 Fortune 1000 corporate clients, which include the leading companies in the retail, consumer packaged goods, energy, healthcare, transportation and technology sectors. Uniformly, our clients give Liquidity Services high marks for the quality and reliability of our services and for our domain expertise in the reverse supply chain.  Yet only a very small percentage of our top clients take advantage of the full breadth of our services or conduct business with us in more than one geographic region.
>
>                   *
>
> Rallo:
>
> *We are again in a period with vast opportunities,* and our ability to capture these opportunities over the next several years will be shaped by our investments we are making over the next several quarters, *the largest of which is the GoIndustry marketplace.*  The opportunity to further serve 75 of the Fortune 500 clients associated with the GoIndustry acquisition will require us to make more

investments and restructure an organization that has not had any investments in the last four years.

*

In addition, we are closing a larger number of locations around the world than originally planned.  ***The success of these changes will be measured starting in next fiscal year and we believe will allow us to drive one of the highest returns on invested capital for any of our acquisitions***.

*

And two, reduced GMV versus our previous expectations from our Liquidation.com marketplace due to lower than expected product flows from existing clients and slower than expected ramp up in product flows from new clients programs.  ***We anticipate normalized flows from new clients and programs sometime during the third and fourth quarter of fiscal year 2013.***

*

As far as the growth rate for the retail business for the rest of the year, we see a lowering of that growth rate from our prior expectations primarily related to existing clients where their flows are lower than the flows received last year.  Our new clients, which we anticipated ramping up a little faster have not ramped up based on the forecast that we see today – as quick as we anticipated.  So we would expect to see low double-digit growth in the retail supply of our business for the rest of the year.

*

***As far as GoIndustry's performance in the first quarter, it was better than the last quarter that we had of fiscal year 2012***.  This . . . tends to be a seasonally higher quarter for GoIndustry.  Capital assets, many of the clients are 12-31 year-end companies.  And so there is a lot of capital assets that tend to move off the balance sheet before the next fiscal year.

***So again, I would say we actually had sequential growth in the business quarter to quarter.***  What we are not seeing in the pipeline is the kind of growth that was anticipated at the beginning of the year.  ***So we certainly expect to be significantly under our budgeted ranges for GoIndustry that we talked about at the beginning of the year.***

*

***Most of the rest is coming from, again, the retail part of the business which I think Bill and I discussed earlier in detail what is driving that***.  And then there's a small little bit that you have, to be frank, which is coming from scrap, which continues to be lower than expectations, albeit not a material part of our business anymore, it is obviously a part of our core business and going down.  I think one point I would comment on is the scrap business continues to decline, yet our operating margins continue to improve in the core business.

*

Angrick:

I think there are two aspects there [with GoIndustry].  One, the new organization provides their view of potential and, until LSI has had experience interacting with

particular business leaders or vetting information, we have a certain reliance that we place on newly acquired teams and personnel and forecasting techniques. And as we peel the onion and we have more experience with what they use as a risk adjusted forecast, we have some risk in working with that forecast.

In the current state, *we have eliminated a lot of the risk of their forecasting techniques because we have either put an LSI long tenured employee in place to lead a division or a marketplace.*

*

. . . [W]e conserve our clients in more regions, *we have a very small percentage of clients that use more than one of our services or work with us in more than one region.  So our growth to $2 billion is merely a function of serving the needs of our existing clients and leveraging that expansion potential while also using the strong references to be the market leader in those industry categories.  So that drive the opportunity to grow on a consistent basis.*  (Emphasis added.)

181.    The statements made by Defendants Angrick and Rallo during the January 31, 2013 earnings call regarding Liquidity's "long-term growth prospects" and strengthening competitive position, particularly with regard to the retail supply chain division, were materially false and misleading because, as discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.   Moreover, Defendants' statements touting current success and the long-term value of GoIndustry, notwithstanding the expense of integrating and restructuring that business, were materially false and misleading because, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants gave the appearance of

candor by discussing logistical difficulties in integrating GoIndustry, they failed to disclose that, *inter alia*: (i) GoIndustry's European division was not having success in that market, and (ii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them. Further, Defendant Rallo's explanation that "we're not seeing in the pipeline . . . the kind of growth that was anticipated at the beginning of the year" at GoIndustry was also false and misleading because this statement in effect attributed GoIndustry's financial problems at the time to a lack of products made available by customers, and not the true difficulties Liquidity was having with GoIndustry.

182. On this news, the Company's stock plummeted from $41.07 on the prior day's close, down to $31.87 on January 31, 2013. The media attributed this decline to Defendants' statements regarding macroeconomic conditions, as opposed to the operational concerns that Defendants concealed. For instance, an article published by the AP on the same day observed that "Liquidity Services Inc.'s shares sank Thursday after the online auction company cut its earnings outlook on the ***anticipated impact of the weak economy***. . . . Liquidity Services said that while economic conditions have improved, its overall outlook remains cautious due to the ***volatility in the broader environment***." (Emphasis added.)

183. An article published on *Bloomberg* on the same day stated that the Company's shares "drop[ped] as much as 28% to lowest intraday since Dec. 2011" due to the reduced forecast. The piece noted that the Company "[c]ited ***volatility in the macro environment*** including instability arising from the fiscal cliff and debt ceiling negotiations." (Emphasis added.)

184.   Notwithstanding the Company's lowering of guidance for fiscal year 2013, Barrington Research maintained its "outperform" rating – its highest rating – for Liquidity's shares, and opined that the harsh stock reaction was an "overreaction, though we acknowledge that there are credibility issues with investors that need to be addressed by management."

O.     **March 5, 2013 Conference Call**

185.   On March 5, 2013, Defendant Rallo participated in a question and answer conference call hosted by Deutsche Bank AG. During the course of the conference call, Defendant Rallo made the following statement with respect to Liquidity's opportunities for growth and the competition facing the Company:

> Well, we can certainly get to $2 billion a year with our existing client base.  And if you look at the list of our existing clients, I mean, they're on our website, it's really a who's who in the retail side of the business or the manufacturing side of the business or the energy side of the business.  It's a large market opportunity.
>
> *
>
> There's a lot of opportunity within our existing client base to grow the business.  And so what – the one thing that people have to remember about our business is that we were founded in 2000, so again the liquidation industry has been out there for a long time.  ***We're always displacing somebody else that's in there.  So we don't really have a lot of formidable competition, but we certainly have a lot of competition.***  And our job is to go in there and demonstrate with data, which we can do, that we're going to drive a better net return and provide the services that these large retailers need.  So we can certainly hit our $2 billion bogey with our existing client base.  (Emphasis added.)

186.   The statements in ¶ 185 regarding competition were materially false and misleading because, as discussed more fully at ¶¶ 64-73, *supra*, Defendant Rallo failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; and (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins.

**P.      May 2, 2013 Press Release**

187.      On May 2, 2013, Liquidity issued a press release announcing its second quarter 2013 financial results, which were republished in the Company's Form 10-Q, filed with the SEC on May 7, 2013.  The Company boasted record revenue of $130.3 million and record GMV of $259.1 million, which was up 19%.  However, the Company's adjusted EBITDA dropped 6% to $29.2 million, and adjusted diluted EPS dropped 8% to $0.48 per share.   Nevertheless, Defendant Angrick assuaged investor concerns:  "Liquidity Services generated solid results during Q2-FY13 as we expanded adjusted EBITDA margins in our core business and continued to deliver a high level of service to large commercial and government clients in managing their excess inventory and high value capital asset sales."

188.      The Company also provided guidance for the third quarter and fiscal year 2013. The Company forecast full year GMV to range from $1.025 billion to $1.1 billion, and for third quarter GMV to range from $250 million to $275 million.  It forecast full year adjusted EBITDA to range from $115 million to $121 million, and for third quarter adjusted EBITDA to range from $29 million to $32 million.  Lastly, the Company predicted adjusted diluted EPS to range from $1.90 to $2.02 per share for the full year, and from $0.49 to $0.54 per share for the third quarter.   Furthermore, Liquidity represented that "GMV continues to diversify due to the continued growth in our commercial business and state and local government business (the GovDeals.com marketplace).   As a result, the percentage of GMV derived from our DoD contracts during Q2-13 decreased to 21.3% compared to 24.3% in the prior year period."

189.      Defendant Angrick also emphasized the Company's growth initiative, referred to as Liquidity One:

> We remain focused on executing our long term growth strategy to achieve $2 billion in GMV by fiscal 2016.  During the quarter, we continued to advance our multi-year investment efforts in upgrading our e-commerce platform,

investing in our sales and marketing organization and integrating our sales and marketing organization and integrating our recent acquisitions of NESA and GoIndustry. *We made significant progress this quarter integrating GoIndustry, including the award of several new client engagements, and anticipate that we will exit this fiscal year with GoIndustry operating profitability, while enhancing our strategic plan of serving global capital asset clients. We believe these important investments uniquely address the needs of the Fortune 1000 and public sector agencies and position us well to drive shareholder value over the next five years.* (Emphasis added.)

190.    The financial results and guidance provided by the Company in the May 2, 2013 press release were materially false and misleading because they gave investors the impression of success and growth in the Company's divisions while, behind the scenes, Liquidity's business was suffering.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.   Moreover, Defendant Angrick's statement that the Company made "significant progress this quarter integrating GoIndustry" was materially false and misleading because it gave investors the impression that GoIndustry's difficulties stemmed merely from logistical issues when, as discussed more fully at ¶¶ 80, 82, *supra*: (i) GoIndustry's European division was not having success in that market, and (ii) GoIndustry paid its sales staff unsustainably high salaries and commissions that Liquidity would not

continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them, all of which was concealed from investors.

### Q. May 2, 2013 – 2Q13 Earnings Call

191. Also on May 2, 2013, the Company hosted a conference call to discuss its earnings. During that call, Defendant Angrick represented that:

> *During Q2, Liquidity Services generated solid results in line with our guidance range while also funding major investments in support of our long-term growth strategy.*
>
> *
>
> Q2 GMV was up 19% year-over-year to $259.1 million, *driven by growth in the volume of capital assets in our commercial* and government marketplaces.
>
> *
>
> *We remained focused on executing our long-term growth strategy to achieve $2 billion in GMV by fiscal year 2016.* (Emphasis added.)

192. Likewise, Defendant Rallo stated that:

> *Our solid results for the second quarter demonstrate the operating efficiencies we have achieved across our entire business as a result of investments we have made to support our growth over the last several years.*
>
> *
>
> First, on the margins, I guess, core, for lack of a better word, is everything excluding GoIndustry. *So, when you look at the rest of the business, frankly, operating extremely efficiently right now, in fact, a record quarter margin wise, again, excluding GoIndustry. So we had nice growth in the retail side of our business, driving efficiencies there.* (Emphasis added.)

193. Also during that call, Defendants Angrick and Rallo made a number of other statements concerning the Company's growth initiative, profitability, operating condition, and future prospects:

Angrick:

> Our third major initiative is the integration of recent acquisitions. We have dedicated, cross functional project teams focused on completing the integration of our recent acquisitions of NESA and GoIndustry. NESA continues to go smoothly and *we have continued to make progress with the integration of GoIndustry into our Capital Assets Group.* We have eliminated non value added locations and activities while also making investments to integrate the sales and

marketing organization, IT and back office systems.  ***This has resulted in a more effective, aligned, and responsive organization.  We expect to exit this fiscal year with GoIndustry operating profitably.***

\*

[W]e made significant progress advancing our business plan during Q2.  Our integrity, customer focus, and investment in innovation have enabled us to continue to expand our roster of blue chip clients.  We now serve clients in over 25 countries across America, Europe, and Asia and have created the most talent and capacity we have ever had to pursue key organic and external growth opportunities that build on our leadership position.

