**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEONARD HOWARD, *Individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>LIQUIDITY SERVICES, INC., *et al,*<br><br>Defendants. | Civil Action No. 14-1183 (BAH)<br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

The co-lead plaintiffs, Caisse de dépôt et placement du Québec ("Caisse") and the

Newport News Employees' Retirement Fund ("NNERF"), bring this proposed shareholder class

action lawsuit on behalf of themselves and all others similarly situated, against Liquidity

Services, Inc. ("LSI"), the company's Chief Executive Officer ("CEO") William Angrick, and

Chief Financial Officer ("CFO") James Rallo, pursuant to sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), for disseminating "materially false and

misleading information" and omitting "other material information that artificially inflated

Liquidity's stock price."  Amended Compl. ("Am. Compl.") ¶ 1, ECF No. 35.[1]  Relying heavily

on the fact that the "*[p]laintiffs do not challenge the accuracy of any of LSI's reported historical

financial or operating results*," Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 1 (emphasis

in original), ECF No. 40, the defendants have moved to dismiss the plaintiffs' 145-page

Amended Complaint.[2]  For the reasons set forth below, and in accordance with recent guidance

---

[1]     The proposed class is defined in the Amended Complaint as "all persons and entities who purchased or otherwise acquired Liquidity common stock between February 1, 2012, and May 7, 2014, inclusive."  Am. Compl. ¶ 1.

[2]     The defendants have requested oral argument on the pending motion, Defs.' Mot. Dismiss ("Defs.' Mot.") at 1, ECF No. 40, but given the sufficiency of the parties' written submissions to resolve the pending motion, this request is denied.  *See* LCvR 7(f) (stating allowance of oral hearing is "within the discretion of the court").

from the D.C. Circuit, *In re Harman Intern. Indus., Inc. Sec. Litig.*, 791 F.3d 90 (D.C. Cir. 2015), this motion is denied in part and granted in part.

## I.        BACKGROUND

LSI, founded in 1999, is an online auction marketplace for "surplus and salvage assets" for which service Liquidity retains a percentage of the sale proceeds. Am. Compl. ¶ 37. LSI is comprised of three business divisions—the retail division, which sells consumer goods, *id.* ¶ 46; the capital assets division, which sells "large items such as material-handling equipment, rolling stock (such as trucks or military tanks), heavy machinery, and scrap metal," *id.* ¶ 48; and the public sector division, which "enables local and state government entities . . . to sell surplus and salvage assets," *id.* ¶ 51. The capital assets division is further divided by type of seller: commercial sellers and the Department of Defense ("DoD"). *Id.* ¶ 48. LSI "commonly refers to the 'commercial' capital assets business to describe the non-DoD portion of its capital assets business. *Id.*

The plaintiffs allege that the majority of LSI revenue comes from its "exclusive right to manage and sell substantially all DoD scrap property." *Id.* ¶ 2. Consequently, the company's relationship with DoD is "vital to the overall health of the Company." *Id.* ¶ 3. In 2012, DoD renewed, until 2014, two contracts with LSI: a non-rolling surplus goods contract and a scrap goods contract. *Id.* ¶ 50. As the contract expiration date of 2014 approached, however, "[f]ear was mounting within all levels of the Company" that the contracts with DoD, which were "subject to a competitive bidding process," would not "be renewed on the same favorable terms, or even renewed at all." *Id.* ¶ 3; *id.* ¶ 58 ("As the renewal period for Liquidity's lucrative DoD Surplus Contract loomed, and in the face of growing competition in that marketplace, Defendants grew increasingly concerned that it would not be renewed or extended."). Therefore,

LSI embarked on an expansion of its business in order to "lessen its substantial dependence on the government contracts market," *id.* ¶ 3, by "acquiring competing businesses," *id.* ¶ 4.

Based in part upon information supplied by twenty confidential witnesses, including a vice-president, directors and other senior managers of LSI components, the plaintiffs allege that from February 1, 2012 to May 7, 2014 (the "Class Period"), the defendants constructed a story of sustained growth and expansion of LSI's business outside of the DoD contracts by making fraudulent and misleading public statements on fifteen separate days over nine consecutive fiscal quarters regarding the growth of its non-DoD business—particularly emphasizing the "two pillars of growth: (1) 'organic' growth ***through sustained margins*** and improvements in client penetration and services; and (2) 'inorganic growth ***through Liquidity's acquisition strategy***." *Id.* ¶ 5 (emphasis in the original).  The plaintiffs allege that these misrepresentations artificially inflated stock prices throughout the Class Period, *id.* ¶ 60, and that the defendant CEO exploited this "wave of artificial stock inflation" with "strategically timed stock sales during the Class Period" that "paid him ***$68.2 million***," *id*. ¶ 18 (emphasis in original).

The plaintiffs quote extensively from public statements made in press releases, earnings calls, and filings with the Securities Exchange Commission ("SEC") for each of the nine fiscal quarters.  The pertinent statements are summarized below.

### A.      Public Releases in 2012

#### 1.      First Quarter 2012

Starting on February 1, 2012, upon release of its first quarter 2012 financial results, LSI allegedly began building a narrative that its "[r]ecord GMV [gross merchandising volume] results were driven by ***growth in the volume of capital assets sales across our commercial and government clients***, and benefited from improved merchandising, penetration of existing clients

and ***expanding market share***." Am. Compl. ¶ 100 (emphasis in original) (quoting defendant CEO's statement accompanying Form 8-K, dated February 1, 2012); Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply"), Ex. 5 (8-K, dated Feb. 1, 2012), ECF No. 48-6.[3]  As such, LSI suggested that the company's growth was partially attributable to its non-DoD business and "organic growth . . . principally from using data and expertise to enhance the value of the assets we sell, penetrating existing client relationships, and adding new sellers to our platform."  Am. Compl. ¶ 105 (quoting defendant CEO's statement during Feb. 1, 2012 earnings call).  In particular, the defendant CEO touted during the February 1, 2012 earnings call with analysts "***[w]e are increasing the demand side of [LSI's] marketplace to drive higher returns on the assets we sell***," "we continue to add new Fortune 500 clients, including retailers, manufacturers and industrial corporations."  *Id.* (emphasis in original).  During the earnings call, the defendant CFO explicitly attributed LSI's "***strong results for the quarter***" to the "***record volume in both [LSI's] commercial capital assets and retail supply chain verticals***," *id.* ¶ 106 (emphasis in original), noticeably leaving out reference to the renewed DoD contracts, *id.* ¶ 50.

Despite public statements of growth in the non-DoD business, the plaintiffs allege that, according to a former LSI Senior Sales Executive, margins began to decline in the retail division "as early as March 2011," and "declined again during 2012."  *Id.* ¶ 69.  Indeed, a former LSI Business Analyst and Contact Center Manager observed that "GMV and margins trended downwards" in the retail division "during his three-year tenure," from October 2010 through November 2013, "due to 'new players on the block,'" and margins were compressed due to "competition forc[ing] Liquidity to renegotiate with big-box stores."  *Id.* ¶ 67.

---

[3]     Gross Merchandise Volume, or GMV, "is a metric often provided by online sellers and which Liquidity defines as a measurement of 'the total sales value of all merchandise sold through [LSI's] marketplaces during a given period.'"  Am. Compl. ¶ 38.

Stock prices surged from $34.51 per share at the close of January 31, 2012 to $39.36 at the close of February 2, 2012.  *Id.* ¶ 108.  The defendant CEO sold a total of 500,000 shares on February 6, 2012, and February 10, 2012, for $40.35 and $40.02 per share, respectively.  *Id.* ¶ 266

### 2.     Second Quarter 2012

According to the plaintiffs, the public statements touting the financial performance of LSI's retail and commercial capital assets divisions continued throughout the Class Period, even as internal evaluations showed weaker profits.  On May 3, 2012, LSI released its financial results for the second quarter of 2012, which exceeded previous guidance, *id.* ¶ 110, and the defendant CEO emphasized in the accompanying statement that the "*[r]ecord GMV results were primarily driven by growth in the volume of goods sold in [LSI's] retail supply chain and municipal government marketplaces by existing and new clients*," *id.* ¶ 111 (quoting LSI Press Release, dated May 3, 2012) (emphasis in original).  Similarly, during the earnings call on the same day, the defendant CFO stated "*[o]ur strong results for the quarter were driven by record volumes in both our retail supply chain group, which has its seasonable high in the second quarter, and public sector verticals*.").  *Id.* ¶ 117 (emphasis in original).  Despite averments from multiple confidential witnesses that the retail business was already experiencing deteriorating margins due to heightened competition, *see, e.g.*, *id.* ¶ 69, the defendant CFO downplayed the issue, explaining on an earnings call that "as our mix of business changes . . . more to a consignment model, if we have higher levels of capital assets under the consignment model, that margin just mathematically goes down."  *Id.* ¶ 119.  While the defendant CFO admitted that "*margins will bounce around a little bit from quarter-to-quarter*," he opined that "*I do believe that we can maintain the solid margins we have*."  *Id.* (emphasis in original).

