EXHIBIT 2

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEONARD HOWARD, Individually and on | ) | |
| Behalf of All Others Similarly Situated, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-01183-BAH |
| | ) | |
| LIQUIDITY SERVICES, INC., et al., | ) | |
| Defendants. | ) | |

## <u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>

**September 2, 2016**

**Table of Contents**

<u>Page</u>

I.     **INTRODUCTION** ..........................................................................................**3**

II.    **QUALIFICATIONS**.......................................................................................**3**

III.   **SUMMARY OF OPINIONS** .......................................................................**4**

IV.   **OVERVIEW OF LIQUIDITY SERVICES AND ALLEGATIONS** ....................**5**

V.     **DISCUSSION OF RELIANCE ELEMENT** ..................................................**7**

VI.   *CAMMER* **FACTORS** ...............................................................................**10**

VII.  **APPLICATION OF EFFICIENCY FACTORS TO LIQUIDITY SERVICES COMMON STOCK** ..................................................................................**11**

     A.     OVERVIEW ................................................................................ 11

     B.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME.................. 13

     C.     *CAMMER* FACTOR 2: ANALYST COVERAGE..................................... 15

     D.     *CAMMER* FACTOR 3: MARKET MAKERS ...................................... 18

     E.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ........................ 19

     F.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ............. 20

     G.     ADDITIONAL FACTOR 1: MARKET CAPITALIZATION................................. 30

     H.     ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ............................ 31

     I.     ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ............................ 33

     J.     ADDITIONAL FACTOR 4: AUTOCORRELATION ............................ 33

     K.     ADDITIONAL FACTOR 5: OPTIONS ................................................ 34

VIII. **DAMAGES**.........................................................................................**35**

IX.   **CONCLUSION** .....................................................................................**36**

## I.   INTRODUCTION

1.      My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiffs Caisse de dépôt et placement du Québec and the Newport News Employees' Retirement Fund ("Lead Plaintiffs") to examine and opine on whether the market for Liquidity Services, Inc. ("Liquidity Services" or the "Company") common stock ("Liquidity Services Common Stock") was efficient during the Class Period.[1] In addition, I have been asked to opine on whether the calculation of damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.      The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $600 per hour for my work on this matter and my compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.   QUALIFICATIONS

3.      I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's in Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period identified in the Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") is from February 1, 2012 through May 7, 2014 (Amended Complaint ¶ 1).

4.     I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

### III.  SUMMARY OF OPINIONS

6.     After analyzing Liquidity Services Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Liquidity Services Common Stock was efficient throughout the Class Period and that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

7.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of Liquidity Services' business operations and the allegations in this case. **Section V** discusses the reliance requirement and the "fraud on the market" theory. **Section VI**

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

introduces the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Liquidity Services Common Stock during the putative Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

8.     I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF LIQUIDITY SERVICES AND ALLEGATIONS

9.     Liquidity Services is a Delaware corporation which was formed in November 1999 and has its executive offices in Washington, D.C.  The Company described itself as follows in its Form 10-K for the period ending September 30, 2013:

> We operate leading online auction marketplaces for surplus and salvage assets. We enable buyers and sellers to transact in an efficient, online auction environment offering over 500 product categories. Our marketplaces provide professional buyers access to a global, organized supply of surplus and salvage assets presented with customer focused information including digital images and other relevant product information along with services to efficiently complete the transaction. Additionally, we enable our corporate and government sellers to enhance their financial return on excess assets by providing liquid marketplaces and value-added services that integrate sales and marketing, logistics and transaction settlement into a single offering. [3]

10.     Liquidity Services facilitates a "reverse supply chain" across product types such as consumer electronics, general merchandise, apparel, scientific equipment, aerospace parts and equipment, technology hardware, energy equipment, industrial capital assets, fleet and transportation equipment, and specialty equipment.  Liquidity Services generates revenue

---

[3] Liquidity Services 2013 10-K, p. 1.

through transaction fees from buyers and sellers, revenue sharing agreements, and advertising fees. In fiscal year 2013, the Company generated gross merchandise value ("GMV") of $973.3 million, and revenue of $505.9 million.[4]  As of September 30, 2013, Liquidity Services had approximately 2,424,000 registered buyers, 1,020 U.S. employees, and 282 international employees.[5]  Its shares traded on the NASDAQ under the ticker "LQDT".

11.    The Amended Complaint alleges that Liquidity Services and the Individual Defendants issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of Liquidity Services Common Stock who unknowingly bought Liquidity Services Common Stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information.[6]

12.    More specifically, the Amended Complaint alleges that Defendants misrepresented Liquidity Services' financial performance and growth prospects, telling investors that the Company's current margins were sustainable, and that this would generate significant expansion in terms of GMV, which was one of Liquidity Services' most important metrics.  Essentially, throughout the Class Period, Liquidity Services, its CEO, and its CFO repeatedly represented that the Company was growing organically, was in a position to withstand the impact of competition, and was in a position to maintain strong margins.[7]

13.    While Defendants were making positive public statements, there were myriad undisclosed problems having a marked effect on the Company's profitability and growth potential.  Not only were Liquidity Services' margins and revenues deteriorating, but the

---

[4] Liquidity Services 2014 10-K, pp. 32.

[5] Liquidity Services 2013 10-K, pp. 16.

[6] Amended Complaint ¶¶1-20, 280-289.

[7] Amended Complaint ¶¶119, 137, 146, 165, 185.

Company was not forthcoming about heightened competition. An increasingly crowded market forced Liquidity to accept new and renegotiated contracts at reduced margins, and enter barely profitable – and sometimes unprofitable – arrangements just to maintain relationships with existing customers. According to the Amended Complaint, sales numbers were manipulated in the retail division; figures for 2013 were allegedly inflated by at least 10%.

14.     The Company continued to suggest strong growth potential and misled shareholders up until the end of the Class Period. On May 8, 2014, Defendants announced that Liquidity Services had experienced substantial declines in GMV (12%), adjusted EBITDA (43%), and adjusted diluted EPS (46%).[8] Investors sustained enormous losses immediately.

## V.   DISCUSSION OF RELIANCE ELEMENT

15.     Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiffs' Section 10(b) claims. Lead Plaintiffs assert the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions, since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic v. Levinson* and reaffirmed in *Halliburton II*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and

---

[8] Amended Complaint ¶¶ 233-34, 239.

the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[9]

16.     The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[10]

17.     As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (deflated) price.

18.     Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[11] The esteemed economist Dr. Eugene Fama, in his seminal

---

[9] *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988).

[10] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

[11] To recognize the presumption of reliance, the Supreme Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency. Indeed, in making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof. *See Halliburton II.*

research, first outlined definitions of an "efficient market."[12] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[13]

19.     The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[14] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.[15]

---

[12] Eugene Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. FIN. 383 (1970).

[13] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[14] *Basic,* 485 U.S. at 242.

