# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LEONARD HOWARD, individually and on behalf of all others situated, | |
| Plaintiff, | Civil Action No. 14-1183 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| LIQUIDITY SERVICES INC., WILLIAM P. ANGRICK III, and JAMES M. RALLO, | |
| Defendants. | |

## MEMORANDUM OPINION

In this putative shareholder class action, the plaintiffs allege that Liquidity Services, Inc. ("LSI") publicly touted its retail division as a driver of the company's overall growth despite internal knowledge that the retail division was troubled and suffering from deteriorating margins due to heightened competition. The plaintiffs assert claims under section 10(b) and of the Securities Exchange Act of 1934 (the "Exchange Act"), and the Security Exchange Commission's Rule 10b-5, promulgated thereunder, *see* 17 C.F.R. § 240.10b–5, as well as section 20(a) of the Exchange Act, alleging that the defendants disseminated "materially false and misleading information" and omitted "other material information that artificially inflated Liquidity's stock price." Amended Compl. ("Am. Compl.") ¶ 1, ECF No. 35. When the truth emerged, LSI's stock price plummeted, resulting in financial losses to investors who purchased the stock at inflated prices.

The co-lead plaintiffs, Caisse de dépôt et placement du Québec ("Caisse") and the Newport News Employees' Retirement Fund ("NNERF"), now seek to certify a class consisting of purchasers of common stock of LSI from February 1, 2012, to May 7, 2014, (the "class

period") against the defendants: LSI; the company's Chief Executive Officer, William Angrick; and the company's Chief Financial Officer, James Rallo.[1] Presently before the Court are the plaintiffs' motion for class certification and appointment of class representatives and class counsel, and the defendants' related motion for summary judgment on the issue of the co-lead plaintiffs' reliance on alleged misrepresentations and omissions. For the reasons set forth below, the plaintiffs' motion for class certification and appointment of class representatives and class counsel is granted. The defendants' motion for partial summary judgment is denied.

## I.     BACKGROUND

The plaintiffs' allegations are detailed in the Court's prior opinion in this action. *See Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 295–303 (D.D.C. 2016). The factual background and procedural history relevant to understanding the pending motion for class certification and motion for summary judgment are set out below.

### A.     Factual Background[2]

The factual background proceeds in four parts. Following an overview of LSI's business model, and LSI's Department of Defense business, the alleged misrepresentations concerning the retail division are set out. This section concludes with an overview of the plaintiffs' investment advisories, since the defendants' opposition to class certification focuses in large part on purported distinctions between these advisories and other putative class members.

---

[1]     The Proposed Class is defined in the plaintiffs' motion for class certification as "all persons and entities who purchased or otherwise acquired the publicly traded common stock of Liquidity Services, Inc. ('Liquidity' or the 'Company') during the period of February 1, 2012 through May 7, 2014, inclusive (the 'Class Period'), and who were damaged thereby (the 'Class')." Pls.' Mem. Supp. Mot. Class Cert. ("Pls.' Mem. Supp. Class Cert.") at 1, ECF No. 64.

[2]     Many of the relevant filings and exhibits thereto were filed under seal and are quoted in this Memorandum Opinion. The documents are unsealed to the extent of the quoted material since the Court finds such unsealing necessary to explain the reasoning in ruling on the pending motions.

### 1.     Liquidity Services, Inc.

LSI, founded in 1999, provides online auction marketplaces for "surplus and salvage assets"—also known as a "reverse supply chain"—for which service the company retains a percentage of the sale proceeds. Defs.' Mot. Summ. J., Ex. 1, LSI Form 10-K for Fiscal Year Ended Sept. 30, 2014 at 1, ECF No. 83-2. LSI is comprised of three business divisions: (1) the retail division, sometimes referred to as the commercial division, which sells consumer goods; (2) the capital assets division, which sells large items including material-handling equipment, rolling stock such as trucks and military tanks, heavy machinery, and scrap metal; and (3) the public sector division, which sells surplus and salvage assets on behalf of local and state governments. *See* Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 42, LSI Corporate Structure Chart, ECF No. 81-43; Defs.' Mem. Supp. Mot. Protective Order at 3, ECF No. 65. The capital assets division is further divided by type of seller into the "commercial capital assets division" and Department of Defense ("DoD") business. *See* LSI Corporate Structure Chart; Defs.' Mem. Supp. Mot. Protective Order at 3. The commercial capital assets division consists of three online marketplaces, each with a particular focus: Truck Center, Network International, and GoIndustry. Defs.' Mem. Supp. Mot. Protective Order at 3; Disc. Hr'g Tr. dated Oct. 14, 2016 ("Disc. Hr'g Tr.") at 5:2–8, ECF No. 72. Network International enables energy sector clients to sell equipment in the oil, gas, and petrochemical industries. GoIndustry provides surplus asset management, auction, and valuation services largely to Asian and European clients in the manufacturing sector. Truck Center sells trucks and trailers through online auctions. *See* Defs.' Mem. Supp. Mot. Dismiss at 7, ECF No. 40; Am Compl. ¶ 49.

The Court previously dismissed claims based on alleged misrepresentations regarding "inorganic growth" in the commercial capital assets division, *i.e.*, growth by the acquisition of

Network International and GoIndustry. *Howard*, 177 F. Supp. 3d at 317; Disc. Hr'g Tr. at 9:1–3. The Court has also clarified that, based on the plaintiffs' evidence, the allegations of material misrepresentations about "organic growth"—growth through sustained margins and improvements in sales—concern only the retail division, and has limited discovery accordingly. Disc. Hr'g Tr. at 9:5–16, 14:18–20. Consequently, of LSI's three business divisions, the capital assets and the public sector divisions are not at issue. *Id.* at 11:5–8, 8:10–18, 10:15–18. Thus, the only remaining allegations concern misrepresentations and omissions regarding organic growth in the retail division.

### 2.     Department of Defense Contracts

Prior to and during the class period, a large portion of LSI's revenue came from exclusive rights to sell DoD surplus and scrap property. LSI had two contracts with DoD: a non-rolling surplus goods contract, which granted LSI the exclusive right to sell surplus property turned in to the Defense Logistics Agency ("DLA"), and an exclusive scrap material contract, which granted LSI the right to sell substantially all DoD scrap property turned into the DLA, such as metals, alloys, and building materials. Defs.' Mot. Dismiss, Ex. 1, LSI Form 10-K for Fiscal Year Ended Sept. 30, 2012 at 6, ECF No. 40-2 ("The Surplus Contract accounted for 29.9%, 30.3%, and 27.2% of [LSI] revenue . . . for the fiscal years ended September 30, 2010, 2011 and 2012, respectively. . . . the Scrap Contract . . . accounted for 25.0%, 25.5%, and 16.1% of [LSI] revenue . . . for the fiscal years 2010, 2011 and 2012, respectively."). LSI entered into the surplus contract in 2001 and renewed the contract in 2008; LSI entered into the scrap goods contract in 2005. *Id.* In late November of 2012, LSI acknowledged: if "we are not awarded new DoD contracts when our current contracts expire, [if] any of our DoD contracts are terminated[,]

or [if] the supply of assets under the contracts is significantly decreased, we would experience a significant decrease in revenue and have difficulty generating income." *Id*. at 8.

After the scrap goods contract expired in June 2012, DoD extended the contract for two additional one-year terms, through June 2014. *Id*. at 6. The surplus contract expired in February 2012, at which time DoD exercised two one-year renewal options, extending the contract until February 2014. *Id*. The plaintiffs allege that as the 2014 contract expiration dates approached, "[f]ear was mounting . . . within all levels of the Company" that the contracts with DoD, which were "subject to a competitive bidding process," would not "be renewed on the same favorable terms, or even renewed at all." Am. Compl. ¶ 3.

Around this time, LSI "sought to expand into the larger and more lucrative retail and commercial markets" because "it could not count on maintaining an exclusive relationship with the federal government indefinitely." Pls.' Mem. Supp. Mot. for Class Cert. ("Pls.' Mem. Supp. Class Cert.") at 3, ECF No. 64. This expansion entailed increased efforts and acquisitions in the retail reverse supply chain market and the commercial capital assets market, including expanding its distribution center in Dallas, Texas, which opened in 2005 to sell excess goods for major commercial retailers. Specifically, LSI aimed to have deeper client engagement with existing clients, and to expand its geographic reach and client base. *See id.*; *see also* Am. Compl. ¶¶ 8, 53. In October 2011, LSI acquired Jacob's Trading, which sells bulk returns from well-known retailers. LSI Form 10-K for Fiscal Year Ended Sept. 30, 2012 at 3, 8.

In April 2014, LSI lost the DoD surplus contract to a competitor, at the same time LSI's DoD scrap contract was renewed on new and less favorable terms.

### 3. Alleged Misrepresentations and Omissions

Based in part on information supplied by twenty confidential witnesses ("CWs"), including a vice-president, directors, and other senior managers of LSI components, the plaintiffs allege that, from February 1, 2012, to May 7, 2014, the defendants constructed a story of sustained growth and expansion of LSI's business outside of the DoD contracts. *See* Am. Compl. ¶¶ 1–20. In particular, the plaintiffs contend that the defendants issued fraudulent and misleading public statements on fifteen separate days over nine consecutive fiscal quarters regarding the growth of its non-DoD business—particularly emphasizing the "two pillars of growth: (1) 'organic' growth **through sustained margins** and improvements in client penetration and services; and (2) 'inorganic growth **through Liquidity's acquisition strategy**." Am. Compl. ¶ 5 (emphasis in original). The plaintiffs allege that misrepresentations artificially inflated stock prices throughout the class period, Am. Compl. ¶ 60, and that LSI's CEO, Mr. Angrick, exploited this "wave of artificial stock inflation" with "strategically timed stock sales during the Class Period" that "paid him *$68.2 million*," *id.* ¶ 18 (emphasis in original).

As noted above, only those allegations concerning misrepresentations about the organic growth of LSI's retail division remain. *Howard*, 177 F. Supp. 3d at 317; Disc. Hr'g Tr. at 14:18–20. On two of the fifteen days originally at issue, the defendants made statements concerning only inorganic growth (in particular about the acquisition of GoIndustry), and no statements concerning organic growth in the retail division. Thus, the statements issued on those two days are no longer relevant because the plaintiffs' claims concerning inorganic growth through acquisition have been dismissed.[3]

---

[3] The plaintiffs claim that defendants made fraudulent or misleading statements about the acquisition of GoIndustry on May 9, 2013, and July 5, 2013. Am. Compl. ¶¶ 122–24, 126–27. Regarding the statements issued on August 7, 2013, the plaintiffs' allegations largely concern the defendants' discussion of inorganic growth through the acquisition of GoIndustry, but the plaintiffs also allege that the defendants made misleading statements about

The plaintiffs quote extensively from public statements made in press releases, earnings calls, and filings with the U.S. Securities and Exchange Commission ("SEC") during each of the nine fiscal quarters that fall in the class period. The plaintiffs allege that the defendants' public statements about LSI's financial performance through the February 7, 2014 release were materially misleading and led investors to believe that the company was growing its retail division business and maintaining margins. According to the plaintiffs, contrary to LSI's public statements, the retail division was suffering from deteriorating margins due to heightened competition. Am. Compl. ¶¶ 65, 67–73. As detailed in the Court's previous opinion, the plaintiffs have made no allegation that the released financial results were inaccurate. *Howard*, 177 F. Supp. 3d at 306–07. Rather, the plaintiffs allege that the defendants misrepresented the underlying health of the retail division by making statements attributing "***strong results***" for the fiscal quarters to "***record volumes in both [LSI's] commercial capital assets and retail supply chain verticals***." Am. Compl. ¶ 106; Defs.' Mot. Dismiss, Ex. 1, LSI Earnings Conference Call Transcript (dated Feb. 1, 2012) at 3, ECF No. 48-2 (emphasis in original).

Indeed, LSI and its executives made many statements touting the strength of the retail division. Beginning on February 1, 2012, and throughout the class period, LSI maintained that "***[r]ecord GMV [gross merchandise volume[4]] results were primarily driven by growth in the volume of goods sold in [LSI's] retail supply chain and municipal government marketplaces by existing and new clients***." Am. Compl. ¶ 111 (quoting a May 3, 2012 press release) (emphasis in original). In the third quarter of 2012, LSI continued to report that the company's

---

organic growth within LSI generally. Am. Compl. ¶¶ 208–11. The remaining dates at issue are February 1, 2012; May 3, 2012; July 31, 2012; November 29, 2012; December 12, 2012; January 16, 2013; January 31, 2013; March 5, 2013; May 2, 2013; August 6, 2013; August 7, 2013; November 21, 2013; and February 7, 2014. *See* Am. Compl. ¶¶ 46–111.

[4] "GMV" is "a metric often provided by online sellers and which Liquidity defines as a measurement of the total sales value of all merchandise sold through [its] marketplaces during a given period." Am. Compl. ¶ 38 (internal quotation marks omitted).

"***strong results for the quarter were driven by record volumes in both our retail supply chain***

***group, which did not slow down from its seasonal high in the second quarter as we continued***

***to add new clients and further penetrate existing clients***", and continued growth in our public

sector verticals," *id*. ¶ 135 (emphasis in the original). During the earnings call discussing results

for the fourth quarter of 2012, Mr. Angrick repeated that LSI "enjoyed broad-based organic

growth" due to market share expansion within the commercial, non-DoD, market. *Id*. ¶ 146.

LSI also publicly claimed that competition was not seriously affecting the health of its retail

division. On December 12, 2012, during LSI's Investor Day presentation, Mr. Rallo stated that

"***when you look to the competition, there is a lot of it, but it's not very formidable***." *Id*. ¶ 165

(emphasis in original); *see also id*. ¶ 185 (citing Mr. Rallo's statement during the March 5, 2013

earnings call discussing second quarter 2013 financial results).

     LSI continued to proclaim that its retail division was a source of growth throughout 2013.

On January 31, 2013, the defendants released first quarter results for fiscal year 2013. *Id*. ¶ 172.

During the earnings call with analysts, Mr. Rallo lauded the "retail business" for "perform[ing]

extremely well during the first quarter." *Id*. ¶ 179. On May 2, 2013, LSI released the second

quarter 2013 financial results. *Id*. ¶ 187. During the earnings call, Mr. Rallo again attributed the

increase in GMV to the "***nice growth in the retail side of our business, driving efficiencies***

***there***." *Id*. ¶ 192 (emphasis in original). While LSI's third quarter earnings fell below previous

guidance, fourth quarter earnings met or exceeded guidance, which Mr. Angrick attributed to

"***strong sequential growth in our retail supply chain marketplaces driven primarily from new***

***consumer electronic programs with existing clients***." *Id*. ¶ 220 (emphasis in original).

     The defendants' laudatory statements about the retail division persisted into early 2014.

On February 7, 2014, the defendants released the first quarter financial results for fiscal year

2014 and Mr. Angrick stated that the "***better than expected financial results***" were "***driven by strong topline performance in our retail supply chain and municipal government businesses***," and that the "retail supply chain business saw sequential growth in GMV." *Id.* ¶¶ 226–27 (emphasis in original).

On May 8, 2014, the defendants announced financial results for the second quarter of fiscal year 2014, which fell below guidance. *Id.* ¶ 233. GMV had decreased by 12 percent, while adjusted EBITDA (earnings before interest, tax, depreciation and amortization) and adjusted diluted EPS (earnings per share) suffered 43 percent and 46 percent declines, respectively, as compared to the same period in the previous year. *Id.* In the statement accompanying LSI's Form 8-K, filed with the SEC, Mr. Angrick attributed these results to several factors, including the loss of the DoD surplus contract; the restructured, less profitable DoD scrap contract; "mix changes in our . . . retail businesses and delayed capital asset projects in both the U.S. and Europe;" and "unusual softness in our energy vertical due to an industry wide decline in line pipe and related equipment." *Id.* ¶ 234; Merrill Lynch Analyst Report (dated Apr. 3, 2014) at 2–3. On this news, LSI's stock price plummeted nearly 30 percent. *Id.* ¶ 239. The plaintiffs allege that the defendants' public statements about the financial performance of LSI through the February 7, 2014 release were materially misleading and caused investors to believe that the company was growing its non-DoD business. Contrary to LSI's public statements, the plaintiffs allege that the LSI's components that were publicly touted as driving the organic and inorganic growth were internally known as drags on performance. Am. Compl. ¶¶ 5–10.