\*

Let me address the commercial growth.  One, as you heard, we are investing in our sales and marketing organization.  The quality and productivity of our enterprise sales force continue to improve over time.  Given the focus of our strategy to aim our services at the largest corporations with the most capital-intensive industries with high-value equipment and inventory to sell, when we win business, it's meaningful.  ***And as we progress through the balance of fiscal '13, we will see that come through with high organic growth.  We're in the high-single digits coming out of the current quarter and we would expect that to improve.***

\*

Rallo:

As far as additional top line growth, we're in a unique situation this year where we have signed several large clients during the year.  As Bill indicated in his comments, we also have some what I would say is ancillary business or projects we're going to do for existing client programs as we've called them in the past, which are ramping up in the third and fourth quarter.

\*

So when we look at the end of the first quarter and look [] at the rest of the year, ***we did not have a ramp up in new programs coming as fast as we thought, meaning that we expected to have a better ramp this quarter, the quarter that just closed, Q2.***

***In addition, we weren't getting growth from existing client programs.***  So these are programs that we've been running for over a year.  That phenomenon has not changed.  So we haven't really seen growth from existing client programs.  What has changed, though, is as we talked about in the last call, we've used what I would say is the slowdown in volume with the great demand that we have on the buyer side to increase the number of programs we're doing with existing clients.  So, these are new programs for existing clients which are ramping, also again, as Bill noted in his comments, we've signed a significant number of new clients, which we did not have three or four months ago when we did our last call.  And so, that's really driving the growth.

\*

Our strategy of bringing innovative technology to the reverse supply chain market and our efficient business model has translated into strong results for stockholders. Trailing 12 months adjusted earnings before interest, taxes, depreciation and amortization, or adjusted EBITDA was $109.9 million.

***Our solid results for the second quarter demonstrate the operating efficiencies we have achieved across our entire business as a result of investments we have made to support our growth over the last several years.***

***Adjusted EBITDA margin as a percent of GMV was 14.6% for our core business during the quarter, which excludes the operating results and losses from GoIndustry.***

194.    In addition, on the May 2 earnings call, Defendant Rallo made the following representations as to the GoIndustry acquisition:

During the 3 months ended March 31, 2013, ***we made significant progress implementing and restructuring our plan for GoIndustry***. We closed non-performing locations and rationalized the remaining supporting infrastructure while maintaining key elements of the organization that have consistently provided a high level of service to our Fortune 1000 clients.

This restructuring resulted in approximately $2.3 million in additional costs during the quarter. ***We expect to complete our restructuring plan over the next six months and we believe these changes will enable the GoIndustry marketplace to achieve profitable operations in fiscal year 2014. Over the next several years, we believe GoIndustry will drive one of the highest returns on invested capital for any of our acquisitions***. (Emphasis added.)

195.    With respect to margins, Defendant Rallo stated on the second quarter earnings call that:

First on the margins, I guess core for a lack of a better word, is everything excluding GoIndustry. ***So when you look at the rest of the business, frankly operating extremely efficiently right now, in fact, a record quarter margin wise, again, excluding GoIndustry. So we had a nice growth in the retail side of our business driving efficiencies there.***

196.    The statements made by Defendants Angrick and Rallo on the May 2, 2013 earnings call concerning, *inter alia,* the Company's organic growth and margins, particularly in the retail division, and the sustainability of this growth, as well as the Company's progress

integrating and restructuring GoIndustry, were materially false and misleading.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability was suffering as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants tried to assuage market concerns about GoIndustry by touting progress integrating and restructuring that business, they failed to disclose that GoIndustry's European division was not having success in that market.

197.    On these announcements, the Company's stock price rose from its May 1, 2013 close of $32.53 per share to a close of $35.00 per share on May 3, 2013.

198.    Notably, in June 2013, as the Company's stock climbed, Defendant Angrick unloaded a significant number of shares at artificially inflated prices.  Indeed, he sold 200,000 shares for a return of $7,960,870 over the course of June 3, 4, and 5, 2013.

199.    Not coincidentally, the very next day – on June 6, 2013 – Liquidity reported lower than expected growth in GMV for the month of May.  On this news, the Company's stock tumbled from a close of $39.12 on June 6, 2013, to $31.46 on June 13, 2013, as the market absorbed the news.

### R.     July 16, 2013 Press Release

200.    On July 16, 2013, Liquidity issued a press release announcing preliminary financial results for the third quarter of fiscal 2013, ended June 30, 2013.   The Company announced these limited results because it had become apparent that Liquidity was going to badly miss its previously affirmed guidance.   Liquidity announced that it expected to report GMV of $228 million to $231 million, compared to the expected range of $250 million to $275 million; adjusted EBITDA of $26 million to $27 million, compared to the expected range of $29 million to $32 million; and Adjusted Diluted EPS of $0.43 to $0.45, compared to the expected range of $0.49 to $0.54.   The Company stated that these results were driven by lower than expected GMV.   Yet Defendants still managed to tout Liquidity's organic growth and the GoIndustry acquisition.   According to the press release:

> Results were impacted by lower than expected GMV in the Company's capital assets and retail supply chain verticals as a result of lower product flows from existing clients and slower than expected rollout of new client programs.  "While our preliminary GMV results for Q3-FY13 and the impact on our Adjusted EBITDA and Adjusted EPS results were disappointing and below our expectations, our emphasis has been on profitable growth and *we have made good progress with the integration of our GoIndustry acquisition, which is now operating at near breakeven. Overall margins in our business remain strong*; we expect to report that adjusted EBITDA margins increased to approximately 11.5% in the third quarter from 11.3% in the second quarter primarily as a result of sharper focus and streamlined operations," said Bill Angrick, Chairman and CEO of Liquidity Services.  "The lower than expected top line results during the quarter were driven by delays in new programs, weaker volumes in the consumer electronics sector and the continued repositioning of the GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth in this business."
>
> "*Fundamentally, we are confident in our competitive position and our ability to achieve attractive organic growth over the next several years driven by our strong client service and continued investments in innovation*.  However, in the short term, results have been less predictable and pressured due to significant integration efforts and the timing of new large programs coming on line in our retail supply chain vertical," continued Angrick.  (Emphasis added.)

201.    The preliminary financial results provided by the Company in the July 16, 2013 press release were materially false and misleading because they gave investors the false impression of profitability and growth in the Company's divisions, as did Defendant Angrick's statement expressing confidence in Liquidity's organic growth and competitive position and the unattributed statement that "[o]verall margins in our business remain strong."  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations, but failed to disclose that, *inter alia*:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Moreover, the statement in the press release touting "good progress" in the integration of GoIndustry was materially false and misleading because, as discussed more fully at ¶¶ 80, 82, *supra*, Defendants failed to disclose that GoIndustry's European division was not having success in that market.

202.    On this news, the Company's stock declined from a close of $32.38 on July 15, 2013, down to $29.60 per share on July 17, 2013.

**S.      August 6, 2013 Press Release**

203.    On August 6, 2013, the Company announced its financial results for the third quarter ended June 30, 2013, via a press release.  These results were also filed with the SEC in a Form 10-Q on August 9, 2013.  For the quarter, Liquidity reported revenue of $124.2 million, up

2% from the prior year period; adjusted EBITDA of $26.4 million, a decrease of approximately 21% from the prior year period; GMV of $230.3 million, an increase of approximately 2% from the prior year period; and adjusted diluted EPS of $0.44 per share, down 21% from the prior year period.

204.    The Company also provided updated guidance for fiscal year 2013 and the fourth fiscal quarter of 2013.  The Company expected full year 2013 GMV to be from $925 million to $950 million, and fourth quarter GMV of $200 million to $225 million.  It expected full year adjusted EBITDA of $104 million to $106 million, and fourth quarter adjusted EBITDA of $24.0 million to $26.0 million.  Lastly, the Company forecast full year adjusted diluted EPS to be $1.72 to $1.76 per share, and third quarter adjusted diluted EPS to range from $0.39 to $0.43 per share.

205.    In conjunction with announced financial results, Defendant Angrick stated that:

Q3-FY13 results were in line with our pre-announced guidance range.  We continue to make important investments in our sales and marketing organization to expand awareness of Liquidity Services as the trusted provider of choice in our industry which will drive our future growth.  ***We have made good progress with the integration of our GoIndustry acquisition, which is now operating near breakeven.***  Overall margins in our business remain strong as adjusted EBITDA margins increased to 11.5% in the third quarter from 11.3% in the second quarter primarily as a result of sharper focus and streamlined operations.  ***Our year-over-year results were impacted by delays in new programs, weaker volumes and pricing in the consumer electronics category and the continued repositioning of our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth in this business.***

\*

***Fundamentally, we are confident in our competitive position and our ability to achieve attractive organic growth over the next several years driven by our strong client service and continued investments in innovation***.  However, in the short term, results have been less predictable and pressured due to significant integration efforts and the timing of new large commercial programs coming on line.  (Emphasis added.)

206.    Additionally, Liquidity made the following representation concerning GMV and revenue mix:

> GMV continues to diversify due to the continued growth in our commercial business and state and local government business (the GovDeals.com marketplace).   As a result, the percentage of GMV derived from our DoD Contracts during Q3-13 decreased to 21.9% compared to 23.7% in the prior year period.

207.    The financial results and guidance provided by the Company in the August 6, 2013 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, as did Defendant Angrick's statements expressing confidence in Liquidity's organic growth and competitive position and the unattributed statement touting continued growth of the commercial business.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, Defendant Angrick's statement in the press release touting "good progress" in the integration of GoIndustry was materially false and misleading because, as discussed more fully at ¶¶ 80, 82, *supra*, Defendants failed to disclose that GoIndustry's European division was not having success in that market.

**T.       August 7, 2013 – 3Q13 Earnings Call**

208.     On August 7, 2013, the Company hosted a conference call to discuss the earnings announcement.  During the call, Defendants Angrick and Rallo made a number of statements:

Angrick:

During Q3 Liquidity Services reported results in line with our revised guidance range provided on July 16, while also funding major investments in support of our long-term growth strategy.  *Margins in our core business expanded sequentially over Q2 as a result of operating leverage and efficiencies gained from a more streamlined and focused organization.*

We exited Q3 with zero debt and we continue to generate strong cash flows with an annual return on invested capital in excess of 50%.  *We have continued to make good progress repositioning our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth.*

*Fundamentally we are confident in our competitive position and our ability to achieve attractive organic growth over the next several years driven by our strong client service and continued investments in innovation.   Our recent organic growth rate does not reflect the full impact of the progress we're making with clients and prospects in the marketplace.*

*

Rallo:

*While we are not satisfied with our recent performance and our organic growth, we're making significant progress towards achieving our long-term growth goals.*   One, we continue to improve the quality and effectiveness of the sales organization, as well as the range of services we provide, resulting in new client wins and new programs with existing clients, many of which are global in nature due to the addition of capabilities from the GoIndustry acquisition.