On May 9, 2012, LSI announced its acquisition of GoIndustry.  *Id.* ¶ 122.  Between May

23, 2012 and June 12, 2012, the defendant CEO sold 170,300 shares of stock at prices ranging

from $63.01 to $64.69, up more than $9 per share from the per share price of $54.93 on May 2,

2012, immediately prior to the announcements.  *Id.* ¶¶ 120, 266.

### 3.   Third Quarter 2012

On July 5, 2012, LSI announced the completion of its acquisition of GoIndustry.  *Id.* ¶

126.  Later that month, on July 31, 2012, LSI announced its third quarter financial results.  *Id.* ¶

129.  During the earnings call with analysts on the same day to discuss the third quarter results,

defendant CFO stated that the company's "***strong results for the quarter were driven by record***

***volumes in both our retail supply chain group, which did not slow down from its seasonal high***

***in the second quarter as we continued to add new clients and further penetrate existing clients***,

and continued growth in our public sector verticals," *id.* ¶ 135 (emphasis in original).  The

defendants noted the company's "organic growth" through market share expansion in the

commercial market, *id.* ¶ 137 (quoting defendant CFO on July 31, 2012, earnings call) but

omitted reference to compressed margins and the resulting decline in profitability, *id.* ¶ 67.  In

contrast to the positive public statements, a former LSI Business Analyst and Contact Center

Manager "observed that as the market grew increasingly crowded, Liquidity was forced to

renegotiate contracts at a much lower level of profitability—sometimes to the point where the

Company was merely breaking even, sometimes to the point where the Company was losing

money—just to keep contracts away from competitors."  *Id.*

In the same release for its 2012 third quarter financial results, LSI described its recent

acquisition of GoIndustry as "***enhanc[ing] Liquidity Services' ability to deliver . . .  services to***

***large multinational enterprises across North America, Europe and Asia***," and that

GoIndustry's "***blue chip corporate clients are already being integrated into [LSI's] commercial business***." *Id.* ¶ 130 (quoting LSI Press Release, dated July 31, 2012) (emphasis in original). Contrary to this positive public image of GoIndustry's prospects, the plaintiffs allege that several former insiders knew that GoIndustry had deep structural problems, such as "overpromising its clients—*i.e.*, promising to obtain a certain price for its clients' products, but having to sell them for substantially less than the promised price—leading to missed expected revenue targets," *id.* ¶ 79, and fixed high salaries for the sales representatives, *id.* ¶ 80, resulting in "$3 million in debt" at the time GoIndustry was acquired, *id.* ¶ 79.  Moreover, the plaintiffs allege that the defendants downplayed the difficulty of transforming GoIndustry into a growth asset, since "three of the top sales reps in the European division left GoIndustry following the acquisition, taking their accounts to competing companies, including a 'million dollar' energy account in Germany." *Id.* ¶ 80.

### 4.     Fourth Quarter 2012

On November 29, 2012, LSI released financial results for the fourth quarter of 2012 as well as for full fiscal year 2012.  *Id.* ¶ 140.  The defendant CEO, on the earnings call with analysts on the same day, repeated that LSI "enjoyed broad-based organic growth" due to market share expansion within the commercial, non-DoD, market, *id.* ¶ 146, and that acquisitions, such as GoIndustry will drive growth by allowing LSI to expand globally, *id.* ¶ 147.  The defendant CEO noted, however, that "the integration of GoIndustry will require significant upfront investments to fully realize the global assets market opportunity, which will result in a drag on earnings in the first half of fiscal '13 ***but will benefit the second half of fiscal '13 and our long-term growth prospects***." *Id.* ¶ 146 (emphasis in original).

On December 12, 2012, during LSI's Investor Day presentation, LSI again promoted its "positioning in the market," beyond its DoD contracts, by noting "strong customer loyalty," "[s]ignificant expansion with F1000 commercial clients," and "[b]uyer annual growth rate of 41.6% over past 10 years," *id.* ¶ 155 (quoting the Investor Day Powerpoint presentation, dated Dec. 12, 2012) (alterations in original), while omitting information that "Liquidity was, in fact, selling merchandise at lower values in an attempt to stay ahead of the competition," *id.* The defendant CFO downplayed competitive forces, stating during the Investor Day presentation that "***when you look to the competition, there is a lot of it, but it's not very formidable***." *Id.* ¶ 165 (emphasis in original).  Investor analysts picked up on these positive messages about LSI's capability for growth outside of the DoD contracts, and one analyst report noted "**[k]ey takeaways include: (1) the Capital Asset business represents a significant global opportunity with GOI, (2) Commercial Retail has significant growth opportunities through deeper client engagement while sales cycle remain long due to complexity/changing industry behavior**." *Id.* ¶ 167 (quoting analyst report from Janney Montgomery Scott, a financial services firm, dated Dec. 13, 2012) (emphasis in original).

The plaintiffs allege that LSI's statements in connection with the release of the financial statements for fiscal year 2012 were false and directly contradicted by internal assessments. Multiple confidential sources noted that "as the market grew increasingly crowded, Liquidity was forced to renegotiate contracts at a much lower level of profitability—sometimes to the point where the Company was merely breaking even, sometimes to the point where the Company was losing money—just to keep contracts away from competitors." *Id.* ¶ 67; *id.* ¶¶ 68–70.  Several sources revealed that not only were margins "trending downward throughout 2012," goods were "often sold at a loss during 2012" in order to keep customers.  *Id.* ¶ 70.  In around October 2012,

during the Class Period, LSI lost a contract with "a large overstock company to a competitor," and the loss led to a ten percent reduction in work force at LSI's customer Contact Center.  *Id.* ¶ 67.

**B.     Public Releases in 2013**

The plaintiffs allege that the defendants continued to release publicly positive financial news through 2013 even as the defendants knew about weak financial performances in the non-DoD businesses.

**1.      First Quarter 2013**

On January 31, 2013, the defendants released first quarter results for fiscal year 2013. *Id.* ¶ 173.  During the earnings call with analysts, the defendant CFO lauded the "***retail business***" for "***perform[ing] extremely well during the first quarter***."  *Id.* ¶ 179 (emphasis in original).  In the face of decreased GMV, however, the defendant CFO admitted that product flows from "existing clients . . . are lower than the flows received last year," but explained that despite the slower-than-anticipated "ramping up" of new clients,  "low double-digit growth in the retail supply . . . business for the rest of the year" was expected as these new clients were brought fully onboard.  *Id.* ¶ 180.  While the defendant CFO again touted the "vast opportunities" presented by the GoIndustry marketplace, he also admitted that to take advantage of the opportunity, LSI will be required "to make more investments and restructure an organization that has not had any investments in the last four years."  *Id.* ¶ 180.  On news of the GMV decrease, stock prices dropped more than twenty-two percent.  *Id.* ¶ 182.

On March 5, 2013, when heightened competition had already decreased LSI's margins, the defendant CFO, on a conference call hosted by Deutsche Bank, repeated the company's position stated first during the December 12, 2012 Investor Day presentation that "***we don't***

*really have a lot of formidable competition, but we certainly have a lot of competition*." *Id.* ¶ 185 (emphasis in original).

### 2.    Second Quarter 2013

On May 2, 2013, LSI released the second quarter 2013 financial results. *Id.* ¶ 187. During the earnings call with analysts, the defendant CEO again attributed the increase in GMV to "*the growth in the volume of capital assets in our commercial* and government marketplaces" and the "*nice growth in the retail side of our business, driving efficiencies there*." *Id.* ¶ 191 (emphasis in original).  In particular the CFO explained that LSI has "signed several large clients during the year," that it has "increase[d] the number of programs [LSI is] doing with existing clients," and "that's really driving the growth." *Id.* ¶ 193.  The defendant CEO, in his statement accompanying LSI's Form 10-Q, continued to promote the "*significant progress*" LSI made "*integrating GoIndustry, including the award of several new client engagements*," and anticipated that "*[LSI] will exit this fiscal year with GoIndustry operating profitability*." *Id.* ¶ 189 (emphasis in original).