[15] Indeed, *Halliburton II* sensibly makes clear that the standard is short of some idealized notion of semi-strong efficiency, but rather, "[t]o recognize the presumption of reliance, the Court explained, was not 'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.' *Id.* The Court instead based the presumption on the fairly modest premise

20.    In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.   *CAMMER* FACTORS

21.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[16]

22.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[17] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.[18] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.

> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

> An *efficient market* is one which rapidly reflects new information in price.

---

that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" 134 S. Ct. at 2410 (internal citations omitted).

[16] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[17] *Cammer,* 711 F. Supp. at 1276, n.17.

[18] Eugene Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fin. 383 (1970).

These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[19]

23.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have used beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

24.    In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns), and 5) option trading.

## VII.  APPLICATION OF EFFICIENCY FACTORS TO LIQUIDITY SERVICES COMMON STOCK

### A.  OVERVIEW

25.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for Liquidity Services Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes each of the factors examined, both under *Cammer* and the additional

---

[19] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

factors considered by courts, providing empirical evidence in support of a finding that Liquidity Services Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Liquidity Services Common Stock closing price and trading volume for each day throughout the Class Period.

26.     In summary, and as discussed more fully below, Liquidity Services Common Stock traded in an efficient market (indeed, it traded on the NASDAQ, which is widely recognized as an open and well-developed market). First, the average weekly trading volume of Liquidity Services Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average daily trading volume for Liquidity Services Common Stock was approximately 643 thousand shares, which represents an average of 10.19% turnover per week, higher than the average common stock traded on the NASDAQ, one of the largest and most liquid security exchanges in the world, with billions of shares traded daily.[20] Second, there were a large number of securities analysts following and reporting on Liquidity Services. Third, Liquidity Services Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers.[21] Fourth, Liquidity Services Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Fifth, Liquidity Services Common Stock had a low bid-ask spread relative to other exchange-traded stocks. Sixth, institutions, which are considered generally to be well-informed investors, held, on average, over 93% of the public float. Seventh, there was no evidence of autocorrelation during the Class Period. Eighth, there was considerable trading in Liquidity

---

[20] For additional information, see www.nasdaq.com.

[21] Large, modern exchanges such as the NASDAQ are often assumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market. See Roman L. Weil, Daniel G. Lentz & David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert* (5th ed. 2012); https://listingcenter.nasdaqomx.com/assets/initialguide.pdf.

Services options throughout the Class Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Liquidity Services Common Stock during the Class Period. These factors all support the conclusion that Liquidity Services Common Stock traded in an open, developed, and efficient market throughout the Class Period.

27.    Many of my opinions are admitted by the Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Admissions, dated August 22, 2016 ("Defendants' Responses to RFAs").

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

28.    The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[22]

29.    Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[23] Third, substantial volume would indicate there is likely a

---

[22] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[23] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a

market for the collection and distribution of information about the security. As Thomas and

Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

information dissemination to the market, and was an important criterion for investment analysts

in deciding which stocks to follow."[24]

30.     Liquidity Services Common Stock easily surpasses the threshold level of average

weekly trading volume necessary for an efficient market. The average weekly turnover for

Liquidity Services Common Stock was 10.19%, compared to 3.49% for the NASDAQ over the

Class Period. **Exhibit 3** plots Liquidity Services Common Stock's trading volume as a fraction

of shares outstanding for each week during the Class Period.[25] Indeed, the average *daily* volume

during the Class Period was 643 thousand shares.[26]

31.     The volume of trading for Liquidity Services Common Stock supports the

conclusion that the market for this security was efficient throughout the Class Period.

32.     Another way to measure trading volume is annualized turnover velocity, which is

essentially the first *Cammer* Factor expressed in dollar terms.[27] To be more specific, instead of

---

relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

[24] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[25] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[26] Defendants admit that the daily trading volume for Liquidity common stock during the Class Period was no less than 63,000 shares, and that the average weekly trading volume for Liquidity common stock during the Class Period was no less than 1.7% of shares outstanding. *See* Defendants' Responses to RFAs, Nos. 20, 21.

[27] Turnover velocity is simply the average turnover (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of

shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all

shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio

because the numerator and denominator are multiplied by price per share. The advantage of this

measure is that once quoted in annualized terms, Liquidity Services Common Stock's turnover

velocity can be compared directly with other publicly traded stocks based on exchange-reported

statistics. For example, over the Class Period, the annualized turnover velocity ratio for Liquidity

Services Common Stock was 531.52%, compared with the NASDAQ average of 181.99% for

the Class Period.[28] Thus, Liquidity Services Common Stock had an average annualized turnover

that was substantially higher than the average stock trading on the NASDAQ, further supporting

that it traded in an efficient market.

33.    In short, the relatively high trading volume in Liquidity Services Common Stock

throughout the Class Period supports the conclusion that the market for Liquidity Services

Common Stock was efficient.

### C. *CAMMER* FACTOR 2: ANALYST COVERAGE

34.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities
> analysts followed and reported on a company's stock during the class period.
> The existence of such analysts would imply, for example, the [relevant]
> reports were closely reviewed by investment professionals, who would in
> turn make buy/sell recommendations to client investors.[29]

35.    Analyst coverage can be important confirmatory evidence of efficiency. Significant

analyst coverage implies that there is sufficient interest in a company and its securities, that there

---

[28] Turnover velocity for the NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* http://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[29] *Cammer*, 711 F. Supp. at 1286.

is an active market for information regarding the company and its securities, and that the information is widely distributed.

36. During the Class Period, there was an abundance of analyst coverage for Liquidity Services. **Exhibit 4** shows that there were at least 218 reports issued during the Class Period by equity analysts from at least 10 separate firms, including major firms such as Janney, Oppenheimer, RBC, and Deutsche Bank.[30] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Liquidity Services by securities analysts supports the conclusion that Liquidity Services Common Stock traded in an efficient market throughout the Class Period.

37. Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[31] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and

---

[30] I obtained Liquidity Services analyst reports from Investext and also from Lead Plaintiffs' Counsel. The number of analyst reports I identify is likely understated since a number of analyst reports are not available through third party data providers such as Investext.

Defendants admit, subject to and without waiving their Objections, that at least nine equity research analysts covered LSI at various times during the Class Period. *See* Defendants' Responses to RFAs, No. 25.

[31] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

38.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of Liquidity Services, there were many other sources of public information dissemination. For example, there was substantial public press regarding Liquidity Services. A search for articles classified as related to Liquidity Services by Factiva over the Class Period results in over 656 unique articles.[32] In addition, there were also numerous SEC filings available online at EDGAR at no out-of-pocket cost as well as various other sources of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of and demand for information regarding Liquidity Services in the public arena throughout the Class Period.

39.     In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Liquidity Services, provides evidence of a robust and active market for public information about Liquidity Services and evidence that its Common Stock traded in an efficient market during the Class Period.