The plaintiffs further assert that, "[b]etween June 20, 2012, and May 7, 2014, selective information was revealed about Liquidity's financial performance and outlook, which had a

material adverse impact upon Liquidity's stock price without revealing the full extent of the known risks and challenges facing the Company." *Id.* ¶ 283. According to the plaintiffs, "[a]nalysts following the company downplayed the significance of these partial disclosures, accepting Defendants' efforts to mitigate and blunt the truth." *Id.* These partial disclosures include, *inter alia*, (1) a June 22, 2012 statement by Mr. Rallo to investors attending a conference sponsored by Stifel Nicolaus that "margins may not continue to grow as in the past," *id.* ¶ 283(a); (2) a July 1, 2012 report from a short-selling research firm, Off Wall Street Consulting Group, indicating, among other things, that non-DoD business is "unlikely to drive the earnings growth that investors expect," and that "competition is increasing," *id.* ¶ 283(b); and (3) a September 12, 2012 "reduction in price target by Stifel Nicolaus, citing a decline in GMV in August compared to July and sales that were lower than forecast[ed]," *id.* ¶ 283(c). The plaintiffs claim that, "[w]hile all of these partial disclosures revealed pieces of information that cast some doubt on Defendants' bullish claims that Liquidity would continue to grow and achieve guided profit levels, none of them provided investors with anything close to the full picture of the known risks and challenges facing the Company and its ability to achieve the guidance levels Defendants provided the market." *Id.* ¶ 284.

### 4. The Plaintiffs' Investment Advisors

Co-lead plaintiffs Caisse, an institutional investor headquartered in Montreal, Canada, *id.* ¶ 25, and NNERF, a public pension fund established and administered by the city of Newport News, Virginia, *id.* ¶ 26, invested in LSI through "professional investment managers to whom they extended discretionary trading authority," Pls.' Omnibus Reply Mem. Supp. Mot. Class Cert. & Opp'n Defs.' Mot. Summ. J. ("Pls.' Omnibus Reply") at 2 n.5, ECF No. 89. Caisse invested in LSI common stock through Van Berkom and Associates, Inc. ("Van Berkom"). *Id.*;

*see also* Pls.' SMF Opp'n Defs.' Mot. Summ. J. ("Pls.' SMF") at 6–10, ECF No. 89-1.  Mathieu

Sirois, a portfolio manager at Van Berkom, made investment decisions on behalf of Caisse

concerning LSI, and served as Van Berkom's Rule 30(b)(6) designee.  Defs.' Opp'n Pls.' Mot.

Class Cert. at vi; *see also generally* Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 1, Deposition of

Mathieu Sirois ("Sirois Dep."), ECF No. 81-2.  The NNERF used two investment managers who

invested in LSI common stock: Pier Capital, LLC ("Pier Capital") and NewSouth Capital

Management, Inc. ("NewSouth").  Pls.' Omnibus Reply at 2 n.5; *see also* Pls.' SMF at 54, 71.

Alexander Yakirevich, a portfolio manager at Pier Capital, made investment decisions on behalf

of NNERF concerning LSI, and served as Pier Capital's Rule 30(b)(6) designee.  Defs.' Opp'n

Pls.' Mot. Class Cert. at vi, ECF No. 81; *see also generally* Defs.' Mot. Summ. J., Ex. 17,

Deposition of Alexander Yakirevich ("Yakirevich Dep."), ECF No. 83-19.  Alexander McLean,

a portfolio manager at New South, made investment decisions on behalf of NNERF concerning

LSI, and served as New South's Rule 30(b)(6) designee.  *See generally* Defs.' Opp'n Pls.' Mot.

Class Cert., Ex. 3, Deposition of Alexander McLean ("McLean Dep."), ECF. No. 81-4.

### B.    Procedural History

The original lead plaintiff, Leonard Howard, an individual investor, filed this putative

class action against LSI and Messrs. Angrick and Rallo on July 14, 2014.  Compl. at 1, ECF No.

1.  Several other shareholders entered appearances to move for appointment as lead plaintiff.  *See*

Mots. Appoint Counsel & Appointment as Lead Pl., ECF. Nos. 25, 26, 29, 31.  On October 14,

2014, institutional investors Caisse and NNERF were appointed as co-lead plaintiffs pursuant to

the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(3), given

that these two institutional investors had "'the largest financial interest in the relief sought by the

class'" and "(b) otherwise satisf[ied] the requirements of Rule 23 of the Federal Rules of Civil

Procedure, which, as set forth in the PSLRA, establishes the presumption that the Institutional Investors are the plaintiffs 'most capable of adequately representing the interests of class members.'" Order Appointing Lead Pl. & Approving Selection of Counsel at 1, ECF No. 32. The co-lead plaintiffs filed an amended complaint on December 15, 2014. *See generally* Am. Compl.

Thereafter, the defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and the PSLRA. *See generally* Defs.' Mot. Dismiss. The Court dismissed part of the plaintiffs' Count I, which alleged violations of Section 10(b) of the Securities Exchange Act of 1934 based on misrepresentations regarding the acquisitions of Network International and GoIndustry in the commercial capital assets division. *Howard*, 177 F. Supp. 3d at 311. The Court denied the motion to dismiss the portion of Count I based on "alleged misrepresentations regarding the financial performance of Liquidity Services, Inc.'s retail and commercial capital assets divisions." *Id.* Further, the Court denied the defendants' motion to dismiss plaintiffs' Count II, which alleges that Messrs. Angrick and Rallo are jointly and severally liable for LSI's alleged 10(b) violation. *Id.* at 316–17. As explained above, during a subsequent hearing addressing a discovery dispute, the Court clarified that the allegations of material misrepresentations about "organic growth" through sustained margins concern only the retail division, based on the evidence proffered by the plaintiffs thus far. Disc. Hr'g Tr. at 14:18–20.[5] Following the discovery hearing, the defendants moved for reconsideration of the

---

[5] The parties' discovery dispute concerned whether the defendants had to produce discovery concerning LSI's business divisions other than the retail division. The plaintiffs had filed a motion to compel such discovery, *see generally* Pls.' Mot. Compel Discovery, ECF No. 66, and the defendants had filed a motion for a protective order concerning that same discovery, *see generally* Defs.' Mot. Protective Order, ECF No. 65. In this context, and more than six months after the defendants' motion to dismiss had been decided, *see* Minute Entry (dated Oct. 14, 2016), the defendants explained for the first time LSI's structure and its various business components.

Court's previous opinion denying their motion to dismiss, Defs.' Mot. Recons., ECF No. 73, which was denied, *see* Minute Order (dated Dec. 21, 2016).

The plaintiffs have now moved to certify a class consisting of "all persons and entities who purchased or otherwise acquired the publicly traded common stock" of LSI "during the period of February 1, 2012 through May 7, 2014, inclusive," and "who were damaged thereby." Pls.' Mem. Supp. Class Cert. at 1. Shortly after filing their opposition to class certification, the defendants moved for partial summary judgment on the issue of reliance by the co-lead plaintiffs. *See generally* Defs.' Mot. Summ. J., ECF No. 83. The defendants' opposition to the plaintiffs' motion for class certification and the defendants' motion for summary judgment advance similar arguments and, thus, both motions are addressed in this Memorandum Opinion.[6]

## II.    LEGAL STANDARD

The legal standards governing the plaintiffs' motion for class certification and the defendants' motion for summary judgment are set out in turn.

### A.    Class Certification

Class certification is governed by Federal Rule of Civil Procedure 23, which requires two separate inquiries set out in Rule 23(a) and Rule 23(b). *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 249 (D.C. Cir. 2013); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). First, pursuant to Rule 23(a), the plaintiff must show that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the

---

[6]    Upon granting the defendants leave to file their motion for summary judgment, the Court expressly instructed that "[t]he Lead Plaintiffs may seek leave to file a sur-reply." *See* Minute Order (dated Apr. 11, 2017). Accordingly, the plaintiffs' motion for leave to file a sur-reply, ECF No. 94, is granted, over the defendants' objections, *see* Defs.' Opp'n to Lead Pltfs.' Mot. for Leave to File Sur-Reply, ECF No. 96 (arguing that the plaintiffs' motion for leave to file a sur-reply should be denied because it contains additional arguments about facts that were raised in the parties' opening and opposition briefs, rather than arguments about new factual matters).

claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. These four requirements are referred to as numerosity, commonality, typicality, and adequacy of representation, respectively. *See generally Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, the plaintiffs point to Rule 23(b)(3) as the basis for this putative class action. Accordingly, the plaintiffs must demonstrate (1) that questions of law and fact common to the entire class predominate, and (2) the superiority of the class action method to other methods of adjudication. FED. R. CIV. P. 23(b)(3).

The D.C. Circuit has cautioned that class certification "is far from automatic." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 249. Indeed, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (quoting *Wal–Mart*, 564 U.S. at 350) (emphasis in original) (internal quotation marks omitted). Determining whether the class proponent has satisfied its Rule 23 burden often "resembles an appraisal of the merits, for 'it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.'" *Id.* (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Wal–Mart*, 564 U.S. at 350. Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *DL v. District of Columbia*, 713 F.3d 120, 125

(D.C. Cir. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013) (internal quotation marks omitted)).

## B.    Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 256–57 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (internal quotation marks omitted)); *see also* FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

In this lawsuit, the plaintiffs allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Section 10(b) makes it illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b–5, in turn, prohibits "mak[ing] any untrue statement of a material fact . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5. The elements of a securities fraud claim brought under § 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Harman Intern. Indus., Inc. Sec. Litig.*, 791 F.3d 90, 99 (D.C. Cir. 2015) (quoting *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 140 n.3 (2011)). Section 20(a) of the Securities Exchange Act provides that individuals who are in "control of the primary violator" of other provisions of the Act, including section 10(b), maybe be held jointly and severally liable. *In re Harman*, 791 F.3d at 111. The elements of a section 20(a) claim are (1) that "there is a viable claim against the corporation," under section 10(b), and (2) that the section 20(a) defendants qualify as "controlling persons." *Id.*

The plaintiffs have moved for class certification, and the defendants, in addition to opposing class certification, have moved for summary judgment. The defendants oppose class certification primarily on the ground that the proposed lead plaintiffs are subject to unique defenses regarding the reliance element of their claims. Similarly, the defendants' motion for summary judgment contends that there are no genuine issues of material fact with respect to the proposed lead plaintiffs' non-reliance on the alleged misrepresentations and omissions. These two motions are addressed in turn after setting out the applicable standard provided in *Basic v. Levinson,* 485 U.S. 224, 245 (1988), for invoking the presumption of reliance, on which the plaintiffs rely to establish their reliance on the alleged misrepresentations and omissions. *See* Am. Compl. ¶ 291 ("Co-Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory.").

## A.     The *Basic* Presumption

A plaintiff asserting security fraud claims under section 10(b) and Rule 10b–5 must prove, *inter alia*, reliance upon the alleged misrepresentations or omissions in question. *In re*

*Harman*, 791 F.3d at 99.  As the Supreme Court has explained, "[t]he reliance element [of a § 10(b) and Rule 10b–5 securities fraud claim] 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'"  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014) (*Halliburton II*) (quoting *Amgen*, 568 U.S. at 461). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (*Halliburton I*).  In *Basic v. Levinson*, the Supreme Court recognized, however, that "requiring such direct proof of reliance . . . place[s] an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market."  *Halliburton II*, 134 S. Ct. at 2407 (citing *Basic*, 485 U.S. 224, 245 (1988)). Even if a plaintiff could show awareness of the alleged misrepresentation, he would also have to "show a speculative state of facts, *i.e.*, how he would have acted . . . if the misrepresentation had not been made."  *Basic*, 485 U.S. at 245.  The Supreme Court further acknowledged that, requiring individualized proof of reliance would essentially prevent security fraud suits from proceeding as class actions, as individual issues of reliance would predominate over common issues, foreclosing class certification under Rule 23(b).  *Halliburton II*, 134 S. Ct. at 2407–08 (citing *Basic*, 485 U.S. at 242).

To avoid this outcome, the *Basic* Court established a rebuttable presumption of reliance, predicated on the notion that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.  Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b–5 action."  *Basic*, 485 U.S. at 247; *accord*

*Halliburton II* 134 S. Ct. at 2408. To invoke *Basic*'s presumption of reliance, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2413 (citing *Basic*, 485 U.S. at 248; *Amgen*, 133 S. Ct. at 1198).

That said, the *Basic* presumption of reliance is "rebuttable rather than conclusive." *Halliburton II*, 134 S. Ct. at 2408. A defendant may rebut the *Basic* presumption with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [its] decision to trade at a fair market price." *Basic*, 485 U.S. at 248. Thus, a defendant can rebut the *Basic* presumption, for example, by establishing that the plaintiff "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton II*, 134 S. Ct. at 2408; *see also Basic*, 485 U.S. at 249 ("For example, a plaintiff who believed that Basic's statements [falsely disclaiming the possibility of a merger] were false and that Basic was indeed engaged in merger discussions, and who consequently believed that that Basic stock was artificially underpriced, but sold his shares nevertheless because of other unrelated concerns, *e.g.*, potential antitrust problems, or political pressures to divest from shares of certain businesses, could not be said to have relied on the integrity of a price he knew had been manipulated.").

The defendants do not dispute that the plaintiffs have properly invoked *Basic*'s rebuttable presumption.[7] Rather, the defendants contend that the presumption has been rebutted. As the

_____

[7] In short, the plaintiffs have established that the alleged misrepresentations were "publicly known" and "material," and that the plaintiffs "traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2413 (citing *Basic*, 485 U.S. at 248; *Amgen*, 568 U.S. at 460–61). As for market efficiency, the defendants do not dispute the plaintiffs' expert's determination that "the market for Liquidity Services Common Stock was efficient throughout the class period." Pls.' Mot. Class Cert., Abramowitz Decl., Ex. 2, Expert Report of Chad Coffman, CFA (dated Sept. 2, 2016) ("Coffman Rep.") ¶ 6, ECF No. 64-4. The expert, Chad Coffman, analyzed the so-called *Cammer* factors, *see generally Cammer v. Bloom*, 711 F. Supp. 1264

defendants acknowledge, they bear the burden of rebutting the *Basic* presumption. Defs.' Mot. Summ. J. at 15 ("*Basic* thus shifted the burden so that defendants must show 'by a preponderance of the evidence' that the presumption of reliance is rebutted." (quoting *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 490 (S.D.N.Y. 2011))); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 258 (N.D. Tex. 2015) (the defendant bears the burden of production and persuasion as to rebutting the *Basic* presumption).[8]

## B.    The Plaintiffs' Motion for Class Certification

The defendants do not dispute that the plaintiffs in this case satisfy Rule 23(a)'s requirements of numerosity and commonality, and the 23(b)(3) requirement of superiority of the class action mechanism. *See generally* Defs.' Opp'n Pls.' Mot. Class Cert.; *see also* Pls.' Omnibus Reply at 1 n.2. Nevertheless, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" *Wal–Mart Stores, Inc.*, 564 U.S. at 350–51 (quoting *General Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see also General Telephone Co.*, 457 U.S. at 160 ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable."). Thus, each applicable Rule 23(a) and relevant Rule 23(b) requirement is addressed *seriatim*.

---

(D. N.J. 1989) (identifying as relevant factors (1) average weekly trading volume, (2) analyst coverage, (3) market makers, (4) SEC Form S-3 eligibility, and (5) price reaction to unexpected information), in addition to other factors courts consider in addressing efficiency, in opining that the market for LSI stock was efficient. *See* Coffman Rep. ¶¶ 21, 24.

[8]    The plaintiffs also contend that they are entitled to the so-called *Affiliated Ute* presumption, which applies in the case of an alleged omission or "failure to disclose" (as compared to an alleged misrepresentation). *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). Given that the "gravamen" of the plaintiffs' claims is that the defendants issued statements containing misrepresentations as to the retail division, the *Affiliated Ute* presumption is inapplicable here. *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (finding that the *Affiliated Ute* presumption did not apply where the defendant allegedly took part in a Ponzi scheme and "the gravamen of the appellants' complaint [was] that, by certifying Interbank's materially false financial statements, Radin affirmatively misrepresented Interbank's financial situation").

### 1. Rule 23(a) Requirements

As noted, Rule 23(a) requires the plaintiff to demonstrate that the putative class meets the numerosity, commonality, typicality, and adequacy of representation prerequisites for certification.

#### a. Numerosity

Rule 23(a)(1) permits members of a class to sue as representative parties if "the class is so numerous that joinder of all members is impractical." "Absent unique circumstances, 'numerosity is satisfied when a proposed class has at least forty members.'" *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 76 (D.D.C. 2015) (quoting *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013)). "In assessing the number of potential class members, the Court need only find an approximation of the size of the class, not 'an exact number of putative class members.'" *Bunn*, 306 F.R.D. at 76 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 347 (D.D.C. 1998)). It is undisputed that there were more than 1,000 purchasers of LSI stock during the class period. *See* Pls.' Mem. Supp. Class Cert., Ex. 1, Defs.' Resps. and Objs. to Pls.' First Set of Reqs. for Admis. ("Defs.' RFA Responses") at 4, ECF No. 64-3. While the exact number of class members will not be ascertained until official notice is given, the putative class likely numbers over 1,000, and certainly well over 40. Thus, the numerosity requirement is satisfied.