While many of these programs have not ramped up as fast as we originally expected, the relationships that we are developing with these clients will drive strong results for shareholders over the long-term.

*

Colin, let me take the second part of the question which was the change in guidance for the fourth quarter.  Really it is driven by two factors – one is the retail supply chain which I discussed in detail in my earlier comments; we also discussed that in detail in our pre-announcement call.  But we are assuming that we will not see any substantial improvement in the fourth quarter over the third-quarter results, which obviously, as we talked about earlier, were below expectations.

I will tell you that we are seeing a change in the consumer electronics trend in the retail supply chain and I think things may be turning, but I'm just at this point not willing to put that into the forecast.   The GSS data will be out either later today or early tomorrow, that data will show that there was a pick up in the retail business, particularly the consumer electronics side.  But again, I'm not going to anticipate that occurring for the rest of the quarter.

The second piece is GoIndustry where, first off, there is a significant exposure to the European market.  Bill indicated in his comments a lot of recent wins globally.  And this is just a slow quarter for particularly non-US – the non-US segment primarily just due to holidays.   So I am anticipating again a similar range of GMV in the GoIndustry side of our business.

*

Angrick:

Look, I think the reality is we have had – if you look over last two, two and a half years, we had substantial growth.  And this was a difficult period of year-over-year comparisons with a lot of the progress we made one year ago.  And we should continue to grow in the consumer electronics and technology sectors, the product lifecycle issues do require a marketplace to get in front of those curves and the pace of adding new programs is likely to improve over time.  It was – it has been muted over the last four to six months and that is what has reduced the growth rate year over year.

**But we have had significant progress and success. Some of the clients that we've talked about today are in the consumer electronics vertical.  So we have a very attractive value proposition in that vertical; most of our clients have IT equipment, either operating assets inside their companies that need to be disposed of, or retailers that are dealing with returned inventory, seasonal inventory in the consumer electronics vertical.  So it will continue to have a strong presence in a roll and, yes, we believe that it is a growth sector for us.** (Emphasis added.)

209.   Additionally, on this earnings call, Defendant Angrick stated the following

regarding growth:

**We have continued to make good progress repositioning our GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth. Fundamentally, we are confident in our competitive position and our ability to achieve attractive organic growth over the next several years, driven by our strong client service and continued investments in innovation. Our recent organic growth rate does not reflect the full impact of the progress we are making with clients and prospects in the marketplace.**

- 100 -

A key investment initiative for us is enhancing our sales and marketing organization and expanding our global reach **through our acquisition of GoIndustry** to drive awareness of Liquidity Services as the trusted provider of choice in our industry.  (Emphasis added.)

210.    Similarly, Defendant Rallo stated:

One, we continue to improve the quality and effectiveness of the sales organization as well as the range of services we provide, resulting in new client wins and new programs with existing clients, many of which are global in nature due to the addition of capabilities from the GoIndustry acquisition.

While many of these programs have not ramped up as fast as we originally expected, the relationships that we are developing with these clients will drive strong results for shareholders over the long-term.

***Integration of the GoIndustry acquisition is proceeding as we discussed in our last quarterly earnings call.***

\*

Our European operations are being reorganized to more effectively serve our client base including consolidating smaller country offices while maintaining our ability to serve our clients across the entire European market. These actions have moved GoIndustry to almost breakeven and thus aligned the operations to be profitable in fiscal year 2014. (Emphasis added.)

211.    The statements made by Defendants Angrick and Rallo during the August 7, 2013 earnings call regarding progress integrating GoIndustry, Liquidity's competitive position, organic growth, and experience in the retail supply division were materially false and misleading.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it

had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants tried to assuage market concerns about GoIndustry by touting progress integrating and restructuring the European component of that business, they failed to disclose that, *inter alia,* GoIndustry's European division was not having success in that market.

212.    On this news and Defendants' misrepresentations, the Company's stock began to rise from its August 6, 2013 closing price of $28.97 per share up to $32.56 on August 15, 2013.

213.    On September 3, 2013, Liquidity was named to Fortune's 100 Fastest Growing Companies list.  Liquidity debuted as #48 on the list, owing to its 29% revenue growth, 64% EPS growth, and 39% annualized total return over the three-year period ending June 28, 2013.  On this news, the Company's stock price rose from $29.96 per share on September 6, 2013, to $34.44 on September 9, 2013.

214.    With the Company's stock price inflated, Defendant Angrick took full advantage: between September 9, 2013, and October 2, 2013, he sold 626,270 shares of stock for proceeds of  $22,133,454.66.   Not surprisingly, Defendant Angrick effected these sales prior to a disappointing announcement regarding sales on October 7, 2013.

215.    Specifically, on or about October 7, 2013, Liquidity announced that gross sales volume for September had fallen far below analyst expectations.  The Company reported gross sales for September of $77.7 million, 10% below sales for the prior year period.  On this news, the Company's stock declined from $32.77 on October 4, 2013, to $26.36 on October 10, 2013, as the market absorbed the news.

U.      **November 21, 2013 Press Release**

216.    On November 21, 2013, Liquidity issued a press release announcing the Company's financial results for the fourth quarter and full fiscal year 2013, ended September 30, 2013.   A Form 10-K was correspondingly filed with the SEC on the same day.   Liquidity reported revenue of $505.9 million for the year, an increase of approximately 6% from fiscal 2012, and revenue of $129.1 million for the quarter, up 6% from the prior year period.   Adjusted EBITDA for fiscal year 2013 was $104.6 million, a 5% decrease from the prior year, and $24.9 million for the quarter, an increase of approximately 8% from the prior year period.   The Company's GMV for fiscal 2013 was a record $973.3 million, an increase of approximately 13% from fiscal 2012, and $250.5 million for the quarter, up 4% from the prior year period.   Liquidity also reported that its Adjusted Diluted EPS was $1.75 per share for fiscal 2013 and $0.41 for the fourth quarter, an increase of approximately 3% from the prior year period.

217.    Liquidity also provided guidance for first fiscal quarter and full year 2014.   The Company expected GMV for fiscal year 2014 to range from $1.0 billion to $1.075 billion, and for first quarter GMV to range from $200 million to $225 million.   Adjusted EBITDA was expected to range from $100 million to $108 million for fiscal year 2014, and $14 million to $17 million for the first quarter.   Adjusted diluted EPS was expected to range from $1.60 to $1.76 per share for the fiscal year, and $0.20 to $0.24 for the first quarter.

218.    In connection with the release of the Company's financial results, Defendant Angrick made the following statements:

> Liquidity Services generated improved results during Q4-13 based on the expansion of our services with retail supply chain clients and strong growth in our public sector business highlighted by 33% growth in our GovDeals marketplace this quarter.   Both our retail supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the Company and *we continued to make progress with our integration of Golndustry to deliver profitable growth*

> ***going forward***. . . .   There are compelling opportunities to more broadly extend our technology platform, buyer liquidity and marketplace data to existing and new customers and partners.  During FY14 we will establish and fund a new directive focused on developing new on demand services in these areas to further penetrate and serve our target market.  We believe our continued investments in our people, technology platform and service offering position us well for long term profitable growth and market leadership. Liquidity Services remains focused on executing our long term growth strategy to ensure the Company is well positioned to drive attractive returns for shareholders.  (Emphasis added.)

219.    The financial results and guidance provided by the Company in the November 21, 2013 press release were materially false and misleading because they gave investors the impression of profitability and growth in the Company's divisions, as did Defendant Angrick's statement indicating continued progress in the GoIndustry integration, despite the fact that behind the scenes, Liquidity's business was suffering.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants tried to assuage market concerns about GoIndustry by touting progress integrating that business, they failed to disclose that GoIndustry's European division was not having success in that market.  Finally, as discussed at ¶¶ 83-89, *supra*, Defendants failed to disclose that, *inter alia*: (i) internal analyses at Network International demonstrated macroeconomic weaknesses in the energy vertical that

Defendants knew or were reckless in not knowing would have a material negative impact on Liquidity's financial operations; (ii) that Network International's sales had begun to suffer "a big slowdown" as a result of these macroeconomic weaknesses; and (iii) Defendants' own ill-conceived interventions into Network International's business were causing problems and alienating the segment's niche customer base.

### V.    November 21, 2013 – 4Q and FY2013 Earnings Call

220.    Also on November 21, 2013, the Company hosted a conference call to discuss its earnings.  During that call, Defendant Rallo represented that Liquidity "***had strong sequential growth in our retail supply chain marketplaces driven primarily from new consumer electronic programs with existing clients***."  (Emphasis added.)

221.    Also during that call, Defendants Angrick and Rallo made a number of other statements concerning the Company's growth initiatives, profitability, operating condition, and future prospects.  For instance, Defendant Angrick stated:

> During Q4, Liquidity Services reported results in line with our guidance range while also funding major investments in support of our long-term growth strategy. ***Growth during the quarter was driven by the expansion of our services with retail supply chain clients and strong growth in our public sector business, highlighted by 33% growth in our GovDeals marketplace.***  Both our retail supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the company, and ***we continue to make progress with our integration of GoIndustry to deliver profitable growth going forward.***

222.    In addition, with respect to growth and acquisitions, Defendant Angrick stated on the year-end earnings call that:

> Finally, ***I'm also pleased to report that the restructuring of our GoIndustry business is largely behind us, and we're now focused on driving awareness of Liquidity Services as the trusted provider of choice in our industry***.  We have a great story to tell backed by a proven track record of success. We have formed a new centralized marketing function and global brand council that will support our sales outreach by developing a strong aligned global brand message for the Fortune 1000 audience to increase awareness of our brand and reinforce our

market leadership. *We are encouraged by the progress of our capital assets group and we continue to expand our pipeline of new business with large multinational corporate clients* in our target markets, including biopharma, consumer packaged goods, energy, technology, and transportation.   (Emphasis added.)

223.   Likewise, Defendant Rallo represented to investors that:

We also saw *significant sequential growth in our commercial capital assets marketplaces, primarily as a result of new programs from our GoIndustry global platform*.

*We have completed the restructuring of the GoIndustry organization and are entering the second phase of the integration process during fiscal 2014, which is investing for growth. We will be combining the best attributes of the LSI technology platform with that of the GoIndustry technology platform while we continue to invest in the sales and marketing team to drive long-term growth.* (Emphasis added.)

224.   The statements made by Defendants Angrick and Rallo during the November 21, 2013 earnings call regarding progress integrating GoIndustry, Liquidity's growth, and the Company's experience in the retail supply division were materially false and misleading.   As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:   (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.   Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants tried to assuage market concerns about GoIndustry by touting completion of the restructuring of that business, they failed to disclose that, *inter alia,* GoIndustry's European

division was not having success in that market.  Finally, as discussed at ¶¶ 83-89, *supra*, Defendants failed to disclose that, *inter alia*: (i) internal analyses at Network International demonstrated macroeconomic weaknesses in the energy vertical that Defendants knew or were reckless in not knowing would have a material negative impact on Liquidity's financial operations; (ii) that Network International's sales had begun to suffer "a big slowdown" as a result of these macroeconomic weaknesses; and (iii) Defendants' own ill-conceived interventions into Network International's business were causing problems and alienating the segment's niche customer base.

225.    On this news, the Company's stock fell $4.87 per share, down to $21.13 from its previous close of $26.00 per share on November 20, 2013.