The plaintiffs allege that the defendants misrepresented material facts about the weakness of LSI's non-DoD business during this period.  According to LSI's former Director of Global Compensation, between March 2013 and November 2013, the retail segment was "sinking fast," and "revenue was only coming in from existing contracts, as Liquidity was unable to secure new contracts." *Id.* ¶ 65.  At the same time, a "former Director of Global Sales who was employed in Liquidity's retail division from 2009 through May 2014, observed that even the addition of new business did not translate into profitability for the business segment, as the Company had to purchase the retail products it would sell and then warehouse them at its own cost." *Id.* Increasingly, the defendants were forced to "renegotiate contracts" with existing clients at "much

lower level of profitability." *Id.* ¶ 67; *see also id.* ¶ 68 (a former Director of Global Sales "noted that competitors were vying for the same business as Liquidity, and thus the Company was forced to accept lower margins, which negatively impacted profitability"). An LSI Inventory Control Quality Assurance Analyst pointed out that, in April 2013, LSI renegotiated a contract with Amazon.com with such unfavorable terms that "[m]argins were so low . . . it was not even profitable enough to support labor costs." *Id.* ¶ 72.

On June 6, 2013, LSI reported "lower than expected growth in GMV for the month of May," and share prices dropped nearly $8 dollars in the following week, from $39.12 on June 6, 2013 to $31.46 on June 13, 2013. *Id.* ¶ 199. Immediately prior to this release, on June 3, 4, and 5, the defendant CEO sold 200,000 shares at prices ranging from $39.15 to $40.13. *Id.* ¶ 198.

### 3. Third Quarter 2013

On July 16, 2013, LSI announced preliminary financial results for the third quarter that were below previous guidance. *Id.* ¶ 200. In the accompanying press release, LSI revealed that the poorer results were due to its "lower product flows from existing clients and slower than expected rollout of new client programs," and "the continued repositioning of the GoIndustry marketplace to focus on the key global Fortune 1000 relationships that we expect will drive sustained profitable growth in this business." *Id.* Stock prices decreased by over eight percent on this news. *Id.* ¶ 202.

On August 7, 2013, the defendants released final financial results for the third quarter, which were, as expected, below guidance. In the accompanying statement on LSI's Form 10-Q, the defendant CEO announced that LSI "***made good progress with the integration of [its] GoIndustry acquisition, which is now operating near breakeven,***" but acknowledged the decreased performance, explaining this was "due to significant integration efforts and the timing

of new large commercial programs coming on line." *Id.* ¶ 205 (emphasis in original).  The

defendants did not attribute the decline to any fundamental softness due to overall

competitiveness.  To the contrary, during the earnings call with analysts, the defendant CFO

indicated that "the relationships that [LSI is] developing with these clients," whose "programs

have not ramped up as fast as [] originally expected," "will drive strong results for shareholders

over the long-term." *Id.* ¶ 208.  Share prices returned to the same levels as before the July 16,

2013 release.  *Id.* ¶ 212.  The defendant CEO sold a total of 600,000 shares between September

9, 2013, and September 12, 2013.  *Id.* ¶ 266.

### 4.    Fourth Quarter 2013

On November 21, 2013, LSI issued fourth quarter and full fiscal year results for 2013,

which met or exceeded previous guidance.  *Id.* ¶ 216.  The defendant CEO's statement

accompanying LSI's Form 10-K stated that the "improved results . . . [were] based on the

expansion of our services with retail supply chain clients and strong growth in our public sector

business highlighted by 33% growth in our GovDeals marketplace this quarter." *Id.* ¶ 218.

During the earnings call with analysts, the defendant CFO touted the "***strong sequential growth***

***in our retail supply chain marketplaces driven primarily from new consumer electronic***

***programs with existing clients***." *Id.* ¶ 220 (emphasis in original).  Both the defendants CEO and

CFO spoke positively about the operation of GoIndustry.  The CEO stated that LSI "***continue[s]***

***to make progress with [its] integration of GoIndustry to deliver profitable growth going***

***forward***," *id.* ¶ 221 (emphasis in original), and the CFO attributed the "significant sequential

growth in our commercial capital assets marketplaces" to the "***new programs from our***

***GoIndustry global platform***." *Id.* ¶ 223 (emphasis in original).  While the defendant CFO stated

that LSI has "***completed the restructuring of the GoIndustry organization***," it was "***entering the***

*second phase of the integration process during fiscal 2014, which is investing for growth*," by "*combining the best attributes of the LSI technology platform with that of the GoIndustry technology platform while [it] continue[s] to invest in the sales and marketing team to drive long-term growth.*"  *Id.* (emphasis in original).

      **C.**    **Public Releases in 2014**

          **1.**    **First Quarter 2014**

On February 7, 2014, the defendants released the first quarter financial results for fiscal year 2014, which exceeded previous guidance, but these financial results decreased from those in the same period in the prior fiscal year period.  *Id.* ¶ 226.  Echoing previous press releases, the accompanying statement from the defendant CEO stated that the "*better than expected financial results*" were "*driven by strong topline performance in our retail supply chain and municipal government businesses*," and that the "*retail supply chain business saw sequential growth in GMV*."  *Id.* ¶ 227 (emphasis in original).  During the earnings call with analysts, the defendant CEO stated "we are signing . . . impressive [business] . . . both relative to the competition and relative to change in the behavior of some of the large Fortune 1000s."  *Id.* ¶ 230.  In his statement accompanying the financial results, the defendant CEO explained that the strong performance in the retail supply chain "were partially offset by a sharp decline in our DoD Surplus business due to changing property mix which has impacted margins."  *Id.* ¶ 227.  The market reacted to this optimistic financial report about the retail supply chain, and the stocks rose over fifteen percent.  *Id.* ¶ 232.

The DoD surplus contract was set to expire in February 2014, *id.* ¶ 50, and by April 2014, LSI lost this contract to a competitor at the same time its DoD scrap contract was renewed on restructured terms that were less lucrative than its previous contract, Defs.' Mem., Ex. 21

("Merrill Lynch Analyst Report, dated April 3, 2014") at 2 (LSI lost a high-margin rolling

surplus goods contract from the Defense Logistics Agency), ECF No. 40-22; *id.*, Ex. 23 (LSI 8-

K, dated May 8, 2014) at 3 (announcing a new six-year contract with the DoD "for all useable

surplus items other than rolling stock"), ECF No. 40-24.

### 2.    Second Quarter 2014—The Corrective Disclosure

On May 8, 2014, LSI announced financial results for the second quarter of fiscal year

2014, which were below guidance.  *Id.* ¶ 233.  GMV decreased by 12 percent, while adjusted

EBITDA and adjusted diluted EPS suffered 43 percent and 46 percent declines, respectively,

from the prior year period.[4]  *Id.*  In the statement accompanying LSI's Form 8-K, filed with the

Securities Exchange Commission ("SEC"), the defendant CEO attributed the lower results to the

loss of the DoD surplus contract, the restructured, less profitable DoD scrap contract, "***mix***

***changes in our . . . retail businesses and delayed capital asset projects in both the U.S. and***

***Europe,***" and "***unusual softness in our energy vertical due to an industry wide decline in line***

***pipe and related equipment***."  *Id.* ¶ 234 (emphasis in original); Merrill Lynch Analyst Report,

dated April 3, 2014 at 2–3.  On this news, LSI stock prices plummeted nearly thirty percent.  *Id.*

¶ 239.

The plaintiffs allege that this announcement of "drastic deline[s]," *id.* ¶ 233, revealed the

underlying weakness of LSI's non-DoD business once the company lost the lucrative DoD

contracts.  An LSI employee, who served as the Director of Development from March 2009

through October 2013, and then as the Director of Global Sales from October 2013 through May

2014, explained that "the government business tended to prop up many of the Company's less

---

[4]      "EBITDA stands for Earnings Before Interest, Taxes, Depreciation and Amortization."  Am. Compl. ¶ 38
n.5.  Adjusted EBITDA refers EBITDA adjusted "for stock based compensation expense and acquisition costs such
as transaction expenses and changes in earn out estimates."  *Id.* ¶ 38 n.6 (citing LSI's 2012 Form 10-K).  EPS stands
for earnings per share.  *Id.* ¶ 7.

profitable business units." *Id.* ¶ 59.  The Vice President of Business Development confirmed

that, throughout the Class Period, non-DoD "'margins [were] tighter . . . . and were nowhere near

as aggressive as on the government side of the business." *Id.* ¶ 71.

The plaintiffs allege that the defendants' public statements about the financial

performance of LSI through the February 7, 2014, release were materially misleading and led

investors to believe that the company was growing its non-DoD contracts business.  Contrary to

LSI's public statements, the plaintiffs allege that the very segments publicly touted as driving the

organic and inorganic growth were actually suffering from negative performance.  Throughout

the Class Period, confidential witnesses, including senior executives, observed that LSI

experienced increasing competition and consequently accepted contracts with decreasing

margins, sometimes to the point of actually losing money.  *Id.* ¶¶ 65, 67–73.  In fact, the

plaintiffs allege that the retail segment may have only appeared to be doing well due to

manipulation of sales figures by the Vice President of the Retail Supply Chain Group.  *Id.* ¶ 74.