---

[32] Based on a search for "All Sources" with the company field "Liquidity Services, Inc." for the period "February 1, 2012 – May 8, 2014." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

### D. *CAMMER* FACTOR 3: MARKET MAKERS

40.    A market maker is a firm that is ready to buy or sell a particular stock on a regular

and continuous basis.[33] The third *Cammer* Factor states:

> For over the counter markets without volume reporting, the number of
> market makers is probably the best single criterion. Ten market makers for a
> security would justify a substantial presumption that the market for the
> security is an efficient one; five market makers would justify a more modest
> presumption.[34]

41.    Liquidity Services Common Stock traded on the NASDAQ with continuous public

price and volume reporting, as opposed to an over-the-counter market without volume reporting,

which is the context in which *Cammer* indicated this was a relevant criterion. On such over-the-

counter markets, there may be a question as to liquidity and information dissemination.

However, these concerns are generally not applicable to stocks trading on large, modern

exchanges such as the NASDAQ, which are often assumed to be efficient,[35] report volume and

trade details, and tend to have rules that virtually guarantee a liquid market.[36] The NASDAQ is

one of the largest and most liquid security exchanges in the world, with billions of shares traded

each day. Unlike an over-the-counter market that relies on decentralized market makers

providing liquidity for trading, the NASDAQ relies on a computerized system to match orders

and provide quotes.[37] The minimum requirements to be listed on the NASDAQ and remain in

good standing virtually guarantee a liquid market for the security. Therefore, the number of

---

[33] *See* http://www.sec.gov/answers/mktmaker.htm.

[34] *Cammer*, 711 F. Supp. at 1293.

[35] Roman L. Weil, Daniel G. Lentz & David P. Hoffman, *Litigation Services Handbook, The Role of the Financial Expert* (5th ed. 2012).

[36] https://listingcenter.nasdaqomx.com/assets/initialguide.pdf.

[37] *See* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities; http://www.nasdaq.com/reference/market_mechanics.pdf.

"market makers" itself is not a particularly relevant metric in this case. Liquidity Services meets the spirit of this factor, further supporting the efficiency of the market during the Class Period.

## E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

42.    The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[38]

43.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[39] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement.[40]  Interpreted in this way, the standard makes sense as an indicator of efficiency.

44.    Liquidity Services did not appear to have any public offerings of equity during the Class Period and thus had no occasion to file a Form S-3.  I am not aware of any factor that

---

[38] *Cammer*, 711 F. Supp. at 1287.

[39] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

[40] *Cammer*, 711 F. Supp. at 1287.

would have prevented Liquidity Services from filing a Form S-3 had it issued equity to the public during the Class Period.  Defendants admit that, as a registered issuer, Liquidity was eligible to file a Form S-3 Registration Statement with the SEC throughout the Class Period.[41] Therefore, this factor affirmatively supports the conclusion that Liquidity Services Common Stock traded in an efficient market.

### F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.    The fifth *Cammer* Factor relates to how the price of a security reacts to new information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[42]

46.    Establishing a causal connection between new company-specific news events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called the "event study." An event study is a well-accepted statistical method used to isolate the impact of information on market prices.[43] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds, if not thousands, of academic articles as scientific evidence in evaluating how new information affects securities prices.[44]

---

[41] Defendants' Responses to RFAs, No. 27.

[42] *Cammer,* 711 F. Supp. at 1291.

[43] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

[44] *See* John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

47. An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, news reports, or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48. To analyze cause and effect, I performed an event study to determine whether Liquidity Services Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no news. Based on the event study I performed, which explicitly controls for market factors, I find that there is a clear cause-and-effect relationship between new public information about Liquidity Services and the market price of Liquidity Services Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

49. A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[45] I have performed such an analysis in this matter where I evaluate the relationship between Liquidity Services Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total

---

[45] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in Liquidity Services Common Stock (the Liquidity Services daily "return") is the dependent variable and the contemporaneous daily return for the S&P 500 is the independent variable. For a general discussion of regression analysis, see Chapters 1-3 in Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.

Return Index (the "S&P 500" or the "Market Index") and the S&P Composite 1500 Software and

Services (Industry Group) Index (the "Industry Index").[46]

50.    For each trading day analyzed, I constructed a regression model using data from the

prior 120 trading days (roughly six months).[47] By using a "rolling" estimation window of 120

trading days prior to the event of interest, it allows for the relationship between Liquidity

Services Common Stock and the market as well as the firm-specific volatility to update over time

according to the data observed over the most recent 120 trading day period. Use of a rolling

model to account for changing volatility and evolving relationships among market indices is

accepted in peer-reviewed literature.[48]

51.    The model indicates that there is a positive correlation between Liquidity Services

Common Stock and the S&P 500. In other words, the movement of the Market Index and

Industry Index help explain movements in Liquidity Services stock price. For instance, choosing

a day in the Class Period purely as an example, April 17, 2012, and looking at the regression

results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.39,

---

[46] As of the time of writing, LQDT was a member of six S&P Software & Services industry indices: *S&P 600 Internet Software & Services (Industry) Index*; *S&P 600 Internet Software & Services (Sub Ind) Index*; *S&P 600 Software & Services (Industry Group) Index*; *S&P Composite 1500 Internet Software & Services (Industry) Index*; *S&P Composite 1500 Internet Software & Services (Sub Ind) Index*; and *S&P Composite 1500 Software & Services (Industry Group) Index*. I selected the *S&P Composite 1500 Software & Services (Industry Group) Index* because it is a strict superset of the other indices (i.e., it is the broadest index of the six), and there was no compelling economic rationale to select a narrower index.

In unreported robustness checks, I repeated my analyses using alternate regression specifications: 1-factor model controlling for the S&P 500 alone; a 2-factor model controlling for the S&P 500 and the *S&P Composite 1500 Internet Software & Services (Industry) Index*; and a 3-factor model controlling for the S&P 500, *S&P Composite 1500 Software and Services (Industry Group)* Index, and eBay (which is Liquidity Services' peer most commonly-mentioned by analysts). These small variations on my market model specification did not change the substance of my conclusions.

[47] *See*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[48] Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

which means that a 1% rise in the S&P 500 predicts a 1.39% increase in Liquidity Services Common Stock return. The estimated coefficient for the Industry Index is 0.83, which means that a 1% rise in the Industry Index predicts a 0.83% increase in Liquidity Services Common Stock Return. **Exhibit 5** plots the estimated coefficients for the rolling regression model for each day during the Class Period. **Exhibit 5** demonstrates there was a consistently positive relationship between the Market Index and Liquidity Services Common Stock price.