#### b. Commonality

Rule 23(a)(2) requires the plaintiffs to show the existence of "questions of law or fact common to the class." In addressing this requirement, the Supreme Court has explained that the class's "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke." *Wal–Mart*, 564 U.S. at 350 (2011); *accord DL*, 713 F.3d at 125 (discussing *Wal–Mart*). "The touchstone of the commonality inquiry is 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Bunn*, 306 F.R.D. at 82 (emphasis in original) (quoting *Wal–Mart*, 564 U.S. at 350). "Depending upon the circumstances, this may involve many common issues that together provide a resolution, but 'even a single common question will do.'" *Id.* (quoting *Wal–Mart*, 564 U.S. at 359); *see also In re District of Columbia*, 792 F.3d 96, 100 (D.C. Cir. 2015) ("[T]he Supreme Court explained in *Wal–Mart* that 'for purposes of Rule 23(a)(2) even a single common question will do.'" (quoting *Wal–Mart*, 564 U.S. at 359)). "A class may satisfy the commonality requirement even if factual distinctions exist among the claims of putative class members." *Bunn*, 306 F.R.D. at 82. "Ultimately, '[w]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.'" *Id.* (quoting NEWBERG ON CLASS ACTIONS § 3:20 (5th ed. 2014)). Commonality often exists in securities class actions where investors sue for misrepresentations or omissions that had an impact on stock price. *See In re Newbridge Networks Securities Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) ("[W]here members of a class are subject to the same misrepresentations and omissions, and where alleged misrepresentations fit within a common course of conduct, common questions exist and a class action is appropriate."); *In re VeriSign, Inc. Sec. Litig.*, No. 02-cv-2270, 2005 WL 7877645, at *5 (N.D. Cal. Jan. 13, 2005) ("Commonality is easily met in cases where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties, even when damages may vary." (internal quotation marks omitted)).

While the defendants contest other 23(a) requirements that might overlap with the commonality inquiry, the defendants do not explicitly dispute that the plaintiffs satisfy Rule 23(a)(2)'s commonality requirement. Here, common questions emerge from the defendants' common course of conduct: allegedly issuing misrepresentations and omissions to the investing public. As the plaintiffs contend in their motion for class certification, "the common questions of law and fact at issue here include: (a) whether Defendants violated the Exchange Act; (b) whether Defendants misrepresented and/or omitted material facts in their public statements; (c) whether Defendants knowingly or recklessly disregarded that their statements were false and misleading; (d) whether the price of Liquidity's stock was artificially inflated as a result of Defendants' misrepresentations and/or omissions; and (e) whether and to what extent disclosure of the truth regarding Defendants' misrepresentations and/or omissions of material facts caused Class members to suffer economic harm." Pls.' Mem. Supp. Class Cert. at 8. Accordingly, Rule 23(a)(2)'s commonality requirement is satisfied.

### c. Typicality

Under Rule 23(a)(3), the representative parties' claims or defenses must be "typical of the claims or defenses of the class." "'Typicality' is satisfied 'if each class member's claim arises from the same course of events that led to the claims of the representative parties and each class member makes similar legal arguments to prove the defendant's liability.'" *In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 15 (D.D.C. 2015) (quoting *Trombley v. Nat'l City Bank*, 826 F. Supp. 2d 179, 192 (D.D.C. 2011) (internal quotation marks omitted)). While "the class representatives should have 'suffered injuries in the same general fashion as absent class members,'" *id.* (quoting *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (internal quotation marks omitted)), "[t]he facts and claims of each member of the class need not

be identical," *id.* (citing *Daskalea v. Wash. Human Soc'y*, 275 F.R.D. 346, 358 (D.D.C. 2011)). Typicality "is not destroyed merely by 'factual variations.'" *Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987). Instead, the typicality requirement calls for "'sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members.'" *In re Navy Chaplaincy*, 306 F.R.D. 33, 53 (D.D.C. 2014) (quoting WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3:31 (5th ed. 2013)).

While factual variations are acceptable, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1984). The "presence of a unique defense will not . . . destroy typicality," however, unless it "will 'skew the focus of the litigation' and create 'a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 246 F.R.D. 293, 302 (D.D.C. 2007) (quoting *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 304–05 (E.D. Mich. 2001)).

Here, the defendants do not dispute that the class members' claims are based on the same legal theory—that the defendants violated sections 10(b) and 20(a) of the Securities Exchange Act by making the same alleged misrepresentations and omissions. Nor do the defendants dispute that, like the rest of the putative class members, Caisse and NNERF each purchased shares of LSI's stock during the class period, and contend that they relied on LSI's alleged misrepresentations and omissions through *Basic*'s fraud-on-the-market theory and suffered damages when LSI's stock price came to reflect the truth about the retail division's margins and

organic growth. Instead, the defendants argue that Caisse and NNERF are atypical because they are subject to the unique defense of non-reliance on alleged misrepresentations and omissions, or on the market price of LSI stock. According to the defendants, "the mere fact that Plaintiffs will be subject to such defenses renders their claims atypical," because those defenses threaten to become the focus of the litigation, even if they are ultimately not viable. Defs.' Opp'n Pls.' Mot. Class Cert. at 16. The defendants further contend that NNERF is atypical because Pier Capital, one of the two investment advisories that purchased shares of LSI on behalf of NNERF, earned a profit on its LSI investment. These two elements—reliance and loss—are addressed in turn.

### i.      Reliance

According to the defendants, Caisse and NNERF are subject to unique defenses as to the element of reliance, and therefore are atypical of other putative class members. Specifically, the defendants contend that plaintiffs are variously susceptible to three defenses concerning the issue of reliance: (1) the plaintiffs' "investment advisors testified that they were *not misled* about the very subjects of the purported fraud," and in any event the health of the retail division was irrelevant to their investment decisions, *id.* at 2; (2) the plaintiffs' "investment advisors admitted that they believed the market for LSI stock was *in*efficient and did *not* reflect LSI's intrinsic value," *id.* at 4 (emphasis in original); and (3) "both New South and Van Berkom (and, by extension, Plaintiffs) are subject to atypical defenses due to their close relationship and frequent private meetings with LSI senior management," *id.* As the defendants' rebuttal rests on specific facts related to each investment advisory of Caisse and NNERF, the defendants' arguments with respect to each investment advisory is addressed in turn.

### 1.      Van Berkom

On February 25, 2013, Van Berkom acquired 16,630 shares of LSI stock for a fund in which Caisse invested. Pls.' SMF ¶¶ 17, 19. The defendants argue that Caisse is not typical

because Van Berkom (1) was not misled about LSI's retail division, Defs.' Opp'n Pls.' Mot. Class Cert. at 18; (2) understood that the market had undervalued LSI shares and invested to exploit markets inefficiencies instead of relying on the integrity of the market price, *id.* at 21; and (3) had private interactions with LSI management, *id.* at 22. These three arguments are addressed *seriatim.*

### (a) Van Berkom, and, by Extension, Caisse, Was Misled by the Alleged Misrepresentations

The defendants contend that Caisse is subject to unique defenses involving the *Basic* presumption because Van Berkom was not misled about the health of LSI's retail division. In particular, the defendants maintain that LSI's DoD business was Van Berkom's primary consideration in deciding to invest in LSI and that the health of the retail division was irrelevant. According to the defendants, Van Berkom "would still be invested in LSI but for the loss of the DoD contract—regardless of any supposed fraud regarding the Retail Division." *Id.* at 17. For support, the defendants cite testimony from Van Berkom's portfolio manager, Mathieu Sirois, as well as Van Berkom's review of its small-cap investments to argue that "the reason for Van Berkom's early exit was that its entire investment thesis was defeated by the loss of the DoD contract—a 'binary event' that 'broke' its model and 'destroyed the economics of the business.'" *Id.* at 18; *see also* Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 10, Van Berkom & Assoc., Review and Outlook of U.S. Small-Cap Stocks at VAN-BERKOM_000072, ECF No. 81-11 (characterizing LSI's loss of the DoD surplus contract as a "binary event[]" and explaining that "the news about the loss of the contract was . . . hard . . . to swallow").

The defendants rely heavily on Sirois's response to the deposition question: "Would you think if that DoD contract had been renewed on the same terms you would be in the stock today?" *Id.* (quoting Sirois Dep. at 78:20–22). Sirois answered, "Yes, most likely. I mean, that

broke the model." *Id.* (quoting Sirois Dep. at 78:23–24). Although in a vacuum this testimony might suggest that Van Berkom was concerned only with the DoD business, and that the retail division was irrelevant to Van Berkom's investment decision, the totality of Sirois's testimony indicates that Van Berkom considered non-DoD components of the company. In addition to saying that Van Berkom "most likely" would still be invested in LSI stock had DoD renewed its contracts, Sirois immediately clarified that LSI "went from pretty good margins to making almost nothing. And therefore, when that happened, the stock no longer fit with our criteria and that's why we sold it." Sirois Dep. at 78:20-79:2. Thus, Van Berkom *was* concerned with LSI's margins, and, as explained by Sirois, when LSI "lost part of the surplus contract with the DOD, this was when the weak margins on the commercial side really came to light, *and that was the big thing*." *Id.* at 25:12–26:14 (emphasis added). Sirois's testimony thus supports the plaintiffs' contention that "the loss of a portion of the DoD contract caused Van Berkom to reevaluate its investment in LSI not merely because it meant losing DoD revenues, but because this revealed that a fundamental premise of Van Berkom's investment thesis—that LSI had the potential to realize organic growth and profits *in the Retail Division*—was entirely false." Pls.' Omnibus Reply at 12. Even if the plaintiffs have overstated the extent to which organic growth in the retail division was a "fundamental premise" of Van Berkom's investment thesis, the record demonstrates that Van Berkom cared about margins within the retail division. *See, e.g.*, Sirois Dep. at 52:10–12 (noting that if Van Berkom "thought [organic growth] was going down to that level [Van Berkom] would have never made the investment").

To be sure, Van Berkom viewed the loss of the DoD contract as the "biggest letdown," and stated that "what broke the model altogether was not the retail trends." *Id.* at 77:18–78:6. Yet even these statements do not prove that Van Berkom's choice to invest was unrelated to the

supposed strength of the retail division. As Sirois testified, "[i]t was all about the money they were not making on the commercial side and all this money they were making on the DOD that was taken away on the renewal." *Id.* When asked point blank whether Van Berkom invested in LSI "based on the expectation that DOD would be renewed," Sirois responded, "[y]es, but also on the expectation that commercial business would be more profitable." *Id.* at 32:4–14. Thus, the defendants have not established that Van Berkom cared only about the DoD contract, and that the subject of the purported fraud—the health of the retail division—was "irrelevant to [Van Berkom's] decision to purchase" shares of LSI. *GAMCO Inv'rs, Inc. v. Vivendi, S.A.*, 927 F. Supp. 2d 88, 100 (S.D.N.Y. 2013) (holding that the *Basic* presumption was rebutted with respect to a particular plaintiff, after the class certification decision, because the subject of the fraud was irrelevant as to that plaintiff).

Nevertheless, to bolster their argument, the defendants cite a string of out-of-Circuit district court decisions, each of which concerns the same allegedly fraudulent statements, in which the defendants succeeded in rebutting the *Basic* presumption with respect to particular plaintiffs. *See* Defs.' Opp'n Pls.' Mot. Class Cert. at 18–19 (citing *In re Vivendi Universal S.A. Securities Litig.*, 183 F. Supp. 3d 458, 466 (S.D.N.Y. 2016) ("*Capital Guardian*"); *In re Vivendi Universal S.A. Securities Litig.*, 123 F. Supp. 3d 424, 426–27 (S.D.N.Y. 2015) ("*Southeastern Asset Management*" or "*SAM*"); and *GAMCO*, 927 F. Supp. 2d at 100 (collectively, "the *Vivendi* cases"). By way of background, the *Vivendi* litigation arose out of alleged misstatements and omissions by Vivendi, a French multimedia firm trading American Depository Shares on the New York Stock Exchange. *GAMCO*, 927 F. Supp. 2d at 92. Beginning in the late 1990s, Vivendi "engaged in a series of mergers and acquisitions," and, "[a]s a result of this activity, . . . took on a significant debt, and eventually faced a liquidity crisis." *Id.* The alleged

misstatements and omissions concerned Vivendi's alleged attempts to conceal the liquidity crisis. *Id.* Following a jury verdict in favor of the class plaintiffs, "the . . . core disputes remaining . . . address[ed] whether certain, sophisticated members of the class actually relied on defendant Vivendi['s] . . . misstatements in trading its stock." *SAM*, 123 F. Supp. 3d at 425.[9] The *Vivendi* cases are distinguishable from the instant case on their facts and ultimately undercut the defendants' argument. For example, in *GAMCO*, the court held that the *Basic* presumption was rebutted where the subject of the fraud was "irrelevant" to the investors' decision to purchase shares of the defendant company. *GAMCO*, 927 F. Supp. 2d at 97, 100. Here, although the defendants have shown that the DoD contract was a significant driver of Van Berkom's decision to invest in LSI, and, later, to sell LSI shares, Sirois's testimony amply demonstrates that Van Berkom also decided to invest based on growth prospects in other LSI divisions. Those divisions were not "irrelevant" to Van Berkom's purchasing decision.

The defendants further contend that even if the performance of the retail division was relevant, Van Berkom was not actually misled about LSI's competition or retail division margins. Defs.' Opp'n Pls.' Mot. Class Cert. at 19–21. Regarding competition, the plaintiffs allege that LSI's statement that "when you look at the competition, there is a lot of it, but it's not very formidable" was misleading. Am. Compl. ¶¶ 11, 165, 185. The defendants argue that Van

---

[9]       As noted, the *Vivendi* cases were decided *after* class certification, raising the question whether the defendants' reliance arguments are appropriate *at* the class certification stage. *See, e.g., Willis v. Big Lots, Inc.*, Civ. No. 2:12-604, 2017 WL 1063479, at *7 (S.D. Ohio Mar. 17, 2017) (distinguishing the *Vivendi* decisions when addressing a motion for class certification because, *inter alia*, the *Vivendi* cases were "made in the course of post-trial proceedings wherein the defendant attempted to rebut the presumption of reliance with respect to individual plaintiffs"); *see also Todd v. STAAR Surgical Co.*, Civ. No. 14-05263, 2017 WL 821662, at *5 (C.D. Cal. Jan. 5, 2017) (collecting cases for the proposition that "[d]istrict courts generally find that where plaintiffs have bought and sold stock for investment purposes, subject to the same information and representations as the market at large those plaintiffs are typical and not subject to a unique defense" (internal quotation marks omitted)); *Loritz v. Exide Techs.*, Civ. No. 2:13-02607, 2015 WL 6790247, at *5 (C.D. Cal. July 21, 2015) ("[T]he defense of nonreliance is not itself a basis for denial of class certification." (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992))); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584–85 (S.D.N.Y. 2011) (collecting cases for the proposition that "courts in securities fraud actions have consistently recognized that issues of individual reliance can and should be addressed after a class-wide trial, through separate jury trials if necessary").

Berkom was not misled by this statement because Sirois had identified LSI's competitors through his own due diligence, Sirois Dep. at 109:5–24, and agreed that competitors were not "all on equal footing" with LSI, *id.* at 19:2–12. The plaintiffs are "baffl[ed]" by the defendants' assertion, since, "as reflected in a memorandum to clients, Van Berkom believed that LSI's 'strong competitive position and its large scale' enabled it to 'generate[] good profit margins, high returns on capital (over 25%) and equity and steady free cash flows.'" Pls.' Omnibus Reply at 12 (quoting Abramowitz Decl., Ex. 6, March 2013 Memo. to Clients at 8, ECF No. 88-3 (explaining that due to LSI's "significant[]" growth, "huge barriers to entry" were created "for *any* competitor" (emphasis added))). Furthermore, although Sirois testified that he had identified LSI's competitors and determined that they were not as "sophisticated" as LSI, Sirois Dep. at 19:4, Sirois later testified that Van Berkom "knew [the competitors] could create some noise and some slow-down in [LSI's] business, but we felt that at the end of the day that [LSI's] competitive advantages were strong enough that they should be able to grow at a decent clip," *id.* at 116:11–15. Thus, the totality of the evidence suggests that although Van Berkom researched and was able to identify LSI's competitors, Van Berkom ultimately believed that LSI had a "*strong* competitive position." March 2013 Memo to Clients at 8 (emphasis added); *see also* Sirois Dep. at 12:4–5 (stating that Van Berkom invests in companies that it identifies as having a "sustainable competitive advantage"). Accordingly, the defendants are incorrect in asserting that Van Berkom was "fully capable of sizing up the competition," and "*agreed* with [Mr.] Rallo" that competition was not very formidable, as the defendants maintain. Defs.' Opp'n Mot. Class Cert. at 19 (emphasis in original).