**W.      February 7, 2014 Press Release**

226.    On February 7, 2014, Liquidity announced its financial results for the first quarter of fiscal year 2014, and also filed its Form 10-Q with the SEC.  The Company reported revenue for the first quarter of $121.9 million, which was consistent with the prior year period.  Adjusted EBITDA for the quarter was $20.0 million, a decrease of approximately 17% from the prior year period.  GMV was $234.4 million, consistent with the prior year period.  The Company's adjusted diluted EPS was $0.32 per share, down 22% from the prior year period.

227.    In connection with the release of the Company's financial results, Defendant Angrick stated as follows in the press release:

> ***Liquidity Services generated better than expected financial results in Q1- FY14 driven by strong topline performance in our retail supply chain and municipal government businesses.  Our retail supply chain business saw sequential growth in GMV*** as we helped more OEM and retail clients create strategic value in the secondary market for consumer goods through our marketplace channels and service offering.  These results were partially offset by a sharp decline in our DoD Surplus business due to changing property mix which has impacted margins.  During the quarter, we continued to expand our GovDeals municipal government

business in both the U.S. and Canada driven by agencies' desire for more transparency, convenience and value in the sale of surplus assets. We also continued to invest in extending our technology platform, buyer liquidity and marketplace data with existing and new clients to unlock new opportunities during the quarter as our clients seek greater strategic value from the reverse supply chain. We believe our continued investment in innovation and strong client service positions us well to drive long term shareholder value. (Emphasis added.)

228.   In announcing its first quarter 2014 results, Liquidity also affirmed its full year 2014 guidance and offered guidance for the second quarter. The Company expected second quarter GMV of $220 million to $240 million, adjusted EBITDA of $20 million to $23 million, and adjusted diluted EPS of $0.33 to $0.37 per share.

229.   The financial results and guidance provided by the Company in the February 7, 2014 press release were materially false and misleading because they gave investors the impression of success and growth in the Company's divisions while, behind the scenes, Liquidity's business was suffering. Similarly, Defendant Angrick's statements concerning near-term successes in the Company's retail supply chain business created a misleadingly positive impression of the Company's financial position. As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*: (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe. Moreover, as discussed at ¶¶ 83-89, *supra*, Defendants failed to disclose that, *inter alia*: (i) internal analyses at Network

International demonstrated macroeconomic weaknesses in the energy vertical that Defendants knew or were reckless in not knowing would have a material negative impact on Liquidity's financial operations; (ii) that Network International's sales had begun to suffer "a big slowdown" as a result of these macroeconomic weaknesses; and (iii) Defendants' own ill-conceived interventions into Network International's business were causing problems and alienating the segment's niche customer base.

### X.    February 7, 2014 – 1Q14 Earnings Call

230.    Also on February 7, 2014, the Company hosted a conference call to discuss its earnings release.   During that call, Defendants Angrick and Rallo made several statements concerning the Company's growth, profitability, operations, and future prospects:

Angrick:

Liquidity Services generated better-than-expected financial results in Q1, driven by strong top-line performance in our retail supply chain and municipal government businesses, which both generated organic growth of over 20% during the quarter.

\*

These strong results were partially offset by a sharp decline in our DoD surplus business due to changing property mix, which has reduced growth and margins in this area of our business.

\*

**Second, many verticals in our capital assets client sectors are very slow this time of year, particularly energy and transportation.**   Those are major drivers to the March-quarter guidance.

\*

Rallo:

Yes, Colin, I'd also add – as you know, the March quarter is a big quarter for retail; but it's not going to offset everything going on with the federal business, as well as the capital assets that Bill indicated.   **As far as upside to the year, we had a decent range in there for the year.   We feel comfortable still with that range.**

We had a nice quarter this quarter.   And at this point in time, we are just – we're comfortable with those numbers.

\*

Angrick:

So forecast is driven by individual programs, individual client wins that we're planning to roll out during the course of the year.  I know that there's been a concerted effort to invest in our sales organization, our branding program, to drive awareness of our services; and that has led to a robust commercial pipeline, Jason.

And when you look at the type of business that we are signing, it's very impressive from our point of view – both relative to the competition and relative to change in the behavior of some of the large Fortune 1000s that we call on.

*

**We've had robust growth, both in the December quarter, and we see that continuing on the commercial side and the opposite on the DOD surplus side.**

*

Rallo:

**So when you look at GoIndustry, as you know, we have spent the last 18 months, really – I'm not counting this quarter – restructuring that business, which was completed the last fiscal year.  We came out with a fresh quarter here in the beginning of fiscal year 2014.  We are very pleased with what's going on in that business.**

So we would expect that business to be a run rate of around $130 million to $140 million, which is in line with what we told people we'd do, and then we would expect it to grow from there, with the addition of a lot of these new client wins that Bill discussed earlier.   (Emphasis added.)

231.    The statements made by Defendants Angrick and Rallo during the February 7, 2014 earnings call regarding the retail supply chain business, seasonal slowness in the energy vertical, growth of Liquidity's business, and the status of the GoIndustry business were materially false and misleading.  As discussed more fully at ¶¶ 64-73, *supra*, various confidential witnesses have detailed how Defendants not only had no reasonable basis to make the aforementioned representations but failed to disclose that, *inter alia*:  (i) Liquidity was facing heightened competition that was negatively impacting margins on new and renegotiated contracts; (ii) although it was adding new clients, Liquidity's profitability suffered as a result of its inability to maintain margins; (iii) the Company was unable to capitalize on synergies with its retail supply chain acquisitions, and therefore could not capture the margins and market

expansion it had expected; and (iv) the Company's exposure to mix changes in the retail supply chain was more significant than the market was led to believe.  Moreover, as discussed more fully at ¶¶ 80, 82, *supra*, although Defendants gave the appearance of candor by noting that GoIndustry had been subject to a restructuring process, they failed to disclose that, *inter alia,* GoIndustry's European division was not having success in that market.  Finally, as discussed at ¶¶ 83-89, *supra*, although Defendants noted certain weaknesses in the energy vertical for that quarter, they attributed these weaknesses to a cyclical slowdown, but failed to disclose that, *inter alia*: (i) internal analyses at Network International demonstrated macroeconomic weaknesses in the energy vertical that Defendants knew or were reckless in not knowing would have a material negative impact on Liquidity's financial operations; (ii) Network International's sales had begun to suffer "a big slowdown" as a result of these macroeconomic weaknesses; and (iii) Defendants' own ill-conceived interventions into Network International's business were causing problems and alienating the segment's niche customer base.

232.   On this news, the Company's stock closed at $24.61 per share on February 7, 2014, up $3.32 per share from its previous close of $21.29 on February 6, 2014.  In the weeks that followed, Liquidity's stock would continue to tick higher, closing at $26.05 on March 31, 2014.

### Y.   May 8, 2014 – The Truth is Revealed

233.   On May 8, 2014, Liquidity issued a press release that, in announcing its second quarter fiscal year 2014 earnings, shocked investors.  The Company reported revenue of $128.3 million for the quarter, a decrease of 1.5% from the prior year period, but Liquidity's GMV was $227.2 million, a decrease of 12% from the prior year period, adjusted EBITDA was $16.7 million for quarter – a stunning decline of *43%* from the prior year period – and adjusted diluted EPS was $0.26 – another drastic decline of *46%* from the prior year period.

234.    In connection with the release of the Company's financial results, Defendant Angrick made the following statements:

> *While GMV was within our expected results, our Adjusted EBITDA and Adjusted EPS were lower than expected due to mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe.  We also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment.*
>
> In addition, we continued to invest aggressively to integrate our marketplaces and global operations and develop new capabilities to achieve our long term goal of a diversified, multi-billion dollar commercial business that enables sellers and buyers of all sizes to easily manage, evaluate and monetize assets in the $150 billion reverse supply chain based on their industry, location and channel preferences.  At scale, Liquidity Services will provide shareholders with multiple high margin revenue streams that leverage our investments in game changing technology and global operations.  To achieve our future vision, we are undergoing a multi-year transformation of our business from independent marketplaces to an integrated global business and marketplace platform with a singular and superior user experience.  As we execute our transformation plan and manage the multi-year transition of our DoD surplus contract, consolidated results will be less reflective of our progress.  Therefore, investors should evaluate our progress based on our ability to grow the GMV and revenue of our commercial and municipal government business going forward.  (Emphasis added.)

235.    As a result of these struggles, and in a concession that it had vastly overstated its ability to generate growth and that its margins were significantly impaired, Liquidity was forced to substantially revise its forecast for the full fiscal year 2014.  The Company reduced its GMV forecast for fiscal year 2014 to $930 million to $975 million, down from its previous guidance of $1.0 billion to $1.075 billion.  Liquidity now expected adjusted EBITDA for the year to be $70 million to $80 million, down from its previous guidance of $100 million to $108 million.  Adjusted diluted EPS was revised for the year to range from $1.10 to $1.27, down from its previous guidance of $1.60 to $1.76.

236.    On this news, Liquidity's stock price plummeted *29.7%* to close at $12.17 per share on May 8, 2014, down from a closing price of $17.31 per share on May 7, 2014.

237.    Analysts reacted immediately to the Company's revelations.  On May 8, 2014,
*The Street* rated Liquidity a "hold," and reported that "Liquidity Services (LQDT) stock is
plunging Thursday after the Company missed first-quarter earnings and as guidance was
reduced."

238.    Likewise, on May 9, 2014, RBC Capital downgraded Liquidity to "sector
perform," citing the second-quarter results and the reduced guidance.

239.    Ultimately, the steep declines in adjusted EBITDA and adjusted EPS, in shocking
investors into a nearly 30% devaluing of Liquidity's stock, reveal that Defendants could no
longer conceal the financial and operational difficulties they had been concealing for several
quarters.  *First*, as a multitude of former employees have established, Defendants could not live
up to the growth story they publicly portrayed, as competition in the market was having a
devastating impact on margins, and correspondingly, earnings.  *Second*, Defendants could no
longer bury the difficulties the Company was experiencing in the capital assets business,
including the integration of the GoIndustry acquisition, particularly its toll on earnings.  *Third*,
Defendants were keenly aware of adverse macro trends in Network International's business (the
energy vertical) as early as August 2013, as well as the immediate negative effects in late 2013
resulting from Defendants' attempts to integrate Network International's systems and operations,
which completely undermines the Company's indication in May 2014 that "softness" in the
energy vertical had taken it by surprise.

## VIII.    UNDISCLOSED ADVERSE INFORMATION

240.    At all relevant times, the market for Liquidity common stock was open, well-
developed, and efficient.  As a result of the materially false and misleading statements and
failures to disclose described herein, Liquidity common stock traded at artificially inflated prices

during the Class Period.  Co-Lead Plaintiffs and the other members of the Class purchased or otherwise acquire Liquidity's common stock relying upon the integrity of the market price of that security and market information related to Liquidity, and have been damaged thereby.  If not for the materially misleading misrepresentations and omissions operating on the market, Liquidity's prevailing public stock price would have been substantially lower at all relevant times.

241.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Liquidity's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material, adverse, non-public information and misrepresented the truth about the Company, its business, and its operations, as alleged herein.

242.   At all relevant times, the specific material misrepresentations and omissions alleged in this complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by the Co-Lead Plaintiffs and the members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about the Company's success and growth, the integration of acquisitions, and the financial and operating condition of the Company.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Liquidity and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' false and misleading statements during the Class Period resulted in the Co-Lead Plaintiffs and other members of the Class purchasing Liquidity's stock at artificially inflated prices, thus causing the damages complained of herein.