A former Director of Global Compensation "believed that the sales numbers for the retail

segment in 2013 were inflated by at least 10%," and, as a result, "more money was being paid

out in compensation and bonuses . . . than was being brought in." *Id.*   A former Business

Analyst and Contact Center Manager observed that the "problem was more widespread than the

retail division," and that "Liquidity had a Company-wide 'culture' of overstating sales goals."

*Id.* ¶ 76.

The plaintiffs also allege that LSI's acquisitions also encountered difficulties throughout

the Class Period, contrary to the defendants' statements.  *Id.* ¶ 78.  GoIndustry never turned a

profit during the Class Period.  *Id.* ¶ 82.  Network International, another acquired business in the

"Company's energy-vertical capital assets business," which was historically "'the most

profitable' business segment" for LSI, *id.* ¶ 83, faced challenges as early as August 2013, *id.* ¶ 84, with worsening performance through the end of 2013 and early 2014, *id.* ¶ 86.

On July 14, 2014, an LSI shareholder, Leonard Howard, filed a lawsuit against the defendants pursuant to "Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all persons and entities who purchased or otherwise acquired Liquidity stock between February 1, 2012, and May 7, 2014, inclusive." Compl. ¶ 1, ECF No. 1. Several other shareholders entered appearances to move for appointment as lead plaintiffs. *See* Motions to Appoint Counsel and for Appointment as Lead Plaintiff, ECF Nos. 25, 26, 29, 31. The Court appointed Caisse and NNERF as co-lead plaintiffs, Order Appointing Lead Plaintiff and Approving Selection of Counsel, ECF No. 32, [5] and they, on behalf of a proposed class, filed the Amended Complaint, *see generally* Am. Compl.

The defendants' motion to dismiss the amended complaint is now ripe for resolution. *See generally* Defs.' Mot.

## II.   LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when the plaintiff pleads factual content

---

[5]      Six groups of plaintiffs submitted motions to be appointed lead plaintiff and lead counsel but, subsequently, all but two of these motions were withdrawn. *See* The Bricklayers Group's Motion for Appointment of Lead Plaintiff and Lead Counsel, ECF No. 20; Jonathan P. Rode's Motion for Appointment as Lead Plaintiff and Approval of His Selection of Counsel, ECF No. 21; Caisse de Dépôt et Placement du Québec and the Newport News Employees' Retirement Fund's Motion for Appointment as Co-Lead Plaintiffs and Approval of their Selection of Counsel as Co-Lead Counsel, ECF No. 22; Twin City Pipe Trades Pension Trust's Motion for Appointment as Lead Plaintiff and for Approval of Selection of Counsel, ECF No. 24; The Devlin Investor Group's Motion to Appoint Lead Plaintiff and Approve the Selection of Counsel, ECF No. 25; Notice of Withdrawal of Motion by Twin City Pipes Trade Pension Trust, ECF No. 26; Notice of Withdrawal of Motion by Jonathan P. Rode, ECF No. 29; Notice of Withdrawal of Motion by the Bricklayer Group, ECF No. 31.

that is more than "'merely consistent with' a defendant's liability," and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012). Where, as here, the plaintiff alleges fraud, the complaint must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). This heightened pleading standard is designed to 'discourage[] the initiation of suits brought solely for their nuisance value, and safeguard [] potential defendants from frivolous accusations of moral turpitude," as well as "guarantee all defendants sufficient information to allow for preparation of a response." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)). "In addition, 'because fraud encompasses a wide variety of activities,' the complaint must be particular enough to 'guarantee all defendants sufficient information to allow for preparation of a response.'" *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (quoting *Williams*, 389 F.3d at 1256).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555; *see also Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015). At the same time, the Court "is not required to accept the plaintiff's legal conclusions as correct." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014); *see Harris*, 791 F.3d at 68 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." (quoting *Iqbal*, 556 U.S. at 678)). Courts may "ordinarily examine" other sources "when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated in the complaint by reference, and

matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## III.   DISCUSSION

The plaintiffs assert two claims: (1) that the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the corresponding implementing regulation Rule 10b-5, which prohibits, in connection with the purchase or sale of any security, "mak[ing] any untrue statement of a material fact or [] omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5; and (2) that the individual defendants, LSI's CEO and CFO, are jointly and severally liable, under Section 20(a) of the Exchange Act, as persons "who, directly or indirectly, controls any" violator of Section 10(b), 15 U.S.C. § 78t(a). *See* Am. Compl. ¶¶ 292–306. The defendants' challenges to each of these claims are discussed below.

### A.   Count I—Violation of Section 10(b)

To survive the pending motion to dismiss, the plaintiffs must sufficiently allege the following elements of a claim under Rule 10b-5, "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *In re Harman*, 791 F.3d at 99 (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 n.3 (2011)). The Securities Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), demands a heightened pleading standard, and, construed together with the heightened pleading standard required under Fed. R. Civ. P. 9(b), plaintiffs alleging securities fraud must "'specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' and to 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 100 (quoting 15 U.S.C. § 78u-4(b)).

The defendants move to dismiss Count I on grounds that the plaintiffs fail to allege adequately (a) any "material misrepresentation or omission," (b) "scienter," and (c) "loss causation." [6]   *See* Defs.' Mem. at 17, 29, 32.  Each of these challenges is addressed *seriatim* below.

### 1.    Material Misrepresentations

Actionable misstatements under Section 10(b) and Rule 10b-5 "must be 'material' in the sense that it would have 'been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *In re Harman*, 791 F.3d at 108 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2413 (2014)).  Moreover, "'statements of reasons, opinions or beliefs'" regarding material facts can be actionable, *id.* (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1091 (1991)), even if these statements contain "'conclusory terms [like 'high' value and 'fair],'" because these terms, when used "'in a commercial context[,] are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading,'" *id.* at 108–109 (quoting *Va. Bankshares*, 501 U.S. at 1093).

As noted, the plaintiffs' lengthy Amended Complaint quotes extensively from the defendants' various public statements made throughout the two-year Class Period, s*ee generally* Am. Compl. ¶¶ 99–232, but the allegedly false and misleading statements fall into two categories: (1) public statements regarding the "organic growth" of LSI's retail and commercial

---

[6]     The defendants do not dispute that the plaintiffs have adequately alleged reliance and economic loss.  *See generally* Defs.' Mem.

capital assets divisions; and (2) public statements and omissions regarding LSI's "inorganic growth" through its acquisitions, including GoIndustry and Network International.

### a.   Public Statements Regarding the Organic Growth of LSI's Retail and Commercial Capital Assets Divisions

The plaintiffs allege that the defendants made a series of public material misrepresentations during nine fiscal quarters of the Class Period regarding the financial performance of LSI's retail and commercial capital assets divisions, touting them as drivers of LSI's overall growth, despite internal knowledge that those divisions were, in fact, troubled and suffering from deteriorating margins due to heightened competition.  The plaintiffs' Amended Complaint is replete with public statements from both individual defendants, the CEO and CFO, attributing "***strong results***" for the fiscal quarters to "***record volumes in both [LSI's] commercial capital assets and retail supply chain vertical***."  Am. Compl. ¶ 106 (during the February 1, 2012, earnings call discussing financial results for first fiscal quarter of 2012) (emphasis in original).[7]  Likewise, the plaintiffs point to public statements by the defendants repeatedly down-playing the competition.  *See, e.g., id.* ¶ 165 (defendant CFO stating during the December 12, 2012 Investor Day presentation, "***when you look to the competition, there is a lot of it, but it's not very formidable***") (emphasis in original); *id.* ¶ 185 (defendant CFO's statement during the March 5, 2013 earnings call discussing second quarter 2013 financial results).

---

[7]      *See also* Am. Compl. ¶ 111 (defendant CEO's statement accompanying May 3, 2012 press release of second quarter 2012 financial results); *id.* ¶ 135 (defendant CFO's statement during the July 31, 2012 earnings call discussing third quarter 2012 financial results); *id.* ¶ 146 (defendant CEO's statement during the November 29, 2012 earnings call discussing fourth quarter and full fiscal year 2012 financial results); *id.* ¶ 179 (defendant CFO's statement during the January 31, 2013 earnings call discussing first quarter 2013); *id.* ¶ 191 (defendant CFO's statement during the May 2, 2013 earnings call discussing second quarter 2013); *id.* ¶ 206 (defendant CEO's statements during the August 7, 2013 earnings call discussing third quarter 2013); *id.* ¶ 220 (defendant CFO's statements during the November 21, 2013 earnings call discussing fourth quarter and full fiscal year 2013 financial results); *id.* ¶ 227 (defendant CEO's statement accompanying press release of first quarter 2014 financial results).