52.     Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in Liquidity Services Common Stock price movement after controlling for the Market Index and Industry Index. For instance, on the example date, April 17, 2012, the model predicted that absent any new firm-specific information, the price of Liquidity Services Common Stock would increase by 2.54% because the S&P 500 was up 1.55% and the Industry Index was up 0.14%.[49] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 1.03%. Thus, the "abnormal return" for this day is -1.51% (the actual return of 1.03% minus the predicted return of 2.54%). I then rely on the Standard Deviation of the Errors from the regression model to tell if this abnormal return of -1.51% is sufficiently large that I reject random movement as the explanation.

53.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic", which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -1.51% represents -

---

[49] The expected return of 2.54% is found as follows: 1.39 * 1.55 (Coefficient on Market Index *times* Market Index return) + 0.83 * 0.14 (Coefficient on Industry Index *times* Industry Index return) + 0.26% (constant term from regression).

0.63 standard deviations or a t-statistic of -0.63 (abnormal return of -1.51% divided by the Standard Deviation of the Errors of 0.02). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should only have a t-statistic greater than 1.96 (or less than -1.96) 5% of the time.[50] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of -0.63, I would say that the abnormal return is not statistically significant at the 95% confidence level and I could not reject randomness as the cause with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.[51] Similarly, using a 90% confidence level and large sample size, the abnormal return should only have a t-statistic greater than 1.645 (or less than -1.645) 10% of the time.  Thus, there is a 90% confidence that the actual return will fall within 1.645 standard deviations of the predicted return unless there is some non-random explanation.  Using our example t-statistic of -0.63, I would say that the abnormal return is not statistically

---

[50] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

[51] Based on my regression model, 44 out of 569 days in the Class Period (7.73%) were statistically significant at the 95% confidence level.

significant at the 90% confidence level and I could not reject randomness as the cause with greater than 90% confidence.

54.     **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility as depicted in **Exhibit 6**.

55.     To analyze cause-and-effect, I examined the price response of Liquidity Services Common Stock to earnings announcements that occurred during the Class Period, an objective set of dates (see **Exhibit 7**).

56.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that release of company earnings announcements often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[52] Also, newly released earnings reports by the company are an objective set of news to identify and test. As an example, Liquidity Services issued an earnings release on February 7, 2014, in which they announced Q1 2014 results well above analyst estimates, and reaffirmed fiscal year 2014 earnings guidance.[53]  In response, the market price of Liquidity Services Common Stock increased 15.59%, compared to the predicted return of 2.31%. Thus, the abnormal return on February 7, 2014 was positive 13.28%. With a t-statistic of 5.23, this

---

[52] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

[53] "Q1/14 Better Than Expected," *Barrington Research*, February 7, 2014; "Q1 Upside; Retail Rebound Off Easy Comps; Looking for Sustained Commercial Growth," *Janney Capital Markets*, February 7, 2014; "LQDT Beats Dec Qtr. – First Sign Of Stabilization," *Deutsche Bank Market Research*, February 10, 2014.

abnormal price movement is statistically significant, and I therefore have scientific evidence that Liquidity Services Common Stock reacted rapidly to this new information.[54]

57.    Similar to this example, I analyzed the market reaction to Liquidity Services other earnings announcements throughout the Class Period. In total, of the twelve quarterly earnings announcements and pre-announcements Liquidity Services issued during the Class Period ("earnings announcement dates"), seven resulted in statistically significant price movements above the 95% confidence level (in fact, all of these movements were above the 99% confidence level). Additionally, two of the quarterly earnings announcements were significant at the 90% confidence level.

58.    **Exhibit 7** presents a summary of the earnings announcements and **Exhibits 8A – 8L** depict the intraday price movements for all of these announcement dates.

59.    I then compared these results against the 223 days during the Class Period on which no news articles,[55] no identified analyst reports, and no SEC filings were issued ("days with no news"). Of these 223 days with no news, there were 4 statistically significant price movements.

---

[54] Note that there are other earnings announcements that did not (and would not be expected to) result in statistical significance. This would happen, for instance, in quarters where there was not much surprise and the firm roughly met expectations and/or if the firm offered little change in guidance, or if there was offsetting news that affected the stock price in the opposite direction from the earnings announcement.

For example, there was no statistically significant price movement following the earnings announcement on 8/6/2013. Earnings for 3rd quarter 2013 had been pre-announced on 7/16/2013, and the results were largely in line with the pre-announcement.  For example, see "Q3/13 In Line; Guidance for Q4/13 Better Than Our Expectations," Barrington Research, "Q3/13 results were in line with revised guidance that included GMV within a range of $228-231 million, adjusted EBITDA of $26-27 million and adjusted EPS of $0.43-0.45."

[55] Based on a Factiva search for "All Sources" with the company field "Liquidity Services, Inc." for the period "February 1, 2012 through May 8, 2014." Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.

Thus, during the Class Period there was a statistically significant price reaction at the 95% level on 58.33% of the earnings announcement dates; on days with no news, I observed a statistically significant reaction 1.79% of the time.[56] The fact that I observed statistically significant movements on 1.79% of the days with no news is consistent with what I would expect to observe by randomness alone.[57] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information and changes in Liquidity Services Common Stock price.[58]

60.    Furthermore, on the 223 days with no news, the average change in Liquidity Services Common Stock price was 1.50% after controlling for the Market Index and Industry Index, while the average change in Liquidity Services Common Stock price on earnings announcement dates was 11.18%. In other words, the average magnitude of stock price movement on earnings announcement days was over 7 times higher than on days with no news.[59] Again, this demonstrates that on days when important firm-specific information is released to the market (namely, earnings announcements), the stock price moves much more than on days where there is no firm-specific news. This provides further evidence of a cause-and-effect relationship between firm-specific news and changes in Liquidity Services Common Stock price, and thus an efficient market.

---

[56] This difference between 58.33% and 1.79% is itself statistically significant at the 95% confidence level.

[57] By chance alone, 5% of dates would be significant when using a 95% confidence interval.

[58] In the field of financial economics, academics often evaluate statistical significance at the 90% confidence level as providing scientific evidence of a cause-and-effect relationship.  As shown in **Exhibit 7**, there are two additional earnings announcement dates with abnormal returns significant at the 90% level but not at the 95% level. Incorporating dates significant at the 90% level results in 75% of earnings announcement dates being statistically significant, as compared to 4% of days with no news. The difference between 75% and 4% is itself statistically significant at the 95% level.

[59] This difference between 1.50% and 11.18% is itself statistically significant.

61.   The bar charts below summarize this analysis, while **Exhibit 9** gives more detail.





62.    Finally, when important firm-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher than on days with no news. For instance, the average daily trading volume of the 12 earnings announcement dates was 3.37 million. Compare this to the average daily trading volume of 0.48 million for days with no news.[60] The bar chart below summarizes this analysis.



**Average Daily Trading Volume**

63.    The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in Liquidity Services Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.

---

[60] The difference between 3.37 million and 0.48 million is significant at the 95% confidence level.