The defendants have likewise failed to show that Van Berkom "kn[ew] of the purportedly concealed facts as to . . . organic growth" in the retail division. Defs.' Opp'n Pls.' Mot. Class

Cert. at 21. The defendants point to Sirois's testimony that Van Berkom "knew [DoD margins] were higher. [LSI] [m]anagement had said the DoD margins were higher, and it made sense for a couple of reasons." Sirois Dep. at 26:19–21. Again, these cherry-picked sound bites do not accurately reflect the totality of Sirois's testimony with respect to margins. Sirois testified that Van Berkom had no way of ascertaining margins in particular divisions, and was unaware that the margins in the retail division were so low until the loss of the DoD contract exposed the truth about the margins in the non-government divisions. *Id*. at 25:12–26:21 ("The only thing I will say is the key in the economic model of the business were the margins they were generating on the commercial business versus the government business, and they never disclosed that to anyone. . . . So we did all the research we could do in the world to try to find out what the margin structure could be of each of these businesses."); *id*. at 26:18–27:10 ("We just didn't know how weak the commercial margins were, and I don't think there is any research in the world that would have shown that."); *id*. at 27:18–22 ("[W]e knew that retail margins were weaker. We know they were lower. We just didn't know they were that bad. And when the lost the [DoD] surplus contract that proved to be the case."). Van Berkom's understanding that retail margins were lower than DoD margins does not establish that Van Berkom was not misled about the strength of margins in the retail division, or the extent to which the DoD business propped up failing units.

Similarly, the defendants claim that Van Berkom "invested in 2013 knowing full well that LSI's 'organic growth' had slowed, and would not return for *one or two years—i.e.*, well *after* the end of the Class Period—and that LSI's Retail Division's margins would not be expanding during this time, either." Defs.' Opp'n Pls.' Mot. Class Cert. at 20 (citing Sirois Dep. at 42:20–43:19) (emphasis in original). The defendants are correct that Van Berkom did not

expect any margins to increase from around 2013 to 2015—an "investment period" for LSI. *See* Sirois Dep. at 44:7–9 ("Q: You understood in 2013 margins weren't going up for the next two years? A: Yes."); *id.* at 42:11–15 ("Q: So you are telling us that Ammar's takeaway from this meeting is that margins are not expanding? . . . A: In the short term, because they were going into an investment period."). Yet, when pressed further by the defendants' attorney as to whether Van Berkom "underst[ood] that in 2013 there was not margin expansion in the next two years," Sirois clarified: "Probably not a whole lot, but the whole point was more that the commercial business just wasn't making any money, and we thought it was." *Id.* at 44:10–16. Thus, Van Berkom may have known that there would not be *much* margin growth from 2013 to 2015, but Sirois's testimony does not establish that Van Berkom knew that any margins, including retail margins in particular, would constrict to the extent they did. The defendants also cite an internal investment memorandum written before Van Berkom first purchased LSI shares, which memorandum indicates that LSI's "management recently lowered organic growth expectations for the full year 2013." *See id.* at 110:22–24. Similarly, the defendants cite a call between Van Berkom and Mr. Angrick in 2013, during which Mr. Angrick confirmed that LSI would see "slower organic growth," *id.* at 51:3–24. Much like Sirois's testimony, these statements disclose only that margins were not expected to expand during the period—the statements do not reveal the full extent of the margin trouble LSI faced.[10]

---

[10]     The defendants also cite notes taken by Sirois's colleague, Ammar Ali, during a call with Mr. Angrick on May 6, 2013, and highlight that the notes state "zero growth @ existing client progs: not going to change." Defs.' Opp'n Pls.' Mot. Class Cert. at 20–21; *id.*, Ex. 2, Handwritten Notes re LQDT at VAN-BERKOM_000250, ECF No. 81-3; *see also* Sirois Dep. at 54:24–25. Yet, this cherry-picked line is not as persuasive as the defendants urge for several reasons. First, it is unclear from Ammar's notes to which "clients" these notes refer, whether the notes refer to the retail division at all, or the time period covered by the notes and thus how long the zero growth status would persist. Second, the notes also contain the sentence "[w]e are a growth co[mpany]—every Q is better than last." Handwritten Notes re LQDT at VAN-BERKOM_000250. Finally, the defendants rely upon Sirois to interpret Ammar's handwritten notes, and Sirois testified that he did not know whether "zero growth" statement was something that Mr. Angrick said, or where it came from. Sirois Dep. at 54:21–55:3. Considered with Sirois's statements that Van Berkom did not know the extent of the retail margin constriction, and that Van Berkom did care

The defendants again cite the *Vivendi* cases in support of their position that Van Berkom's decision to invest in LSI even though it knew the declines in retail margins renders Van Berkom subject to unique defenses. The *Vivendi* cases, however, do not support the defendants' position. For example, in *SAM*, the investment analyst who made the decision to purchase shares of Vivendi testified that, due to his own independent analysis, he was aware of the subject of the alleged fraud—the liquidity crisis—when he made the purchasing decision. 123 F. Supp. 3d at 436 (citing the analyst's testimony that "he was 'right the whole time' about his calculations and assessments and 'was not misled' about Vivendi's debt"). On this record, the court concluded that "[e]ven had [the analyst] known about the fraud, it would not have mattered to him." *Id.* (noting the analyst's testimony that none of the nine corrective disclosures corrected anything he believed about Vivendi's liquidity). Likewise, in *Capital Guardian*, the investment analyst invested in Vivendi with an "understanding and acceptance of Vivendi's liquidity risks." 183 F. Supp. 3d at 466–67 (noting that, prior to any of the corrective disclosures, Capital Guardian's analyst projected that Vivendi's debt would increase from approximately €23 billion to €29.8 billion in a short period of time and that the company "would need to sell assets in order to address its liquidity needs"). Accordingly, the court in *Capital Guardian* concluded that Vivendi had rebutted the *Basic* presumption because Capital Guardian was "*indifferent* to the fraud." *Id.* at 466 (emphasis added). Here, in contrast, the evidence shows that Van Berkom did *not* know the extent of the issues allegedly concealed by LSI and was not indifferent to the fraud. For all the foregoing reasons, the defendants' argument that Van Berkom knew the truth about the retail division margins fails.

---

about margins and growth in the retail division, these scrawled notes are insufficient to show that Van Berkom knew that retail margins would stagnate.

**(b) Van Berkom's Sophisticated Investment Strategy Does Not Rebut the *Basic* Presumption**

The defendants next argue that Van Berkom is subject to unique defenses involving the *Basic* presumption, rendering Caisse atypical, because Van Berkom "did not regard the market price of LSI's shares as a proxy for the Company's intrinsic value at the time it acquired LSI shares." Defs.' Opp'n Pls.' Mot. Class Cert. at 21. Instead, according to the defendants, Van Berkom, a so-called "value investor,"[11] believed based on its own sophisticated models and analysis that the market for LSI stock was inefficient and invested to exploit that inefficiency. *Id.* at 21–22. The defendants emphasize that Van Berkom assessed LSI's value using a discounted cash flow model, which did not include stock price as a direct input, *id.* at 21–22 (citing Sirois Tr. at 11:23-13:18), and that Van Berkom invested only in companies it deemed to be "'mispriced or undervalued by the market,'" *id.* at 22 (quoting Sirois Dep. at 11:8) (emphasis omitted). The plaintiffs respond that being a value investor or otherwise employing a sophisticated investment strategy does not negate typicality "[a]s long as the investment decision rests to some degree on public information." Pls.' Omnibus Reply at 5.

Sirois described Van Berkom's investment model as follows: "Our goal is to be invested in the very best and highest quality companies that we can find across our universe. So we define such companies as companies that generate a significant return on capital over time, very strong free cash flows, that maintain a very strong balance sheet that has sustainable competitive advantages and that are run by a very, very strong management team. And we only buy these companies when they are mispriced or undervalued by the market." Sirois Dep. at 1123–12:8.

---

[11]    Value investors "believe[] that certain stocks are undervalued or overvalued and attempt[] to beat the market by buying the undervalued stocks and selling the overvalued ones." *Halliburton II*, 134 S. Ct. at 2410 (internal quotation marks omitted).

When asked what he meant by "mispriced or undervalued by the market," Sirois explained: "[F]or each investment candidate we go through a very extensive research process that involves several steps, but . . . one of them is the building of a detailed financial model on Excel where we will put several years of historical financial statements in the numbers that we restate according to what we think are some adjustments required in any . . . of the financial statements released by companies, and then we put forward between five and [ten] years of forecasts for the income statement, cash flow statement and balance sheet, and from that we derive a discounted cash flow evaluation to help us assess whether the company is fairly valued, overvalued, or undervalued, using a variety of assumptions and inputs that we generate from the knowledge that we acquire as we go through out research process." *Id.* at 12:13–13:5.

As the Supreme Court noted in *Halliburton II*, in response to Halliburton's argument that price integrity is "marginal or irrelevant" for value investors, "there is no reason to suppose that . . . the value investor . . . is as indifferent to the integrity of market prices." *Halliburton II*, 134 S. Ct. at 2410–11. "Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur?" *Id.* at 2411. Recognizing that a value investor necessarily believes that the market price does not accurately reflect public information at the time he transacts, the Supreme Court held that *Basic* reliance requires only that the investor "trade stock based on the belief that the market price will incorporate public information within a reasonable period of time." *Id.* The Court noted, moreover, that a value investor relies on the market price of an asset insofar as he "presumably tries to estimate *how* undervalued or overvalued a particular stock is." *Id.* (emphasis in original). Thus, the mere fact that Van Berkom is a value investor does not rebut the *Basic* presumption. *See Willis v. Big Lots, Inc.*, Civ. No. 2:12-604, 2017 WL 1063479,

at *7 (S.D. Ohio Mar. 17, 2017) ("[N]o cases hold[] that the mere fact that a class member is a value investor is, alone, enough to defeat *Basic*'s presumption of reliance."); *Saddle Rock Partners v. Hiatt*, Civ. No. 96 9474, 2000 WL 1182793, at *4 (S.D.N.Y. Aug. 21, 2000) (finding a class representative typical even though he was a "sophisticated stockbroker" and a "gambler" who purchased "stock based upon its trading history which he thought revealed short term market inefficiencies"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000) ("All of the usual smoke and mirrors and computer programs to rank stocks, relied on by professionals, have at their foundation an assumption that there is an efficient public market.").

In arguing that Van Berkom's investment strategy renders Caisse atypical, the defendants continue to cite the *Vivendi* cases, but those cases, again, are distinguishable. In the first case, *GAMCO*, the record demonstrated that the plaintiff–investor, GAMCO, "would have seen Vivendi as a *more* attractive investment" had the liquidity situation been fully disclosed, 927 F. Supp. 2d at 102 (emphasis in original), in light of GAMCO's proprietary methodology used to determine when to invest in a company, which was "completely independent of liquidity concerns and market price," *id* at 101. In other words, the *Basic* presumption was rebutted not only because GAMCO employed a sophisticated, proprietary methodology in making its investment decisions, but also because the fraud would have made Vivendi's ADSs "more attractive," and because GAMCO "would have purchased Vivendi securities even had it known of Vivendi's alleged fraud." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 218 (2nd Cir. 2016), *cert. denied*, 137 S. Ct. 1104 (2017); *accord Todd v. STAAR Surgical Co.*, Civ. No. 14-05263, 2017 WL 821662, at *5 (C.D. Cal. Jan. 5, 2017) ("Although Lead Plaintiff's decision-making may have been idiosyncratic, his testimony indicates that he relied on

information publicly available on the internet when deciding whether to purchase STAAR's stock. As the court in *Diamond Foods* explained, '[m]ost investors think they are a little smarter than average and see opportunities others have missed. Still, they all rely on publicly available data.'" (quoting *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 253 (N.D. Cal. 2013))).

Indeed, the *GAMCO* court was careful to emphasize that its holding "should not be taken to suggest that sophisticated institutional investors or value-based investors are not entitled to the [*Basic*] presumption," and that it is easy to imagine a case in which an investor "used the market price of a security merely as a comparator with a private method of valuation, but in which the [*Basic*] presumption could not be fairly rebutted, because, but for the material misstatements, that investor would not have transacted in the securities at issue. 927 F. Supp. 2d at 102. On appeal, the Second Circuit affirmed, explaining that, "whereas one can imagine situations in the abstract where a sophisticated investor, apprised of a fraud, would necessarily conclude that a security was no longer a logical purchase, the district court did not clearly err in concluding, on *this* record, that *in this case*, and with regard to *this particular fraud*, GAMCO would still have viewed Vivendi's securities as a profitable investment—even if it might have been concerned about the hidden liquidity risks." *GAMCO*, 838 F. 3d at 221 (emphasis in original). Here, there is no evidence to suggest that if Van Berkom had known of the issues in the retail division, LSI stock would have been a *more attractive* investment (or even that Van Berkom would have been indifferent to the alleged fraud). To the contrary, Sirois testified that Van Berkom invested in LSI on the expectation that the DoD contract would be renewed, "but also on the expectation that commercial business would be more profitable[,] . . . that it was one of the major growth drivers," and that although the DoD business was "the cash cow," "the retail and commercial business is where you are going to get the growth." Sirois Dep. at 32:9–24.

*SAM* and *Capital Guardian*, both of which involved post-certification motions for summary judgment on the issue of reliance, are likewise distinguishable. First, in *SAM*, the court found that Vivendi had rebutted the *Basic* presumption with respect to SAM because its analyst both testified that "Vivendi's declining stock price made investing in the company 'more attractive,'" and "admitted that . . . *none* of the nine corrective disclosures . . . 'corrected' any misunderstanding by [him] concerning the value of Vivendi." 123 F. Supp. 3d at 428 (emphasis in original). In other words, the analyst testified that he was not misled about the subject of the fraud and none of the corrective disclosures were corrective to him. *See id.* at 429 (citing deposition testimony by the analyst that he "had it right the whole time . . . [and] was not misled on the level of debt"). Like SAM, Capital Guardian understood and accepted Vivendi's liquidity risks and chose to invest anyway. *Capital Guardian*, 183 F. Supp. 3d at 461, 466–67 (noting that, prior to any of the corrective disclosures, Capital Guardian's analyst projected that Vivendi's debt would increase from approximately €23 billion to €29.8 billion in a short period of time and that the company "would need to sell assets in order to address its liquidity needs"). On these facts, the court concluded that Vivendi had rebutted the *Basic* presumption because Capital Guardian was "*indifferent* to the fraud." *Id.* at 466 (emphasis added). These facts are plainly distinguishable from the facts in the instant case, where Sirois's testimony demonstrates that Van Berkom did not invest with full knowledge of the troubles facing the retail division. *See* Sirois Dep. at 27:18–22 ("[W]e knew that the retail margins were weaker. We know they were lower. We just didn't know they were that bad. And when [LSI] lost the surplus contract that proved to be the case.").

**(c) Van Berkom's Private Meetings with LSI Management Do Not Defeat Caisse's Typicality**

The defendants' final argument as to Caisse's atypicality is that Van Berkom made its investment decisions based on information obtained during private meetings with LSI management. Defs.' Opp'n Pls.' Mot. Class Cert. at 22. The defendants point out that Sirois had at least nine private meetings and calls with LSI management, including phone calls with Mr. Angrick that lasted up to 45 minutes, and face-to-face meetings that lasted at least an hour. *Id*. at 23 (citing Sirois Dep. at 53:15–25). Moreover, many of Van Berkom's stock purchases and sales occurred immediately following these meetings, *see* Defs.' Opp'n Pls.' Mot. Class Cert at 23–24 (documenting Van Berkom contact with LSI and Van Berkom purchases of LSI stock), and Sirois testified that it would be "logical" to conclude that shares were purchased "after [he] had a meeting or a call with [LSI] management," *id*. at 24 (quoting Sirois Dep. at 117:6–11). Caisse contends that "'[m]ere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information.'" Pls.' Omnibus Reply at 18 (quoting *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 202–03 (E.D. Pa. 2008)); *accord In re Providian*, Civ. No. 01-03952, 2004 WL 5684494, at *3 (N.D. Cal. Jan. 15, 2004); *In re Intuitive Surgical*, Civ. No. 5:13-01920, 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016); *Beaver Cty. Emp. Ret. Fund v. Tile Shop Holdings, Inc.*, Civ. No. 14-786, 2016 WL 4098741, at *5 (D. Minn. July 28, 2016); *Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014). The defendants respond that "[i]t does not matter whether plaintiffs *actually* received inside information" because "'the fact remains that [Caisse] will be required to devote considerable time to rebut the unique defense.'" Defs.' Opp'n Pls.' Mot. Class Cert. at 22–23 (quoting *Shiring v. Tier Tech., Inc.*, 244 F.R.D. 307, 314 (E.D. Va. 2007)).