## IX.    SCIENTER ALLEGATIONS

243.    As alleged herein, Defendants acted with scienter in that they issued and/or disseminated public statements during the Class Period which were materially false and misleading and which they knew or recklessly disregarded would artificially inflate the value of Liquidity's stock.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements in violation of the federal securities laws, and failed to make the necessary corrective disclosures.

244.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Liquidity, their control over, receipt, and/or modification of Liquidity's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Liquidity, participated in the fraudulent scheme alleged herein.

245.    The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including Defendants Angrick and Rallo.

### A.    Defendants' Knowledge of the Wrongful Conduct

246.    The flow of information within the Company, from the sales levels straight up to senior management, was open and direct at all relevant times.  Accordingly, members of senior management, including the Individual Defendants, were aware on a constant basis of the state of Liquidity's operations and financial performance, including, but not limited to, the status of retail and government contracts, trends in its market share, its margins, and the status of the integration of acquired companies.

247.    Former Liquidity employees are consistent in their attestation that protocols were in place so that senior management was constantly informed, through periodic reports and

meetings, of the state of the Company's operations.  Even for a company with as many divisions and subsidiaries as Liquidity, key information was uniformly transmitted up the chain in a formal, routinized process to senior management, including Defendants Angrick and Rallo.

248.   For instance, according to CW 9, a former Vice President of Business Development, GMV and margins were tracked very closely using a software system called LSI Admin, which was considered "the Bible" within Liquidity.  Through data entered into LSI Admin, weekly reports were generated for each account (Wal-Mart, for example) that broke down each account by sales and profitability.

249.   CW 2, a Senior Sales Executive who worked at Liquidity's DC headquarters for seven years – including the entirety of the Class Period – described how sales figures were entered into LSI Admin, which was accessible to his managers and all other employees with the proper clearance.  CW 2 reported to a sales manager, who reported to Vice President of Business Development, who reported to Vice President of Retail Supply Chain Group Cayce Roy, who reported to CEO Defendant Angrick.  According to CW 2, his sales numbers were reviewed with sales managers on a daily basis, and his managers discussed this data with their superiors on weekly Key Performance Indicator ("KPI") conference calls.

250.   CW 17, a former office manager at Government Liquidation, a Liquidity subsidiary, corroborates the use of the proprietary LSI Admin software system, explaining that sales, GMV, margins, costs, and other information were communicated from Liquidity's websites – including govliquidation.com – to the LSI Admin system.

251.   According to CW 1, a former Business Analyst and Contact Center Manager employed by the Company from October 2010 through November 2013, sales were reported up the chain to Vice President of Retail Supply Chain Group Cayce Roy via email on a weekly basis

on an extensive Excel spreadsheet.  CW 1 managed the B2B and B2C portions of Liquidity's Ebay "stores," as well as the liquidation.com website.  He dealt with big-box companies from whom Liquidity bought merchandise (such as Target, Best Buy, and Wal-Mart), and facilitated the sale of those items (which included food, clothing, and electronics) to smaller stores through Liquidity's Ebay stores and liquidation.com.  Every week, CW 1 emailed to Roy an Excel spreadsheet that contained approximately thirteen (13) tabs whose titles included B2B Sales, B2C Sales, Company Defects, Sales/Defects (Sales Divided by Defects), Refurbishing Customer Defects, and several others.

252.    CW 9 further detailed the manner in which information was communicated to senior management in regular meetings.  For example, CW 9 explained that he would meet with Cayce Roy, the Vice President of the Retail Supply Chain Group, to discuss their business segment, and that Roy would then meet with Defendants Angrick and Rallo.  According to CW 9, Roy had a standing one-on-one meeting with Defendant Angrick every Monday to discuss day-to-day issues in the Consumer business, and CW 9 knew about these weekly meetings because he would meet with Roy afterwards to discuss any feedback from Defendant Angrick. As CW 9 noted, leaders from Liquidity's other two divisions were meeting as frequently with Defendants Angrick and Rallo as Roy was.  In addition to these weekly meetings, Roy would meet with Defendants Angrick and Rallo in the weeks leading up to the quarterly and annual earnings releases.  CW 9 also commented that, after Roy left Liquidity in 2014, he had much more exposure to Defendants Angrick and Rallo, who he described as the "center of power" at the Company, and ultimately all management decisions were made by the two of them.

253.    The reporting process is further delineated by CW 18, former Senior Manager of Client Services in the Asset Recovery Division.  This individual was employed by the Company

for seven years, from July 2006 through January 2013.  During his tenure, he reported to Senior Director of Client Services Tom Stoerck, who reported to the Vice President of Business Development, who reported to President of Retail Supply Chain Group Cayce Roy, who in turn reported to Defendant Angrick.   According to CW 18, Liquidity's sales metrics were communicated up the chain as follows:  (i) items sold, inventory, sales, sales margins, GMV, cost input, and other metrics were culled from sales data and activity from Liquidity's website and captured in the Company's proprietary software system; (ii) this data was then transferred to an Excel spreadsheet, which became the Weekly KPI Report, and which contained approximately thirteen (13) tabs, such as sales volume per account, sales margins per account, GMV per account, returns per account, and cost input per account; (iii) the Weekly KPI Report was then transmitted up the chain to Roy, who used it at the weekly teleconference meetings that he conducted.  CW 18 participated in these weekly meetings, which were run by Roy and held at the beginning of each week.  Representatives of every department attended these meetings and discussed their respective KPI Reports, with the general focus being on revenue, margins, and GMV.  While Defendants Angrick and Rallo did not directly participate in these meetings, CW 18 believed Roy shared the weekly KPI Report information with Defendant Angrick.

254.    CW 3 also spoke of reports transmitted weekly via file-share on Liquidity's network.  According to CW 3, these reports would include sales volume and margins, as well as inventory levels, and would be accessed by managers up the chain – including Vice President of Channel Optimization Greg Bennett, Cayce Roy, and the Vice President of Business Development.

255.    CW 10 corroborated the transmittal of sales and inventory data to management through Excel spreadsheets.  He populated the spreadsheet with "capacity" (inventory levels)

figures every other week, and then participated in weekly teleconferences – which included Senior Director of Operations Preston Mosier and Vice President of Channel Optimization Greg Bennett – where the quality of materials was discussed.

256. CW 17 also reported the weekly-generated Excel spreadsheet through which information from Government Liquidation was conveyed up the chain. He stated that the spreadsheet reported inventory levels and other data to his supervisor, Cesar Rodriguez, who reported to Western Pacific Zone Director Christopher Hamm, who reported to Vice President of Operations Timothy Daniel, who reported to Defendant Angrick. The weekly spreadsheet included Disposal Turn-In Document ("DTID") figures, which were the numbers that DoD assigned to each item and were used by Government Liquidation as a reference number for keeping track of inventory, including the amount of each item and how long it remained in inventory.

257. According to CW 17, there were also weekly teleconference meetings every Monday. During these meetings, which were chaired by Western Pacific Zone Director Christopher Hamm, CW 17 and others would review each site's inventory levels, and the group would discuss inventory that was held 45 days or longer.

258. Similarly, CW 19, an Inside Sales Representative at Network International, a Liquidity subsidiary, from December 2012 through July 2014, stated that Network International's COO Gardner Dudley had weekly teleconference meetings with Defendant Angrick during which sales metrics were communicated.

259. CW 20 corroborated how revenue information was transmitted up to senior management on a daily basis. CW 20, a former B2C Channel Associate employed by Liquidity from June 2009 through April 2012, stated that his direct supervisor, Director of Retail

Marketing Todd Lusby, would email the department the daily revenue results on a daily basis, and Lusby's supervisor, Vice President of Channel Optimization Greg Bennett, was included in the daily updates. Lusby headed weekly departmental meetings in which revenues were discussed. According to CW 20, daily revenue information was passed from Lusby up the chain to senior executives, and managers of each department (including Lusby) met on a weekly basis with their respective vice presidents. Lusby always communicated revenue information to the "wider team," and there was "no way that anyone on the C-level [i.e., chief officer level] did not know what was going on." CW 20 also corroborated that the managers met on a weekly basis with their vice presidents to discuss revenues and projections.

260. A number of former employees, including CW 9, CW 11, and CW 5, also stated that the Company used a website called Salesforce.com to report and track sales, to generate forecasts, and for business development. CW 11, a former Senior Manager of Sales and Marketing Platforms who was employed by Liquidity from July 2011 through March 2014, had extensive knowledge of the Company's use of Salesforce, as his responsibilities included serving as the administrator of Salesforce. CW 11 also served as the administrator of Eloqua, Liquidity's marketing platform.

261. CW 13, a former Account Manager and Marketing Developer at Liquidity's Network International subsidiary from November 2011 until August 2013, commented that Liquidity, as well as Network International and other subsidiaries of the Company, used Eloqua for lead generation. He advised that it contained client information and was used to run email marketing campaigns across Liquidity's businesses. CW 13 concluded that Eloqua helped to build markets by fully integrating Liquidity's marketing systems, allowing each subsidiary to market to the other subsidiaries' customers. Separately, CW 13 explained that Network

International used the SalesLogix system "for everything."   According to CW 13, Network International used SalesLogix to generate "every type of report" for Liquidity, and many of these reports, at least some of which were formatted as PDF files or Excel spreadsheets, were run daily.   CW 13 believed that senior executives at Liquidity would have had access to SalesLogix and these reports.

262.   Given the existence of this reporting structure and the platforms used by the Company, the Individual Defendants were keenly aware of the status of sales generation, revenue figures, and margins in the retail segment, as well as the factors impacting those metrics, such as competition, difficulty integrating acquired businesses, and trends in the various verticals.   As the statements of these numerous former employees amply demonstrate, the Individual Defendants knew or were reckless in not knowing that, *inter alia*, margins were shrinking and the integration of certain acquisitions was not successful, and thus the Company's financial performance was being adversely impacted.

263.   Importantly, according to former Liquidity employees, inaccurate or otherwise manipulated sales information was being conveyed up to senior management.   Such data had the effect of inflating the retail division's sales.   But instead of stamping out this practice, senior management fostered and/or encouraged it.   For instance, according to CW 4, who had extensive visibility into internal sales numbers owing to his responsibility for compensating sales personnel, the retail segment was the hardest segment from which to obtain accurate sales figures, and the Retail Supply Chain Group's sales numbers were often incorrect during his tenure because Cayce Roy, Vice President of Retail Supply Chain Group, was manipulating his sales figures to benefit his group and maximize compensation and bonuses for his team.   CW 4 stated that the sales numbers for the retail segment in 2013 were inflated by at least 10%.   He

observed that more money was being paid out in compensation and bonuses to Cayce Roy's group than was being brought in. According to CW 4, the Retail Segment was "doing a lot of data massaging with credits and other things to inflate the numbers." When looking further into these issues, Mike Lutz, Vice President of Human Resources, informed him that ***Defendant Angrick did not want him "rattling Cayce [Roy]'s chain" and to leave the retail sales figures alone***. According to CW 4, "***I was actually told to back off from getting their numbers as per Bill [Angrick]***." (Emphasis added.)