The plaintiffs allege that contrary to the defendants' positive public statements throughout the Class Period regarding growth from non-DoD segments of LSI's business, internal information showed negative performance from these divisions, specifically seven confidential witnesses, from various departments holding different levels of positions, spoke of decreasing margins and profits in the retail and commercial capital assets segments, and purposeful inflation of sales figures within the retail segment.  For example, the former Director of Global Sales, "who was with the Company for a five-year period encompassing 2009 through the end of Class Period, observed that the market became more sophisticated with an influx of competition . . . [and] noted that competitors were vying for the same business as Liquidity, and thus the Company was forced to accept lower margins, which negatively impacted profitability." *Id.* ¶ 68.[8]   A Senior Sales Executive, "whose seven-year tenure spanned August 2007 through October 2014, first noticed a decline in margins in his B2B group as early as ***March 2011***," which then "declined again during 2012 and 2013, and then were flat in 2014."  *Id.* ¶ 69 (emphasis in original).  The former Director of Compensation also noted problems in the non-DoD business, indicating his belief "that the sales numbers for the retail segment in 2013 were inflated by at least 10% and did not support the commissions being paid to sales representatives." *Id.* ¶ 74.

---

[8]      *See also*, Am. Compl. ¶ 65 ("[A] former Director of Global Compensation who was employed by Liquidity from March 2013 through November 2013, characterized the retail business as a 'mess,' and that it was 'tanking,' and 'sinking fast.'); *id.* ¶ 67 ("[A] former Business Analyst and Contact Center Manager from October 2010 through November 2013 . . . observed that as the market grew increasingly crowded, Liquidity was forced to renegotiate contracts at a much lower level of profitability—sometimes to the point where the Company was merely breaking even, sometimes to the point where the Company was losing money—just to keep contracts away from competitors."); *id.* ¶ 70 (a former "Channel Optimization Specialist in Liquidity's DC headquarters from February 2008 through November 2012 . . . noted that sales margins in the electronics vertical for Global Accounts clients were 'definitely' trending downwards throughout 2012," and "recalled, for instance, that in his electronics vertical, televisions were often sold at a loss during 2012"); *id.* ¶ 66 ("a former Senior Corporate Recruiter whose December 2011 through June 2014 tenure encompassed the entire Class Period," shared that his director supervisor who "reported directly to CEO Defendant Angrick[,] would emerge from quarterly meetings and discuss their shared view that Liquidity's prospects were not as strong as what was being publicly portrayed").

Taking the plaintiffs' factual allegations as true, misrepresentations regarding the financial performance of the two business components that the defendants have publicly touted as growing with healthy margins is clearly material even if the plaintiffs do not allege that the overall financial results are inaccurate.  In *In re Harman*, the D.C. Circuit reversed the dismissal of a complaint, where the plaintiffs alleged that the defendants made "materially false and misleading statements about the Company's financial condition" by misrepresenting the strength of sales of a particular line of products, personal navigational devices, also known as PNDs.  794 F.3d at 97–98, 112.  Notwithstanding that, as here, no allegation was made that the released financial results were inaccurate, the D.C. Circuit found that the plaintiffs adequately alleged material misrepresentations actionable under Rule 10b-5, where the defendants stated that "[s]ales of . . . PNDs[] were very strong during fiscal 2007," when, in fact, the PNDs had already become obsolete.  *Id.* at 109–110.  The Circuit reasoned, while the PNDs were "only a 'rather small component of [the Company's] total portfolio,'" they were "part of the Company's largest division and had been the focus of recent public statements," and so the "'very strong' statement could have had the same effect on an investor in the Company's stock and is therefore actionable."  *Id.* at 109.

Similarly here, the strength of the retail and commercial capital assets divisions were publicly touted by the defendants during every fiscal quarter throughout the Class Period.  Moreover, by misstating the key drivers of LSI's apparent overall health, the defendants actively concealed LSI's unsuccessful attempt to "diversify away from its dependence on its DoD relationship," which permitted investors to believe that "revenue growth [i]s robust," in the event that LSI lost the lucrative DoD contracts when they expired in 2014, near the end of the Class Period.  Am. Compl. ¶ 60; *see also id.* ¶ 59 (a confidential witness explained that "the

government business tended to prop up many of the Company's less profitable business units"). Therefore, even if the financial statements were not themselves inaccurate, the defendants' public statements publicizing the strong performance of divisions, which were in fact doing poorly, are material because these statements "would be viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

Other courts confronted with similar types of misrepresentations have also found them material and actionable under Rule 10b-5. *See In re Gilead Sciences Secs. Litig.*, 536 F.3d 1049, 1052–53 (9th Cir. 2008) (reversing a dismissal where the defendants allegedly misrepresented what was really driving strong sales, not that the sales figures themselves were misrepresented); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 389 (D. Del. 2010) *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ("A statement regarding successful financial performance, even when accurate, is still misleading under the securities laws if the speaker 'attribut[es] the performance to the wrong source.'" (quoting *In re ATI Techs., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 436 (E.D. Pa. 2002))).

Moreover, statements regarding the positive performance of LSI's retail division are particularly material because the plaintiffs have alleged that the sales numbers may in fact have been inflated, by as much as ten percent, and thereby affected earnings reports, even if that division was a small portion of Liquidity's source of revenue. *See New Orleans Employees Retirement Sys. v. Celestica, Inc.*, 455 Fed. App'x. 10, 15–16 (2d Cir. 2011) (finding material "purported misstatements" regarding "inventory buildup," even if the potential write-offs "were minuscule in comparison to Celestica's global assets and annual revenues" because they may affect "Celestica's net earnings statements," which "'are among the pieces of data that investors

find most relevant to their investment decision" (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 164 (2d Cir. 2000)).

### b.     PSLRA's Safe Harbor Provision Provides No Protection

The defendants rely heavily on the argument that the alleged misrepresentations are subject to the PSLRA's statutory safe harbor provision.  *See* Defs.' Mem. at 22–28; Defs.' Reply at 9–11.  Codified at 15 U.S.C. § 78u-5(c)(1)(A)(i), the safe harbor provision protects any "forward-looking statements" that are "identified as [] forward-looking statement[s,] and [are] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."  This reliance is misplaced.  While the defendants are correct that the Amended Complaint recounts numerous LSI forward-looking statements, these statements simply provide context for other, specific statements that the plaintiffs allege are false and misleading.  In other words, the forward-looking statements are not the gravamen of the plaintiffs' allegations.  In fact, none of the statements outlined *supra* in Part III.A.1.a indicate any prediction of the future but, instead, describe past performance of the retail and commercial capital assets divisions.  *See, e.g.*, Am. Compl. ¶ 179 ("***the retail business performed extremely well during the first quarter***") (emphasis in original); *id.* ¶ 191 ("***we had nice growth in the retail side of our business, driving efficiencies there***") (emphasis in original); *id.* ¶ 221 ("Both our retail supply chain and capital assets businesses grew sequentially during a seasonally low quarter for the company . . . .").

In any event, even if the alleged misrepresentations can be considered as forward-looking, they would not be subject to protection under the safe harbor because they were not accompanied by "meaningful cautionary statements."  As the D.C. Circuit explained in *In re Harman*, meaningful cautionary language "'calls for substantive company-specific warnings,'"

791 F.3d at 102 (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th

Cir. 2004), "'tailored to the specific future projections, estimates or opinions in the [statements]

which the plaintiffs challenge,'" *id.* (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d

242, 256 (3d Cir. 2009)).  In other words, a "mere boilerplate" warning "does not meet the

statutory standard because by its nature it is general and ubiquitous, not tailored to the specific

circumstances of a business operation, and not of 'useful quality.'"  *Id.* (quoting NEW OXFORD

AMERICAN DICTIONARY 1052).  Additionally, "cautionary language cannot be 'meaningful' if it

is 'misleading in light of historical fact[s.]'"  *Id.* (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 658,

770 (2d Cir. 2010)) (alteration in original).

      The cautionary language cited by the defendants either amounts to boilerplate or are

"misleading in light of historical facts."  The defendants cite to the standard cautionary language

accompanying SEC filings and announced prior to each earnings call:  "The outcome of the

events described in these forward-looking statement is subject to *known and unknown risks,*

*uncertainties and other factors that may cause our actual results . . . to differ materially from*

*any future results . . . .* These risks and other factors include but are not limited to those listed in

Part I, Item 1A ("Risk Factors") and in our other filings with the Securities and Exchange

Commission (SEC) from time to time . . . ."  Defs.' Mem. at 24 (emphasis in original).  This

cautionary warning, citing to "*known and unknown risks,*" is clearly too general and "not specific

regarding the business at issue."  *In re Harman*, 791 F.3d at 102.