64.     In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of Liquidity Services Common Stock.

## G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

65.     In *Krogman v. Sterritt*, the Court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[61] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[62] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[63] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.     Liquidity Services Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks combined during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 30.6 million and 32.3 million shares of Liquidity Services Common Stock outstanding throughout the Class Period.[64]

---

[61] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The factors identified by the *Krogman* Court are: 1) market capitalization, 2) size of the float of common stock, and 3) bid-ask spread.

[62] *Krogman*, 202 F.R.D. at 478.

[63] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[64] Source: S&P Capital IQ. Defendants admit, subject to and without waiving their Objections, that there were between 29,000,000 and 32,000,000 shares of Liquidity common stock outstanding throughout the Class Period. *See* Defendants' Responses to RFAs, No. 24.

67.     Based on the market price, the market capitalization for Liquidity Services Common Stock averaged $1.145 billion during the Class Period.[65] **Exhibit 10** shows Liquidity Services market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, Liquidity Services Common Stock's market capitalization fell between the 54th and 85th percentile of firms on the NASDAQ for the applicable quarters during the Class Period.[66] In other words, over the Class Period, Liquidity Services Common Stock had a higher market capitalization than at least 54% of the firms on the NASDAQ.

68.     Given that Liquidity Services Common Stock market capitalization was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Liquidity Services Common Stock.

## H. ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

69.     The *Krogman* Court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[67] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small

---

[65] Defendants admit, subject to and without waiving the Objections, that the average market capitalization for Liquidity based upon the trading price of its common stock was approximately $1.1 billion during the Class and that the average market capitalization for Liquidity common stock was never below $546,000,000 during the Class Period. *See* Defendants' Responses to RFAs, Nos. 18, 19.

[66] Thomson Reuters and S&P Capital IQ.

[67] *Krogman*, 202 F.R.D. at 478.

inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

70.     I analyzed bid-ask spreads for Liquidity Services Common Stock during the Class Period. **Exhibit 12A** shows that during the Class Period, the time-weighted average monthly percentage bid-ask spread ranged from 0.07% and 0.21%. This is well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ in May 2013 (the full month when Liquidity Services had the largest percentage bid-ask spread).[68] **Exhibit 12A** demonstrates that Liquidity Services Common stock had an average bid-ask spread of 0.21% in May 2013, while a randomly selected group of 100 other common stocks on the NASDAQ had an average bid-ask spread of 1.99%.[69] **Exhibit 12B** shows that the time-weighted average dollar bid-ask spread for Liquidity Services was no more than $0.08 per share during the Class Period, while my randomly-selected group of 100 common stocks had an average bid-ask spread of $0.73.[70] Accordingly, Liquidity Services bid-ask spread was low during the Class Period in both dollar and percentage terms, thus this factor further supports market efficiency for Liquidity Services Common Stock.

---

[68] In the last month of the Class Period, May 2014, the bid-ask spread analysis was limited to the trading days in the Class Period.  Based on the full months contained within the Class Period, May 2013 had the largest bid ask spread percentage and thus is used for comparison. Quote data for Liquidity Services and other publicly traded stocks were obtained from the TICK database. *See* www.tickdata.com.

[69] The average bid-ask spread was calculated by taking a time-weighted average of the spread during trading hours on the primary exchange of each security. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[70] Calculated as the average percentage bid-ask spread for this sample, scaled by $36.66, the average price of LQDT in May 2013.

## I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

71.    Institutional investors are considered to be sophisticated and well-informed with

access to most publicly available information for the stocks that they own. These investors

include mutual funds, pension funds, investment banks and other types of large financial

institutions that have substantial resources to analyze the securities they purchase for their

portfolios. Most institutions that hold over $100 million in assets are required to report their

equity holdings on a quarterly basis on SEC Form 13F.[71] As **Exhibit 13** shows, these large

institutions reported owning a majority of Liquidity Services Common Stock during the Class

Period. For the quarters spanning the Class Period, 495 institutions owned Liquidity Services

Common Stock, holding, on average, 93% of the public float.[72] This high level of institutional

ownership of Liquidity Services Common Stock during the Class Period coupled with the high

trading volume further supports a conclusion of market efficiency.

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.    If previous price movements of a security have the ability to predict future price

movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency

because if the autocorrelation is persistent and sufficiently large that a trader could profit from

taking advantage of the autocorrelation, it means that past price movements are not fully

reflected in the current price, which would suggest market inefficiency.

73.    Autocorrelation may occur from time to time for random reasons or due to the

pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation

---

[71] See http://www.sec.gov/about/forms/form13f.pdf.

[72] Defendants admit, subject to and without waiving their Objections, that as of the end of each fiscal
quarter during the Class Period, institutional investors owned more than 70% of the shares outstanding of
Liquidity common stock. *See* Defendants' Responses to RFAs, No. 23.

were large enough and persistent enough that a trader could consistently earn riskless profits over time.[73]

74.    A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[74] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

75.    **Exhibit 14** displays the autocorrelation coefficient for Liquidity Services Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is very close to zero and not statistically significant, meaning there is no evidence of autocorrelation (*i.e.*, throughout the Class Period, the coefficient on the previous day's abnormal return averaged 0.03). This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that Liquidity Services Common Stock traded in an efficient market throughout the Class Period.

## K.  ADDITIONAL FACTOR 5: OPTIONS

76.    In addition to the factors analyzed above, there was also considerable option trading in Liquidity Services during the Class Period.[75] Academic articles have demonstrated that

---

[73] Doron Avramov, et al., Liquidity and Autocorrelations in Individual Stock Returns, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, Some Anomalous Evidence Regarding Market Efficiency, 6 J. FIN. ECON. 95 (1978).

[74] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[75] For instance, according to IVolatility data, there were 10,432 Liquidity Services Common Stock put contracts and 12,591 Liquidity Services Common Stock call contracts that traded during the Class Period.

options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[76] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[77]

## VIII. DAMAGES

77.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[78]

78.    The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most

---

[76] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[77] Raman Kumar et al., The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, 53 J. FIN. 717 (1998).