Yet, clearly, private meetings conceivably threaten to become a focus of the litigation only if a party could plausibly argue that insider information was exchanged. *See, e.g.*, *Shiring*, 244 F.R.D. at 314 ("[T]he presence of an *arguable* defense is sufficient to find atypicality. (emphasis added)). Here, however, even after extensive discovery, the defendants do not so much as *assert* that Van Berkom received insider information not publicly available, and the evidence refutes any such ideation. *See* Sirois Dep. at 54:8–19 (defense counsel questioning Sirois about his visits to LSI, and moving on to a different subject after Sirois testified that, during a meeting at LSI, he "[saw] [s]taffers and sales people, people on the collection side, things like that. There wasn't anything, frankly, too impressive to see. It was just a business office."). Thus, the defendants' concern that the private meetings would become the focus of the litigation appears entirely unfounded. *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *6 ("Courts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a corporate officer. In general, the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative." (internal quotation marks omitted)).

Moreover, finding atypicality under these circumstances would frustrate the purpose of the PSLRA. As other courts have recognized, "institutional investors, especially those with large holdings, [commonly] communicate directly with corporate officials." *In re DVI, Inc. Sec. Litig.*, 249 F.R.D. at 203. "Since the PSLRA clearly contemplates that institutional investors—who are generally understood to communicate with corporate officers—will serve as class representatives," courts have "decline[d] to find that an investor will be precluded from serving

as class representative merely because of his private communications with corporate insiders about publicly available information." *Id.*

## 2. Pier Capital

Pier Capital, one of NNERF's investment advisories, acquired its first shares of LSI in January 2012, and purchased additional shares between February and July 2012. Pls.' SMF ¶¶ 100–01. Pier Capital sold all its shares in LSI on November 28, 2012, for a profit of over $1.6 million, yielding a $69,270 profit for NNERF. *Id.* ¶¶ 102–04.[12] The defendants argue that NNERF is subject to unique defenses and therefore atypical because Pier Capital was not misled about the health of the retail division. Specifically, the defendants contend that Pier Capital's portfolio manager, Alexander Yakirevich, decided to invest in LSI on the "underst[anding] that LSI retail margins were *not* going to grow," Defs.' Opp'n Pls.' Mot. Class Cert. at 25 (emphasis in original), and that Pier Capital's decision to liquidate its position in LSI was due solely to factor unrelated to retail division margins, *id.* at 27–28; Defs.' Reply Supp. Mot. Summ. J. at 16.

### (a) Pier Capital Did Not Know the Truth About the Subject of the Fraud

The defendants' argument that Pier Capital knew the truth about the retail margins is belied by the record. Pier's investor letter addressing performance in the second quarter of 2012, issued on July 13, 2012, indicates that Pier knew about the problems with LSI's DoD business but was unaware of the issues in the retail division. The investor letter reports that "20% of [LSI's] business is from the government and recently this segment has stopped growing, which together with lower prices for scrap metals has lowered their still high growth rate," "knock[ing] the stock down by about 15%" in early June 2012." Abramowitz Decl., Pier Capital Q2 Investor

---

[12]     As the plaintiffs point out, NNERF was invested in LSI after November 28, 2012, through its investment advisor NewSouth, and NNERF "suffered a loss based on its investment in LSI during the Class Period." *Id.*

Letter, Ex. 32 at PIER_000053, ECF No. 88-5. Further, Pier Capital's "take" on the stock price drop "[wa]s that *with commercial growth rates still very strong (and a very large market opportunity)*, it simply does matter if their government business remains unchanged and becomes an event smaller piece of the pie." *Id.* (emphasis added). Indeed, as Pier communicated to its clients, "[o]n the recent dip," Pier Capital "*added* to [its] holdings so that this is now our largest position at around 2.3%." *Id.* (emphasis added). Thus, at least as of July 2012, Pier Capital evinced no understanding that the retail margins were in decline. That conclusion is reinforced by the deposition testimony of Alexander Yakirevich, Pier Capital's analyst who made the decision to invest in LSI. When questioned by defense counsel, Yakirevich acknowledged that the he "understood that the *government* business had stopped growing in 2012" and then stated that, "[a]s a story, we expected both—obviously you want both businesses—retail and government business—to contribute and not, you know, slow down." Yakirevich Dep. at 120:10–13 (emphasis added).

In support of their argument that Pier Capital knew that retail margins would not grow, the defendants point to several of the alleged partial corrective disclosures, with which Yakirevich was familiar. First, the defendants cite Mr. Rallo's statement at a conference on June 22, 2012, "suggesting that margins—the pace of margin expansion would not be as robust going forward." Yakirevich Dep. at 143:13–16. In testifying about Mr. Rallo's statement, Yakirevich stated that he "understood" from Mr. Rallo's statements that "'the pace of margin expansion would not be as robust," but that he did not believe "that it was going to stop." *Id.* at 143:14–15, 152:15–16. Thus, as the plaintiffs allege, Mr. Rallo's statement conveyed a generalized

possibility of margin decline, but no particulars, and nothing about the retail division, which in other statements was touted by the defendants.[13]

The defendants also point to Yakirevich's testimony about an email his colleague received from an outside analyst and forwarded to Yakirevich concerning a June 2012 report by Off Wall Street Consulting Group. Defs.' Opp'n Pls.' Mot. Class Cert. at 26. The email stated, *inter alia*, that "margins in [the] commercial business are lower than people realize, therefore they are unlikely to drive results." *Id.* Yakirevich responded to the email by noting that it "d[id] not appear to be raising any new issues with the story," and that "the original investment thesis still appears to be intact," Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 33, Yakirevich Email (dated July 2, 2012), ECF No. 82-5. Yet, the fact that Pier Capital was aware to some extent that retail margins would not continue to grow does not distinguish NNERF from other putative class members. Indeed, NNERF fits neatly within the putative class, since the operative complaint in this case acknowledges that "[a]lthough Defendants periodically disclosed the fact that, over time, they expected margin growth to slow, they did not fully disclose the extent of, or reasons for, these challenges." Am. Compl. ¶ 64; *accord, e.g.*, *id.* ¶ 11 ("Although Defendants finally disclosed the fact that, over time, they expected margin growth to slow, they did not come anywhere near the necessary level of candor with investors. Ultimately, deteriorating margins was a tremendous problem, . . . a fact that Defendants were keenly aware of but stubbornly refused to *adequately* disclose." (emphasis added)); *id.* ¶ 68 ("Although as far back as 2012 Defendants mentioned that margins could impact Liquidity's balance sheet in the near term,

---

[13] Notably, moreover, Yakirevich testified that he was not present at the conference at which Mr. Rallo made the relevant statements, and therefore "do[es]n't know exactly what [Mr. Rallo] said." *Id.* at 143:11–12. Further, when asked by the defense counsel whether he "view[ed] the news that there were worries about margins going forward and that that statement came from the CFO" as "new information," Yakirevich responded, "to me, it was new information." *Id.* at 144:9–17. Thus, even if Mr. Rallo's statements gave Pier Capital some indication that retail margin growth would decelerate, Yakirevich's testimony suggests that Pier Capital was unaware of "worries about margins" when first purchasing shares of LSI in January 2012.

these were belated and soft-pedaled general references that hardly revealed the truth regarding the known impact of competition on margins and profitability.").[14]

### (b) Pier Capital Was Not Indifferent to Retail Margins

The defendants' second contention—that Pier Capital sold its stock in LSI for reasons unrelated to retail division margins, Defs.' Opp'n Pls.' Mot. Class Cert. at 27–28—is undercut by the record, and, even if it were true, would not be dispositive. The defendants first point to an email that Yakirevich sent on October 16, 2012, at the same time he sold *some* of Pier Capital's LSI stock, in which he wrote that "[w]hile we continue to like the long-term growth story behind [LSI], we are concerned about the cyclical deceleration in GMV growth." Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 35, Yakirevich Email (dated Oct. 16, 2012) at PIER_019271, ECF No. 82-7. This email, however appears to explain why Pier Capital was scaling down to a 1% interest in LSI from its then-current 2.3% interest. Although the email consists only of a single sentence, the subject line reads "LQDT – selling to 1% scap smid." *Id.*[15] The email is addressed to other employees of Pier Capital. *Id.* During Yakirevich's deposition, defense counsel inquired about the October 16, 2012 email, asking "[a]nd the reason you are selling [the LSI shares] is because of concern about deceleration in GMV growth trends?" Yakirevich Dep. at 259:10–12. Yakirevich responded: "So, at the time we owned an oversized position. . . . And things ha[d] been decelerating. Then basically, we are saying is that we need to reduce our exposure." *Id.* at 259:14–21. Regarding Pier Capital's "oversized position" in LSI, Yakirevich explained that

---

[14]     The defendants also take issue with the plaintiffs' claim that LSI's November 29, 2012 earnings report constituted a corrective disclosure, since that earnings report was issued one day after Pier Capital sold its last shares of LSI. Defs.' Opp'n Pls.' Mot. Class Cert. at 27. Accordingly, the defendants press, "Pier Capital (and thus NNERF) has no loss attributable to that report." *Id.* The defendants say nothing further about the legal significance of this fact. The defendants also cite no caselaw indicating that a lead plaintiff is atypical if it did not suffer a direct loss from every single alleged misrepresentation.

[15]     "Scap smid" refers to Pier Capital's "small cap" portfolio. Yakirevich Dep. at 260:17–19.

"[t]ypically, we own between 75 and 100 names in a portfolio. I mean, our strategy is to establish 1% positions." *Id.* at 33:1–3. Thus, the email on which the defendants so heavily rely appears to suggest that, at least in part, the sale of LSI stock down to a 1% position may have been simply in keeping with Pier Capital's "typical[]" practice. In addition, given the plaintiffs' allegations that, at the time of the October 2012 sale, LSI was pumping the market with incomplete information about the retail division, one would not expect Yakirevich to choose to sell based on that information.

The defendants also cite Yakirevich's testimony that Pier Capital decided to sell LSI because "there w[ere] questions about the *government* business." Defs.' Opp'n Pls.' Mot. Class Cert. at 28 (emphasis in original). From this testimony, the defendants speculate that "[i]t was this factor, and *not* any undisclosed facts or trend concerning retail margins, sales or product mix that prompted Pier Capital to sell its LSI shares nearly two years before the May 8, 2014 announcement that supposedly revealed the truth about the Retail Division." *Id.* (emphasis in original). Yakirevich's testimony simply does not establish that retail margins were irrelevant to Pier Capital's investment decisions, and that if the truth had been revealed, Pier Capital would have been indifferent to it. In any event, Yakirevich testified that there were concerns about the government business at the time, and that this was "*one of* the factors that basically impact[ed] the company's ability to grow," Yakirevich Dep. at 125:2–11 (emphasis added).

In sum, the defendants' arguments that Pier Capital was not misled by the defendants' alleged misrepresentation fail, and NNERF is not atypical.

### (c) NNERF Suffered an Overall Loss Notwithstanding Pier Capital's Gain

The defendants also contend that NNERF cannot represent a class of people that suffered a loss by investing in LSI because "[i]t is undisputed that Pier Capital's investment in LSI

yielded a $69,270 profit for NNERF." Defs.' Opp'n Pls.' Mot. Class Cert. at 28; *see also* Yakirevich Dep. at 95:9–15. In total, Pier Capital earned over $1.6 million on LSI. Yakirevich Dep. at 304:22–305:18. Thus, according to the defendants, NNERF has not suffered the same injury as the rest of the putative class, and so is an atypical representative. *See* Defs.' Opp'n Pls.' Mot. Class Cert. at 28–29. The plaintiffs respond that "[t]his argument borders on the disingenuous, for, as Defendants well know, despite making a small profit from the Class Period trades made on its behalf by Pier Capital (one of its investment managers), the NNERF as a whole suffered a devastating loss of $526,422 based on its' overall LSI trades during the Class Period." Pls.' Omnibus Reply at 20.

The defendants do not dispute that the NNERF suffered an overall loss through its investments with LSI. NNERF's small profit, through one of its investment advisors, while suffering an overall loss, is a minor factual variation that does not defeat typicality. The defendants do not cite any cases to the contrary, and indeed, appear to concede the point by arguing that "[w]here the *lead plaintiff* makes a profit during the class period, 'he has not suffered a loss, his claim fails, and he is not a typical representative of his class.'" Defs.' Opp'n Pls.' Mot. Class Cert. at 28 (quoting *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 403 (D. Mass. 2007)). In other words, the caselaw relied upon by the defendants focuses on the lead plaintiff's overall experience with the stock—not the performance of the individual investment advisors acting on behalf of the lead plaintiff.

In an analogous case, the plaintiff-investor had invested through two investment advisories, one of which had purchased shares of the defendant's stock during the class period, and one of which had not. *See Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204, 208 (D.R.I. 2005). The plaintiffs in that case conceded, and the court agreed, that "only purchases by" the advisory

who made investments during the class period would be "in issue." *Id.* Here, the defendants may wish to challenge which purchases of LSI stock are in issue, but a typicality challenge is unavailing. Notably, other class members may very well have booked a profit on particular trades or during particular time periods, even if they suffered overall losses. That Pier Capital profited from a small portion of its investment is not sufficiently anomalous to affect adversely NNERF's typicality.[16]

### 3.    New South

The defendants argue that "NNERF is also subject to unique defenses based on the testimony of its second investment advisor, New South." Defs.' Opp'n Pls.' Mot. Class Cert. at 29. Echoing their arguments with respect to Van Berkom and Pier Capital, the defendants assert that, unlike other investors, New South (1) "was not misled by or about any of the purported material misstatements that form Plaintiffs' core theory of fraud" because "retail margins and organic growth were not material to New South's investment decision;" (2) "had nearly a dozen private calls and meetings with [LSI's] senior management;" and (3) "purchased LSI shares

---

[16]    In a similar vein, the defendants assert that Pier Capital is atypical because it cannot prove loss causation, *i.e.*, that its losses are attributable to the fraud. In particular, the defendants contend that Pier Capital cannot "recoup any price decline that occurred after November 28, 2012 because it no longer owned shares and thus cannot demonstrate loss causation." Defs.' Opp'n Pls.' Mot. Class Cert. at 28. For support, the defendants cite *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009), in which an in-and-out trader that sold months before the alleged corrective disclosure was deemed atypical and inadequate, and therefore not permitted to serve as a class representative. *Id.* at 41. *In re Flag Telecom Holdings*, however, was decided on its unique facts, which are not present in the instant case. In particular, the plaintiffs in *In re Flag Telecomm Holdings*, relied on a "leakage" theory to establish loss causation, *i.e.*, that "the truth regarding Flag's financial condition began to leak into the market prior to the February 13, 2002 announcement, causing the value of Flag common stock to decline," since the plaintiffs had sold their stock shares prior to the end of the class period on February 13, 2002. *Id.* at 40. The Second Circuit held that the plaintiffs had "failed to demonstrate that any of the information that 'leaked' into the market prior to February 13, 2002, revealed the truth with respect to the specific misrepresentations alleged." *Id.*; *accord Silversman v. Motorola, Inc.*, 259 F.R.D. 163, 171 (N.D. Ill. 2009) (noting that the Second Circuit in *In re Flag Telecom Holdings* "did not reject the leakage theory per se"). Here, in contrast, the defendants do not contest that the partial corrective disclosures identified by the plaintiffs—the June 22, 2012 statement by Mr. Rallo, the July 2, 2012 Off Wall Street report, and a September 12, 2012 report projecting reduced earnings estimates—gave some indication that retail margins were deteriorating but did not reveal the full extent of that decline.

because it believed that the market for LSI stock was *in*efficient." *Id.* (emphasis in original).

Each of these arguments is addressed in turn.

### (a) The Retail Division Was Not Irrelevant to New South's Investment Thesis

First, citing testimony by Alexander McLean, New South's portfolio manager who oversaw LSI investments, the defendants contend that New South's investment in LSI was premised on the DoD contract and that the performance of the retail division was irrelevant. *Id.* at 30 ("New South's investment thesis was destroyed by the results of the DoD auction—not revelation of any hidden problem with the Retail Division."). Indeed, "New South began to liquidate its LSI holdings almost a *month before* the final May 8, 2014 corrective disclosure." *Id.* (emphasis in original). The defendants focus on McLean's testimony about an October 6, 2014 quarterly letter to investors, issued after LSI's final May 8, 2014 corrective disclosure, and argue that this letter "confirm[s] that its decision to sell had nothing to with Retail." *Id.*

The letter in question states that that New South's "initial experience with [LSI] was quite a prosperous one," McLean Dep. at 217:26, but that "[s]everal issues surfaced that were not accounted for in the due diligence process, including more unprofitable accounts than expected," a statement which referred to LSI's GoIndustry acquisition in the commercial capital assets division, *id.* at 217:7–15. The following paragraph of the letter states that "more recent setbacks with the DoD surplus contract will be of longer lasting detriment." *Id.* at 219:1–6 (referencing LSI's loss of the rolling stock options contract to a competitor). The defendants emphasize that this letter, issued after the full truth came to light, "had nothing to do with Retail." Defs.' Opp'n Pls.' Mot. Class Cert. at 30; *compare* McLean Dep. at 205:21–206:3 ("Q: And was that decision [to sell LSI stock] primarily driven by the loss of a DOD contract, as we discussed? A: That was—that was definitely—a major part of our decision."). During his deposition, McLean

48

testified that the loss of the contract "was definitely a—*a major part of* our decision." (emphasis added)). Yet, just because New South sold its LSI stock upon the loss of the DoD contract (and attributed its sale to the loss of that contract) does not establish that New South was indifferent to the alleged fraud or the health of the retail division, and the defendants have simply adduced no testimony to that effect. *Compare Capital Guardian*, 183 F. Supp. 3d at 466 (the *Basic* presumption was rebutted because the defendant, Vivendi, had established that the plaintiff was "indifferent to the fraud").