264.   CW 1 believed the problem was more widespread than the retail division. According to him, Liquidity had a company-wide "culture" of overstating sales goals. He observed sales targets growing increasingly more unrealistic through 2013, and that the various divisions within the Company increasingly set optimistic expectations which were not met (and thus from which management ultimately had to publicly retreat). The divisions in which CW 1 worked – he managed online stores in B2B and B2C – got progressively worse throughout 2013 in terms of missing sales goals. According to CW 1, following quarterly telephonic meetings chaired by Defendants Angrick and Rallo, during which the sales targets for each division were announced, CW 1's colleagues in other divisions privately complained that the sales goals were unrealistic, that they had been missing them, and that there was "no way" they were going to meet the new goals. CW 1's direct supervisor, Mary Hageny, Director of Customer Support and Major Account Sales, used to state during team meetings that sales goals handed down by management were unattainable.

265.   These statements make clear that not only were the Individual Defendants clued in to the various factors negatively impacting Liquidity's growth and success, but that they were

taking active steps to conceal them from the market by setting unrealistic sales goals that formed the basis of the Company's revenue and earnings projections.

### B.    Insider Trading

266.    Throughout the Class Period, Defendant Angrick capitalized on his insider knowledge by engaging in stock sales when Liquidity's shares were trading at artificially inflated prices.  As the chart below indicates, Defendant Angrick sold 1,642,979 shares – approximately 25 percent of his total holdings – and reaped proceeds of *$68.2 million*:

| Date | # Shares Purchased/(Sold) | Price | Proceeds/(Cost) |
|---|---|---|---|
| 02/06/2012 | (38,800) | $40.35 | $1,565,580 |
| 02/10/2012 | (461,200) | $40.02 | $18,457,224 |
| 05/23/2012 | (66,233) | $63.05 | $4,175,990.65 |
| 05/24/2012 | (13,767) | $63.01 | $867,458.67 |
| 05/25/2012 | (7,424) | $63.06 | $468,157.44 |
| 05/29/2012 | (12,576) | $63.04 | $792,791.04 |
| 06/08/2012 | (35,000) | $63.73 | $2,230,550 |
| 06/11/2012 | (30,000) | $64.69 | $1,940,700 |
| 06/12/2012 | (5,300) | $63.02 | $334,006 |
| 07/05/2012 | 617[11] | $17.02 | ($10,501.34) |
| 07/05/2012 | 2,283[12] | $9.96 | ($22,738.68) |
| 07/05/2012 | 1,667[13] | $8.23 | ($13,719.41) |
| 09/06/2012 | 13,578[14] | $17.02 | ($231.097.56) |
| 09/06/2012 | 27,397[15] | $9.96 | ($272.874.12) |

---

[11] Exercise of employee stock options.

[12] Exercise of employee stock options.

[13] Exercise of employee stock options.

[14] Exercise of employee stock options.

[15] Exercise of employee stock options.

| | | | |
|---|---:|---:|---:|
| 09/06/2012 | 19,999[16] | $8.23 | ($164,591.77) |
| 09/06/2012 | 3,501[17] | $12.02 | ($42,082.02) |
| 09/27/2012 | (1,122) | $49.42 | $55,449.24 |
| 10/02/2012 | (11,781) | $46.65 | $549,583.65 |
| 03/04/2013 | (3,370) | $34.82 | $117,343.40 |
| 03/05/2013 | (62,230) | $33.81 | $2,103,996.30 |
| 03/06/2013 | (46,483) | $33.25 | $1,545,559.75 |
| 03/07/2013 | (8,080) | $33.26 | $268,740.80 |
| 03/20/2013 | (937) | $29.50 | $27,641.50 |
| 04/04/2013 | (4,837)[18] | $33.25 | $160,830.25 |
| 04/09/2013 | (105,000)[19] | $33.25 | $3,491,250.00 |
| 04/10/2013 | (5,000)[20] | $33.25 | $166,250.00 |
| 06/03/2013 | (122,000) | $40.13 | $4,895,860.00 |
| 06/04/2013 | (13,000) | $40.02 | $520,260.00 |
| 06/05/2013 | (65,000) | $39.15 | $2,544,750.00 |
| 08/08/2013 | 6,789[21] | $17.02 | ($115,548.78) |
| 08/08/2013 | 25,114[22] | $9.96 | ($250,135.44) |
| 08/08/2013 | 1,668[23] | $8.23 | ($13,727.64) |
| 09/09/2013 | (100,000) | $32.89 | $3,289,000.00 |
| 09/10/2013 | (100,000) | $34.27 | $3,427,000.00 |
| 09/11/2013 | (250,000) | $36.07 | $9,017,500.00 |
| 09/12/2013 | (150,000) | $36.95 | $5,542,500.00 |
| 10/01/2013 | (21,356) | $32.67 | $697,700.52 |

---

[16] Exercise of employee stock options.

[17] Exercise of employee stock options.

[18] Pursuant to 10b5-1 trading plan established 3/12/2013.

[19] Pursuant to 10b5-1 trading plan established 3/12/2013.

[20] Pursuant to 10b5-1 trading plan established 3/12/2013.

[21] Exercise of employee stock options.

[22] Exercise of employee stock options.

[23] Exercise of employee stock options.

| 10/02/2013 | (4,914) | $32.51 | $159,754.14 |
| **TOTALS** | 1,642,797 | | **$68,276,410.59** |

267.  **First**, Defendant Angrick's stock sales are suspicious in terms of amount.  The more than 1.6 million shares unloaded represents nearly **one quarter** of Defendant Angrick's entire holdings.  By contrast, in the two years prior to the Class Period, Defendant Angrick sold merely 875,621 shares for proceeds of only $15.3 million.  In other words, as the chart below demonstrates, he sold nearly **double** the number of shares during the approximately two-year Class Period than he did in the prior two-year period, earning **four-and-a-half times** the amount of money:

| Date | # Shares Purchased/(Sold) | Price | Proceeds/(Cost) |
|---|---|---|---|
| 9/3/2010 | (200) | $14.00 | $2,800.00 |
| 9/8/2010 | (9800) | $14.00 | $137,200.00 |
| 9/9/2010 | (10,000) | $14.41 | $144,100.00 |
| 9/10/2010 | (10,000) | $14.50 | $145,000.00 |
| 9/13/2010 | (10,000) | $14.75 | $147,500.00 |
| 9/14/2010 | (10,000) | $14.82 | $148,200.00 |
| 9/15/2010 | (10,000) | $14.59 | $145,900.00 |
| 9/16/2010 | (10,000) | $14.56 | $145,600.00 |
| 9/17/2010 | (10,000) | $14.45 | $144,500.00 |
| 9/20/2010 | (10,000) | $14.38 | $143,800.00 |
| 9/21/2010 | (10,000) | $14.75 | $147,500.00 |
| 9/22/2010 | (10,000) | $14.56 | $145,600.00 |
| 9/23/2010 | (10,000) | $14.46 | $144,600.00 |
| 9/24/2010 | (10,000) | $15.40 | $154,000.00 |
| 9/27/2010 | (10,000) | $15.70 | $157,000.00 |
| 9/28/2010 | (10,000) | $15.52 | $155,200.00 |
| 9/29/2010 | (10,000) | $15.84 | $158,400.00 |
| 9/30/2010 | (10,000) | $15.99 | $159,900.00 |
| 10/1/2010 | (10,000) | $16.00 | $160,000.00 |

| | | | |
|---|---|---|---|
| 10/1/2010 | 8,777 | - | - |
| 10/1/2010 | (3,945) | $15.97 | $63,001.65 |
| 10/4/2010 | (10,000) | $16.02 | $160,200.00 |
| 10/5/2010 | (10,000) | $16.35 | $163,500.00 |
| 10/6/2010 | (10,000) | $16.28 | $162,800.00 |
| 10/7/2010 | (5,502) | $16.26 | $89,462.52 |
| 10/8/2010 | (10,000) | $16.09 | $160,900.00 |
| 10/11/2010 | (10,000) | $16.29 | $162,900.00 |
| 10/12/2010 | (10,000) | $16.02 | $160,200.00 |
| 10/13/2010 | (10,000) | $16.24 | $162,400.00 |
| 10/14/2010 | (10,000) | $16.76 | $167,600.00 |
| 10/15/2010 | (10,000) | $17.11 | $171,100.00 |
| 10/18/2010 | (10,000) | $17.05 | $170,500.00 |
| 10/19/2010 | (10,000) | $16.91 | $169,100.00 |
| 10/20/2010 | (10,000) | $16.75 | $167,500.00 |
| 10/21/2010 | (10,000) | $16.68 | $166,800.00 |
| 10/22/2010 | (10,000) | $16.84 | $168,400.00 |
| 10/25/2010 | (10,000) | $16.94 | $169,400.00 |
| 10/26/2010 | (10,000) | $16.52 | $165,200.00 |
| 10/27/2010 | (10,000) | $16.65 | $166,500.00 |
| 10/28/2010 | (10,000) | $16.73 | $167,300.00 |
| 10/29/2010 | (10,000) | $16.41 | $164,100.00 |
| 11/1/2010 | (10,000) | $16.01 | $160,100.00 |
| 11/2/2010 | (10,000) | $16.00 | $160,000.00 |
| 11/3/2010 | (10,000) | $16.16 | $161,600.00 |
| 11/4/2010 | (10,000) | $16.85 | $168,500.00 |
| 11/5/2010 | (10,000) | $16.64 | $166,400.00 |
| 11/8/2010 | (10,000) | $16.40 | $164,000.00 |
| 11/9/2010 | (10,000) | $16.07 | $160,700.00 |
| 11/10/2010 | (10,000) | $15.80 | $158,000.00 |
| 11/11/2010 | (10,000) | $16.05 | $160,500.00 |
| 11/12/2010 | (10,000) | $15.79 | $157,900.00 |
| 11/15/2010 | (10,000) | $16.02 | $160,200.00 |
| 11/16/2010 | (10,000) | $15.43 | $154,300.00 |

| 11/17/2010 | (10,000) | $14.93 | $149,300.00 |
| 11/18/2010 | (10,000) | $15.19 | $151,900.00 |
| 11/19/2010 | (10,000) | $15.03 | $150,300.00 |
| 11/22/2010 | (10,000) | $15.17 | $151,700.00 |
| 11/23/2010 | (10,000) | $14.75 | $147,500.00 |
| 11/24/2010 | (10,000) | $15.08 | $150,800.00 |
| 11/26/2010 | (10,000) | $15.13 | $151,300.00 |
| 1/3/2011 | (10,000) | $14.42 | $144,200.00 |
| 1/4/2011 | (10,000) | $14.35 | $143,500.00 |
| 1/5/2011 | (4,260) | $14.12 | $60,151.20 |
| 1/18/2011 | (5,740) | $14.00 | $80,360.00 |
| 2/2/2011 | (10,000) | $14.54 | $145,400.00 |
| 2/3/2011 | (10,000) | $14.54 | $145,400.00 |
| 2/4/2011 | (10,000) | $16.43 | $164,300.00 |
| 2/7/2011 | (10,000) | $16.77 | $167,700.00 |
| 2/8/2011 | (10,000) | $16.33 | $163,300.00 |
| 2/9/2011 | (10,000) | $16.34 | $163,400.00 |
| 2/10/2011 | (10,000) | $16.37 | $163,700.00 |
| 2/11/2011 | (10,000) | $16.99 | $169,900.00 |
| 2/14/2011 | (10,000) | $16.70 | $167,000.00 |
| 2/15/2011 | (4,498) | $16.25 | $73,092.50 |
| 2/16/2011 | (10,000) | $16.59 | $165,900.00 |
| 2/17/2011 | (10,000) | $16.56 | $165,600.00 |
| 2/18/2011 | (10,000) | $16.17 | $161,700.00 |
| 2/22/2011 | (10,000) | $15.46 | $154,600.00 |
| 2/23/2011 | (4,300) | $15.14 | $65,102.00 |
| 2/24/2011 | (10,000) | $15.04 | $150,400.00 |
| 2/25/2011 | (10,000) | $15.71 | $157,100.00 |
| 2/28/2011 | (10,000) | $15.94 | $159,400.00 |
| 3/1/2011 | (10,000) | $16.01 | $160,100.00 |
| 3/2/2011 | (10,000) | $15.65 | $156,500.00 |
| 3/3/2011 | (10,000) | $15.72 | $157,200.00 |
| 3/4/2011 | (10,000) | $15.50 | $155,000.00 |
| 3/7/2011 | (10,000) | $15.60 | $156,000.00 |