      To the extent the defendants cite to more specific cautionary language regarding the

possibility that "increased competition may result in reduced operating margins and loss of

market share," Defs.' Mem. at 11, 24, these are not "meaningful" because they are "misleading

in light of historical facts."  The plaintiffs allege that during the Class Period, the increased

competition had already resulted in reduced margins and loss of certain customers.  *See* Pls.'
Opp'n Defs.' Mot. Dismiss ("Pls.' Opp'n") at 19 (citing Am. Compl. ¶¶ 10–11, 13–14, 64–73,
78–90).  "If a company were to warn of the potential deterioration of one line of its business,
when in fact it was established that that line of business had already deteriorated, then . . . its
cautionary language would be inadequate to meet the safe harbor standard."  *In re Harman*, 791
F.3d at 102–03 (citing *Slayton*, 604 F.3d at 769–70).  Moreover, the meaningfulness and
sufficiency of these warnings are undermined by conflicting statements by the defendants that
the competition LSI faced was not at all "formidable."  Am. Compl. ¶ 165.  Therefore, consistent
with the holding of the D.C. Circuit in *In re Harman*, this Court finds that even if the alleged
fraudulent statements are forward-looking, they would not be subject to the protection of the safe
harbor provision because they are not accompanied by meaningful cautionary language.

In sum, the plaintiffs have adequately alleged that statements concerning the strong
growth and margins of the retail and commercial capital assets segments are material
misrepresentations, even though the plaintiffs do not dispute the accuracy of reports regarding
LSI's overall financial results.

### c.        Public Statements Regarding LSI's Acquisitions

In addition to the defendants' public statements regarding the organic growth of LSI's
retail and commercial capital assets divisions, the plaintiffs allege that the defendants made
material misrepresentations and omissions regarding the financial benefits to LSI from its
acquisitions of GoIndustry and Network International.  Specifically, the plaintiffs allege that the
defendants made affirmative misrepresentations about the growth of GoIndustry and material
omissions about the challenges faced by Network International.

First, the plaintiffs argue that the defendants misrepresented the positive financial impact on LSI of the GoIndustry acquisition by making statements that LSI was "***ma[king] significant progress . . . integrating GoIndustry***," Am. Compl. ¶ 189 (emphasis in original), and that GoIndustry will "***have better profits***" in the near future, *id.* ¶ 137 (emphasis in original); *see also id.* ¶¶ 149, 189, while omitting facts such as: "GoIndustry was historically unprofitable and about to 'shut their doors' when Liquidity acquired it; [] GoIndustry's computer platforms were incompatible with Liquidity's systems, which would result in an extended and expensive logistical integration process; [] GoIndustry's European division was not having success in that market; and [] GoIndustry paid its sales staff unsustainably high salaries and commission that Liquidity would not continue to pay, resulting in GoIndustry's top European sellers leaving the Company, taking their top accounts with them," *id.* ¶ 138.

The plaintiffs have not sufficiently alleged that these misrepresentations are material, such that "it would have 'been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *In re Harman*, 791 F.3d at 108 (quoting *Halliburton*, 134 S. Ct. at 2413). As the defendants point out, all of the aforementioned omissions have been disclosed in some form. GoIndustry was a public company, and, as a result, its precarious financial situation leading up to the acquisition would have been public knowledge. Defs.' Mem. at 25. Moreover, soon after its acquisition of GoIndustry in July 2012, LSI disclosed that it "expect[ed] the integration of GoIndustry [to] require significant upfront investments," Am. Compl. ¶ 146, and observed at the same time that GoIndustry was a "disparate organization . . . one that has not been run historically with common systems and common processes, which is a departure from the normal Liquidity Services Philosophy," *id.* ¶ 148. Throughout the Class Period, the defendants continued to make disclosures about the

significant costs required to fully integrate GoIndustry into LSI, and to acknowledge that GoIndustry was not operating at a profit.[9] In short, the defendants disclosed to the public sufficient information regarding the ongoing integration efforts of GoIndustry, which lasted the entire Class Period, and quarter-after-quarter of reports of GoIndustry operating just short of breakeven, to render the alleged misrepresentations immaterial because it would not have "significantly altered the total mix of information made available."

Second, the plaintiffs allege that the defendants made material omissions by failing to disclose "known negative developments" within Network International. *Id.* ¶ 14; *see also id.* ¶ 239. The Supreme Court held in *Basic Inc. v. Levinson* that an omitted fact is actionable under Section 10(b) if the defendants have a duty to disclose, 485 U.S. at 239 n.17, and it is material, defined to mean that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total' mix of information made available," *id.* at 231–32. "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information," however, and "disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

---

[9] *See id.* ¶ 174 (the defendant CEO stated in the press release of LSI's first quarter 2013 financial results that "the pace of integrating our GoIndustry acquisition is currently slower than expected and will require more investment"); *id.* ¶ 193 (during the May 2, 2013 conference call, the defendant CEO discloses that integration efforts continue into the second quarter of 2013, that LSI continues to "mak[e] investments to integrate the sales and marketing organization, IT and back office systems," and admits that GoIndustry was not yet operating at a profit though he "expect[ed] to exit this fiscal year with GoIndustry operating profitably"); admitted that GoIndustry was not operating as efficiently as the rest of LSI's business); *id.* ¶ 200 (the defendants again admit in the July 16, 2013 press release that GoIndustry is still operating only at "near breakeven"); *id.* ¶ 205 (explaining lower year-over-year results were, in part, due to "the continued repositioning of our GoIndustry marketplace"); *id.* ¶ 223 (the defendant CFO stating during the November 21, 2013 earnings call that while LSI has "completed the restricting of the GoIndustry organization," it was "entering the second phase of the integration process during fiscal 2014, which is investing for growth" by "combining the best attributes of the LSI technology platform with that of the GoIndustry technology platform while we continue to invest in the sales and marketing team to drive long-term growth").

"Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.'" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001) (quoting *SEC v. Texas Gulp Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)).  By contrast, information regarding a small business segment that is unlikely to affect the future of the entire company is generally not material, particularly where the defendants have not put such information "in play."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014) (holding the defendant was "under no duty to provide additional details about" a subject that was not "in play"); *see also In re Boston Scientific Corp. Sec. Litig.*, 686 F.3d 21, 29 (1st Cir. 2012) ("In any case, an undisclosed speculative chance of an event that affects only a very small proportion of revenues is not material."); *City of Roseville Employees' Ret. Sys. v. Nokia Corp.*, No. 10 CV 00967, 2011 WL 7158548, at *8 (S.D.N.Y. Sept. 6, 2011) ("Defendants are not required, however, to disclose production delays or software problems with a particular product 'merely because a reasonable investor would very much like to know the fact.'" (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *cf. In re Harman*, 791 F.3d at 109 (the financial health of products representing "only a 'rather small component of [the Company's] total portfolio'" was considered material because those products "had been the focus of recent public statements").

Here, any omissions regarding any business challenges within Network International were not material.  As the plaintiffs concede, Network International represented "a small business segment," though "key part of Liquidity's business" because of its high profitability. Am. Compl. ¶ 83.  Additionally, unlike with GoIndustry, the defendants "said relatively little about Network International." *Id.*  A small business segment, no matter how profitable, is unlikely to affect the future of an entire company, by contrast to alleged misstatements regarding

entire divisions of a business, such as retail and commercial capital assets, which essentially captured all of Liquidity's business other than DoD contracts.  Therefore, the alleged omissions regarding Network International are not actionable under Section 10(b).

In conclusion, the plaintiffs have adequately alleged that the defendants made material misrepresentations regarding the health of LSI's retail and commercial capital assets divisions—the non-DOD portion of LSI's business—but the plaintiffs have not alleged that the defendants made material misrepresentation regarding GoIndustry and Network International. Consequently, the Court will discuss the remaining elements of the plaintiff's Section 10(b) claim only as they relate to public statements made regarding LSI's retail and commercial capital assets divisions.

### 2.      Scienter

The plaintiffs have alleged facts that, "taken collectively, give rise to a strong inference of scienter," *Tellabs*, 551 U.S. at 323, which is "'a mental state embracing intent to deceive, manipulate, or defraud,'" *id.* at 319 (quoting *Ernsts & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 (1976)), while taking "into account plausible opposing inferences," *id.* at 323.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" though it must be "more than merely 'reasonable' or 'permissible.'"  *Id.* at 324.  Therefore, "a complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.*

The requisite scienter is defined "as a mental state embracing intent to deceive, manipulate, or defraud."  *Koch v. SEC*, 793 F.3d 147, 152 (D.C. Cir. 2015) (internal quotations and citation omitted); *see also Hochfelder*, 425 U.S. at 193.  The D.C. Circuit has explained that

"[e]ither intentional wrongdoing or 'extreme recklessness' satisfies the standard." *Liberty Prop.*

*Trust v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009) (quoting *Steadman*, 967 F.2d

at 641). "The kind of recklessness required, however, is not merely a heightened form of

ordinary negligence; it is an 'extreme departure from the standards of ordinary care, . . . which

presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it." *Steadman*, 967 F.2d at 641–642 (quoting

*Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). Additionally,

"the presence of insider trading can be used, in combination with the other evidence, to establish

scienter." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35,

55 (5th Cir. 2008) (citations omitted).