[78] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.   CONCLUSION

79.    In sum, every factor analyzed supports my opinion that Liquidity Services Common Stock traded in an efficient market. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

80.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on September 2, 2016

Chad Coffman

Exhibit 1

## Summary of Efficiency Factors for Liquidity Services (LQDT)

| Factor | Summary of Factor | Liquidity Services (LQDT) |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | The average weekly trading volume of 10.19%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 643 thousand shares traded daily on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | During the Class Period at least 10  securities analysts issued 218 analyst reports, which implies that important information relevant to trading Liquidity Services common stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | Because Liquidity Services shares were exchange-traded on the NASDAQ during the class period, not over the counter, this factor is satisfied. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | Liquidity Services met the important eligibility criteria for SEC Form S-3 and was eligible to file a  Form S-3 Registration Statement with the SEC throughout the Class Period. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Liquidity Services Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | During the Class Period, Liquidity Services common stock market capitalization ranged from $0.506 billion to $1.597 billion, which is at or above the 54th percentile of NASDAQ stocks. Liquidity Services Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | During the Class Period, the bid-ask spread for Liquidity Services Common Stock in each month ranged from 0.07% to 0.21%. LQDT's average percentage bid-ask spread was well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in  May 2013  (the full month when LQDT had the largest bid ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | 495 institutions held 93% of the public float throughout the class period, on average, which further supports the finding that Liquidity Services Common Stock traded in an efficient market. (Note: Institutions held as much as 98% of the public float during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | No evidence of autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Liquidity Services Common Stock based solely on its past price movements. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks | There were 10,432 LQDT Common Stock put contracts and 12,591 LQDT Common Stock call contracts that traded during the Class Period. Liquidity Services Common Stock therefore easily meets this criterion |

**Exhibit 2**
## Liquidity Services Common Stock Price and Volume
## 2/1/2012 - 5/30/2014



Source: Capital IQ
Note: NASDAQ Listed

**Exhibit 3**

# Liquidity Services Average Weekly Trading Volume
## as a Percentage of Shares Outstanding
### 2/1/2012 - 5/7/2014



LQDT Weekly Volume as Percentage of Shares Outstanding:
Average: 10.19%
Median: 7.99%

"2% average weekly trading volume of the outstanding shares justify strong presumption that the market for the security is an efficient one" (*Cammer*)

Volume as a Percentage of Shares Outstanding

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on 2/1/2012 through 5/7/2014. The last week consists of four trading days.

# Exhibit 4

## Summary of Securities Analyst Reports Issued
## for Liquidity Services During the Class Period
## 2/1/2012 - 5/7/2014

|  | Analyst Name | Number of Reports Issued |
|---|---|---|
| [1] | Janney | 47 |
| [2] | Oppenheimer | 37 |
| [3] | RBC | 28 |
| [4] | Roth | 26 |
| [5] | Benchmark | 23 |
| [6] | Barrington | 21 |
| [7] | Sadif | 15 |
| [8] | Wright | 11 |
| [9] | Deutsche Bank | 8 |
| [10] | Validea | 2 |
|  | **Total** | **218** |

Source: Investext and Counsel.

Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
## Coefficients from Rolling Event Study Regression for Liquidity Services
## 2/1/2012 - 5/7/2014



Source: Capital IQ
The coefficients for each day are based on a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an industry index (S&P Composite 1500 Software and Services (Industry Group) Index). The returns of the industry index are net of the S&P 500. Earnings announcements, pre-announcements, and alleged corrective disclosure dates have been removed from estimation, as well as an acquisition announcement on 9/1/2011.

**Exhibit 6**
**Standard Deviation of the Errors**
**from Rolling Event Study Regression for Liquidity Services**
**2/1/2012 - 5/7/2014**



Source: Capital IQ
Note: The standard deviation of the errors for each day is based on a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an industry index (S&P Composite 1500 Software and Services (Industry Group) Index). Earnings announcements, pre-announcements, and alleged corrective disclosure dates have been removed from estimation, as well as an acquisition announcement on 9/1/2011

**Exhibit 7**

**Event Study Analysis of Liquidity Services Earnings Dates**

| # | Date | Time | Market Date | Event | Headline | LQDT Price | LQDT Raw Return | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | Sig Level[2] |
|---|------|------|-------------|-------|----------|------------|-----------------|-----------------|------------------------|--------|---------|--------------|
| | | | | | | | | | Rolling Regression Model (120-day rolling window)[1] | | | |
| 1 | 2/1/2012 | 8:26 AM | 2/1/2012 | Earnings Release | Liquidity Services, Inc. Announces First Quarter Fiscal Year 2012 Financial Results | $36.10 | 4.61% | 3.40% | $1.17 | 1.20 | 0.23 | |
| 2 | 5/3/2012 | 6:55 AM | 5/3/2012 | Earnings Release | Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2012 Financial Results | $62.24 | 13.31% | 14.13% | $7.76 | 5.91 | 0.00 | *** |
| 3 | 7/31/2012 | 8:29 AM | 7/31/2012 | Earnings Release | Liquidity Services, Inc. Announces Third Quarter Fiscal Year 2012 Financial Results | $45.72 | 4.03% | 4.41% | $1.94 | 1.70 | 0.09 | * |
| 4 | 11/29/2012 | 6:58 AM | 11/29/2012 | Earnings Release | Liquidity Services, Inc. Announces Fourth Quarter and Fiscal Year 2012 Financial Results | $37.83 | -13.49% | -13.98% | -$6.11 | -4.72 | 0.00 | *** |
| 5 | 1/16/2013 | 4:27 PM | 1/17/2013 | Pre-Announcement | Liquidity Services, Inc. Provides Preliminary Q1-FY2013 Gross Merchandise Volume Results | $39.87 | -0.75% | -1.26% | -$0.51 | -0.44 | 0.66 | |
| 6 | 1/31/2013 | 6:55 AM | 1/31/2013 | Earnings Release | Liquidity Services, Inc. Announces First Quarter Fiscal Year 2013 Financial Results | $31.87 | -22.40% | -22.56% | -$9.27 | -8.58 | 0.00 | *** |
| 7 | 5/2/2013 | 6:55 AM | 5/2/2013 | Earnings Release | Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2013 Financial Results | $34.18 | 5.07% | 4.25% | $1.38 | 1.87 | 0.06 | * |
| 8 | 7/16/2013 | 6:55 AM | 7/16/2013 | Pre-Announcement | Liquidity Services, Inc. Announces Preliminary Fiscal Third Quarter 2013 Financial Results | $29.83 | -7.88% | -7.52% | -$2.43 | -3.54 | 0.00 | *** |
| 9 | 8/6/2013 | 7:44 PM | 8/7/2013 | Earnings Release | Liquidity Services, Inc. Announces Third Quarter Fiscal Year 2013 Financial Results | $29.00 | 0.10% | 0.49% | $0.14 | 0.23 | 0.82 | |
| 10 | 11/21/2013 | 6:55 AM | 11/21/2013 | Earnings Release | Liquidity Services, Inc. Announces Fourth Quarter and Fiscal Year 2013 Financial Results | $21.13 | -18.73% | -19.38% | -$5.04 | -8.01 | 0.00 | *** |
| 11 | 2/7/2014 | 6:55 AM | 2/7/2014 | Earnings Release | Liquidity Services, Inc. Announces First Quarter Fiscal Year 2014 Financial Results | $24.61 | 15.59% | 13.28% | $2.83 | 5.23 | 0.00 | *** |
| 12 | 5/8/2014 | 6:55 AM | 5/8/2014 | Earnings Release | Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2014 Financial Results | $12.17 | -29.69% | -29.56% | -$5.12 | -10.88 | 0.00 | *** |

Source: S&P Capital IQ; Liquidity Services Inc Press Releases.