The defendants also note that in April 2014, following LSI's loss of the DoD contract, New South revised its model, which "showed LSI's EBITDA growth going to *negative* 23.8% in 2015 and projecting a *negative* EBIDTA in 2014." Defs.' Opp'n Pl.'s Mot. Class Cert. at 30 (citing McLean Dep. at 72:13–16). At the same time, this revised model "contained no change in New South's estimate for the Retail Division," and, accordingly, it is clear that "all of the positive year over year growth projections in the New South model were reversed by the loss of one DoD contract and the increased costs associated with the DoD contract it retained, not anything to do with the retail division." *Id.* (citing McLean Dep. at 205:14–206:3). This model does not prove as much as the defendants suppose. Although the model indicates that the loss of the DoD business was catastrophic, it does not indicate that the retail division was irrelevant.

The defendants next assert that New South was not misled about competition because McLean knew about LSI's two major competitors, including Iron Planet, which outbid LSI for the DoD contract. *Id.* According to the defendants, "[a] Plaintiff cannot possibly represent a class adequately, much less be typical, if its own investment manager flat out contradicts claims about the falsity of a statement that 'when you look to the competition, there is a lot of it, but it's not very formidable.'" *Id.* at 31 (quoting Am. Compl. ¶ 165). The defendants mischaracterize

McLean's testimony. McLean did not testify that the competition was not formidable but rather that "*at the time*, we thought that Liquidity Services had advantages over their competition." McLean Dep. at 204:7–9 (emphasis added). Thus, contrary to the defendants' argument, McLean did not concede in his deposition that LSI's competition was actually "not very formidable," but rather that, *at the time*, presumably based on statements by LSI management, McLean was under the impression that LSI had a competitive advantage.

The defendants further argue that New South was not misled about LSI's retail margins and organic growth. Defs.' Opp'n Pls.' Mot. Class Cert. at 31. Again, the defendants twist McLean's testimony and misunderstand the plaintiffs' allegations. For example, the defendants state that, "[f]ar from being misled that margins would improve, . . . by June 21, 2012, McLean expected that LSI's margins would *drop* by 100 to 150 basis points." *Id.* (emphasis in original) (citing McLean Dep. at 130:9–13). Yet McLean's testimony on this point suggests that he understood that margins would drop 100 to 150 basis points "from the Go/Dove integration," McLean Dep. at 130:16–17, which occurred *not* in the retail division, but in the commercial capital assets division, *id.* at 129:4–8. Likewise, the defendants point to McLean's notes, dated July 16, 2013, *id.* at 179:12–13, from what appeared to be an earnings call, *id.* at 180:5. The defendants assert that McLean's notes from this call "reflect discussion about 'many disruptions in retail.'" Defs.' Opp'n Pls.' Mot. Class Cert. at 31 (quoting McLean Dep. at 180:10–17). Yet, the *full* notation reads "[m]any disruptions in retail *in the past*," McLean Dep. at 180:13–14 (emphasis added), rather than any statement about retail margins in the *future*. Moreover, when defense counsel asked McLean whether his notes referred to "something that was said on the earnings call," McLean responded, "I don't remember," and defense counsel did not press

further. *Id.* at 180:15–16.[17]  As the plaintiffs point out, moreover, much of the other evidence marshalled by the defendants concerns margins in general rather than retail margins in particular.

The defendants' effort to show that "McLean understood LSI management to be issuing warnings about the retail margins and understood that it would *not* see margin growth," Defs.' Opp'n Pls.' Mot. Class Cert. at 31 (emphasis in original), is consistent with the allegations in the complaint.  As noted above, the main thrust of the plaintiffs' claims is that, "[a]lthough as far back as 2012 Defendants mentioned that margins could impact Liquidity's balance sheet in the near term, these were belated and soft-pedaled general references that hardly revealed the truth regarding the known impact of competition on margins and profitability."  Am. Compl. ¶ 68. Accordingly, the fact that McLean was generally aware that retail margins would not continue to grow does not render New South and, by extension, NNERF, atypical.

### (b) New South's Private Meetings with LSI Management Do Not Negate Typicality

Next, the defendants argue that New South's relationship with LSI management renders NNERF atypical.  Defs.' Opp'n Pls.' Mot. Class Cert. at 32.  McLean testified that he met with LSI management, including Messrs. Angrick and Rallo, before the initial investment was made, McLean Dep. at 36:8–17, and "periodically" thereafter, *id.* at 39:2–5.

---

[17]    The defendants also cite New South's reaction to third quarter 2011 earnings results, after the release of which LSI management warned that "margins may be squeezed in coming quarters as consumer weakness pressures volume and value of retail goods sold" in LSI's marketplaces.  McLean Dep. at 111:19–22.  McLean testified that one of New South's "takeaway[s]" was that "margins were [not] going up, at this point in time, for [LSI's] retail business." *Id.* at 112:5–13; *see also id.* at 112:14–17 ("Q: All right.  But that's what you understood management to be doing, is issuing a warning about retail margins?  A: Yes.").  This evidence falls short of establishing that New South was not misled about margins in the retail division.  First, LSI issued this statement in May 2011, eight months before the start of the class period.  Second, this "warning" appeared in public material issued by LSI, and so cannot form the basis of a unique challenge to New South's reliance, as opposed to all investors, with access to public information.

"The presumption of reliance may be rebutted if a purchaser of stock relies on non-market information that is not generally available to the public and, therefore, not available to the unnamed class members." *Beach v. Healthways, Inc.*, Civ. No. 3:08-0569, 2009 WL 3245393, at *3 (M.D. Tenn. Oct. 5, 2009). As the defendants acknowledge, however, McLean testified that New South "w[as] not provided with material non-public information" in its private meetings with LSI. Defs.' Opp'n Pls.' Mot. Class Cert. at 32. Indeed, when asked whether "New South ha[d] any non-public information about Liquidity when it made investment decisions, at any point, to purchase Liquidity stock," McLean responded, "[n]ot that I'm aware of." McLean Dep. at 321:1–5. The defendants nevertheless argue that NNERF's typicality is destroyed because "New South admitted that its decision to invest was influenced by its private meetings and discussions with management." Defs.' Opp'n Pls.' Mot. Class Cert. at 33. The defendants rely on *Beck v. Status Game Corp.*, 1995 WL 422067, at *4 (S.D.N.Y. July 14, 1995), in which the court held that a putative class representative was atypical because he would be subject to a unique defense in light of his testimony that private meetings with the defendant influenced his decision to buy the defendant's stock. *Beck*, however, is simply not the majority rule, as explained *supra*.[18] So long as insider information was not divulged during the private meetings—as is the case here, in light of McLean's unrebutted testimony—the NNERF will not be subject to a unique defense on this basis. *See, e.g., In re Intuitive Surgical*, 2016 WL

---

[18] Indeed, the caselaw that may be read to support the defendants' position tends to be older, *see, e.g., Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 169 (D. Mass. 1989) ("It is beyond reality to suggest that any potential shareholder could meet with corporate officers and special meetings at the company will render a plaintiff atypical to represent the class."), whereas more recent caselaw indicates that private meetings are insufficient, on their own, to subject a plaintiff to unique defenses. Further, although on first blush *Grace* appears to hold that private meetings render a plaintiff atypical, the court in that case operated under the assumption that private meetings could never be cabined to exclusively public information—as the defendants have conceded is the case here. *See* Defs.' Opp'n Pls.' Mot. Class Cert. at 32 (acknowledging that neither New South nor Van Berkom were "provided with material non-public information in these meetings").

7425926, at *6 ("The fact that certain of Plaintiffs' investment managers met with [Defendant] on occasion does not, without more, render [Plaintiffs] atypical of the proposed class."); *O'Neil v. Appel*, 165 F.R.D. 479, 492 (W.D. Mich. 1996) ("Each plaintiff has filed an affidavit indicating that he did not rely upon any information that was not a matter of public record. It often happens that purchasers rely upon statements by brokers, and that brokers have some level of access to corporate officials. This, without more, is insufficient to find a class representative to be atypical." (citing *Kilpatrick v. J.C. Bradgord Co.*, 827 F.2d 718, 724 (11th Cir. 1987))).[19]

### (c) New South's Investment Strategy Does Not Defeat NNERF's Typicality

Finally, as with Caisse, the defendants argue that NNERF is subject to a unique defense because New South was a "value investor" and invested based on the notion that "the market for (and thus stock price of) LSI was *in*efficient," which rebuts the *Basic* presumption of reliance. Defs.' Opp'n Pls.' Mot. Class Cert. at 34. As a general matter, New South questions the notion of efficient markets, telling clients that "investment markets are neither rational nor efficient," and the "concept of market efficiency is completely invalid." McLean Dep. at 292:4–21, 294:4–295:9. In making investment decisions, New South constructs its own model "to determine a value for the company." McLean Dep. at 44:20–21. New South invests in companies it "thinks are trading at significant discounts to what [New South] determine[s] their true intrinsic value per share to be." *Id.* at 45:9–12. McLean testified that New South "did not think the market was accurately pricing the value of [LSI]." *Id.* at 285:5–13.

---

[19]      The defendants also argue that New South is subject to unique defenses because New South "proposed business strategies to LSI." *Id.* at 33 (citing New South's proposal that LSI acquire GoIndustry and that LSI engage FedEx as a client). Even if true, the defendants do not explain why this fact is relevant to the claims in this suit, nor does *Shiring*, 244 F.R.D. at 314, the single case the defendants cite, hold that a securities plaintiff is atypical because the plaintiff proposed business strategies to the defendant.

As explained above with respect to Van Berkom, a plaintiff's status as a value investor is not, in and of itself, sufficient to rebut the *Basic* presumption. *See Halliburton II*, 134 S. Ct. at 2410–11; *Willis*, 2017 WL 1063479, at *7; *In re Diamond Foods*, 295 F.R.D. at 252 (noting that "courts have routinely rejected" the argument that institutional investors' investment strategies subject them to unique defenses concerning the *Basic* presumption and collecting cases). Here, moreover, although New South utilized a sophisticated model in determining whether to invest in LSI, McLean testified that there was "actually a . . . line item in [his] model for margins," McLean Dep. at 51:11–13, and, to derive input values for its model, New South looked at historical information and "evaluated how the company had been growing in the past" and "what sort of margins they could do," *id.* at 51:1–10. Among the metrics considered by New South, "top line growth," which in this case was GMV, and "cash flow margins" were viewed as "the most important ones." *Id.* at 51:17–52:4. New South's investment analysis was based on publically available information, such as "10-Ks, Qs, proxy statements, . . previous earnings, releases, [and] conference call transcripts." *Id.* at 43:15–20. Accordingly, the defendants cannot dispute that public information concerning margins factored into New South's models and resultant investment decisions with respect to LSI, and New South's investment strategy thus does not subject NNERF to unique defenses.[20]

---

[20] In addition to the non-reliance argument, the defendants contend that Caisse and NNERF are atypical because "they are subject to [] unique defenses and arguments to a jury about spoliation." Defs.' Opp'n Pls.' Mot. Class Cert. at 35. According to the defendants, Caisse did not instruct Van Berkom to preserve documents concerning LSI, and neither New South nor Pier Capital received a preservation notice from NNERF, creating a possibility that highly material documents from the investment advisors have been lost. *Id.* at 35–36. As a threshold matter, the case law cited by the defendants pertains to *parties*' obligations to preserve evidence—not the preservation obligations of third parties, like Van Berkom, Pier Capital, and New South. *See id.* at 35 n.15 (citing *Falcon v. Philips Electronics N. Am. Corp.*, 304 Fed. App'x 896, 897 (2d Cir. 2008); *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 521 (S.D.N.Y. 2010), *aff'd*, 694 F.3d 208 (2d Cir. 2012)). In any event, as the plaintiffs point out, Pls.' Omnibus Reply at 21, the defendants' spoliation argument appears to be predicated on the testimony of Yakirevich, who testified that he personally first learned of the litigation in 2016, Yakirevich Dep. at 46:16–22, and McLean, who testified that he never received a litigation hold notice, McLean Dep. at 33:14–18. In fact, however, NNERF sent litigation hold notices to representatives at both Pier Capital and New South. *See* Pls.' Omnibus Reply, Ex. 27, Document Retention Letter from NNERF to Pier Capital (dated Oct. 22, 2014) at

* * *

In sum, then, each of the defendants' arguments concerning the co-lead plaintiffs' typicality fails, and certification is not precluded under Rule 23(a)(3). The defendants also argue, however, that certification is improper because the co-lead plaintiffs cannot satisfy Rule 23(a)(4)'s adequacy requirement, which argument is addressed below.

### d. Adequacy

Rule 23(a)'s final requirement is that a putative class representative "fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The D.C. Circuit has recognized two criteria for determining the adequacy of representation: (1) "the named representative[s] must not have antagonistic or conflicting interests with the unnamed members of the class," and (2) "the representative[s] must appear able to vigorously prosecute the interests of the class through qualified counsel." *Hoyte v. District of Columbia*, Civ. No. 1:13-00569, 2017 WL 3208456, at *4 (D.D.C. July 27, 2017) (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)). To comport with "[b]asic consideration[s] of fairness," Rule 23(a)(4) "require[s] that a court undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation where absent members will be bound by the court's judgment." *Keepseagle v. Vilsack*, 102 F. Supp. 3d 205, 212 (D.D.C. 2015) (quoting *Nat'l Ass'n of Reg'l Med. Programs v. Mathews*, 551

---

LSI_NNERF_0000008, ECF No. 89-7; *id.*, Ex. 52, Document Retention Letter from NNERF to New South (dated Oct. 22, 2014) at LSI_NNERF_0000006, ECF No. 89-9. On the other hand, the plaintiffs do not claim to have sent a litigation hold letter to Van Berkom. Nevertheless, the defendants have pointed to no particular or even generalized shortcomings in Van Berkom or Caisse's production, for example, by identifying the types of documents that the investment advisors failed to produce. Indeed, as the plaintiffs point out, the three advisories collectively produced 101,626 pages of documents, and "[t]he fact that the investment managers' productions include contemporaneous handwritten notes from meetings with LSI managers at least three years prior underscores how thorough those productions were." Pls.' Omnibus Reply at 22. Finally, the defendants have made no attempt to explain why such a spoliation defense would constitute more than a minor variation between the co-lead plaintiffs and the remainder of the class.

F.2d 340, 344–45 (D.C. Cir. 1976)). As the Supreme Court has observed, the Rule 23(a)(4) "adequacy-of-representation requirement 'tends to merge' with the commonality and typicality requirements of Rule 23(a), which 'serve as guideposts'" for determining whether a class action should be maintained and whether the class representative's claim and class claims are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem*, 521 U.S. at 626 n.20.

The defendants contest the lead plaintiffs' adequacy in two ways. First, they argue that because typicality and adequacy are interrelated, the atypical lead plaintiffs cannot adequately protect the interests of class members. Defs.' Opp'n Pls.' Mot. Class Cert. at 17. Given that the plaintiffs have established typicality, this adequacy challenge fails. Second, the defendants contend that the lead plaintiffs are inadequate representatives because they "have relinquished control of this litigation to class counsel" and have insufficient knowledge of the litigation. *Id.* at 37. For support, the defendants cite deposition testimony from the Rule (30)(b)(6) designees of Caisse and NNERF to demonstrate that the designees had limited knowledge of the merits of the case, and the fact that they were contacted by lawyers and asked if they would like to serve as class representatives. *Id.* at 37–39.

The adequacy requirement does not require class representatives to initiate legal proceedings, nor does it mandate that representatives have intricate knowledge of complex legal claims. *See Thorpe v. District of Columbia*, 303 F.R.D. 120, 151 (D.D.C. 2014) ("Rule 23(a)(4) does not require either that the proposed class representatives have legal knowledge or a complete understanding of the representative's role in class litigation."); *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007) ("A class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.").