| 3/8/2011 | (10,000) | $15.98 | $159,800.00 |
|---|---|---|---|
| 3/9/2011 | (10,000) | $15.75 | $157,500.00 |
| 3/10/2011 | (10,000) | $15.24 | $152,400.00 |
| 3/11/2011 | 5,700 | $15.25 | ($ 86,925.00) |
| 8/17/2011 | 15,981 | $9.96 | ($159,170.76) |
| 8/17/2011 | 11,667 | $8.23 | ($ 96,019.41) |
| 8/17/2011 | 80,499 | $12.02 | ($967,597.98) |
| 8/17/2011 | (100,000) | $17.63 | $1,763,000 |
| 9/14/2011 | (25,000) | $31.00 | $775,000.00 |
| 9/15/2011 | (25,000) | $32.00 | $800,000.00 |
| **TOTAL** | **875,621** | | **$15,384,656.72** |

268.    *Second*, the timing of these sales is suspicious.  For instance, over the course of an approximately three-week period beginning on May 23, 2012, and ending on June 12, 2012, when the stock was trading at or near Class Period highs of approximately $63 per share, Defendant Angrick sold 170,300 shares for proceeds of *$10.8 million*.  Immediately thereafter, the Company revealed to investors that it was not experiencing the same level of margin expansion as it recently had.  Consequently, by July 2, 2012, the stock had dropped more than $20 per share to close at $38.44 – but Defendant Angrick had already secured his nearly $11 million cash-out.

269.    Similarly, during the three trading days of June 3, June 4, and June 5, 2013, when the Company's stock closed at $40.11, $39.53, and $39.35, respectively, Defendant Angrick sold 200,000 shares for proceeds of *$7.9 million*.  It could hardly be coincidence that *the very next day*, on June 6, 2013, Liquidity reported weak sales for May 2013, at which point the stock dropped more than 10 percent on June 7, 2014.  By June 13, 2014, the Company's shares were trading at $31.46.

270.    Yet again, on four consecutive days in September 2013 – September 9 through September 12 – Defendant Angrick sold a total of 600,000 shares when the stock closed between $34.00 and $36.58.  During those four days, Defendant Angrick reaped an enormous windfall of *$21.3 million*.  A few weeks later, he pocketed an additional $857,000 on October 1 and 2, 2013, when the stock was trading at around $32.50.  Not surprisingly, Defendant Angrick orchestrated these sales just before the Company's October 7, 2013 announcement that its September sales had been soft, a disclosure that sent the stock plummeting more than 11 percent.  Liquidity shares were trading down at $26.36 on October 10, 2013, and had fallen to $21.13 by November 21, 2013.  Indeed, Defendant Angrick sold at opportune times, as the stock price never rose above $28.00 for the remainder of the Class Period.

271.    Nor can Defendant Angrick point to a legitimate Rule 10b5-1 stock sales plan to insulate his highly suspicious stock trades from scrutiny.  On June 15, 2012, Liquidity filed a Form 8-K with the SEC announcing that Defendant Angrick had entered into a written sales plan pursuant to Rule 10b5-1 (the "6/15/12 Plan").  Under this plan, a broker-dealer was authorized to sell up to a specified number of Defendant Angrick's shares, subject to minimum sales price thresholds.  The sales were expected to occur between June 20, 2012, and March 31, 2013.  The 6/15/12 Plan allowed for the sale of up to approximately 2.5 million of Defendant Angrick's shares and permitted the sale of up to 30,000 shares in a single day.  The Form 8-K also announced that the previous sales plan for Defendant Angrick, as announced in the Form 8-K, dated March 17, 2010, had been terminated following the sale of all shares covered under that plan.  Despite having entered into the 6/15/12 Plan, none of Defendant Angrick's numerous Class Period sales were actually made under that plan.  Rather, once the plan was instituted, Defendant Angrick did not engage in a single purchase or sale, save for exercising options on a

mere 4,567 shares on July 5, 2012.  On August 3, 2012 – a paltry six weeks after announcing the 6/15/12 Plan – Defendant Angrick severed the plan, simultaneously making the vague (and ultimately empty) promise that he was exploring options to purchase shares of the Company's common stock.  Defendant Angrick later adopted a new 10b5-1 plan on August 8, 2013 (the "8/8/13 Plan").  However, a mere three sales of stock were effected pursuant to the 8/8/13 Plan.

272.    Significantly, Defendant Angrick's insider selling did not go unnoticed by his colleagues at the Company.   According to CW 9, a former Vice President of Business Development and six-and-a-half-year veteran of Liquidity who was employed by the Company from November 2007 through April 2014, there was a tremendous amount of jealousy and envy among CW 9's colleagues over Defendant Angrick's stock sales.  The antipathy regarding these lucrative insider transactions rose to such a level that Cayce Roy, the Vice President of Retail Supply Chain Group, was forced to address these concerns within his division.

273.    Likewise, CW 4, a former Director of Global Compensation, stated that Defendant Angrick and other members of senior management were selling "a lot" of their shares at a time when they clearly had access to information indicating that the DoD business was in peril and the retail segment was struggling.  He was also aware that certain executives were selling off stock when the price was trading high, including, for example, in October 2012.  Consistent with that statement and as the chart above demonstrates, at the end of September and beginning of October 2012, Defendant Angrick sold more than 12,900 shares for a profit of more than $600,000.

X.    NO SAFE HARBOR

274.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in

this Complaint.  First, many of the statements alleged herein to be false and misleading relate to historical facts or existing conditions.  Second, any purported "forward looking statements" were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass.  Third, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

A.   **Many of Defendants' False and Misleading Statements Were Not Forward-Looking**

275.   For example, the alleged false and misleading statements below (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objectives:

(a)   Statements concerning financial results, i.e., ¶¶ 99-101, 105-106, 110-112, 115-116, 119, 129, 133, 137, 140, 145, 177, 187, 191-193, 200, 203, 208, 216, 218, 220-221, 226, 227, 230;

(b)   Statements regarding  the success of the retail division, i.e., ¶¶ 105-106, 110-111, 113, 117, 135, 137, 146, 155, 159, 167, 179-180, 187, 192, 195, 200, 206, 208, 218, 220-221, 227, 230;

(c)   Statements regarding the success of the capital assets division, i.e., ¶¶ 100, 104-106, 113, 130, 134, 146, 156, 160, 167, 178, 187, 189, 191, 200, 209, 210, 218, 221-223, 230;

(d)   Statements regarding the status of competition, i.e., ¶¶ 102, 104, 119, 141, 146, 149, 154, 158, 163, 165, 185, 200, 205, 208-209, 230;

(e)     Statements concerning the integration of GoIndustry, i.e., ¶¶ 126, 130, 132, 134, 137, 146, 149, 160-161, 174, 178, 180, 189, 193-194, 200, 205, 208, 210, 218, 221-223, 230; and

(f)     Statements concerning current growth, including current progress towards meeting growth goals, i.e., ¶¶ 102, 104, 107, 118, 136, 141, 146, 158, 163, 177, 191, 193, 205, 208-209, 218, 227, 230.

276.   To the extent any of these statements might be construed to touch on future intent, they are mixed statements of present facts and future intent and not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

## B.     Defendants' False and Misleading Statements Were Not Accompanied by Meaningful Cautionary Language

277.   None of Defendants' statements were accompanied by meaningful cautionary language that identified important factors that could cause actual results to differ materially from any results projected.

278.   To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already manifested.   As detailed herein, at the time Defendants were touting strong results and growth at the Company, Defendants knew that, *inter alia*: (1) its retail divisions were already suffering shrinking margins and reduced revenue; and (2) its capital assets division was suffering from a decline in sales, in part due to the problematic and unprofitable acquisition of GoIndustry, as well as with issues with its Network International business segment.   Thus, vague warnings regarding, for example, how:  failure to integrate an acquired business "***may***" negatively affect Liquidity, that margins "***may***" decline, or that competitive pressure "***could***" adversely affect Liquidity's business, were

insufficient because they failed to warn that the risks had already occurred when Defendants made their false and misleading statements.

### C.       Defendants Knew that the Risks they Warned of Had Already Come to Pass

279.    To the extent there were any forward-looking statements that were identified as such at the time made, Defendants are liable for those statements because at the time each statement was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by an executive officer of Liquidity who actually knew that each such statement was false and/or misleading when made.

## XI.    LOSS CAUSATION

280.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Liquidity common stock and operated as a fraud or deceit on Class Period purchasers of Liquidity common stock.   Defendants accomplished this by touting the Company's success, new business, growth opportunities and financial outlook while misrepresenting the Company's current and future profitability and prospects in two of its three business segments – its retail and capital assets divisions.   Defendants failed to disclose known challenges and risks in (1) Liquidity's retail division, including shrinking margins and reduced revenue, and (2) its capital assets division, including the problematic and unprofitable acquisition of GoIndustry, a decline in sales, and cross-platform integration issues with Network International.

281.    As Defendants' prior misrepresentations and fraudulent conduct were disclosed, and as the undisclosed risks and challenges manifested and became apparent to the market, the

price of Liquidity common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

282.    As a result of their purchases of Liquidity common stock during the Class Period, Co-Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements, and failure to disclose known risks, had the intended effect and caused Liquidity's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $66.57 per share on May 10, 2012.   On May 8, 2014, the day after Liquidity disclosed that it had greatly overstated the Company's financial outlook, growth potential, ability to generate new business and the need to transform its business model, Liquidity's stock closed at $12.17.

283.    Between June 20, 2012, and May 7, 2014, selective information was revealed about Liquidity's financial performance and outlook, which had a material adverse impact upon Liquidity's stock price without revealing the full extent of the known risks and challenges facing the Company.   Analysts following the Company downplayed the significance of these partial disclosures, accepting Defendants' efforts to mitigate and blunt the truth.   Those disclosures include:

> a.  June 22, 2012 revelation by Rallo to investors attending a conference sponsored by Stifel Nicolaus that margins may not continue to grow as in the past. Liquidity's stock dropped 8.82%.   Two days later, analysts with Roth Capital Markets issued a report opining that Rallo's comments "were largely misconstrued," and contributed to the decline in Liquidity's shares.