Here, the plaintiffs have alleged facts "'constituting strong circumstantial evidence of

conscious misbehavior or recklessness.'" *Celestica*, 455 Fed. App'x. at 13 (quoting *ATSI*

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). To support scienter, the

complaint contains information from eleven confidential witnesses, who provided sufficient

information about the defendants' knowledge of the retail and commercial capital assets

divisions' weak financial performance at the time the defendants made the alleged

misrepresentation. [10]

"In the case of confidential witness allegations, we . . . evaluat[e] the 'detail provided by

the confidential sources, the sources' basis of knowledge, the reliability of the sources, the

corroborative nature of other facts alleged, including from other sources, the coherence and

plausibility of the allegations, and similar indicia.'" *Avaya*, 564 F.3d at 263 (quoting *Cal. Pub.*

---

[10]     Out of the twenty confidential witnesses cited in the Amended Complaint, only eleven confidential
witnesses made statements relevant to the scienter inquiry regarding the defendants' statements about LSI's retail
and commercial capital assets divisions.

*Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004)).  The defendants

discount these confidential witnesses as "low-level employees" who may have "'axes to grind,'"

but this characterization is unconvincing.  Defs.' Mem. at 35, 37.  The plaintiffs have

painstakingly detailed every one of the confidential witnesses' previous positions and length of

employment.  *See* Am. Compl. at 1–8. Contrary to the defendants' characterization, some of

these confidential witnesses were not merely low-level employees but former Directors and Vice

Presidents, who were either in close contact with the defendants or reported to a person who

reported to the defendants.  *See, e.g., id.* at 3 (CW 4 is a "former Director of Global

Compensation" who "reported to the Vice President of Human Resources, who reported directly

to Defendant [CEO]"); *id.* at 4 (CW 7 is a former "Director of Business Development from

March 2009 through October 2013" before transitioning to "Director of Global Sales from

October 2013 through May 2014"); *id.* (CW 9 is "a former Vice President of business

Development," who "reported to the Vice President of Retail Supply Chain Group, who reported

directly to Defendant [CEO]").  Importantly, despite hailing from different divisions, at different

levels of seniority, the confidential witnesses provide corroborating information that problems

with LSI's retail and commercial capital assets segments were well known within the company.

*See id.* ¶¶ 64–90; *see also In re Harman*, 791 F.3d at 97 (reversing dismissal of the complaint

where the inside whistleblowers were a former sales engineer and a former accounting manager);

*Celestica*, 455 Fed. App'x at 14 ("Although the witnesses are not identified by name in the

complaint, plaintiffs' descriptions of these persons are sufficiently particular to permit the strong

inference of scienter necessary for plaintiffs to sustain their burden on a motion to dismiss.").

For example, a former Vice President of Business Development from November 2007

through April 2014, who observed that "'margins [were] tighter during the Class Period and

were nowhere near as aggressive as on the government side of the business," and that new acquisitions did not "enhance margins" as hoped, *id.* ¶ 71, reported directly to the Vice President of the Retail Supply Chain Group, who, in turn, reported to the defendants CEO and CFO, *id.* ¶ 252. This confidential witness alleged that the Vice President of the Retail Supply Chain Group "had a standing one-on-one meeting with Defendant [CEO] every Monday to discuss *day-to-day* issues in the Consumer business." *Id.* (emphasis added). A former Senior Manager of Client Services from July 2006 through January 2013 avers that weekly spreadsheets containing such specific sales metrics as "items sold, inventory, sales, sales margins, GMV, cost input and other metrics" were reported to the Vice President of the Retail Supply Chain Group, who then shared this information weekly with the defendant CEO. *Id.* ¶ 253. Notably, a former Director of Global Compensation from March 2013 through November 2013 stated that not only did the Vice President of Retail Supply Chain Group intentionally inflate sales numbers for the retail segment in 2013, inflating them by at least ten percent, he was told specifically by the defendant CEO to stop looking deeply into these numbers. *Id.* ¶ 263.

Not only did the defendants have ample opportunity to learn that these non-DoD business segments were not doing well, but the plaintiffs also allege that the defendants must have known about the specifics of each of these segments because they often referred to metrics such as GMV and margins in their public statements. *See, e.g.*, *id.* ¶ 100 (defendant CEO stating "Record GMV results were driven by ***growth in the volume of capital assets sales across our commercial and government clients***") (emphasis in original); *id.* ¶ 106 (defendant CFO stating "***Our strong results for the quarter were driven by record volumes in both our commercial capital assets and retail supply chain verticals***") (emphasis in original). As other courts have

found, "the perceived importance of margins support an inference that [the defendants were] paying close attention to these numbers." *Avaya*, 564 F.3d at 271.

Furthermore, the plaintiffs have alleged that the individual defendants made suspiciously timed sales of their own stocks in suspiciously high quantities.  The defendant CEO sold twice as much stock during the two year period of the Class Period than the prior two years.  Am. Compl. ¶ 267.  While this quantity, representing a quarter of the defendant CEO's entire holding, alone would not be suspicious, the timing of the sales are.  During the two-year period prior to the Class Period, the defendant CEO sold roughly the same amount of stocks, generally around 10,000 shares, almost daily.  *Id.*  During the Class Period, however, these quantities were much larger than previous sales, including several sales of 100,000 shares or more, and the sales offered occurred on days right after public releases of good results or right before releases of bad results.  *See id.* ¶¶ 266, 268–270.  The defendant CEO earned $68 million from his stock sales during the Class Period.  *Id.* ¶ 266.  In contrast, he earned only $15.3 million from stock sales in the two years prior to the Class Period.  *Id.* ¶ 267

The defendants attempt to provide a nonculpable reason for the defendant CEO's sales by pointing to a publicly disclosed Rule 10b5-1 plan, announced in June 2012, to sell up to 2.5 million shares.  Defs.' Mem. at 44.  The plaintiffs, however, allege that the defendant CEO "did not engage in a single purchase or sale, save for exercising options on a mere 4,567 shares on July 5, 2012" according to the plan.  Am. Compl. ¶ 271.  Instead, six weeks after announcing the plan in June 2012, the defendant "severed the plan, simultaneously making the vague (and ultimately empty) promise that he was exploring options to purchase shares of the Company's common stock." *Id.*  The plaintiffs allege that the defendant CEO does adopt a new Rule 10b5-1

plan on August 8, 2013, but "a mere three sales of stock were effected pursuant to [this] plan." *Id.* The defendants do not address these allegations. Defs.' Mem. at 44.[11]

Instead the defendants dispute whether the sales are indeed as suspiciously timed as the plaintiffs allege, pointing out, for example, that the defendant CEO did not make any sales in the last six months of the Class Period. *See* Defs.' Reply at 24–25. This is a close case, though the change from the CEO's previous selling behavior raises at least a whiff of foul play. Regardless of whether the allegations of insider trading are persuasive however, "*all* of the facts alleged, taken collectively" permit a strong inference of scienter. *Tellabs*, 551 U.S. at 323 (emphasis in original); *see also Avaya*, 564 F.3d at 270–273 (finding scienter based solely on circumstantial evidence including statements from confidential witnesses, without any allegations of improper insider trading). The defendants worked in a culture focused on tracking sales and other metrics, which were conveyed to them in weekly meetings. The defendants themselves have demonstrated an interest and familiarity with figures like sales volume and margins coming out of the retail and capital assets segments based on statements made to the public. Therefore, the Court finds that there is a strong and cogent inference of scienter.

### 3.     Loss Causation

A plaintiff may adequately plead loss causation "'*either* by alleging (a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that . . . the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *In re Harman*, 791 F.3d at 110 (quoting *Carpenters*

---

[11]     The plaintiffs also argue, for the first time in opposition, that the defendant CFO made similarly suspicious sales of Liquidity stock during the Class Period by exercising stock options and selling the converted shares. Pls.' Opp'n at 38. The plaintiffs did not allege with sufficient specificity why these sales are suspicious, and they do not appear so on their face. For example, defendant CFO may have exercised all of his stock options as they became available, rather than waiting for more opportune moments. Thus, the defendant CFO's sales of LSI stock are not considered for the purposes of determining the sufficiency of pleading scienter.

*Pension Tr. Fund. of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014)) (emphasis in the original).  The plaintiffs adequately plead the former.