Notes:

(1) The regression model results for each day are based on a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an industry index (S&P Composite 1500 Software and Services (Industry Group) Index).  Earnings announcements, pre-announcements, and alleged corrective disclosure dates have been removed from estimation, as well as an acquisition announcement on 9/1/2011.

(2) "***" Denotes statistical significance at the 99% confidence level or greater, "**" denotes statistical significance at the 95% confidence level or greater, and "*" denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8A**
**Liquidity Services Intraday Price and Volume**
**2/1/2012**



Source: TICK Data.



**Exhibit 8B**
**Liquidity Services Intraday Price and Volume**
**5/3/2012**



Source: TICK Data.

**Exhibit 8C**
**Liquidity Services Intraday Price and Volume**
**7/31/2012**



Source: TICK Data.

**Exhibit 8D**
**Liquidity Services Intraday Price and Volume**
**11/29/2012**



Source: TICK Data.

**Exhibit 8E**
**Liquidity Services Intraday Price and Volume**
**1/17/2013**



| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| -0.75% | -1.26% | -0.44 |

1/16/2013
4:00 pm - $40.17
**NASDAQ Close**

01/17/2013
4:00 pm - $39.87
**NASDAQ Close**

1/17/13
9:30 am - $39.80
**NASDAQ Open**

1/16/2013 4:27 pm
LQDT Earnings Pre-
Announcement

Source: TICK Data.



**Exhibit 8F**
**Liquidity Services Intraday Price and Volume**
**1/31/2013**

Source: TICK Data.

**Exhibit 8G**
## Liquidity Services Intraday Price and Volume
### 5/2/2013



Source: TICK Data.

**Exhibit 8H**
**Liquidity Services Intraday Price and Volume**
**7/16/2013**



Source: TICK Data.



**Exhibit 8I**
**Liquidity Services Intraday Price and Volume**
**8/7/2013**



Source: TICK Data.

## Exhibit 8J
## Liquidity Services Intraday Price and Volume
## 11/21/2013



Source: TICK Data.

**Exhibit 8K**
**Liquidity Services Intraday Price and Volume**
**2/7/2014**



Source: TICK Data.

**Exhibit 8L**
**Liquidity Services Intraday Price and Volume**
**5/8/2014**



Source: TICK Data.

## Exhibit 9

### Comparison of Statistical Significance and Abnormal Returns
### for Liquidity Services Earnings Announcement Dates
### vs. Days with No News

| Statistic | Earnings Announcement Dates | Days with No News, No Analyst Reports, and No SEC Filings |
|---|---|---|
| N | 12 | 223 |
| Significant Days at 95% Confidence Level | 7 | 4 |
| % Significant Days at 95% Confidence Level[1] | 58.33% | 1.79% |
| Average Absolute Abnormal Return[2] | 11.18% | 1.50% |

Notes:

(1) Abnormal returns are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and an industry index (S&P Composite 1500 Software and Services (Industry Group) Index). Earnings announcements, pre-announcements, and alleged corrective disclosure dates have been removed from estimation, as well as an acquisition announcement on 9/1/2011.

(2) 58.33% rate of statistical significance is statistically significantly different than 1.79% at the 95% confidence level.

(3) An average absolute abnormal return of 11.18% is statistically significantly different than 1.50% based on a t-test for difference of means at the 95% confidence level.

**Exhibit 10**
## Liquidity Services Common Stock Market Capitalization
## 2/1/2012 – 5/30/2014



Source: Capital IQ
Note: NASDAQ Listed

**Exhibit 11**

**Liquidity Services Common Stock Market
Capitalization Compared to Companies Traded on
the NASDAQ**

| Last trading day of: | LQDT Market Capitalization (billions) | Percentile Rank in NASDAQ |
|:---:|:---:|:---:|
| Q1 2012 | $1,372.99 | 82.4% |
| Q2 2012 | $1,597.28 | 85.1% |
| Q3 2012 | $1,556.33 | 84.8% |
| Q4 2012 | $1,285.21 | 82.2% |
| Q1 2013 | $940.62 | 74.5% |
| Q2 2013 | $1,096.40 | 74.3% |
| Q3 2013 | $1,063.46 | 71.9% |
| Q4 2013 | $727.95 | 62.6% |
| Q1 2014 | $841.13 | 65.9% |
| Q2 2014 | $505.52 | 54.3% |

Source: S&P Capital IQ and Thomson Reuters Eikon.

**Exhibit 12A**
**Liquidity Services Common Stock**
**Average Monthly Bid-Ask Percentage Spread per Share**
**2/1/2012 - 5/7/2014**



Source: TICK Data.
Note: May 2014 data are limited to the Class Period.

**Exhibit 12B**
**Liquidity Services Common Stock**
**Average Monthly Bid-Ask Dollar Spread per Share**
**2/1/2012 - 5/7/2014**



Source: TICK Data.
Notes: - May 2014 data are limited to the Class Period.
- The average and median dollar bid-ask spread for the randomly-selected sample of 100 common stocks trading on the NASDAQ in May 2013 are given by the average and median percentage bid-ask spread for this sample, scaled by $36.66 (the average LQDT trading price in May 2013).

Exhibit 13

**Liquidity Services Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Last Trading Day of: | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float: Shares Outstanding Plus Short Interest (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| Q4 2011 | 29,496 | 212 | 7,467 | 908 | 22,937 | 25.31% | 22,022 | 74.66% | 96.01% |
| Q1 2012 | 30,647 | 223 | 6,744 | 1,946 | 25,849 | 22.01% | 23,946 | 78.14% | 92.64% |
| Q2 2012 | 31,209 | 263 | 6,399 | 2,916 | 27,725 | 20.50% | 26,602 | 85.24% | 95.95% |
| Q3 2012 | 30,997 | 246 | 6,528 | 5,672 | 30,141 | 21.06% | 29,350 | 94.69% | 97.38% |
| Q4 2012 | 31,454 | 222 | 6,504 | 5,464 | 30,414 | 20.68% | 29,796 | 94.73% | 97.97% |
| Q1 2013 | 31,554 | 204 | 6,391 | 7,503 | 32,666 | 20.25% | 31,897 | 101.09% | 97.65% |
| Q2 2013 | 31,624 | 212 | 6,056 | 9,434 | 35,002 | 19.15% | 33,625 | 106.33% | 96.07% |
| Q3 2013 | 31,745 | 215 | 5,492 | 9,847 | 36,101 | 17.30% | 34,265 | 107.94% | 94.92% |
| Q4 2013 | 32,125 | 207 | 5,536 | 8,647 | 35,236 | 17.23% | 31,464 | 97.94% | 89.29% |
| Q1 2014 | 32,289 | 192 | 5,761 | 8,303 | 34,832 | 17.84% | 32,537 | 100.77% | 93.41% |
| Q2 2014 | 32,076 | 175 | 5,985 | 5,052 | 31,144 | 18.66% | 23,384 | 72.90% | 75.08% |

| Total Institutions over Class Period: | 495 | | Average: | 20.00% | | 92.22% | 93.31% |
|---|---|---|---|---|---|---|---|

Sources: S&P Capital IQ and SEC filings.