While the lead plaintiffs' involvement in litigation can be considered under the adequacy prong, "only a 'total lack of interest and unfamiliarity with [the] suit would be sufficient grounds to deny plaintiffs' motion [to certify class].'" *Harris v. Koenig*, 271 F.R.D. 383, 391 (D.D.C. 2010) (quoting *In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1177 (D.D.C. 1996)). Particularly in complex cases, "the qualifications of class counsel are generally more important in determining adequacy than those of the class representatives." *Id.* at 392 (quoting *In re Avon Secs. Litig.*, No. 91–cv–2287, 1998 WL 834366, at *9 (S.D.N.Y. Nov.30, 1998)). Indeed, "[c]ourts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 345 (S.D.N.Y. 2015) (quoting *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012)).

This is not such a "flagrant" case. Contrary to the defendants' depiction, Caisse and NNERF have demonstrated a reasonable level of knowledge and interest regarding this litigation. Caisse's designee, Paul Eric Naud, stated that the claims involve statements that are "misleading, in terms of organic growth and in terms of margins that were too rosy, and the competitive situation of the company was not as great as portrayed [by] the management." Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 6, Deposition of Paul Eric Naud at 103:11–14, ECF No. 81-7. Naud also demonstrated knowledge of the general roles and responsibilities of lead plaintiffs, and stated that Caisse was regularly meeting with counsel and staying updated on the case. *Id.* at 256:5–21. Similarly, the NNERF's 30(b)(6) designee, Tonya Anne O'Connell expressed knowledge that the "claims in this case [are] on the retail side where Liquidity claimed that the

retail business was doing very well." Defs.' Opp'n Pls.' Mot. Class Cert., Ex. 7, Deposition of

Tonya Anne O'Connell at 74:22–24, ECF No. 81-8. She also demonstrated basic knowledge of

the status and procedural history of the lawsuit. *Id.* at 29:2–17. Thus, Caisse and NNERF, who

have already satisfied the PSLRA's requirements for appointment as co-lead plaintiffs, *see* Order

Appointing Lead Pl. & Approving Selection of Counsel, have sufficient knowledge and control

of the litigation to meet the adequacy requirement. Accordingly, all four Rule 23(a)

requirements are satisfied.

### 2. Rule 23(b) Requirements

In addition to satisfying all four Rule 23(a) requirements, a party seeking to certify a class

must meet the requirements set out in one of Rule 23(b)'s subsections. Here, the lead plaintiffs

rely on Rule 23(b)(3), which requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy."

While the defendants do not contest that the plaintiffs have demonstrated the superiority of the

class action in this case, the defendants argue that the plaintiffs have not established that

common questions of law or fact predominate. The two prongs of the Rule 23(b)(3) inquiry are

addressed in turn.

### a. Predominance

To demonstrate that common issues predominate over individualized issues, a plaintiff

need not "prove that each 'element of his claim is susceptible to classwide proof.'" *Amgen*, 568

U.S. at 469. Rather, the predominance inquiry "tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "This calls upon

courts to give careful scrutiny to the relation between common and individual questions in a

case." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W. Rubenstein, NEWBERG ON CLASS ACTIONS § 4:50, pp. 196–97 (5th ed. 2012) (internal quotation marks omitted)). The predominance inquiry turns on "whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues." *Id.* (emphasis added) internal quotation marks omitted); *accord In re Petrobras Sec.*, 862 F.3d 250, 268 (2d Cir. 2017) ("[P]redominance is a comparative standard."). Critically, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting 7AA C. Wright, A. Miller, & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 1778, pp. 123–24 (3d ed. 2005)).

In this case, the plaintiffs have established that the central questions of "(i) whether Defendants intentionally or recklessly made materially false and misleading statements and/or omissions; and (ii) whether such false and misleading statements and/or omissions caused the members of the Class to suffer damages as a whole" can be answered through common evidence. Pls.' Mem. Supp. Class Cert. at 13. The defendants argue, however, that individualized damages questions predominate over these common questions. The plaintiffs retained Chad Coffman to prepare an expert report addressing, *inter alia*, "whether the calculation of damages in this matter are subject to a common methodology under Section 10(b) . . . and SEC Rule 10b-5." *Id.*, Ex. 2,

Expert Report of Chad Coffman ("Coffman Rep.") at ¶ 1, ECF No. 64-4.  In addressing the damages issue, Mr. Coffman began by stating that he had "not been asked to calculate class-wide damages in this action," since damages "will be subject to further discovery."  *Id.* ¶ 77; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d at 252 (while the plaintiffs need not "be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member, . . . the common evidence [must] show all class members suffered *some* injury" (emphasis in original) (internal quotation marks omitted)).  Mr. Coffman's report explains that the "standard and well-settled formula for assessing damages for each class member under Section 10(b) is the 'out-of-pocket' method, which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale . . . ."  Coffman Rep. ¶ 77.  According to Mr. Coffman, "[t]he methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide."  *Id.* ¶ 78.  Most commonly, experts "quantify artificial inflation" by "perform[ing] an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations."  *Id.*  Such a study "would be common to the class."  *Id.*  Damages for any given class member would be determined "formulaically" by considering "the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions."  *Id.*  In sum, then, Mr. Coffman concluded, "based on [his] expertise and experience in dozens of similar matters and understanding the nature of the claims in this case," that damages "are subject to a well-settled, common methodology that can be applied to the class as a whole."  *Id.*

The defendants advance two arguments critical of Mr. Coffman's report: first, that Mr. Coffman's report does not adequately demonstrate that damages are capable of measurement on a class-wide basis; and, second, that Mr. Coffman failed to explain how the plaintiffs' damages methodology is consistent with its theory of liability and "'measures only those damages attributable to that theory.'" Defs.' Opp'n Pls.' Mot. Class Cert. at 41 (quoting *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432–33 (2013)). Given that the defendants' arguments are predicated on *Comcast*, a review of that decision is helpful.

*Comcast* involved claims by Comcast subscribers seeking damages for alleged violations of the federal antitrust laws. 133 S. Ct. at 1429–30. The question presented was whether the class of subscribers had been properly certified under Rule 23(b)(3)—*i.e.*, whether questions common to the class predominated over individualized questions. *Id.* at 1430. The district court had held—and neither party disputed—that, to satisfy Rule 23(b)(3)'s predominance requirement, the plaintiffs had to show "(1) that the existence of individual injury resulting from the alleged antitrust violation (referred to as 'antitrust impact') was 'capable of proof at trial through evidence that was common to the class rather than individual to its members;' and (2) that the damages resulting from that injury were measurable 'on a class-wide basis' through use of a 'common methodology.'" *Id.* (quoting *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 154 (E.D. Pa. 2010)). Regarding the first requisite showing, the plaintiffs proposed four theories of antitrust impact. *Id.* The district court credited only one of those theories—the "overbuilder-deterrence theory," *i.e.*, that Comcast's actions would deter market entrants—as "capable of classwide proof and rejected the rest." *Id.* at 1431. The district court further found that damages could be calculated on a class-wide basis. *Id.* On appeal to the Third Circuit, and again before the Supreme Court, Comcast argued that the plaintiff-subscribers had not met their burden of

proving predominance, since the plaintiffs' damages model "did not isolate damages resulting from any one [of the four] theor[ies] of antitrust impact." *Id.*

The Supreme Court began with the "unremarkable premise" that "[i]f [the plaintiffs] prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court." *Id.* at 1433. Accordingly, "a model purporting to serve as evidence of damages in this class action *must measure only those damages attributable to that theory.*" *Id.* at 1433 (emphasis added). If a model measures damages *not* attributable to the alleged injury, then the model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* To be sure, "[c]alculations need not be exact," but "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation." *Id.* (internal quotation marks omitted). In *Comcast*, because "the model assumed the validity of all four theories of antitrust impact initially advanced by [the plaintiffs]," *id.* at 1434, there was "no question that the model failed to measure damages resulting from the particular antitrust injury on which petitioners' liability . . . [was] premised," *id.* at 1433. Thus, the proposed class had been improperly certified under Rule 23(b)(3). *Id.* at 1435.

The D.C. Circuit has examined *Comcast* on only one occasion. In *In re Rail Freight Fuel Surcharge Antitrust Litigation*, freight customers brought an antitrust class action against the four major freight railroad companies, alleging that the railroads had engaged in a price fixing conspiracy in setting their fuel surcharges. 725 F.3d at 248. By way of background, between March 2003 and March 2004, the defendants did away with their previous policy of assessing fuel surcharges only if fuel prices reached a certain level (called a "trigger" or "strike" price).

*See id.* "Not all shippers were affected" by this change, however, since some of the putative class members "had entered into so-called legacy contracts with the defendants . . . , thereby guaranteeing that they would be subject to fuel surcharge formulae that predated the later changes." *Id.* This fact ultimately proved dispositive, as explained below.

Before the district court, the certification decision "centered on the predominance requirement, and whether the plaintiffs could show, through common evidence, injury in fact to all class members from the alleged price-fixing scheme." *Id.* at 249. The district court ultimately certified the class of freight customers, and the D.C. Circuit granted interlocutory review of the certification order. *Id.* at 251. Much of the relevant *Comcast* analysis comes from the D.C. Circuit's rationale for granting interlocutory review, which requires, *inter alia*, that the "certification decision . . . be questionable." *Id.* at 252 (internal quotation marks omitted). The Court began by explaining that "[m]eeting the predominance requirement demands more than common evidence [that] the defendants colluded to raise fuel surcharge rates." *Id.* In addition, the plaintiffs had to show that "they [could] prove, through common evidence, that all class members were in fact injured by the alleged conspiracy." *Id.* (citing *Amchem*, 521 U.S. at 623–24). Absent such a showing, "individual trials [would be] necessary to establish whether a particular shipper suffered harm from the price-fixing scheme." *Id.*

The customer-plaintiffs introduced an expert report "purport[ing] to quantify the injury in fact to all class members attributable to the defendants' collusive conduct." *Id.*; *see also id.* at 249–50 (describing the expert's methodology). The defendants argued that the expert's model was "defective" and failed to prove that all class members had been injured. *Id.* at 252. The D.C. Circuit agreed, concluding that the expert's methodology "detects injury where none could exist," since the damages model yielded "similar results" for all class members—regardless of

whether they were subject to legacy contracts, *i.e.*, "those shippers who, during the Class Period, were bound by rates negotiated before any conspiratorial behavior was alleged to have occurred." *Id.*; *see also id.* at 253 (noting that the damages model "yielded false positives with respect to legacy shippers). Accordingly, the plaintiffs had failed to meet their burden of showing a class-wide injury in fact, and the D.C. Circuit vacated the class certification order. *Id.* at 252–53 ("Common questions of fact cannot predominate where there exists no reliable means of proving classwide injury in fact.").

The D.C. Circuit was careful to note, however, that the plaintiffs need not "be prepared" to "demonstrate through common evidence the precise amount of damages incurred by each class member." *Id.* at 252 (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815–16 (7th Cir. 2012); *Wal–Mart*, 564 U.S. at 362). Instead, it is enough that the common evidence "show all class members suffered *some* injury." *Id.* (emphasis in original). The Circuit also explained that *Comcast*, which had been handed down in the months after the district court's decision, "sharpen[ed] the defendants' critique of the damages model as prone to false positives" insofar as *Comcast* clarified that the district court must "scrutinize the evidence before granting certification, even when doing so 'requires inquiry into the merits of the claim.'" *Id.* at 253 (quoting *Comcast*, 133 S. Ct. at 1433). The Circuit described *Comcast* as holding that "[p]redicating class certification on a model divorced from the plaintiffs' theory of liability . . . indicates a failure to conduct the rigorous analysis demanded by Rule 23." *Id.*; *see also id.* at 255 ("Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it.").

Against this backdrop, the defendants' arguments predicated on *Comcast* are unavailing. In passing, the defendants assert that Mr. Coffman offers only a "conclusory statement" that

"'damages in this matter can be calculated using a methodology common to the class.'" Defs.'
Opp'n Pls.' Mot. Class Cert. at 41 (quoting Coffman Rep. ¶ 77). Yet, as set out above, Mr.
Coffman explained how an event study could be used to ascertain the effect of each alleged
misrepresentation on LSI's stock price, and how the study could be applied "formulaically" to
calculate out-of-pocket expenses for an individual class member. Coffman Rep. ¶ 78. Unlike in
*In re Freight*, the defendants have not identified any deficiencies with this methodology, and,
even after *Comcast*, other courts have approved of this methodology at the class certification
stage. *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 327 n.136 (S.D.N.Y. 2016)
("'Plaintiff's proposed determination of damages by event study appears to be a workable
methodology of determining damages on a class-wide basis.'" (quoting *Wallace v. IntraLinks*,
302 F.R.D. 310, 318 (S.D.N.Y. 2014)); *In re JPMorgan Chase & Co. Sec. Litig.*, Civ. No. 12-
03852, 2015 WL 10433433, at *7 (S.D.N.Y. Sept. 29, 2015) (approving the plaintiffs' expert's
"propos[al] to calculate classwide, per-share damages through an event study analysis of the
stock price inflation caused by Defendants' alleged misrepresentations or omissions"); *Wallace*,
302 F.R.D. at 318 ("Presumably, if plaintiff prevails, class members who purchased or sold at
different times during the class period will be entitled to significantly different recoveries. While
calculating the proper damages based on the date of purchase and sale may be complicated, it
does not demand excessive individual inquiry."); *In re Diamond Foods, Inc., Sec. Litig.*, 295
F.R.D. at 252 (same).

The defendants' second contention is that Mr. Coffman "nowhere explains, as he must
under *Comcast*, why the 'out-of-pocket' methodology is consistent with Plaintiffs' theory of
liability *in this case*." Defs.' Opp'n Pls.' Mot. Class Cert. at 41 (emphasis in original).
According to the defendants, "[e]ven if the Court were to construe the Complaint here as fitting

the 'out-of-pocket' mold,[21] Coffman's report would still fall well short of *Comcast*'s exacting

requirements." *Id.* at 42. In particular, the defendants criticize Mr. Coffman's "unadorned

incantation" that "he *might* use an 'event study' sometime in the future to calculate damages."

*Id.* (emphasis in original). The defendants argue that Mr. Coffman's report is "insufficient under

Rule 23(b)(3)" and cite *In re BP P.L.C. Sec. Litig. ("BP")*, 2013 WL 6388408, at *17 (S.D. Tex.

Dec. 6, 2013), for support, *see* Defs.' Opp'n Pls.' Mot. Class Cert. at 42–43. The defendants

misapprehend *BP*. Contrary to the defendants' understanding, the district court in *BP* did not

hold that an event study no longer passes muster to show that damages are measurable on a

class-wide basis at the class certification stage. Instead, the court simply observed *Comcast*'s

clear command that "class-wide damages must hew to Plaintiffs' theories of liability." *BP*, 2013

WL 6388408, at *16; *see also id.* at *17 ("Plaintiffs have failed to meet *their burden* of showing

that damages can be measured on a class-wide basis consistent with their theories of liability.").

    *BP* is distinguishable from the instant case insofar as the defendants in *BP* proffered their

own event study, which raised three ways in which an event study was "inconsistent with

Plaintiffs' theories of liability," *id.* at *16, two of which the plaintiffs were unable to address, *id.*

at *17. Here, unlike *Comcast*, the plaintiffs' proposed event study is not based on theories of

liability that have been previously dismissed, and, in contrast to *In re Rail Freight Fuel*

*Surcharge Antitrust Litigation*, no study in this case shows that an injury has occurred where it

clearly has not (*i.e.*, the false-positive problem the D.C. Circuit identified). Put differently, the

cases relied upon by the defendants involved denials of class certification because the proffered

---

[21]     The defendants alternatively argue that, if the Court determines that the plaintiffs may invoke the *Affiliated Ute* presumption of reliance—applicable in the case of an omission, rather than a misrepresentation—then the plaintiffs "run head on to the same fatal problem as the . . . plaintiffs" in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015). Defs.' Opp'n Pls.' Mot. Class Cert. at 42. This argument need not be addressed since, as explained *supra*, *see* note 8, the *Affiliated Ute* presumption is inapplicable in this case.

event study did not allow a determination as to whether a particular class member suffered an injury in fact. Here, however, because the plaintiffs invoke the *Basic* presumption, if the proposed event study ultimately shows that the alleged misrepresentations caused LSI's stock price artificially to fluctuate upward, all plaintiffs who purchased LSI stock during the class period will be able to show an injury in fact. Thus, Mr. Coffman's proposed event study, which would measure the effect of the alleged misrepresentations on LSI's stock price, tracks the plaintiffs' theory of liability in this case. *See La. Mun. Police Emps. Ret. Sys. v. Green Mtn. Coffee Roasters, Inc.*, Civ. No. 2:11-289, 2017 WL 3149424, at *7 (D. Vt. July 21, 2017) ("Here, Plaintiffs have offered a damages methodology that can be applied on a class-wide basis, and that is consistent with their theory of the case. . . . Indeed, Dr. Tabak's analysis proposes to calculate damages throughout the Class Period as alleged by the Plaintiffs, and based upon their single theory of fraud perpetrated through November 2011. That methodology does not run afoul of *Comcast*."); *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *7 (finding predominance where "Plaintiffs' expert proposes to calculate classwide, per-share damages through an event study analysis of the stock price inflation caused by Defendants' alleged misrepresentations or omissions").