> b.  July 1, 2012 report from a short-selling research firm, Off Wall Street Consulting Group, Inc., claiming:  (1)  DoD business, which accounts for most of Company's

profits, should decline as realignment of overseas bases winds down; (2) non-DoD business is unlikely to drive the earnings growth that investors expect; (3) acquisitions generally have been used to supplement reported growth and that the acquisition of Jacobs Trading Company was simply an effort to buy earnings, but Jacobs' prospects and performance rely on its contract with Walmart, which expires in 2016; (4) competition is increasing; (5) customer concentration poses a significant risk; (6) the acquisition of [GoIndustry] DoveBid is questionable as its business has been deteriorating over the past two years.  Stock dropped 24.89% the next day, although on July 2, 2012, an analyst at Stifel Nicolaus called the report "meritless" and claimed that Off Wall Street Consulting incorrectly refers to "concentration risk" in Liquidity's GMV.  The Stifel Nicolaus analyst also stated that "[t]he report is incorrect in suggesting that margin upside has been largely due to government contracts. . . .  The incremental margin is coming from the fastest growing segment, Commercial, which was also confirmed by management."  Oppenheimer issued a research report on July 3, 2012, stating that the "sell" report contained factual inaccuracies and "over-reaching" conclusions, and kept its Outperform rating on the Company's stock.

c.  September 12, 2012 reduction in price target by Stifel Nicolaus, citing a decline in GMV in August compared to July and sales that were lower than forecast. Liquidity's stock declined 8.68%.

d.  November 29, 2012 press release, Form 10-K, and statements by Defendants Angrick and Rallo during a conference call with securities analysts, both touting growth in market share, performance, and opportunities for future growth, but

also reporting a drop in first quarter and fiscal 2013 guidance, citing challenging economic conditions and the need to invest in GoIndustry.  Liquidity's shares declined 13.49%.  Certain media sources attributed this decline to Defendants' statements about macroeconomic conditions, as opposed to operational concerns within the Company.  For instance, an article in the AP on November 29 stated as follows:  "Shares of Liquidity Services, Inc. tumbled more than 17 percent in Thursday morning trading, after the online auction operator posted a 77 percent jump in fiscal fourth-quarter net income, *but warned that global economic conditions remain tough.*"  (Emphasis added.)  The article further noted that "Liquidity Services said that while the economy has improved, *it remains cautious about the effect of volatile economic conditions on retail and industrial supply chains*, as well as GDP growth."  (Emphasis added.)   Janney Capital Markets gave Liquidity a "buy" rating on November 29, 2012, citing improving Commercial growth as a reason.  On the same day, Oppenheimer gave Liquidity an "Outperform" rating, saying that "Retail drives F4Q upside."  Thus, for the reasons articulated above in ¶¶ 79-80, 82, the market absorbed a message from Defendants that did not reflect the truth of what was being experienced within the Company.  Likewise, on December 4, 2012, a report issued by Barrington Research maintained an "outperform" rating on the Company, its highest rating.

e. January 16, 2013 press release providing preliminary disclosure of Q1 GMV falling below guidance.  Liquidity's stock dropped 4.33%.  Oppenheimer reported that Liquidity pre-announced "weaker than expected F1Q GMV driven by softer

capital asset sales," also saying that "Capital energy assets responsible for the miss."

f. January 31, 2013 press release and earnings call touting growth and opportunities while also announcing a reduction in full year guidance attributable to a restructuring of GoIndustry, reduced earnings and GMV from GoIndustry, reduced GMV from liquidation.com, and "[a]s far as the growth rate for the retail business for the rest of the year, we see a lowering of that growth rate from our prior expecations."  Liquidity's shares fell 22.4%. Notwithstanding, Deutsche Bank, Janney Capital Markets, Benchmark, and Roth Capital Partners maintained a "Buy" rating on Liquidity's stock, while Barrington Research and Oppenheimer maintained an "Outperform" rating.  Additionally, the market absorbed the Company's news as a reflection of macroeconomic conditions, as opposed to the true operational concerns.  Accordingly, an article published by the AP on the same day observed that "Liquidity Services Inc.'s shares sank Thursday after the online auction company cut its earnings outlook on the *anticipated impact of the weak economy*. . . .  Liquidity Services said that while economic conditions have improved, its overall outlook remains cautious due to the *volatility in the broader environment*."  (Emphasis added.)

g. June 6, 2013 report by RBC Capital Markets reflecting Liquidity's announcement of lower than expected May GMV growth.  Liquidity's stock declined 10.38% on June 7, 2013.

h. July 16, 2013 press release pre-announcing disappointing preliminary third-quarter 2013 results and that it would be lowering guidance for the year,

attributing the decline to lower GMV in the Company's capital assets and retail divisions.  Liquidity's shares fell 7.88%.

i.   October 7, 2013 disclosure of soft September 2013 sales compared to July and August.  Liquidity's stock declined 11.53%.

j.   November 21, 2013 press release lowering 2014 guidance, 10% below consensus estimates for 2014.  Liquidity's stock declined 18.73%.

284.   While all of these partial disclosures revealed pieces of information that cast some doubt on Defendants' bullish claims that Liquidity would continue to grow and achieve guided profit levels, none of them provided investors with anything close to the full picture of the known risks and challenges facing the Company and its ability to achieve the guidance levels Defendants provided the market.

285.   On May 8, 2014, Liquidity issued a press release that finally revealed that Defendants had greatly overstated the Company's growth potential and its ability to generate new business and that as a result, the undisclosed risks and challenges facing the Company had materialized:  earnings for the second quarter, 2014, in all of the Company's markets – DoD surplus, retail, and capital assets – were significantly below guidance and a "multi-year transformation of [the] business," which would adversely impact results going forward, was required.   Defendants also disclosed softness in Liquidity's energy vertical – Network International.  Liquidity's stock declined 29.6% on the news.   The next day, an analyst with RBC Capital Markets stated "we will step to the sidelines until management builds back credibility," while downgrading the stock and reducing the share price target from $30 to $15. Janney Capital Markets, Oppenheimer, and Benchmark also lowered their ratings on Liquidity.

286. By concealing from investors the adverse facts detailed herein, and by failing to disclose the risks known to them, Defendants presented a misleading picture of Liquidity's business and prospects. As the truth about the Company was revealed to the market and as the Company publicly acknowledged the need to transform its business model and completely re-set guidance, those risks manifested, and the price of Liquidity common stock fell significantly. These declines removed the inflation from the price of Liquidity common stock, causing real economic loss to investors who had purchased Liquidity common stock during the Class Period.

287. The declines in the price of Liquidity common stock after each partial disclosure and the May 8, 2014 final corrective disclosure came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Liquidity common stock negate any inference that the loss suffered by Co-Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

288. During the Class Period, the price of Liquidity stock declined as the true state of Liquidity's operations was revealed to the investing public.

289. The economic loss, *i.e.*, damages, suffered by Co-Lead Plaintiffs and the other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Liquidity common stock and the subsequent significant decline in the value of Liquidity common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.  APPLICATION OF PRESUMPTION OF RELIANCE: <u>FRAUD ON THE MARKET</u>

290.    Co-Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

291.    In the alternative, Co-Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, in that, among other things:

    a.  as a regulated issuer, Liquidity filed periodic public reports with the SEC;

    b.  Liquidity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

    c.  several hundreds of thousands of shares of Liquidity stock were traded on a weekly basis, demonstrating a strong presumption of an efficient market;

    d.  Liquidity was followed by numerous analysts that issued reports about the Company;

    e.  new, company-specific information was rapidly reflected in the Company's stock price; and

    f.  dozens of market makers made a market in the Company's stock, which was listed on the NASDAQ, a highly automated market.

## <u>COUNT I</u>

### For violations of Section 10(b) of the Exchange Act <br> <u>and Rule 10b-5, against all defendants.</u>

292.    Co-Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

293.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

294.    As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.   Defendants intended to and did, as alleged herein:   (i) deceive the investing public, including Co-Lead Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Liquidity common stock; and (iii) cause Co-Lead Plaintiffs and members of the Class to purchase Liquidity common stock at artificially inflated prices.

295.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Co-Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

296.    As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Co-Lead Plaintiffs and the other members of the Class who purchased Liquidity common stock during the Class Period.

297.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Liquidity common stock, Co-Lead Plaintiffs and other members of the Class purchased Liquidity common stock at artificially inflated prices during the Class Period.  But for the fraud, Co-Lead Plaintiffs and members of the Class would not have purchased Liquidity common stock at such artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Liquidity common stock declined precipitously and Co-Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchases of Liquidity common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

298.    By virtue of the foregoing, Defendants are liable to Co-Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For violations of Section 20(a) of the Exchange Act
### and Rule 10b-5, against the Individual Defendants.

299.    Co-Lead Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

300.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

301.    As alleged above, Liquidity violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of Liquidity's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  This fraudulent conduct was

undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

302.     As set forth above, the Individual Defendants were controlling persons of Liquidity during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations.

303.     By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Liquidity, including participating in writing or reviewing Liquidity's public statements, reports, press releases, and SEC filings alleged herein to be misleading prior to and/or shortly after they were issued and thus had the ability and opportunity to prevent their issuance or cause them to be corrected, and thereby culpably participated in the fraud alleged herein.

304.     These Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Co-Lead Plaintiffs and the other members of the Class who purchased Liquidity common stock during the Class Period.

305.     In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Liquidity common stock, Co-Lead Plaintiffs and other members of the Class purchased Liquidity common stock at an artificially inflated price during the Class Period.  But for the fraud, Co-Lead Plaintiffs and members of the Class would not have purchased Liquidity common stock at artificially inflated prices.  As set forth herein, when the true facts were subsequently disclosed, the price of Liquidity common stock declined precipitously and Co-Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result

of their purchases of Liquidity common stock at artificially inflated prices and the subsequent

decline in the price of that stock when the truth began to be disclosed.

306.    By reason of the foregoing, the Individual Defendants are liable to Co-Lead

Plaintiffs and the members of the Class as controlling persons of Liquidity in violation of Section

20(a) of the Exchange Act.

## PRAYER FOR RELIEF

Co-Lead Plaintiffs seek relief and judgment, as follows:

1. Determining that this action is a proper class action and certifying Co-Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding compensatory damages, including interest, in favor of the Co-Lead Plaintiffs and the other Class members against all of Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

3. Awarding Co-Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Granting any other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Co-Lead Plaintiffs hereby demand a trial by jury.


Dated: December 15, 2014                    Respectfully submitted,

                                            /s/ Mark S. Willis
                                            **SPECTOR ROSEMAN KODROFF**
                                            **& WILLIS, P.C.**
                                            Mark S. Willis
                                            1101 Pennsylvania Avenue, N.W.
                                            Suite 600
                                            Washington, D.C. 20004
                                            Tel.:  202.756.3601
                                            Fax:  202.756.3602

Andrew D. Abramowitz
Daniel J. Mirarchi
Joshua B. Kaplan
1818 Market Street
Suite 2500
Philadelphia, PA 19103
Tel.:  215.496.0300
Fax:  215.496.6611

*Counsel for Caisse de dépôt et placement du Québec and Co-Lead Counsel for the Class*

Jonathan Gardner
Mark S. Goldman
Carol C. Villegas
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY  10005
Tel.:  212.907.0700
Fax:  212.818.0477

*Counsel for the Newport News Employees' Retirement Fund and Co-Lead Counsel for the Class*