The plaintiffs posit that throughout the Class Period, the defendants, from time to time, made partial corrective disclosures that the growth from the retail and commercial capital assets segments were overstated before the final reveal on May 8, 2014.  Pls.' Opp'n at 41.  For example, on January 31, 2013, the defendants announced first quarter 2013 results that exceeded previous guidance for adjusted EBITDA and adjusted diluted EPS per share, but did not meet previous guidance for GMV.  Am. Compl. ¶ 172.  The defendants, in order to explain the gap between expected and actual GMV for the quarter, made the mild admission that the "growth rate for the retail business" is "lowering" "for the rest of the year," primarily because product flows from "existing clients . . . are lower than the flows received last year."  *Id.* ¶ 180.  Stock prices dropped from $41.07 on the prior day's close, to $31.87 after this news was released.  *Id.* ¶ 182.

On July 16, 2013, the defendants announced preliminary financial results for the third quarter of fiscal year 2013, which were likely to miss previous guidance.  *Id.* ¶ 200.  The defendants revealed, again, that "[r]esults were impacted by lower than expected GMV in the Company's capital assets and retail supply chain verticals as a result of lower product flows from existing clients and slower than expected rollout of new client programs," *id.*, while confirming that "[o]verall margins in our business remain strong," *id.* ¶ 201 (alteration in original).  Upon this news, stocks declined from $32.38 to $29.60.  *Id.* ¶ 202.  On August 6, 2013, when actual third quarter results were released, which were indeed below previous guidance, *id.* ¶ 203, share prices actually increased from $28.97 to $32.56, *id.* ¶ 212.  During the August 6, 2013 announcement, however, the defendants noted that "GMV continues to diversify due to the

continued growth in our commercial business and state and local government business," and the defendants represented that "the percentage of GMV derived from our DoD Contracts during Q3-13 decreased to 21.9%." *Id.* ¶ 206.

Finally, on May 8, 2014, after losing the more lucrative DoD surplus contract, and receiving a new and less lucrative DoD scrap contract, LSI was allegedly unable to hide the weak state of its non-DoD business anymore and revealed second quarter fiscal year 2014 financial results that were far below guidance. *Id.* ¶ 233.  Notably, while GMV decreased by only twelve percent, adjusted EBITDA declined forty-three percent, and adjusted diluted EPS declined forty-six percent, year-over-year. *Id.*  After years of enjoying "aggressive" margins on the government business, *id.* ¶ 71, which "prop[ped] up many of the Company's less profitable business unit," *id.* ¶ 59, the defendants finally had to reveal that the remaining segments simply did not enjoy the same type of attractive margins to which the investors were accustomed.  The defendants, explaining the decrease in performance, stated "[w]hile GMV was within our expected results, our Adjusted EBITDA and Adjusted EPS were lower than expected due to mix changes in our DoD surplus and retail businesses and delayed capital asset projects in both the U.S. and Europe. We also experienced unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment." *Id.* ¶ 234.  The defendants at last admitted, though in halting and vague terms, that its retail business has been plagued by lower-margin sales.  On this news, the share prices plunged nearly thirty percent. *Id.* ¶ 239.

The defendants contend that the May 8 release did not constitute a corrective disclosure because it "did not reveal or correct any prior misstatement, nor did it restate any financial results," instead, "it reported an entirely new event—the DoD declining to renew a previously profitable contract—a risk that LSI warned might occur." Defs.' Mem. at 31.  The defendants'

argument is unavailing for two reasons.  First, "'a corrective disclosure need not be a 'mirror-image' disclosure—a direct admission that a previous statement is untrue,' although it 'must relate to the same subject matter as the alleged misrepresentation.'"  *In re Harman*, 791 F.3d at 110 (quoting *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 240 (1st Cir. 2013)); *see also Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010 ("[N]either the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud [b]ecause corporate wrongdoers rarely admit that they committed fraud . . . .  Thus, the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, caused the 'economic loss.'").  Therefore, the plaintiffs need not allege that the defendants corrected any prior misstatements or restated any financial results.  Instead, plaintiffs need only show that the retail and commercial capital assets segments were not as strong as previously indicated, which the May 8 release, as well as the aforementioned other releases, does.  *See in re Harman*, 791 F.3d at 111 (finding the plaintiffs sufficiently alleged loss causation where the corrective disclosure stated that the challenged portion of the Company's business "was not flourishing as the Company had indicated" previously).

Second, the defendants' loss of the DoD contract was previously publicized.  *See* Defs.' Mem. at 22 ("On April 3, 2014 . . . LSI announced in real-time that while it was the 'apparent high bidder' for the Non-Rolling Stock Contract, it had 'withdr[awn] from the live auction bidding' for the Rolling Stock Contract after it had determined that '[b]idding reached a level that . . . would [have] be[en] economically unsustainable[.]" (quoting Defs.' Mem., Ex. 20 (LSI 8-K dated April 3, 2014) at 6, ECF No. 40-21)).  In other words, May 8, 2014 was not the first

time the market would have been advised of the defendants' loss of the DoD contract.  In fact,

the defendants' May 8, 2014, press release does not even address the issue that LSI lost the DoD

surplus contract to a competitor.  *See* Am. Compl. ¶ 234 (referencing only "mix changes in

[their] DoD surplus" business and their "multi-year transition of [their] DoD surplus contract").

In any event, whether the drop in share prices is due to the reveal that the non-DoD business was

weaker than previously stated or due to the loss of the DoD contract need not be proven at the

pleading stage.  *See in re Harman*, 791 F.3d at 111 ("'[P]laintiffs need not demonstrate on a

motion to dismiss that the corrective disclosure was the only possible cause for decline in the

stock price.'" (quoting *Carpenters*, 750 F.3d at 233)).  Consequently, the plaintiffs adequately

plead loss causation.

Accordingly, for the reasons stated above, the defendants' motion to dismiss is denied as

to the plaintiffs' Section 10(b) claim regarding the alleged misrepresentations about LSI's

growth in the retail and commercial capital assets business during the Class Period.

> **B.     Count II—Liability Under Section 20(a)**

Section 20(a) of the Securities Exchange Act provides that individuals who are in

"control of the primary violator" may be held jointly and severally liable.  *In re Harman*, 791

F.3d at 111.  "A claim under Section 20(a) can exist only if there is a viable claim against the

corporation."  *Id.*  Here, the plaintiffs have alleged a viable Section 10(b) claim against the

corporation.

Circuits differ on "whether the plaintiff must show that the alleged control person

'culpably participated' in the underlying fraud" or whether "the plaintiff need only show the

defendant is a 'controlling person,'" with the burden then shifting "to the defendant to show the

actions were taken in good faith and did not directly or indirectly induce the act or acts

constituting the violation or cause of action." *In re Harman*, 791 F.3d at 111–12 (internal

quotations and citations omitted).  The D.C. Circuit has declined "which approach to adopt."  *Id.*

In this case, the plaintiffs have sufficiently alleged that the defendants CEO and CFO are

"controlling persons," who also culpably participated in the underlying fraud.  *See, e.g.*, Am.

Compl. ¶ 252 (a confidential witness describing the individual defendants as "the 'center of

power' at the Company, and ultimately all management decisions were made by the two of

them").  Indeed, many of the offending statements were made by the individual defendants,

whose involvement in the day-to-day operations of LSI would have made them aware of the

falsity of their statements.  *See, e.g., id.* ¶ 106 (defendant CFO stating that "*[o]ur strong results*

*for the quarter were driven by record volumes in both our commercial capital assets and retail*

*supply chain verticals*" (emphasis in original)); *id.* ¶ 111 (defendant CEO stating "*[r]ecord*

*GMV results were primarily driven by growth in the volume of goods sold in our retail supply*

*chain and municipal government marketplaces by existing and new clients*" (emphasis in

original)).  Furthermore, the plaintiffs allege that the defendant CEO was complicit in the

inflation of sales figures from the retail division.  *Id.* ¶ 74 (the former Director of Global

Compensation alleging that when he observed that "the sales numbers for the retail segment in

2013 were inflated by at least 10%," his supervisor was instructed by the defendant CEO to

"*leave the retail sales figures alone*" (emphasis in original)).

    Accordingly, the defendants' motion to dismiss the plaintiff's Section 20(a) claim is

denied.

## IV.    CONCLUSION

    For the reasons stated above, the defendants' motion to dismiss is granted in part and

denied in part.  The defendants' motion to dismiss Count I based on misrepresentations regarding

the growth of LSI's retail and commercial capital assets segments is denied.  The defendants'

motion to dismiss the plaintiff's Count I based on alleged misrepresentations regarding

GoIndustry and Network International is granted.  The defendants' motion to dismiss Count II is

denied.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

**DATE:** March 31, 2016

_____
BERYL A. HOWELL
Chief Judge