# Exhibit 14
# Liquidity Services Common Stock
# Test for Autocorrelation During the Class Period

| Quarter | Coefficient on Previous Day Abnormal Return [1] | T-statistic |
|---|---|---|
| Q1 2012 | 0.12 | 0.88 |
| Q2 2012 | -0.13 | -0.98 |
| Q3 2012 | 0.07 | 0.58 |
| Q4 2012 | -0.07 | -0.57 |
| Q1 2013 | 0.05 | 0.37 |
| Q2 2013 | 0.04 | 0.28 |
| Q3 2013 | -0.12 | -0.93 |
| Q4 2013 | -0.04 | -0.32 |
| Q1 2014 | 0.10 | 0.77 |
| Q2 2014 | 0.29 | 1.50 |
| **Class Period** | **0.03** | **0.76** |

Source: S&P Capital IQ.
Note: The estimation period runs from 2/1/2012 to 5/7/2014.
(1) For each month I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements have been removed from the estimation.

# Appendix A
# Documents Considered

## Court Documents

- Amended Complaint for Violations of the Federal Securities Laws, *Howard, v. Liquidity Services, Inc.*, dated December 15, 2014.
- Memorandum Opinion on Motion to Dismiss, *Howard, v. Liquidity Services, Inc.*, dated March 31, 2016.
- Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Admission, *Howard v. Liquidity Services, Inc.*, dated August 22, 2016.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. (2014).
- *Krogman v. Sterritt* 202 F.R.D. (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings/Forms

- Liquidity Services, Inc. 10-K Annual filings submitted to the SEC during the Class Period:
    - Liquidity Services, Inc., 10-K for the Fiscal Year End September 30, 2012.
    - Liquidity Services, Inc., 10-K for the Fiscal Year End September 30, 2013.
    - Liquidity Services, Inc., 10-K for the Fiscal Year End September 30, 2014.
- Liquidity Services, Inc. 10-Q Quarterly filings submitted to the SEC during the Class Period.
- Liquidity Services, Inc. 8-K Current reports submitted to the SEC during the Class Period.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

## Security Data

- Historical data for Liquidity Services, Inc. Common Stock, components of the Peer Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for Liquidity Services, Inc. during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for May 2013 were obtained from Tick Data, *see* www.tickdata.com.

- Institutional holdings data was obtained from S&P Capital IQ.
- Liquidity Services, Inc. stock options data were obtained from IVolatility, *see* http://www.ivolatility.com.
- Turnover velocity data for NYSE was obtained from the World Federation of Exchanges, *see* http://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

**Liquidity Services, Inc. News**

- Liquidity Services, Inc. news headlines and select articles downloaded from Factiva for the Class Period.
  - News was obtained by executing a search via Factiva for "All Sources" with the company field Liquidity Services, Inc.", for the period "February 1, 2012 – May 8, 2014." The Factiva search yielded 652 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Liquidity Services, Inc. earnings conference call transcripts during the Class Period.
- Liquidity Services, Inc. earnings press releases throughout the Class Period from the company's website:
- "Liquidity Services, Inc. Announces First Quarter Fiscal Year 2012 Financial Results," *Liquidity Services, Inc. Press Release*, February 1, 2012.
- "Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2012 Financial Results," *Liquidity Services, Inc. Press Release*, May 3, 2012.
- "Liquidity Services, Inc. Announces Third Quarter, Fiscal Year 2012 Financial Results," *Liquidity Services, Inc. Press Release*, July 31, 2012.
- "Liquidity Services, Inc. Announces Fourth Quarter and Fiscal Year 2012 Financial Results," *Liquidity Services, Inc. Press Release*, November 29, 2012.
- "Liquidity Services, Inc. Provides Preliminary Q1-FY2013 Gross Merchandise Volume Results; Reaffirms Q1-FY2013 Earnings Guidance; Announces Quarterly Earnings Call," *Business Wire*, January 16, 2013.
- "Liquidity Services, Inc. Announces First Quarter Fiscal Year 2013 Financial Results," *Liquidity Services, Inc. Press Release*, January 31, 2013.
- "Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2013 Financial Results," *Liquidity Services, Inc. Press Release*, May 2, 2013.
- "Liquidity Services, Inc. Announces Preliminary Fiscal Third Quarter 2013 Financial Results," *Liquidity Services, Inc. Press Release*, July 16, 2013.
- "Liquidity Services, Inc. Announces Third Quarter Fiscal Year 2013 Financial Results," *Liquidity Services, Inc. Press Release*, August 6, 2013.
- "Liquidity Services, Inc. Announces Fourth Quarter and Fiscal Year 2013 Financial Results," *Liquidity Services, Inc. Press Release*, November 21, 2013.
- "Liquidity Services, Inc. Announces First Quarter Fiscal Year 2014 Financial Results," *Liquidity Services, Inc. Press Release*, February 7, 2014.
- "Liquidity Services, Inc. Announces Second Quarter Fiscal Year 2014 Financial Results," *Liquidity Services, Inc. Press Release*, May 8, 2014.

**Liquidity Services, Inc. Analyst Reports**

- Liquidity Services, Inc. analyst reports supplied by Investext via Thomson Reuters and from Lead Plaintiffs' Counsel for the period February 2012 to May 2014.

**Academic Articles/Texts**

- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Yakov Amihud, et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. (2005).
- Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. (1994).
- William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. (1995).
- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. (1970).
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. (1996).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. (1978).
- Raman Kumar et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. (1998).
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. (1976).

- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. (2000).

**<u>Other</u>**

- http://www.sec.gov/answers/mktmaker.htm
- http://www.sec.gov/edgar/searchedgar/companysearch.html
- http://www.sec.gov/about/forms/form13f.pdf
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf
- http://www.nasdaqomx.com/transactions/trading/equities
- http://www.nasdaq.com/reference/market_mechanics.pdf

APPENDIX B

CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:        (312) 470-6500
Mobile:      (815) 382-0092
Email:        ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**      Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**   Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  - In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  - In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  - Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et. al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20,

2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court, Eastern District of Virginia, Alexandria Division. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division. Court testimony April 12, 2013.

- Testifying expert in City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts. Filed expert report October 28, 2013.

- Testifying expert in In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report on March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.


<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

 KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
 KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)


**PUBLICATIONS:**

 Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

 Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).


**PROFESSIONAL AFFILIATIONS:**

 Associate Member CFA Society of Chicago
 Associate Member CFA Institute
 Phi Beta Kappa


**AWARDS:**

 1994  Ford Fellowship Recipient for Summer Research.
 1993  Arnold Prize for Best Research Proposal.
 1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.