Unable to identify any specific issue with an event study in this run-of-the-mill securities fraud case, the defendants make much of the fact that, "despite extensive motion practice which limited and clarified that the only remaining claims related to LSI's Retail Division, Coffman believed that the disclosures at issue here pertained to *all* divisions of the Company and he would not even accept counsel's contrary representations." Defs.' Opp'n Pls.' Mot. Class Cert. at 43 (citing Pls.' Omnibus Reply, Ex. 55, Deposition of Chad Coffman ("Coffman Dep.") at 15:6–17:21; 20:7–21:3, ECF No. 89-10). This argument is similar to an argument that was rejected by

a judge in the Southern District of New York. In *In re JPMorgan Chase & Co. Securities Litigation*, the plaintiffs' expert proposed to calculate class-wide, per-share damages through an event study to determine the stock price inflation caused by the defendants' alleged misrepresentations. *See* 2015 WL 10433433, at *7. The defendants argued, *inter alia*, that the plaintiffs' expert "may not be able to control for the price impact of information other than Defendants' alleged misrepresentations and omissions." The court did not express an opinion on that criticism but noted instead that any such flaws in the expert's report would "appl[y] to the calculation of damages for every member of the Proposed Class." *Id.* Accordingly, "the issue of damages does not preclude a finding that questions of law or fact common to class members predominate over questions affecting only individual members." *Id.* Likewise here, to the extent that the defendants believe that the plaintiffs' expert will be unable to "isolat[e] the alleged inflationary impact of supposedly false statements concerning the Retail Division from statements concerning LSI's other divisions," Defs.' Opp'n Pls.' Mot. Class Cert. at 44, the defendants may take up that issue after the class is certified with respect to all class members. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015) (holding that the plaintiffs did not run afoul of *Comcast* where their expert testified that he would use a "damages methodology [that he] customarily appl[ies, which] involves [ ] measuring the abnormal return on [the security] on the correct[ive] disclosure date . . . and then adjusting for any confounding news"); *see also In re Goldman Sachs Grp., Inc. Sec. Litig.*, Civ. No. 10-3461, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("The possibility that Defendants could prove that some amount of the price decline is not attributable to Plaintiffs' theory of liability does not preclude class certification.").[22]

---

[22]    The defendants' argument that Mr. Coffman "simply assumes that the price declines following the alleged corrective disclosures are appropriate proxies for the associated price inflation at the time the alleged misstatements

Accordingly, the plaintiffs have shown that common issues predominate over individual issues, and the defendants' effort to undermine that showing based on *Comcast* fails.

### b.     Superiority

Rule 23(b)(3) also requires a determination that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Supreme Court has explained that class actions are necessary to enable litigation through economies of scale, as "most of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *Bunn*, 306 F.R.D. at 87 ("The superiority requirement is intended to ensure[ ] that resolution by class action will achieve economies of time, effort, and expense and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." (quoting *Amchem*, 521 U.S. at 615)). Rule 23(b)(3)'s superiority inquiry entails consideration of four factors: (a) the class members' interests in individually controlling the prosecution of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced; (c) the desirability of concentrating the litigation of the claims in one forum; and (d) the likely difficulties in managing the class action. *Bunn*, 306 F.R.D. at 87.

Here, the defendants do not contest that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As the plaintiffs argue, class members' interest in asserting individual claims is limited, there is no other pending litigation that is substantially similar to this suit, a class action would eliminate the risk of inconsistent adjudication, and there are no foreseeable management difficulties. *See* Pls.' Mem. Supp. Class

---

were made" and "offers no method to take into consideration . . . the changing macroeconomic environment, industry trends and LSI-specific changes during the two and a half year class period that would affect the impact of the alleged misstatements on LSI's stock price at different points in time," Defs.' Opp'n Pls.' Mot. Class Cert. at 45, fails for the same reason.

Cert. at 25–26. Thus, like many similar securities fraud cases, this controversy is well-suited for class treatment. *See In re Newbridge Networks Securities Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) ("[C]ourts have widely recognized the utility of, and the necessity for, class actions in securities litigation.").[23]

## C.     The Defendants' Motion for Summary Judgment

The defendants have also moved for summary judgment on the element of reliance. As both parties have observed, the arguments are virtually identical to the arguments the defendants raise in opposition to the plaintiffs' class certification motion. In short, the defendants contend that there are no genuine issues of material fact as to whether the *Basic* presumption is rebutted with respect to the co-lead plaintiffs in light of the practice of their three investment advisories. The defendants' arguments with respect to each investment advisory are addressed in turn. Given the significant overlap with the arguments addressed above, these arguments can be disposed of in fairly short order.

### 1.     Van Berkom

The defendants maintain that the *Basic* presumption is rebutted as to Caisse, disproving reliance, and therefore warranting summary judgment in favor of the defendants, because (1) Van Berkom "would still be invested [in LSI] but for the loss of the DoD contract—regardless of any supposed fraud regarding the Retail Divison;" (2) "Van Berkom was not misled

---

[23]     The plaintiffs also move for appointment of co-lead plaintiffs' counsel as class counsel, *see* Pls.' Mem. Supp. Class Cert. at 26–27, which motion the defendants do not address in their opposition to class certification. Pursuant to Federal Rule of Civil Procedure 23(g), "a court that certifies a class must appoint class counsel," and in making such appointment, must consider (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." FED. R. CIV. P. 23(g)(1)(A). "[A]ny other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class" may also be considered. FED. R. CIV. P. 23(g)(1)(B). For the reasons set out in the plaintiffs' motion, and not contested by the defendants, Spector Roseman Kodroff & Willis, P.C. and Labaton Sucharow LLP are appointed class counsel.

about the Retail Dvision [sic];" and (3) Van Berkom's analyst "testified that [he] believed the market for LSI shares was *in*efficient and purchased based on [LSI's] own models and its own assumptions about LSI's future business." Defs.' Mot. Summ. J. at 18–19.[24]  The evidence cited by the defendants—mostly in the way of deposition testimony—does not conclusively establish any of these points.

Although Van Berkom's portfolio manager, Sirois, testified that Van Berkom would "*most likely*" still be invested in the company if the DoD contracts had not lapsed, Sirois Dep. at 78:23–24 (emphasis added), he did not state that the alleged fraud would have no bearing on the decision whether to invest, or that Van Berkom certainly would still be invested if the DoD contracts had been renewed.  Moreover, after testifying that Van Berkom would "most likely" be invested but for the loss of the DoD contracts, Sirois clarified that the company "went from pretty good margins to making almost nothing.   And therefore, when that happened, the stock no longer fit with our criteria and that's why we sold it." Sirois Dep. at 78:20-79:2.   The defendants' assertion that "LSI would still meet all of Van Berkom's investment criteria" but for the loss of the DoD contract, Defs.' Mem. Supp. Mot. Summ. J. at 20, is not borne out by the record.  For support, the defendants cite LSI's June 2014 letter to clients, and although the letter focuses on the surprising loss of the DoD contract, it simply does not state that Van Berkom would have maintained its position in LSI but for that loss.  *See* Defs.' Mem. Supp. Mot. Summ. J., Ex. 13, Van Berkom June 2014 Letter to Clients at VAN BERKOM_000072, ECF No. 83-15 (describing the loss of the DoD business as "the latest in a string of disappointments with this company since [Van Berkom] first became shareholders" and explaining that "a perfect storm of

---

[24]     The defendants also argue that Van Berkom's private meetings with LSI management negates reliance, *see id.* at 23–25, but that is not the law, so long as insider information is not disclosed, as discussed above.  Here, no evidence has been adduced that Van Berkom obtained insider information during its meetings with LSI, and, accordingly, summary judgment is not warranted on the basis of private meetings.

*different events* have reduced and have negatively and significantly impacted the profitability of this company"). [25] On these facts, the defendants have not established that the DoD contracts were the sole consideration for Van Berkom and that the alleged fraud was irrelevant to Van Berkom's investment decisions.

The defendants next argue that "Van Berkom was not misled" about the health of the retail division, either with respect to competition or margins. The testimony relied upon by the defendants suggests only that Sirois, and Van Berkom, were aware of other competitors and that margins in other divisions were higher. The testimony does not establish that Sirois knew the extent of the competition or the degree to which retail margins had declined. *See* Sirois Dep. at 19:10–12 ("[W]hile there was [sic] many players, I don't think they were *all* on equal footing with Liquidity Services." (emphasis added)); *id.* at 116:15–22 ("The other part of our thesis was that the market was big enough and fragmented enough that you could have more than one big winner in that space. We felt there was room for probably two or three sizeable players over time that could split—that could share the market. So we were concerned, but not overly concerned with any competitors."); *id.* at 25:12–27:22 (explaining that Van Berkom "knew that the retail margins were weaker" than the DoD margins but that "[w]e just didn't know they were that bad"). Thus, the defendants have not demonstrated that there is no genuine issue of material fact as to whether Van Berkom was not misled by LSI's alleged misrepresentations.

Finally, the defendants argue that "Van Berkom's investment philosophy—which Sirois employed as to LSI—belies any reliance on market price as an accurate measure of intrinsic value; rather it was premised on the market being *in*efficient." Defs.' Mem. Supp. Mot. Summ.

---

[25] The defendants cite Van Berkom's position as of the date of Sirois's deposition that LSI should have won the DoD contract. Defs.' Mem. Supp. Mot. Summ. J. at 19 & n.21. This fact is irrelevant to the question whether the DoD contract was Van Berkom's sole consideration in making its investment decisions with respect to LSI.

J. at 22 (emphasis in original). As explained in detail above, Van Berkom's sophisticated modeling and its belief that LSI's market price did not reflect its intrinsic value does not rebut the *Basic* presumption. In short, as Chief Justice Roberts explained in *Halliburton II*, value investing is premised not on the notion that a company's stock price is meaningless but rather that the stock price has not yet come to reflect all publicly available information. 134 S. Ct. at 2410–11. In this regard, a value investor like Van Berkom does rely on the stock price in deciding whether to invest. *See id.* at 2410 ("[T]here is no reason to suppose that . . . the value investor . . . is as indifferent to the integrity of market prices as Halliburton suggests."); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 641–42 (3d Cir. 2011) ("We read *Basic* to mean that an investor who seeks to use the fraud-on-the-market presumption of reliance must show reliance on publicly available information in making the investment decision regardless of the investor's personal belief as to the security's value."), *abrogated on other grounds by Amgen*, 133 S. Ct. 1184.

### 2. Pier Capital

With respect to NNERF's first investment advisor, Pier Capital, the defendants argue that they are entitled to summary judgment because Pier Capital was not misled by the alleged misrepresentations, and in any event, Pier Capital earned a profit of $1.6 million on its LSI investment. Defs.' Mem. Supp. Mot. Summ. J. at 25–28. As to the latter argument, which may be quickly disposed of, Pier Capital is *not* a co-lead plaintiff in this suit. As explained above, the fact that Pier Capital earned a profit on its investment is not dispositive given that NNERF also held investments in LSI through New South, and overall, NNERF sustained a loss on its investment in LSI.

The defendants' former argument—that Pier Capital was not misled by the alleged misrepresentations—is belied by the record. The defendants focus on the fact that three alleged *partial* corrective disclosures "did not reveal to Yakirevich," Pier Capital's portfolio manager, "any information he did not already know." *Id*. at 26. As explained above, however, Yakirevich's testimony indicates that he had not known of the extent of the declines in retail margins prior to the final corrective disclosure on May 8, 2014. *See, e.g.*, Yakirevich Dep. at 143:14–15, 152:15–16 (expressing an "understanding" based on one of the partial corrective disclosures, Mr. Rallo's statements, that "'the pace of margin expansion would not be as robust," but explaining that he did not believe "that it was going to stop"). The defendants' assertion that "it was ultimately [the failure of the government business] and *not* any *un*disclosed facts or trend concerning retail margins, sales, growth, competition or product mix, that prompted Pier Capital to sell its LSI shares" also fails in light of Yakirevich's testimony to the contrary. *See, e.g.*, *id*. at 120:10–13 ("As a story, we expected both—obviously you want both businesses—retail and government business—to contribute and not, you know, slow down."). Thus, the defendants have not established the absence of a genuine issue of material fact as to whether Pier Capital was misled by the alleged misrepresentations and, accordingly, are not entitled to summary judgment on that basis.

### 3. New South

The defendants similarly argue that there is no genuine issue of material fact that the *Basic* presumption is rebutted as to NNERF's second investment advisory, New South, because (1) New South was not misled by LSI's alleged misrepresentations, Defs.' Mem. Supp. Mot. Summ. J. at 29–32; (2) New South's private contact with LSI management was "integral" to its

investment decisions, *id.* at 32–33; and (3) New South believed the market for LSI stock was inefficient, *id.* at 33–35.

Genuine issues of fact exist as to whether New South was misled by LSI's statements concerning the health of the retail division. The defendants rely on the same evidence relied upon in opposing class certification. For example, the defendants point out that New South's April 2014 model, built after LSI lost the DoD contract but before the final corrective disclosure issued on May 8, 2014. According to the defendants, "all of the positive year over year growth projections in the New South model were reversed by the loss of one DoD contract and the increased costs associated with the DoD contract it retained—and not anything to do with the Retail Division." *Id.* at 29.[26] As noted above, however, the fact that the model indicates that LSI went from profitable to unprofitable because of the change in government business does not prove that New South was not misled by, or did not rely on, statements concerning the retail division. Unlike in the *Vivendi* cases, again cited by the defendants, *see, e.g.*, Defs.' Reply Supp. Mot. Summ. J. at 5 n.3, ECF No. 92 ("[T]he facts in the *Vivendi* trilogy are on all fours with this case and dictate that summary judgment on the issue of reliance should be granted in Defendants' favor."), there is no clear statement here that New South was indifferent to the alleged fraud or the health of the retail division. *See Capital Guardian*, 183 F. Supp. 3d at 466 (*Basic* presumption rebutted because investor was "indifferent" to the fraud). The defendants also assert, again, that New South knew about LSI's competition and agreed with LSI's appraisal that the competition was not very "formidable." Defs.' Mem. Supp. Mot. Summ. J. at 30. As explained, McLean did not agree during his deposition that the competition was not formidable

---

[26] In response to the defendants' argument that McLean did not change his assumptions about the retail division in creating the April 2014 model, the plaintiffs make the common sense point that McLean had no reason to change his assumptions at that time, given that the truth about the retail margins had not yet been revealed. *See* Pls.' Sur-Reply Resp. Defs.' Reply Supp. Mot. Summ. J. at 5, ECF No. 94-1.

but rather that, as of February 2014, New South had identified "some of" LSI's competitors and "understood some of them to be very small," McLean Dep. at 203: 6–10, and that "[New South] thought that Liquidity Services had advantages over their competition," *id*. at 204:7–9 (emphasis added). Similar, the defendants argue that McLean was aware that retail margins would not continue to grow. Defs.' Mem. Supp. Mot. Summ. J. at 31–32. For the reasons set out above, the evidence does not bear this out. In short, even assuming McLean had a general sense based on LSI's limited disclosures concerning margin growth that the retail division's margins were suffering, his testimony simply does not indicate that he knew the extent of the margin deterioration.

As for the defendants' argument that New South's private contact with LSI influenced its investment decisions, given the lack of any evidence that New South was granted access to insider information, *see, e.g.*, McLean Dep. at 321:1–5 (New South "w[as] not provided with material non-public information" in its private meetings with LSI and otherwise no awareness of possession of non-public information about LSI when investing), such meetings do not warrant summary judgment on the issue of reliance. Finally, citing the *Vivendi* cases, the defendants contend that the *Basic* presumption is rebutted if an investor does not rely on the market price of the stock as an accurate measure of its intrinsic value. *See* Defs.' Mem. Supp. Mot. Summ. J. at 33 (citing *GAMCO,* 927 F. Supp. 2d at 100). This argument has been amply addressed and rejected above. Briefly, the fact that New South constructed its own models to evaluate LSI's true value does not, in and of itself, rebut the *Basic* presumption as to NNERF. *See Halliburton II*, 134 S. Ct. at 2410–11.

# IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' motion to certify a class of investors in LSI common stock, during the class period of February 1, 2012 through May 7, 2014, inclusive, is granted, and the defendants' partial motion for summary judgment on the issue of reliance is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: September 6, 2017

_____
BERYL A. HOWELL
Chief Judge